# EXHIBIT 7

IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT

ROANE COUNTY, TENNESSEE

| | |
|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian *ad litem,* )<br>)<br>)<br>)<br><br>Plaintiffs, )<br>)<br>)<br>v. )<br>)<br>ALLERGAN FINANCES, LLC; )<br>ACTAVIS, LLC; ACTAVIS PHARMA )<br>INC.; TEVA PHARMACEUTICALS )<br>USA, INC.; WATSON )<br>LABORATORIES; )<br>JOHNSON & JOHNSON, INC.; )<br>JANSSEN PHARMACEUTICALS, )<br>INC., )<br>KVK TECH, INC.; )<br>AMERISOURCEBERGEN DRUG )<br>CORPORATION; )<br>CARDINAL HEALTH, INC.; )<br>MCKESSON CORPORATION; )<br>WALGREEN CO.; )<br>CVS PHARMACY, INC; CVS TN )<br>DISTRIBUTION, LLC; CVS INDIANA, )<br>LLC; TENNESSEE CVS PHARMACY, )<br>LLC; )<br>WAL-MART, INC.; WAL-MART )<br>STORES EAST, L.P.; )<br>WILLIAM BAIRD, )<br>BRIAN BREWSTER, and )<br>JACOB DALTON, )<br>)<br>)<br>)<br>Defendants. ) | Civil Action No.: 2025CV46<br><br>JURY DEMAND |

**COMPLAINT**

Filed____4.29____,20 25
ANN GOLDSTON Time 10.00
By_____D.C.

1.     This is an action brought by minor children Baby Doe 1, Baby Doe 2, and Baby Doe 3 ("Plaintiffs"). From their first moments of life, they suffered from opioid withdrawal. They bring this action against major drug producers, drug distributors, pharmacy chains, and prescribers under the Tennessee Drug Dealer Liability Act ("DDLA") for their roles in facilitating the illegal opioid market that caused them harm.

## INTRODUCTION

2.     The opioid epidemic poses an ongoing crisis in Tennessee. From 2012 to 2020, Tennessee set a new state record each year for the number of opioid overdose deaths, with 1,543 in 2019 and 2,388 in 2020.[1] According to IMS Health data, in 2015, there were also a staggering 7.8 million opioid painkiller prescriptions filled in the state – or 1.18 prescriptions for every man, woman, and child, placing Tennessee at number 2 in the nation among all states for the number of opioid prescriptions per capita.  This trend continued, as evidenced by the CDC report, which showed that Tennessee providers wrote 68.5 opioid prescriptions per 100 persons in 2020, the third highest prescribing rate in the country and more than the average U.S. rate of 43.3 prescriptions.[2]

3.     Along with overdose deaths, the number of babies born with neonatal abstinence syndrome ("NAS") - a condition suffered by babies born to mothers addicted to opioids - has

---

[1] Tennessee Department of Health, Tennessee Drug Overdose Data Dashboard.
Available at: https://www.tn.gov/health/health-program-areas/pdo/pdo-data-dashboard.html.
(hereinafter "Tennessee Drug Overdose Data Dashboard").
[2]    Center for Disease Control, *U.S. State Opioid Dispensing Rates, 2020*
https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.

also increased dramatically in Tennessee. In 2020 alone, there were 824 NAS births in Tennessee.[3]

4.     The Baby Doe Plaintiffs were born dependent on opioids. They bring suit against people and companies that supplied and otherwise facilitated the illegal drug market in their community. These include:

a.     The "Producer Defendants" or "Drug Producer Defendants": ACTAVIS LLC, ACTAVIS PHARMA, INC., ALLERGAN FINANCES, LLC, and WATSON LABORATORIES, INC. (collectively "Allergan"); JANSSEN PHARMACEUTICALS, INC. and JOHNSON & JOHNSON, INC. (collectively "J&J"); TEVA PHARMACEUTICAL USA, INC. ("Teva"); and KVK TECH. INC.;

b.     The "Drug Distributor Defendants" or "the Distributor Defendants": AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") and CARDINAL HEALTH, INC. ("Cardinal Health"); and MCKESSON CORPORATION ("McKesson");

c.     The "Pharmacy Chain Defendants": WALGREEN CO. ("Walgreens"); WAL-MART, INC. and WAL-MART STORES EAST, L.P. ("Walmart"); and CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC, CVS INDIANA, LLC; AND TENNESSEE CVS PHARMACY, LLC ("CVS"); and

d.     WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON (the "Individual Dealer Defendants").

5.     As described below, the Producer Defendants, the Drug Distributor Defendants, the Pharmacy Chain Defendants, and the Individual Drug Dealer Defendants committed various acts that were intended to—and did—facilitate illegal diversion of their drugs.

6.     Indeed, upon information and belief, Defendants spent years convincing suspicious doctors that prescription opioids' addictive properties had been overblown, aggressively marketing opioids, and/or filling suspicious orders and suspicious prescriptions

---

[3]     Tennessee Department of Health, *Neonatal Abstinence Syndrome (NAS)*, https://www.tn.gov/health/nas.html (hereinafter "Tennessee NAS Dashboard").

even when these Defendants knew that millions of Americans and hundreds of thousands of Tennesseans were abusing and misusing prescription opioids. Defendants had to have known that entire regions of the country were being devastated by addiction to prescription drugs that they distributed. They also recognized or should have recognized that prescribers were writing – and pharmacies filling – volumes of opioids that necessarily were both creating and supplying large volumes of drug addicts and pill seekers. Nevertheless, the Drug Producer Defendants, Drug Distributor Defendants, Pharmacy Chain Defendants, and Individual Dealer Defendants persisted with distributing incredible volumes of opioids into these same abuse-riddled communities.

7.       Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."[4] For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.[5] If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee.  Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chaiN.[6]

8.       Upon information and belief, the Producer Defendants, Distributor Defendants, and Pharmacy Chain defendants violated those Tennessee obligations, resulting in drugs that entered the illegal drug market. This included distributing drugs without maintaining necessary controls (rendering the distribution unlawful) and knowingly distributing those drugs into

---

[4] Tenn. Code Ann. § 39-17-407.
[5] *See, e.g.*, Tenn. Code Ann. § 53-11-302, -303, -312(c), 401(a), *and* Rules of Tenn. Bd. Of Pharmacy, Ch. 1140-02.01; *see also* Tenn. Code Ann.§ 53-10-312.
[6] *See* Tenn. Code Ann. § 53-11-401.

channels that they knew were resulting in diversion, and supplying opioids into Tennessee communities at levels that far exceeded any conceivable legitimate medical need, knowingly encouraging high-volume pill mill prescribers to prescribe opioids without a legitimate medical purpose, and supplying pharmacies serving pill mills.

9. Upon information and belief, the Producer Defendants also committed various other acts intended to facilitate the illegal drug market including, inter alia:

e. waging a public campaign of misinformation concerning opioids (including through "key opinion leaders" and front groups);

f. encouraging prescribers to engage in prescription practices that the Producer Defendants knew and expected would drive up addiction rates;

g. repeatedly calling on and targeting the highest volume prescribers to prescribe more opioids while knowing that those prescribers were or were likely operating pill mills;

h. convincing naïve doctors willing to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale; devising marketing strategies to overcome prescribers' legitimate objections to prescribing opioids for long-term use and in higher doses;

i. convincing prescribers whom defendants knew were likely engaging in unlawful conduct and feeding the illegal drug market to prescribe even more opioids;

j. incentivizing sales representatives to do business both with pill mills and with pharmacies supplying pill mills through volume-based compensation (and financially rewarding those sales associates for doing so);

k. adding high-volume prescribers and pharmacies as customers without any (or adequate) due diligence, knowing that there was a strong likelihood that these high-volume businesses were running or supplying pill mills;

l. filling suspicious orders despite knowing or reasonably suspecting that the orders reflected diversion;

m. filling suspicious orders without any investigation;

n. filling suspicious orders even where they met the Producer Defendants' own criteria for orders reflecting potential diversion;

o. filling orders that they had subjectively identified as suspicious before undertaking or completing an investigation;

p.  continuing to do business with prescribers and pharmacies that had a history of suspicious prescribing or ordering practices;

q.  implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded;

r.  continuing to target pill mill prescribers to prescribe more opioids and to target associated pharmacies that served them, even after being told by law enforcement that they were likely feeding the illegal drug market;

s.  supplying outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need;

t.  over-supplying Tennessee with opioids while recognizing that doing so would create addicts and expand the illegal drug market; and

u.  choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

10.  Upon information and belief, the Distributor Defendants and the Pharmacy Chain Defendants committed similar acts that facilitated the diversion of drugs into the illegal drug market in Tennessee:

a.  failing to maintain effective controls against diversion as required by Tennessee law;

b.  filling suspicious orders despite knowing or reasonably suspecting that the orders reflected diversion;

c.  filling suspicious orders without any investigation;

d.  filling suspicious orders even where they met these Defendants' own criteria for orders reflecting potential diversion;

e.  filling orders that they had subjectively identified as suspicious before undertaking or completing an investigation;

f.  continuing to do business with pharmacies that had a history of suspicious prescribing or ordering practices, or that the Defendants were aware were filling prescriptions for suspicious prescribers;

g.  implementing sham suspicious order monitoring programs that were structured to fail;

h. supplying outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need; and

i. Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

11. Moreover, upon information and belief, everyone in the distribution chain collaborated to get around whatever sham suspicious order monitoring systems that the drug producers may have put in place by offering sham justifications for suspicious orders that everyone in the chain accepted without question, no matter how ludicrous – thereby giving the Producer Defendants, Distributor Defendants, and the Pharmacy Chain Defendants a convenient pretense to make, fill, and ship orders that they knew would supply the illegal drug market.

12. Upon information and belief, through this symbiotic relationship, they persisted in filling suspicious orders for large volumes of products, calling on suspicious prescribers and pharmacies, filling suspicious prescriptions, and/or otherwise shipping drugs to Tennessee communities ravaged by the opioid epidemic at levels far exceeding any conceivable need. They knew that their actions would cause (and in fact did cause) increased abuse, addiction, and overdose rates in Tennessee. They also knew or should have known that their actions facilitated illegal drug transactions in Tennessee.

13. The Individual Dealer Defendants also illegally distributed and sold prescription opioids as part of Tennessee's illegal drug market.

14. Defendants' misconduct garnered significant profits. In 2010 alone, opioids generated $11 billion in revenue for drug companies.[7] Opioids are now among the most prescribed class of drugs and the United States' opioid painkiller market is worth an estimated

---

[7] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune.com, Nov. 9, 2011. Available at: http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/.

$10 billion annually.[8] According to Fortune magazine, the Distributor Defendants are each among the top 15 companies in the 2022 Fortune 500: AmerisourceBergen, No. 10, with $213 billion in total revenue; and Cardinal Health, No. 15, with $162 billion in total revenue.[9]

15.   The Baby Doe Plaintiffs now sue to recover damages for which Defendants are liable under the DDLA.

## JURISDICTION AND VENUE

16.   Jurisdiction is proper pursuant to Tenn. Code Ann. § 16-10-101, et seq., and Tennessee's Drug Dealer Liability Act, Tenn. Code Ann. § 29-38-101, et seq. Baby Doe 1 was born in Roane County, Tennessee. Mary Doe consumed and made unlawful purchases of opioids in Roane County before and during her pregnancies with each of the Baby Does.

17.   Venue is proper pursuant to Tenn. Code Ann. § 20-4-101 because the minor children reside in Roane County, and their birth mother purchased, was prescribed, and consumed legal and illegal opioids in Roane County, Tennessee.

## BACKGROUND CONCERNING MARY DOE AND BABY DOES 1-3

### I.   Mary Doe

18.   When she was 17 years old, Plaintiffs' mother ("Mary Doe"), got into a car wreck and was prescribed opioids. Mary Doe became addicted to opioids. She turned to the illegal market and purchased drugs on the street from others who, due to the abundance of prescription opioids flooding her community, were enabled to divert the drug for abusive purposes.

---

[8] Ariana Eunjung Cha, *The drug industry's answer to opioid addiction: More pills*, The Washington Post, Oct. 16, 2016. Available at: https://www.washingtonpost.com/national/the-drug-industrys-answer-to-opioid-addiction-more-pills/2016/10/15/181a529c-8ae4-11e6-bff0-d53f592f176e_story.html?utm_term=.42e0328ca459.
[9] https://fortune.com/fortune500/2022/search/

19.     Mary Doe, the biological mother of Baby Doe 1, Baby Doe 2, and Baby Doe 3, consumed illegal opioid drugs during her pregnancy with each child.

20.     For example, between ages 17 and 25, Mary Doe purchased opioids off the street, including but not limited to Oxycontin, Oxycodone, Roxicodone, and Hydrocodone.

21.     Mary Doe would typically purchase opioids at $1/per milligram.

## II.     Baby Doe 1

22.     When she was about 25 years old, Mary Doe became pregnant with her first child in late 2011. She continued to fill prescriptions for opioids and purchase from the street until April 2012, when (approximately seven months into her pregnancy) she was prescribed Subutex. She continued with Subutex through the end of the pregnancy.

23.     On June 16, 2012, she gave birth to Baby Doe 1 at Methodist Medical Center in Oak Ridge, Tennessee. Baby Doe 1 was diagnosed with NAS as a result of exposure to opioids in utero.

24.     For treatment of NAS, Baby Doe 1 was transferred to East Tennessee Children's Hospital on June 17, 2012. Baby Doe 1 was treated for NAS there for nearly 8 weeks. Baby Doe 1 was initially placed on morphine to help treat Baby Doe's dependence on opioids.

25.     After Baby Doe 1's birth, Mary Doe and Baby Doe 1 attended Mothers and Infants Sober Together Program, in addition to individual counseling.

26.     Nevertheless, Mary Doe continued to struggle due to her opioid addiction.

### III. Baby Doe 2

27.     In 2016, Mary Doe became pregnant with Baby Doe 2. During the pregnancy, she bought opioids off the street in Tennessee, such as Roxicodone, Oxycodone, and Suboxone.

28.     On November 14, 2016 (after about 38 weeks of pregnancy), Mary Doe gave birth to Baby Doe 2 at the University of Tennessee Medical Center. Baby Doe 2 was diagnosed at birth with NAS as a result of exposure to opioids in utero.

29.     Baby Doe 2 spent six weeks in the Neonatal Intensive Care Unit ("NICU") due to her exposure in utero.

30.     Baby Doe 2 spent the first weeks of her life in excruciating pain as doctors weaned Baby Doe 2 off of powerful opioids. This included placing Baby Doe 2 on morphine for the withdrawal.

31.     Due to her NAS diagnosis, Baby Doe 2 was followed by the Pediatric Rehabilitation Therapy Team.

32.     Baby Doe 2 had abnormal 36-month milestones and behavioral issues.

33.     Baby Doe 2 was diagnosed with speech abnormality in December 2019 at age three.

34.     Baby Doe 2 initially attended public school. However, Baby Doe 2 was removed for homeschooling due to her illnesses.

35.     Baby Doe 2 continues to suffer effects from her prenatal opioid exposure, including behavioral disorders.

36.     Baby Doe 2 will require years of treatment and counseling to deal with the effects of prenatal opioid exposure.

### IV. Baby Doe 3

37.     In April 2018, Mary Doe became pregnant with Baby Doe 3. During the first 7 months of her pregnancy, Mary Doe bought opioids off the street in Tennessee. These included, but were not limited to, Roxicodone and Subutex. After moving to Florida about 7 months into her pregnancy, Mary Doe attempted to quit opioids, but was taken to the Emergency Room about a month prior to delivery with Baby Doe 3 and was prescribed Subutex to treat her withdrawal.

38.     On January 31, 2019 (after about 39 weeks of pregnancy), Mary Doe gave birth to Baby Doe 3 in the Sacred Heart hospital in Pensacola, Florida.

39.     At birth, Baby Doe 3 was diagnosed with NAS as a result of exposure to opioids in utero and was placed in the NICU.

40.     Baby Doe 3 spent over two months in the NICU and was not discharged until April 4, 2019.

41.     Due to high NAS scores, Baby Doe 3 was placed on Methadone for treatment for about 8 weeks until being discharged.

42.     Baby Doe 3 spent the first several weeks of his life in excruciating pain as doctors weaned him from drug dependence.

43.     After Baby Doe 3 was born, Mary Doe returned to Roane County, Tennessee.

44.     Baby Doe 3 will require years of treatment and counseling to deal with the effects of prenatal opioid exposure.

45.     Baby Doe 3 struggles every day with sensory issues and other effects from his prenatal opioid exposure, and will continue to suffer these effects for the rest of his life.

46.     Mary Doe and Baby Does 1, 2, and 3 all currently reside in Roane County, Tennessee.

47.     The Producer Defendants produced opioids and otherwise contributed to the illegal drug market that caused Plaintiffs harm. The Distributor Defendants and the Pharmacy Defendants distributed opioids and otherwise contributed to the illegal drug market that caused Plaintiffs harm. And the Drug Dealer Defendants illegally sold and distributed opioids into and within the illegal market that caused Plaintiffs harm.

48.     During one or more of Mary Doe's pregnancies with Baby Doe 1, Baby Doe 2, and Baby Doe 3, Mary Doe illegally obtained and consumed opioids manufactured by (at least) Purdue Pharma (including OxyContin), Endo Pharmaceuticals (including oxycodone), Mallinckrodt (including oxycodone), and KVK Tech., Inc.

49.     Baby Doe 1, Baby Doe 2, and Baby Doe 3 bring this action through a guardian *at litem* ("GAL"). Legal guardians of children exposed to illegal drugs in utero are authorized to bring this action under the DDLA, T.C.A. § 29-38-106(a)(1).

**PARTIES**

**I.     Plaintiffs**

    **A. Baby Doe 1**: Baby Doe 1 was born in 2012 with NAS, as described above.

    **B. Baby Doe 2**: Baby Doe 2 was born in 2016 with NAS, as described above.

    **C. Baby Doe 3**: Baby Doe 3 was born in 2019 with NAS, as described above.

**II.    Defendants**

    **A. Drug Producer Defendants**

        **i. Allergan**

50.     Defendant ALLERGAN FINANCES, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) ("Allergan Finances") is a Nevada limited liability company that exists for

the purpose of holding shares of other companies that manufacture and distribute prescription pharmaceuticals.

      a.  The sole member of Allergan Finances is Allergan W.C. Holding Inc. f/k/a Actavis.

      b.  W.C. Holding Inc. is a Delaware corporation with its principal place of business in Madison, New Jersey. It is a wholly owned, indirect subsidiary of Allergan PLC.

51.    Defendant WATSON LABORATORIES, INC. ("Watson") is a Nevada corporation with its principal place of business in Corona, California.

52.    Defendant ACTAVIS PHARMA, INC. (f/k/a Watson Pharma, Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey.

53.    Defendant ACTAVIS LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in New Jersey.

54.    Before August 2016, Allergan plc owned Watson, Actavis Pharma, and Actavis LLC. During that time, Watson, Actavis Pharma, and Actavis Pharma LLC were part of the same corporate family as Allergan Finances. Those companies sold and marketed opioids as part of a coordinated strategy to sell and market opioids (both branded and generic).

55.    For the time frame before August 2016, the term "Allergan" in this pleading refers only to Actavis Pharma and Actavis LLC.

56.    In August 2016, Teva Pharmaceuticals Industries Ltd. purchased Watson, Actavis Pharma, and Actavis LLC. For the time August 2016 forward, the term "Allergan" includes these entities.

### ii.  J&J Defendants

57.    Defendant JOHNSON & JOHNSON, INC. is a New Jersey corporation that is headquartered in New Jersey.

58.     Defendant JANSSEN PHARMACEUTICALS, INC. (formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.) is a Pennsylvania corporation headquartered in New Jersey. Janssen is a wholly-owned subsidiary of Johnson & Johnson, which controls the sale and development of Janssen's drugs. Janssen's profits inure to Johnson & Johnson's benefit. Janssen and Johnson & Johnson are collectively referred to herein as "J&J."

### iii.  Teva

59.     TEVA PHARMACEUTICALS USA, INC. ("TPUSA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

60.     TPUSA is a wholly owned subsidiary of Teva Pharmaceuticals Industries, Ltd. ("TPIL"), an Israeli corporation.

61.     Cephalon, Inc. ("Cephalon") is also a wholly owned subsidiary of TPIL.

62.     In August 2016, TPIL bought Actavis Pharma and Actavis LLC from Allergan Plc.

63.     Thus, since August 2016, TPIL has owned the generic business that was formerly owned by Allergan.

64.     This pleading refers to TPUSA, TPIL, Actavis Pharma, Actavis LLC, and Cephalon collectively as "Teva."

65.     Inclusive of companies and product lines it has acquired, Teva develops, markets, and sells prescription drugs, including opioids.

66.     In 2011, Teva purchased Cephalon, which was manufacturing a branded opioid called "Actiq" (a branded opioid containing fentanyl) and Fentora (an oral tablet form of fentanyl).

67.     Teva marketed and sold both Actiq and Fentora in Tennessee.

68.     In 2016, Teva purchased Actavis, which produces generic opioids.

### iv. KVK Tech, Inc.

69.     Defendant, KVK Tech, Inc. ("KVK") is a Pennsylvania corporation with its principal place of business in Newton, Pennsylvania.

70.     At all relevant times, KVK has packaged, distributed, supplied, sold, and otherwise placed into the stream of commerce in Tennessee, opioid drugs. From 2014 to 2019, KVK had a substantial share of the market in Tennessee for opioid pills.

71.     KVK manufactured and sold prescription opioids without fulfilling its legal duty to prevent diversion, report suspicious orders, decline to fill suspicious orders, and implement an effective suspicious order monitoring program. KVK's actions violated its duties under applicable Tennessee law.

### B. The Drug Distributor Defendants

### i. AmerisourceBergen

72.     Defendant    AMERISOURCEBERGEN    DRUG    CORPORATION ("AmerisourceBergen") is a Delaware corporation with its principal place of business located at 1300 Morris Drive in Chesterbrook, Pennsylvania 19087.

73.     At all relevant times, AmerisourceBergen and its affiliates were licensed as wholesaler/distributors in Tennessee.

74.     AmerisourceBergen, through various subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

75.     This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

76. The illegal drug market in those communities would have included pills distributed by AmerisourceBergen.

77. AmerisourceBergen is the second largest pharmaceutical distributor in North America.

78. According to its 2016 Annual Report, AmerisourceBergen is "one of the largest global pharmaceutical sourcing and distribution services companies, helping both healthcare providers and pharmaceutical and biotech manufacturers improve patient access to products and enhance patient care."

79. In 2018, AmerisourceBergen was the 11th largest company by revenue in the United States.

80. AmerisourceBergen established direct relationships with Tennessee pharmacies, including (upon information and belief) in the Baby Doe Plaintiffs' community.

### ii. Cardinal

81. Defendant CARDINAL HEALTH, INC. ("Cardinal") is an Ohio Corporation with its principal place of business in Dublin, Ohio.

82. At all times relevant, Cardinal and its affiliates have been licensed as wholesalers/distributors in Tennessee, and currently holds multiple Tennessee licenses.

83. Cardinal, through various subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

84. This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

85. The illegal drug market in those communities included pills distributed by Cardinal.

86. Upon information and belief, Cardinal Health established direct relationships with Tennessee pharmacies, including in the Baby Doe Plaintiffs' community.

### iii. McKesson

87. Defendant MCKESSON CORPORATION ("McKesson") is a Delaware Corporation with its principal place of business located in San Francisco, California.

88. At all times relevant, McKesson and its affiliates were licensed as wholesalers/distributors in Tennessee.

89. McKesson, through subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

90. This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

91. The illegal drug market in those communities would have included pills distributed by McKesson.

92. Upon information and belief, McKesson established direct relationships with Tennessee pharmacies and dispensing physicians, including those in the Baby Doe Plaintiffs' community.

93. Collectively, McKesson, AmerisourceBergen, and Cardinal Health currently account for the vast majority of drug shipments in the United States. These companies together collect about $400 billion in annual revenue.

### C. Pharmacy Chain Defendants

### ii. Walgreens

94. Defendant WALGREEN CO. ("Walgreens") is a Delaware corporation with its headquarters and principal place of business located in Deerfield, Illinois.

95. Walgreens self-distributed opioids to its locations in Tennessee. At all times relevant, Walgreens has been licensed as a wholesaler/distributor in Tennessee.

ii. **CVS**

96. Defendant CVS PHARMACY, INC. ("CPI") is a Rhode Island corporation with its headquarters and principal place of business in Woonsocket, Rhode Island.

97. Defendant CVS TN DISTRIBUTION LLC (f/k/a CVS TN Distribution, Inc.) ("CVS TN Distribution") is a Tennessee limited-liability corporation with a principal office in Woonsocket, Rhode Island.

   a. CVS TN Distribution is a subsidiary of CPI.

   b. CVS TN Distribution holds a wholesaler/distributor license in Tennessee and held that license at all relevant times.

   c. Upon information and belief, CVS TN Distribution distributed prescription opioids to CVS-branded pharmacies in Tennessee at all relevant times.

98. Defendant CVS INDIANA, LLC is an Indiana corporation and a subsidiary of CVS Pharmacy, Inc.

99. Defendant TENNESSEE CVS PHARMACY, LLC is a Tennessee limited-liability corporation with its principal place of business in Woonsocket, Rhode Island.

100. Tennessee CVS Pharmacy, LLC is a subsidiary of CPI.

101. Collectively, CPI, CVS TN Distribution, CVS Indiana, and Tennessee CVS Pharmacy are collectively referred to as "CVS."

102. CVS self-distributed opioids to its pharmacy locations in Tennessee.

103. Upon information and belief, it self-distributed to those pharmacies at least through TN CVS Distribution.

### iii. Walmart

104. Defendant WALMART INC. (f/k/a Wal-Mart Stores, Inc.) is a multinational retail corporation incorporated in the State of Delaware.

105. Defendant WAL-MART STORES EAST, L.P. is a Delaware corporation which holds the DEA registrations for its parent company's distribution centers.

106. Collectively, these entities are referred to as "Walmart."

107. Walmart self-distributed opioids to its locations in Tennessee. At all times relevant, Walmart has been licensed as a wholesaler/distributor in Tennessee.

### D. Individual Drug Dealer Defendants

108. Brian Brewster is an individual who illegally dealt drugs in the illegal market in or around Roane County. He is a Tennessee resident.

109. Jacob Dalton is an individual who illegally dealt drugs in the illegal market in or around Roane County. He is a Tennessee resident.

110. William Baird is an individual who illegally dealt drugs in the illegal market in or around Roane County. He is a Tennessee resident.

## SCIENTIFIC BACKGROUND

### I.    Opioids Have Never Been Proven Appropriate for Long-Term Chronic Pain and Other Non-Acute Medical Problems

111. This case primarily, but not exclusively, concerns the following four types of opioids:

> a.  Oxycodone: Oxycodone is a powerful type of opioid. It can be prescribed as oxycodone or more specifically branded by a company, such as OxyContin or Roxicodone.
>
> b.  Hydrocodone: Hydrocodone is also a type of opioid. It can be prescribed as hydrocodone or more specifically branded by a company, such as Lortab or Vicodin.

c. Oxymorphone: Oxymorphone is also a type of opioid. It can be prescribed as oxymorphone or more specifically branded by a company, such as Opana and Opana ER.

d. Hydromorphone: Hydromorphone is also a type of opioid. It can be prescribed as hydromorphone or more specifically branded by a company, such as Exalgo.

112. The scientific consensus is that opioids such as these are dangerous, highly addictive, and inappropriate for long-term chronic pain – as opposed to cancer pain and pain associated with surgery and acute injuries. This opinion existed in the mid-1990s and has never been challenged in any meaningful way with new, valid scientific evidence.

113. The National Safety Council, a not-for-profit organization chartered by Congress to improve public health, has published a summary of research titled "Evidence for the Efficacy of Pain Medications."[10] The National Safety Council report concludes that "[d]espite the widespread use of opioid medications to treat chronic pain, there is no significant evidence to support this practice."[11]

114. Multiple researchers have found that "no evidence exists to support long term use—longer than four months—of opioids to treat chronic pain."[12]

115. A 2013 review of existing literature by Dr. Igor Kissin of the Department of Anesthesiology, Perioperative, and Pain Medicine at Brigham and Women's Hospital, Harvard

---

[10] Dr. Donald Teater, Nat'l Safety Counsel, *Evidence for the Efficacy of Pain Medications*, 3 (2014) (hereinafter Evidence for Efficacy).

[11] *Id.* at 6.

[12] *Id.* (citing multiple publications)

Medical School, concluded that "[n]ot a single randomized controlled trial with opioid treatment lasting [greater than] 3 months was found."[13]

116.    The same review found that "[a]ll studies with a duration of opioid treatment [greater than or equal to] 6 months were conducted without a proper control group."[14]

117.    Dr. Kissin further concluded that "[t]here is no strong evidence-based foundation for the conclusion that long-term opioid treatment of chronic malignant pain is effective."[15]

## II.    Opioids Carry a High Risk of Addiction, Serious Medical Problems, and Death

118.    Opioids have severe side effects, including gastrointestinal bleeding, impaired recovery from injury or surgery, cognitive impairment, respiratory depression, endocrine abnormalities, hyperalgesia (increased sensitivity to pain), increased risk of fractures and hospitalization for the elderly, addiction, and death.[16]

119.    Research based on actual patient interviews has found that, among patients who received four or more prescriptions in the prior year, 35% met the criteria for a lifetime opioid dependence, and 25.8% met the criteria for current opioid dependence.[17]

120.    Dr. Nora D. Volkow and Dr. Wilson M. Compton, the Director and Deputy Director of the National Institute of Drug Abuse at the National Institute of Health, respectively, co-authored a 2006 study that concluded: "[t]hough the use of opioid analgesics for the treatment

---

[13] Dr. Igor Kissin, *Long-term Opioid Treatment of Chronic Nonmalignant Pain: Unproven Efficacy and Neglected Safety?*, 2013:6 J. Pain Research 513, 513 (2013), available at https://www.dovepress.com/long-term-opioid-treatment-of-chronic-nonmalignant-painnbspunproven-ef-peer-reviewed-article-JPR.

[14] *Id.*

[15] *Id.*

[16] Dr. Donald Teater, Nat'l Safety Council, *The Psychological and Physical Side Effects of Pain Medications*, 2-6 (2014) (summarizing side effect data). (hereinafter *Side Effects*).

[17] Joseph A. Boscarino, *Opioid-Use Disorder Among Patients on Long-Term Opioid TherapyI*, 2015:6 Substance Abuse and Rehabilitation 87, 87-89 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4548725/.

of acute pain appears to be generally benign, long-term administration of opioids has been associated with clinically meaningful rates of abuse or addiction."[18]

121.    Consistent with this finding, a 2011 review of medical and pharmacy claims records revealed that two thirds of patients who took opioids daily for ninety days were still taking opioids five years later.[19]

122.    Researchers evaluating opioids for treatment following lumbar disc herniation likewise found that giving such patients opioids had no effect on treatment outcome, but significantly increased their risk for long term opioid addiction.[20]

123.    Dr. Mitchell H. Katz, current President and CEO of the New York City Health and Hospitals (the largest public healthcare system in the United States), has described how patients with nonmalignant conditions can end up as drug addicts because of the prescribing of opioids:

> A certain number of patients get better with NSAIDs [non-steroidal anti-inflammatory drugs, like Tylenol]. For those still complaining of pain, you next prescribe a short-acting opioid with a relatively low potency, such as acetaminophen with codeine. …You tell them about the adverse effects of opioids and encourage them to use the lowest dose necessary. Not infrequently, at the next visit they tell you that the medicine works but that they are taking the pills more frequently than directed. At this point, you worry about liver damage from the acetaminophen and switch to a higher potency, longer acting agent. The patient returns for follow-up visits and tells you that the pills work but that they sometimes take an extra pill and could you please increase the number so they "don't run out before the next visit." Before you know it, the patient is on a high dose of an opioid, and you are unsure whether you have actually helped them. *What you know is you have committed yourself to endless negotiations about increasing doses, lost pill bottles, calls from emergency departments, worries that your patient is selling the*

---

[18] Wilson M. Compton et al., *Major Increases in Opioid Analgesic Abuse in the United States: Concerns and Strategies*, 81 Nat'l Inst. on Drug Abuse 103, 103-07 (2006) (emphasis added).
[19] Bradley C. Martin et al., *Long-term Chronic Opioid Therapy Discontinuation Rates from the TROUP Study*, 26(12) J. Gen. Intern. Med. 1450, 1450-57 (2011).
[20] Evidence for Efficacy at 5 (citing Radcliff et al., Does Opioid Pain Medication Use Affect the Outcome of Patients with Lumbar Disk Herniation?, 38(14) The Spine J. E849, E849-60 (2013)).

*drugs, and the possibility that one day, your patient will take too many pills, perhaps with alcohol, and overdose.*[21]

**MATERIAL FACTS**

I.    **Overview: The Defendants Created the Illegal Drug Market Through Unlawful Distribution and Otherwise Knowingly Supplied and Knowingly Participated in the Illegal Drug Market in Tennessee**

124.    The Drug Producer Defendants, Drug Distributor Defendants, Pharmacy Defendants, and Drug Dealer Defendants all participated in the illegal drug market in Tennessee and capitalized on it. Each played a knowing role in creating, perpetuating, and expanding the opioid crisis.

125.    Controlled substances are, by definition, highly subject to abuse and diversion. For this reason, Tennessee regulates every participant in the chain of distribution. No one can distribute or dispense prescription opioids in Tennessee without maintaining effective controls against diversion and ensuring that the drugs are serving a lawful medical purpose. Indiscriminate distribution without sufficient controls is unlawful and can lead to criminal penalties in Tennessee.

126.    Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."[22]

127.    For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.[23]

---

[21] Mitchell H. Katz, *Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith*, 170(16) Arch Intern. Med. 1422, 1422-24 (2010) (emphasis added).
[22] Tenn. Code Ann. § 39-17-407.

128. If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee.

129. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain.[24]

130. In sum, in Tennessee, all licensed entities in the distribution chain were to maintain effective controls against diversion, and to meet that obligation were required to (A) design and operate a system to identify suspicious orders; (B) report suspicious orders, and (C) stop shipment of suspicious orders pending appropriate investigation and due diligence.

131. Upon information and belief, and as described, each Defendant involved in the distribution chain violated one or more these Tennessee duties.

132. In particular, upon information and belief, the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants knowingly distributed drugs into Tennessee without effective diversion controls. Upon information and belief, knew or should have known that they were feeding pill mills and the black market rather than legitimate medical need.[25] That conduct was unlawful. Even in isolation, it subjects them to liability under the DDLA.

133. At every step, these Defendants supplied drugs into the illegal market, to continue over-supplying Tennessee communities at levels that were not medically justifiable, and enjoy profits derived from the illegal distribution of opioids.

---

[23] *See, e.g.*, Tenn. Code Ann. § 53-11-302, -303, -312(c), 401(a), *and* Rules of Tenn. Bd. Of Pharmacy, Ch. 1140-02.01; *see also* Tenn. Code Ann.§ 53-10-312.
[24] *See* Tenn. Code Ann. § 53-11-401.
[25] As noted in the Disclaimer below, this conduct does not encompass opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

## II. The Drug Producer Defendants, Distributor Defendants, Pharmacy Chain Defendants, and Individual Dealer Defendants Have All Participated in the Distribution Pipeline for Opioids in Tennessee and in Plaintiffs' Community

### A. The Drug Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants Possessed Information Reflecting Diversion by Prescribers and Pharmacies but Facilitated that Diversion Anyway

134. As described herein, the Drug Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants did not maintain effective controls against diversion, rendering their actions illegal, and they otherwise engaged in many other acts to facilitate diversion of their drugs illegally. They also plainly undertook actions in Tennessee or directed at Tennessee that they knew were detrimental to public health and safety.

135. The related crises of abuse and illegal diversion of prescription opioids in Tennessee is well-documented in a variety of publicly available sources. Indeed, the prescription statistics reflect how the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants are participating in the unconscionable flow opioids into Tennessee and East Tennessee in particular.

136. Upon information and belief, through their market research and extensive networks of sales representatives and face-to-face detailing of health care providers ("HCP"), the Drug Producer Defendants could, and did, observe signs of illegal diversion.

137. The Drug Producer Defendants also possess information called "chargeback" data from their distributors. As reported in the Washington Post, there is an "industry-wide practice" whereby pharmaceutical drug producers pay their distributors rebates and/or "chargebacks" on prescription opioid sales. In return, the distributors provide the Drug Producer Defendants with

downstream purchasing information, which allows them to track their prescription opioids down the entire supply chain, all the way to the retail level.[26]

### B. Allergan Knowingly Participated in Tennessee's Illegal Drug Market

138.    Allergan was one of the two largest manufacturers of generic opioids. Because Allergan lacked a meaningful suspicious order monitoring program, its opioids flooded the market without pause, worsening the opioid epidemic.

139.    Allergan's promotional spending on opioids, which was virtually nonexistent in the 2004-2008 period, began to sharply rise in 2009, when it began marketing Kadian. The third quarter of 2011 saw a peak of $3 million and nearly $7 million for the year.

140.    To ensure that these messages reached individual physicians, Allergan deployed sales representatives to visit HCPs in Tennessee and across the country. Allergan chose its detailed targets based on the likelihood of higher numbers of prescriptions at higher doses, with no consideration as to the risk of misuse. Allergan carefully tracked the prescription trends of the HCPs whom it detailed.

141.    Allergan trained its sales representatives to deceptively minimize the risk of addiction by: (1) attributing addiction to "predisposing factors" like family history of addiction or psychiatric disorders; (2) emphasizing the difference between substance dependence and substance abuse; and (3) promoting the unsupported term "pseudoaddiction."

142.    Allergan misleadingly instructed its sales team that opioid doses could be escalated during long-term opioid therapy, without hitting a dose ceiling, which purportedly made them safer than other forms of therapy such as acetaminophen or NSAIDs.

---

[26] *Id.*

143.    Allergan also actively marketed its generic drugs. Prior to the sale of its generic business to Teva, Allergan's marketing strategy included promotion of its generic opioids, including generic Kadian (morphine sulfate), directly to HCPs. Allergan sales representatives received bonuses for both branded and generic Kadian sales, and used the same selling points for both versions of the drug, available in many leading pharmacies, advertising that the generic had the same features and benefits as the branded product.

144.    Allergan also promoted its generic Opana ER (oxymorphone ER). Allergan saw a business opportunity due to Endo discontinuing certain dosages and Endo production issues, and began training and deploying the Kadian sales force to detail doctors to promote generic Opana ER. Allergan also paid bonuses to its sales team for meeting sales goals for generic Opana ER.

145.    Allergan also promoted its generics through direct mail and email campaigns and journal advertisements aggressively marketed its generic opioids through its distributors, in particular Distributor Defendant McKesson. To promote Allergan's generic oxymorphone ER, oxycodone, and generic morphine sulfate, McKesson deployed a variety of tactics, including notifying pharmacies about the products using Allergan talking points and posting sell sheets on its website. McKesson had an incentive to maximize Allergan's opioid sales because it received a rebate through its "OneStop" sales program if it achieved a certain sales volume

146.    Allergan similarly collaborated with Distributor Defendants Cardinal and ABC to promote Allergan's generic opioids through targeted telemarketing and direct mail campaigns aimed at pharmacies. Allergan collaborated with ABC in an initiative to drive generic conversion at a faster rate than what would occur without its intervention.

147.    Allergan also worked with Walgreens to send a letter to patients who had filled a prescription for Opana ER within the prior year, informing them that although Endo no longer manufactured certain dosages of Opana ER, a generic was now available from Allergan.

148.    Through its aggressive marketing, Allergan expanded the market for opioids in Tennessee.

149.    As an entity registered with the DEA and the Tennessee Board of Pharmacy, Allergan knew it was required to maintain effective controls against diversion of opioids and to report suspicious orders.

150.    Upon information and belief:

   a.  Allergan failed to put in place appropriate procedures to ensure that suspicious orders—orders of unusual size, frequency, or those deviating from a normal pattern—would be reported to governmental authorities as required by law in Tennessee.

   b.  Allergan (for its entities both pre- and post-merger) did not maintain effective controls against diversion as required by Tennessee law, and used a SOM system that was not meaningfully designed to detect and halt suspicious orders.

   c.  Allergan continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

   d.  Allergan possessed ample sources of data that allowed it to detect and report suspicious orders of opioids, both from its direct and indirect customers. The company's sales representatives regularly visited pharmacies and HCPs to promote Allergan's products, which allowed them to observe red flags of diversion.

151.    Despite these available sources of information regarding potential diversion, Allergan failed to properly design and operate a system that would be capable of detecting suspicious opioid orders. Prior to 2011, any process that Allergan had that could be considered an opioid order monitoring system was not even properly automated. After 2011, Allergan finally began to acknowledge its responsibility to create an opioid order monitoring system, but

the procedures it put in place were severely lacking, and were focused on approving—not restricting— orders of excessive quantities of opioids.

152.    To the extent Allergan established thresholds to detect suspicious orders, they were wholly inadequate.

153.    Allergan failed to perform appropriate due diligence on its customers, both generally and at the time it should have been alerted to a suspicious order.

154.    Allergan failed to stop shipments after it knew or should have known that opioid orders remained suspicious, had no requirement to stop shipments on suspicious indirect sales, and failed to report suspicious orders to the DEA. Eventually, Allergan ceased operating any suspicious order monitoring program at all, when it "outsourced" those duties to a distributor.

155.    Upon information and belief, Allergan failed to discontinue detailing HCPs who were suspected of diversion. On the contrary, Allergan chose its detailing targets based on the likelihood of higher numbers of prescriptions.

### C.  J&J Knowingly Participated in Tennessee's Illegal Drug Market

156.    J&J manufactures, markets, sells, and distributes the following opioids in Davidson County, in Tennessee, and nationwide: Duragesic (fentanyl patch), Nucynta ER (tapentadol hydrochloride), and Nucynta (tapentadol hydrochloride), both of which are Schedule II narcotics.

157.    J&J introduced Duragesic in 1990. It is indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." After seeing the success of OxyContin for chronic non-cancer pain, J&J re-launched Duragesic for chronic non-cancer pain as well.

158. J&J also marketed Nucynta, which was first approved by the FDA in 2008, formulated in tablet form and in an oral solution, and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older. J&J also marketed Nucynta ER ,which was first approved by the FDA in 2011 in tablet form. Initially, it was indicated for the "management of…pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." This pain indication was later altered to "management of moderate to severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."

159. J&J instructed sales representatives in Tennessee, and nationwide to market Duragesic as having better efficacy, better tolerability, and better patient compliance because it was a patch instead of a pill. These sales representatives were instructed to tell doctors that the patch provided better control in the event of patient opioid abuse because patients could not increase the patch dosage. However, sales representatives were aware of patients who increased the dosage by applying more than one patch at a time and were also aware that some patients abused the patch by freezing then chewing on it.

160. These tactics extended to J&J's promotion of Nucynta, wherein J&J trained its sales representatives to avoid the so-called "addiction ditch"—i.e., to avoid the negatives (addiction) and emphasize the positives (supposed efficacy) in sales calls—and to use a study from Dr. Portenoy "to create dialogue about Opiophobia as a barrier."

161. J&J further trained their sales representatives that there was a 2.6% or lower risk of addiction when using opioids prescribed by a doctor. As part of this same training, J&J trained its sales representatives to "establish that moderate to severe acute pain continues to be undertreated."

162.    However, J&J did not provide its sales force with any training on opioid addiction. Instead, J&J sales representatives were rewarded with bonuses for targeting high-volume opioid prescribers.

163.    As part of its "pain management franchise" from the 1990s through at least 2016, Johnson & Johnson wholly owned Tasmania Alkaloids Limited ("Tasmania Alkaloids"), which was based in Tasmania and cultivated and processed opium poppy plants to manufacture narcotic raw materials to be imported into the U.S. to be processed and made into active pharmaceutical ingredients ("APIs") necessary to manufacture opioid drugs. It also wholly owned Noramco, Inc. which is based in Athens, Georgia and imported the raw narcotic materials produced by Tasmania Alkaloids, processed the materials into APIs, then sold the APIs to other opioid manufacturers in the U.S. J&J, through these subsidiaries, supplied the following APIs to other drug manufacturers in the U.S.: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone. J&J had supply agreements to sell controlled substance API with all 7 of the top U.S. generic companies as we as many of the top branded opioid producers.

164.    J&J, acting in concert with others, embarked on a major campaign in which it used branded and unbranded marketing to disseminate the messages that pain was bring undertreated and that there was a low risk of abuse and a low danger of prescribing opioids to treat chronic, non-malignant pain and overstating the efficacy of opioids as a class of drug. J&J funded literature in medical journals and publications, materials from professional societies/patient advocacy groups, continuing medical education, unbranded marketing materials, and paid speakers. It also partnered with third-party advocacy groups or academic groups to hold

seminars, symposiums, and conferences to influence prescriber behavior and increase profits from opioids.

165. J&J trained its sales representatives to target high-opioid prescribing physicians, including pain specialists and primary care physicians.

166. J&J did not train its sales representative regarding red flags that could indicate a "pill mill," including pain clinics with patients lined up out the door or patients passed out in the waiting room. Upon information and belief:

   a. Through its sales force, J&J had visibility, on both macro and micro levels, of how overprescribed branded and generic opioids and that they were ending up on the black market; however, J&J continued supplying these materials to opioid producers which helped fuel the illegal opioid market.

   b. J&J failed to design and operate a system to monitor suspicious orders of controlled substances, and otherwise violated its obligation under Tennessee law to maintain effective controls against diversion.

   c. J&J continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

   d. J&J shipped orders that it knew or should have known were suspicious.

   e. J&J did not report orders that it knew or should have known were suspicious.

   f. J&J shipped orders despite the orders being suspicious.

167. Also, upon information and belief, J&J knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids

in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were engaging in suspicious activity; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

### D. Teva Knowingly Participated in Tennessee's Illegal Drug Market

168.    Teva's generic oxycodone and hydrocodone products both represent the largest market share for either product throughout Tennessee according to IMS Health Data.

169.    These quantities of opioid pills clearly exceed the number that would be appropriate for normally prescribed therapeutic use.

170.    Teva also knowingly participated in the illegal drug market in Tennessee by supplying suspicious quantities of its products to suspect physicians and pharmacies in Tennessee, without disclosing suspicious orders as required by applicable regulations.

171.    According to IMS data, from September 2015 to August 2016, Teva accounted for 33.5% of the hydrocodone prescribed in Tennessee, 28.8% of the oxycodone prescribed in Tennessee, 16.8% of the oxymorphone, and 1.6% of the hydromorphone. This amounted to 1,913,712 Tennessee opioid prescriptions filled by Teva in one year. On average, this means Teva filled an opioid prescription for one out of every 3.5 Tennesseans during that year.

172.    During the same timeframe of September 2016 through August 2017, Teva accounted for 32.3% of Tennessee hydrocodone prescriptions, 25.1% of its oxycodone prescriptions, 1.8% of its oxymorphone prescriptions, and 1.8% of its hydromorphone prescriptions. This amounted to 1,619,143 Tennessee opioid prescriptions filled by Teva in one

year. On average, this means Teva filled an opioid prescription for one out of every 4.1 Tennesseans during that year.

173.    Teva's role relative to branded drugs involved knowing participation in the illegal drug market. Cephalon, a pharmaceutical company purchased by Teva in 2011, sold two opioid drugs, Actiq and Fendora.  As part of the approval process for Actiq the FDA required a risk management program (RMP) for the marketing of the drug.  The RMP for Actiq in 1998 specifically included special adverse event reporting for adverse events related to "unintended pediatric exposure," "diversion (i.e., use by an individual other than for whom it was prescribed)," or "in the context of 'off label use'".  As of 2001, the FDA further informed Cephalon that it had concerns that its fentanyl-based drug, Actiq, might be used by patients who were not indicated for its use and that there was potential for diversion and abuse of the drug.  In 2006 The Wall Street Journal reported that Actiq, a fast-acting lollipop like oral analgesic that contained fentanyl, was reportedly being called "perc-a-pop" on the street.[27]

174.    In 2005, Cephalon knew that 90% of Actiq prescriptions were for off-label use, and 55% of that total were for chronic back pain.  From 2000 to 2006, sales of Actiq grew from $15 million to over $400 million a year.[28] The Wall Street Journal further reported that surveys from research firm ImpactRx from June 2005-October 2006 found that more that 80% of patients who use the drug don't have cancer.[29]

175.    In 2006, as Actiq was losing its patent protection as a branded drug, Cephalon began marking a new fentanyl-based drug to replace it, called Fentora.  Fentora, like Actiq, was only ever approved by the FDA for the treatment of breakthrough cancer pain.  As part of the

---

[27] John Carreyrou, *Narcotic 'Lollipop Becomes Big Seller Despite FDA Curbs*, Wall Street Journal, Nov. 3, 2006, available at: https://www.wsj.com/articles/SB116252463810112292.
[28] *Id.*
[29] *Id.*

FDA approval of Fentora, Cephalon again was required to agree to a risk management program or RiskMAP, including a plan to monitor, evaluate and determine the incidence of use of Fentora by opioid intolerant individuals, misuse of Fentora, and unintended (accidental) exposure to Fentora.

176.    In November 2007, Cephalon submitted a supplemental New Drug Application (sNDA) to the FDA requesting that the FDA approve Fentora for use in non-cancer opioid tolerant patients with breakthrough pain. The FDA denied Cephalon's request, explaining that "[i]n the face of a national crisis of prescription opioid abuse and misuse, it is critical that you provide a risk management program with established efficacy [and] adequate restrictions to avoid widespread abuse and misuse." The FDA's letter to Cephalon denying its request addressed the complete failure of the company to address the abuse and misuse of both its potential and its existing products:

> [Y]ou have not adequately addressed the public health concern of increased abuse, misuse, overdose and addiction that is to be expected with more widespread availability of this product in the community. Your proposed plan to mitigate these risks has not been adequately tested to assure that it will, indeed, achieve this outcome for your currently approved indication, let alone the proposed expanded indication.

These problems were never resolved by Cephalon in an amended application and the FDA never approved Fentora for expanded use beyond cancer pain.

177.    Teva expanded its opioid business beyond Actiq and Fentora when it bought pharmaceutical company Actavis, which produces several generic opioids, mainly hydrocodone-acetaminophen and oxycodone-acetaminophen. Those types of opioids are prevalent in Tennessee.

178.    After the FDA in 2012 required all opioid manufacturers to adopt a strategy to combat opioid abuse, Teva began developing a new branded opioid called Vantrela.  In seeking

FDA approval of the drug, Teva presented Vantrela as an "abuse-deterrent" form of hydrocodone. Teva then developed a marketing plan to target managed care organizations in the hopes they would add this new drug to their formulary. The opioids that Teva sold were the generic versions of these same opioids. In fact, Teva sold millions of those same opioids in Tennessee from, and as part of its pitch, Teva cited to publicly available documents that demonstrated that the U.S. was in the midst of an opioid abuse and addiction crisis.

179. In 2015 and 2016, Teva was reviewing and sharing publicly available information and studies about opioid addiction in preparation for Teva's third-party payer marketing strategy for Vantrela, planning to promote Vantrela as an abuse deterrent product. One such publicly available source was a Time Magazine article in June 2015, highlighting the public health crisis of opioid addiction, including specifically in Tennessee. The Time story highlighted, among other things, that patients often buy the pills on the black market after becoming addicted, and approximately 1/5 of Americans who take opioids are estimated by the National Institutes of Health to be in danger of turning to the black market for more pills.

180. In June 2016, Actavis prepared a managed care overview to be provided to payers outlining why the misuse, abuse and diversion of opioids is a major public health concern, including the fact that in 2010 1 in 20 Americans over 12 abused opioids, in 2011 1 in 3 ER visits were opioid related, and in 2014 there were 18,000 opioid overdose deaths, a 300% increase in deaths from 1999. Teva recognized that between 9-28% of misusers of pain relievers get their drugs through a doctor's prescription. Teva also recognized the substantial economic burden of opioid abuse on healthcare, workplace, criminal justice, and societal costs. Teva even cited studies showing that approximately 27% of chronic pain patients prescribed opioids for non-cancer pain are likely to abuse the drugs. Teva positioned its branded Vantrela as a cost

savings for managed care payers compared to its generic opioids because generic opioids have a "high rate of abuse and generate enormous costs," lead to high levels of addiction, are responsible for around 2/3 of overdose deaths, contribute to increased healthcare costs and other indirect costs.

181.     Despite now having clear knowledge of the risks of abuse of opioids, including its own opioid products, Teva continued to send its generic opioid products into Tennessee and throughout the United States in large numbers. Vantrela was approved by the FDA in January 2017, yet Teva continues to promote its generic, less abuse-deterrent drugs.  From 2015-2017, IMS data shows that over 2 million Teva produced opioids prescriptions were filled in Tennessee.

182.     Like the other Drug Producer Defendants, Teva received chargeback data from its distributors that told Teva precisely where its pills were going, in what amount, and to whom.  It had the ability to deny chargebacks relative to pharmacies and dispensing physicians supplied by its distributors, which effectively amounted to controlling whether its pills would reach those pharmacies or not.

183.     Upon information and belief:

    a.  Teva recognized when orders were suspicious (because of the size of the order, the size of the community served, and other indicators) and likely to be diverted.

    b.  However, Teva rarely, if ever, denied chargebacks relative to pharmacies anywhere in the country, let alone in Tennessee.

    c.  Instead, Teva chose to fill those suspicious orders anyway, recognizing that the shipments were likely being dispensed to fill pill mill prescriptions or otherwise to be diverted into the black market.

184.     Upon information and belief:

    a.  Teva recognized that prescription rates per capita are an indicator of potential abuse of prescription opioids.

b. Nevertheless, Teva continued to fill orders in Tennessee where the per capita prescription rates were high and Teva knew or should have known had no legitimate medical need for the opioids being sold there.

c. In violation of Tennessee law, Teva failed to design and operate a system to monitor suspicious orders of controlled substances, and otherwise failed its obligation under Tennessee law to maintain effective controls against diversion.

d. Teva continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

e. Teva shipped orders that it knew or should have known were suspicious.

f. Teva did not report orders that it knew or should have known were suspicious.

g. Teva shipped orders despite the orders being suspicious.

185. Upon information and belief, Teva placed primary responsibility for detecting and reporting suspicious orders with its sales personnel. Those sales personnel were financially incentivized to call on customers who made suspicious prescriptions or submitted suspicious orders rather than report them, and to come up with sham justifications to "clear" suspicious orders or to justify calling on them further.

186. From 2002 to 2011, Teva did not report a single one of its prescription orders as suspicious.

187. In fact, prior to being named in numerous opioid-related lawsuits, Teva's SOM system has only flagged – and Teva only reported to the DEA – 6 TOTAL suspicious orders for the entire country.

188. This included just one reported suspicious order in 2013, one in 2014, four in 2015, and none in 2016.

189. Otherwise, Teva supplied essentially anyone and everyone who submitted an order for its drugs.

190. This included filling orders that it recognized were being dispensed, in large volumes, to fill prescriptions relative to prescribers under circumstances that Teva recognized were suspicious and indicative of diversion.

191. Teva shipped orders of opioids in frequencies and in volumes that were inherently suspicious. For example, in April 2015 alone, Teva shipped nearly 5 million pills of hydrocodone into Tennessee, through AmerisourceBergen, McKesson, and others. The multitude of orders comprising this volume necessarily were suspicious. Yet Teva filled them.

192. Upon information and belief, Teva filled similarly large volumes of orders from all of the Distributor Defendants for pharmacies and dispensing physicians within Tennessee, under circumstances demonstrating that each order was suspicious. Other than its so-called suspicious order monitoring program, Teva did nothing to prevent the illegal diversion of its prescription opioid products once the products leave the individual manufacturing facilities, even though it knew that some customers of prescription opioids obtain them expressly for nonmedical purposes. Teva was also aware that the opioid drug diversion problem was particularly large and problematic in Tennessee.

193. Upon information and belief:

    a. Teva's suspicious order monitoring program was structured to be ineffective.

    b. Teva, like the other Producer Defendants, utilized a sales force to sell its branded opioids who called on prescribers directly and on pharmacies and dispensing physicians – nationwide and in Tennessee.

    c. Teva, like the other Producer Defendants, paid sales representatives of its branded opioids bonuses or commissions based on sales volume relative to Tennessee (as elsewhere).

d. Relative to branded sales, Teva financially incentivized its sales force to call on high-volume prescribers and targeted those high-volume prescribers to prescribe more opioids.

e. Relative to its relationship with pharmacies and dispensing physicians, Teva financially incentivized its sales personnel to process and fill suspicious orders.

194. Upon information and belief, Teva knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were engaged in suspicious activity; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

### E. KVK Knowingly participated in Tennessee's Illegal Drug Market.

195. KVK knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. KVK is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. KVK knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including KVK's products. KVK also knowingly participated in the illegal drug market in Plaintiffs' community by supplying quantities of its products to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein. This included knowingly and illegally distributing opioids without effective controls against diversion and filling suspicious orders.

196. KVK knowingly distributed, or knowingly participated in the chain of distribution of, an illegal drug that was actually used by Mary Doe (an individual drug user) for purposes of

liability under T.C.A. § 29-38-106(b)(1). Mary Doe illegally obtained and consumed pills manufactured by KVK while pregnant with Baby Doe 1, Baby Doe 2, or Baby Doe 3.

## III.    The Distributor Defendants Participated in the Illegal Drug Market

### A. The Distributor Defendants Facilitated Diversion

197.    The Distributor Defendants facilitated illegal drug transactions in Tennessee by submitting suspicious orders, having them filled, and stocking suspect independent and retail chain pharmacies and dispensing physicians with opioids destined for the illegal drug market.

198.    The Distributor Defendants had a choice when faced with suspicious orders: submit them or impound them and investigate until they actually cleared the suspicion.

199.    ABC and Cardinal and McKesson account for a vast majority of the market nationwide, and an equivalent amount in Tennessee.

200.    They know that they have an important responsibility to monitor their customers' practices and that they are not supposed to fill suspicious orders.

201.    The Distributor Defendants knew they should monitor, detect, and halt suspicious orders.  For example, industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."[30] The guidelines set forth recommended steps in the "due diligence" process, and note in particular "[i]f an order meets or exceeds a distributor's

---

[30] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061, Doc. No. 1362415 (App'x B) (D.C. Cir. Mar. 7, 2012).

threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest."[31]

202.     The Distributor Defendants sold prescription opioids in and around the Baby Doe Plaintiffs' community, which Defendants knew or should have known were likely to be diverted into the illegal drug market.

203.     DEA Agent Joseph Rannazzisi has emphasized the importance of the Distributor Defendants in preventing opioid diversion: "[b]ecause distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances . . . from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system created by the [Controlled Substances Act] collapses."[32]

204.     The sheer volume of prescription opioids distributed to pharmacies in the Baby Doe Plaintiffs' community is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

205.     The Distributor Defendants filled inherently suspicious orders originating from the Baby Doe Plaintiffs' community which the Distributor Defendants knew or should have known were likely to be diverted to or within the Baby Doe Plaintiffs' community.

---

[31] *Id.*

[32] Declaration of Joseph Rannazzisi, ¶ 10 (filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW, Doc. 14-2 (D.D.C. February 10, 2012)).

206. Upon information and belief, the Distributor Defendants filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, orders of unusual frequency in the Baby Doe Plaintiffs' community, and orders which Defendants knew or should have known were likely to be diverted into the Baby Doe Plaintiffs' community.

207. Distributor Defendants possessed direct knowledge of obvious signs of diversion by their customers. They knew that Tennessee pharmacies were receiving prescription opioids in volumes grossly disproportionate to the population and any conceivable medical need. They knew that local prescribers near those pharmacies were prescribing at levels that were not medically justifiable and that the pharmacies were filling prescriptions for suspect prescribers.

208. Upon information and belief, rather than seek to stop pharmacies from supplying pills or to stop dispensing physicians who were operating pill mills, the Distributor Defendants targeted these entities and competed for their business. In other words, the Distributor Defendants targeted high-volume dispensing pharmacies (including independent or locally owned pharmacies) to compete for their business.

209. The Distributor Defendants have been subject to repeated investigations and citations for streaming prescription opioids into the illegal drug market.

210. For example, on September 27, 2006, the DEA sent a letter to "every commercial entity in the United States registered with the [DEA] to distribute controlled substances."[33] The letter stated that manufacturers and distributors "share responsibility for maintaining appropriate safeguards against diversion" and "given the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, even just one

---

[33] 2006 Rannazzisi Letter at 1.

distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[34] The letter advised that "DEA will use its authority to revoke and suspend registrations in appropriate cases."[35] The letter also provides that "in addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[36] The letter further discusses that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[37]

211. The DEA sent another letter on December 27, 2007 to "reiterate the responsibilities of controlled substance manufacturers and distributors to inform DEA of suspicious orders." [38] This letter reminded manufacturers and distributors of their obligation to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[39]

212. The letter states that in terms of reporting suspicious orders:

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one

---

[34] *Id.* at 2 (emphasis added).
[35] *Id.*
[36] *Id.*
[37] *Id.* at 1.
[38] 2007 Rannazzisi Letter at 1.
[39] *Id.*

highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communications with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by a registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."[40]

The 2007 letter also said that "[f]ailure to maintain effective controls against diversion is inconsistent with the public interest . . . and may result in the revocation of the registrant's DEA Certificate of Registration."[41]

213.    The 2007 letter also references the final order issued in Southwood Pharmaceuticals, Inc., 72 FR 36487 (2007), which "[i]n addition to discussing the obligation to report suspicious orders when discovered" and "some criteria to use when determining whether an order is suspicious," the order "also specifically discusses your obligation to maintain effective controls against the diversion of controlled substances."[42]

214.    The Distributor Defendants knew which pharmacies and dispensing physicians were filling prescriptions, including the amount and type of drug. The Distributor Defendants maintained direct relationships with pharmacies and dispensing physicians, including those plainly engaging in filling pill mill prescriptions en masse.

215.    The illegal market for prescription opioids exists because distributors choose to submit suspicious orders to manufacturers, manufacturers choose to fill them, and the distributors distribute them to suspect pharmacies where they fill prescriptions written by pill mill doctors. In American Overdose, Mr. Rannazzisi summed up the role of distributors: To

---

[40] *Id.* at 2.
[41] *Id.* at 1-2.
[42] *Id.* at 2.

Rannazzisi, distributing highly addictive and potentially lethal drugs wasn't the same as delivering chocolate bars. He regarded the lucrative licenses the wholesalers held—McKesson is the fifth-biggest company on the Fortune 500 index with around $200 billion in revenue—as carrying particular responsibilities: "These companies have one task, and that is the safe and secure distribution of drugs, particularly prescription drugs. Otherwise FedEx or UPS could do this role. This isn't a compliance challenge, like gender discrimination at a tech company, which is horrific, but it's not fundamental to their operation. This is the equivalent of a tech company failing on cybersecurity. If these companies were doing their job right, you shouldn't be seeing black-market prescription painkillers."

### B. AmerisourceBergen Has a History of Facilitating Illegal Drug Transactions

216.    On April 24, 2007, the DEA issued an immediate suspension order ("ISO") on AmerisourceBergen's Orlando, Florida distribution center, alleging that AmerisourceBergen was not controlling shipments of prescription opioids to Internet pharmacies and revoking the facility's license to distribute controlled substances.[43]

217.    On June 22, 2007, AmerisourceBergen entered into a settlement with the DEA which led to the reinstatement of the Orlando distribution center's suspended license.[44] Under that agreement, AmerisourceBergen was required to implement an enhanced order-monitoring program in all of its distribution centers by June 30, 2007.[45]

218.    In 2012, West Virginia's then-Attorney General Darrell McGraw filed lawsuits against AmerisourceBergen, Cardinal Health, and a dozen smaller drug distributors for their role

---

[43]    2007    AmerisourceBergen    Corporation    Form-10K.    Available    at:
https://www.sec.gov/Archives/edgar/data/1140859/000119312507255013/d10k.htm.
[44] *Id.*
[45] *Id.*

in a drug supply chain that includes doctors who write prescriptions for nonmedical purposes and "pill mill" pharmacies that dispense excessive numbers of painkillers, including opioids.[46] In February 2017, Cardinal Health and AmerisourceBergen agreed to pay $20 million and $16 million, respectively, to resolve West Virginia's claims.[47]

219.    The settlement, which is believed to be the largest pharmaceutical settlement in West Virginia history, came shortly after a Charleston Gazette-Mail investigation revealed that drug wholesalers shipped 780 million hydrocodone and oxycodone pills to West Virginia in just six years – a period when 1,728 West Virginians fatally overdosed on those two drugs.[48] AmerisourceBergen alone shipped 80.3 million hydrocodone pills and 38.4 million oxycodone pills from 2007 to 2012.  McKesson shipped 3.3 million hydrocodone pills to a single county.[49] And Cardinal Health and AmerisourceBergen combined to ship nearly 40 percent of all hydrocodone and oxycodone pills to West Virginia.[50]

220.    According to unsealed court documents from the West Virginia case, AmerisourceBergen distributed 149,300 hydrocodone pills – or 12,400 pills a month – to Tug Valley Pharmacy in Mingo County in 2009.[51] The pharmacy filled prescriptions for Drs. Diane

---

[46] Eric Eyre, 2 drug distributors to pay $36M to settle WV painkiller lawsuits, Charleston Gazette-Mail, January 9, 2017. Available at: http://www.wvgazettemail.com/news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wv-painkiller-lawsuits.

[47] Id.

[48] Id.

[49] https://www.wvgazettemail.com/news/cops_and_courts/drug-firms-poured-m-painkillers-into-wv-amid-rise-of/article_99026dad-8ed5-5075-90fa-adb906a36214.html

[50] Id.

[51] Eric Eyre, 18 'words' reveal drug giant's pain pill shipments to WV, Charleston Gazette-Mail, May 25, 2016. Available at: http://www.wvgazettemail.com/news/20160525/18-words-reveal-drug-giants-pain-pill-shipments-to-wv.

Shafer, Katherine Hoover and William Rykman, who operated "sham" pain clinics in Williamson.[52] Federal agents raided the clinics in 2010 and they never reopened.[53]

221. Unsealed court documents from that case further evidence that AmerisourceBergen shipped 8,000 hydrocodone painkiller tablets to a drive-thru pharmacy over two days in July 2012.[54] On those same two days, a competing drug wholesaler shipped 8,600 hydrocodone tablets to the same "pill mill" pharmacy.[55] AmerisourceBergen sold another 3,800 oxycodone pills to the same pharmacy that month.[56]

222. AmerisourceBergen also sent 16 billion pills to Missouri in a five-year period, during which time it reported only 244 suspicious orders nationwide.[57]

223. In 2017, AmerisourceBergen plead guilty to illegally distributing misbranded drugs and agreed to pay $260 million to resolve criminal liability for its distribution of drugs from a facility that was not registered with the FDA.

224. In 2018, AmerisourceBergen entered into a Corporate Integrity Agreement ("CIA") with the U.S. Dept. of Health & Human Services, and agreed to pay $625 million to resolve civil fraud charges.

225. AmerisourceBergen had a sales force responsible for establishing relationships with pharmacies and dispensing physicians. Upon information and belief, AmerisourceBergen premised utilized sales of prescription opioids as a basis for sales representative compensation at least through 2012.

---

[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] https://www.npr.org/sections/health-shots/2018/07/12/628191409/report-1-6-billion-opioid-doses-poured-into-missouri-over-6-years.

226.    Upon information and belief, AmerisourceBergen continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

227.    AmerisourceBergen failed to report suspicious orders, shipped opioids even after flagging an order as suspicious, and did not maintain effective controls against diversion.

228.    Upon information and belief, AmerisourceBergen has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs.  This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to be ineffective), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

229.    AmerisourceBergen maintained an internal list of suspect prescribers, but it chose not to share that information with the pharmacies it supplied.

230.    AmerisourceBergen also placed certain customers on a "do not ship" list, but (upon information and belief) continued to ship opioids to them.

231.    AmerisourceBergen recognized that many of its customers in Tennessee were supplying the illegal drug market, filling prescriptions for pill mills, and otherwise filling prescriptions far beyond any legitimate medical need.

232.    Upon information and belief, it also filled orders originating in Tennessee and Baby Doe Plaintiffs' community of unusual size or frequency, or that the Distributor Defendants otherwise recognized were indicative of diversion.

233.    Upon information and belief, AmerisourceBergen was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and

knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

234. AmerisourceBergen also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

235. Also, upon information and belief, AmerisourceBergen knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

### C. Cardinal Health Has a History of Facilitating Illegal Drug Transactions

236. On September 27, 2006, the DEA sent a letter to Cardinal reminding Cardinal that it was the distributors' responsibility to ensure that their products were not diverted for illicit use. The letter reminded Cardinal that it could not "simply rely on the fact that the person placing the suspicious order is a DEA registrant and turn a blind eye to the suspicious circumstances." Cardinal and, upon information and belief, all the other defendants in this action nevertheless used that an entity was registered as a basis to submit and fill plainly suspicious orders.

237. Based on findings from DEA investigations, in November and December 2007, the DEA issued three Immediate Suspension Orders ("ISOs") to Cardinal Health.

238.    On November 28, 2007, the DEA issued an ISO to Cardinal Health in connection

with its distribution center in Auburn, Washington (the "Auburn Facility"), immediately

suspending the facility's Certificate of Registration because its continued registration constituted

"an imminent danger to public health and safety."[58]

239.    According to the ISO, the Auburn Facility repeatedly "distributed unusually large

amounts of hydrocodone" to Horen's Drugstore, Inc. ("Horen's Drugstore") – distributing

600,000 dosage units of hydrocodone to Horen's Drugstore from March 2007 through September

2007 – and "disregard[ed] the clear indications that Horen's Drugstore was engaged in the

diversion of controlled substances[.]" Horen's Drugstore was Cardinal Health's largest purchaser

of combination hydrocodone products in 2007, and according to the ISO, the drugstore was "a

pharmacy engaged in a scheme to dispense controlled substances based on prescriptions that are

issued for other than a legitimate medical purpose and by physicians acting outside the usual

course of professional practice. This pharmacy dispensed excessive amounts of hydrocodone

based on illegitimate prescriptions originating from rogue Internet pharmacy websites, in

violation of applicable Federal and State law." The DEA found that Cardinal Health "failed to

maintain effective controls against diversion of a particular controlled substance into other than

legitimate medical, scientific and industrial channels," and concluded that its continued

registration with the DEA constituted "an imminent danger to the public health and safety."

---

[58] *Cardinal Health, Inc. v. Holder*, Case No. 1:12-cv-00185, Dkt. 14-15 ("Settlement and Release Agreement and Administrative Memorandum of Agreement"), ¶ 2, Appendix B (D.D.C. 2012). (Hereinafter "2008 Cardinal Health MOA").

240. On December 5, 2007, the DEA issued an ISO notifying Cardinal Health of the immediate suspension of its Lakeland, Florida drug distribution facility for failure to maintain effective controls against diversion of hydrocodone.[59]

241. The ISO detailed how, from August 2005 through October 2007, Cardinal Health failed to maintain effective controls against the diversion of hydrocodone into other than legitimate medical, scientific and industrial channels. According to the ISO, Cardinal Health distributed hydrocodone to various pharmacies, even though the company knew that many of the orders placed by the pharmacies were of an unusual size and were "suspicious" as defined in the CSA. For example, Cardinal Health distributed 1,213,000 dosage units of hydrocodone to Q-R-G, Inc. over the course of February to June 2006, and approximately 1,148,100 dosage units to United Prescription Services, Inc. from July to October 2006. The ISO further detailed that, on September 1, 2006, Eric Brantley, Manager of Quality and Regulatory Affairs for Cardinal Health, sent an email to the DEA stating that Cardinal Health discontinued all sales of controlled substances to 13 Internet pharmacies, including RKR Holdings, Inc. Nevertheless, from September 1, 2006 to January 31, 2007, Cardinal Health distributed 393,600 dosage units of hydrocodone products to RKR Holdings. As explained therein Cardinal distributed over 8,000,000 dosage units of hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific, and industrial channels. Indeed, the ISO indicated that many of Cardinal's largest purchasers "were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that are issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

___

[59] *Id.* at ¶ 3, App'x C.

242.    On December 7, 2007, the DEA issued an ISO to Cardinal Health regarding its distribution center in Swedesboro, New Jersey which, from January 2005 to August 2007, "distributed over 4.5 million dosage units of combination hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific and industrial channels."[60]

243.    The ISO stated that some of Cardinal Health's "largest purchasers of combination hydrocodone products were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that were issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

244.    In addition to the November and December 2007 ISOs, on January 30, 2008, the DEA issued an Order to Show Cause as to why the agency should not revoke the Certificate of Registration assigned to Cardinal Health's Stafford, Texas distribution center for the improper distribution of hydrocodone.   The DEA also found that Cardinal Health failed to maintain effective controls against the diversion of controlled substances at its McDonough, Georgia facility, Valencia, California facility, and Denver, Colorado facility.   In total, the DEA had reason to believe that seven of Cardinal Health's twenty-seven then-registered distribution centers were not adhering to their obligations under the CSA.

245.    On December 27, 2007, the DEA sent another letter to Cardinal reminding it that all distributors had an obligation to maintain effective controls against diversion.[61]

246.    Following the three 2007 ISOs and the Order to Show Cause, the DEA and Cardinal Health entered into a Settlement and Release Agreement and Administrative

---

[60] *Id.* at ¶ 4, App'x D.
[61] *Cardinal Health, Inc. v. Holder*, Decl. of J. Rannazzisi, doc no. 14-2 at 12.

Memorandum of Agreement ("MOA") on September 29, 2008.[62] Pursuant to the MOA, Cardinal Health agreed to pay a civil fine of $34 million, and "maintain a compliance program designed to protect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations."[63]

247.    Cardinal's 2008 settlement and MOA with the DOJ lists Cardinal facilities in La Vergne, Tennessee and Knoxville, Tennessee as having failed to maintain effective controls against diversion.

248.    After entry of the 2008 MOA, Cardinal Health began violating the CSA again almost immediately. A further investigation of Cardinal Health's Lakeland, Florida facility by the DEA "revealed a persistent failure to exercise due diligence to ensure that controlled substances were not being diverted" over a period of approximately 3 years, from November 2008 to December 2011.[64] The lack of anti-diversion controls resulted in the top four customers of Cardinal Health's Lakeland facility being supplied with approximately 50 times the amount of oxycodone compared to the average Florida retailer that Cardinal Health services, which the DEA referred to as a "staggering" difference in distribution.[65] Of those four pharmacies, one was found to be "dispensing oxycodone 30mg prescriptions . . . for persons whose addresses were in Kentucky and Tennessee and who paid cash."[66]

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at ¶ 75.

[65] *Id.* at ¶ 76.

[66] Holidays CVS, LLC d/b/a CVS Pharmacy Nos. 219 and 5195 Decision and Order, 77 Fed. Reg. 62316, 62318 (Oct. 12, 2012).

249.    The DEA's further investigation culminated in the issuance of another ISO regarding the Lakeland, Florida facility on February 2, 2012 (the "2012 ISO") for failure to maintain effective controls against diversion of oxycodone.[67]

250.    The 2012 ISO stated that, "[d]espite the MOA, the specific guidance to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of [the CSA]."[68] According to the ISO:

251.    From January 1, 2008 through December 31, 2011 . . . Cardinal's sales of oxycodone products to its top four retail pharmacy customers exceeded 12.9 million dosage units. . . . From 2008 to 2009, Cardinal's sales to its top four retail pharmacy customers increased approximately 803%. From 2009 to 2010, Cardinal's sales to its top four retail pharmacy customers increased approximately 162%. [¶] The egregious quantities of oxycodone distributed by Cardinal to its top four retail pharmacy customers well exceeded the amount of oxycodone distributed to Cardinal's Florida retail pharmacies, which receive, on average, approximately 5,347 dosage units of oxycodone per month.[69]

252.    The 2012 ISO further provided that "[n]otwithstanding the large quantities of controlled substances ordered by Cardinal's top retail pharmacy customers, Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into

---

[67] *Cardinal Health, Inc. v. Holder*, Case No. 1:12-cv-00185, Dkt. 14-18 (D.D.C. 2012).
[68] *Id.* at ¶ 3.
[69] *Id.* at ¶ 4.

other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers."[70]

253.    In May 2012, following a DEA investigation, Cardinal Health entered into a second memorandum of agreement relative to its 28 registered distribution facilities. The MOA required Cardinal to maintain a compliance program to monitor and detect diversion, to implement a system for conducting an in-person investigation for any suspicious orders."

254.    On December 23, 2016, Cardinal Health agreed to pay a $34 million fine (separate from the $34 million fine in 2008) to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center.[71]

255.    Also on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the Controlled Substances Act in Maryland, Florida, and New York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA. In the settlement, Cardinal Health admitted, accepted, and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to "timely identify suspicious orders of controlled substances and inform the DEA of those orders" or to "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."

256.    Upon information and belief, Cardinal Health had a sales force responsible for establishing relationships with pharmacies and dispensing physicians. Cardinal Health utilized

---

[70] *Id.* at ¶ 5.
[71] Press Release, United States Reaches $34 Million Settlement With Cardinal Health For Civil Penalties Under The Controlled Substances Act, DOJ, U.S. Attorney's Office – Middle District of Florida. Available at: https://www.justice.gov/usao-mdfl/pr/united-states-reaches-34-million-settlement-cardinal-health-civil-penalties-under.

sales of prescription opioids as a basis for sales representative compensation at least through 2012.

257. Upon information and belief, Cardinal Health continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

258. Upon information and belief, Cardinal Health has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

259. Cardinal also chose not to report (i.e., to conceal) customers who it identified in an initial onboarding process as having signs of diversion.

260. Also, where a manufacturer removed a Cardinal customer from its chargeback list, Cardinal understood that this was because the customer was suspected of diversion. However, where a manufacturer reinstated a customer to the chargeback list, Cardinal would resume distributing opioids to those customers anyway.

261. Cardinal also engaged in other practices that facilitated diversion of its productions, including:

      a. Terminating a customer from one distribution center but not the other (*i.e.*, even where a customer was flagged for diversion and cut off from one Cardinal distribution center, Cardinal did not cut the customer from other Cardinal centers).

b. Where a customer hit Cardinal's "threshold" for suspicious activity on one type of opioid, Cardinal might terminate the customer only as to that specific opioid but nevertheless continue to ship other below-threshold opioids to that customer (rather than stop shipments entirely until the suspicion was investigated and dispelled).

c. Cardinal permitted sales representatives to request SOM threshold increases to permit Cardinal to keep shipping opioids to a customer even though Cardinal's own self-imposed metrics had flagged it.

d. Cardinal chose not to examine whether pharmacy retail chains had any anti-diversion programs in place and chose not to audit the compliance efforts of national alternate care accounts or national mail order accounts.

262.    Upon information and belief, Cardinal was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

263.    Cardinal also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

264.    Upon information and belief, Cardinal also knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and

inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

## D. McKesson Has a History of Facilitating Illegal Drug Transactions

265. On May 2, 2008, McKesson agreed to pay a total of $13.25 million in civil penalties to six U.S. Attorney's Offices to settle allegations that the company violated federal reporting provisions relating to its handling of prescription painkillers, including hydrocodone.[72]

266. In a press release regarding the agreement, the Department of Justice explained:

Three McKesson distribution centers received and filled hundreds of suspicious orders placed by pharmacies participating in illicit Internet schemes, but failed to report the orders to DEA. They did so even after a Sept. 1, 2005, meeting at which DEA officials met with and warned McKesson officials about excessive sales of their products to pharmacies filling illegal online prescriptions. The pharmacies filled purported online "prescriptions" for hydrocodone (contained in drugs such as Vicodin), but the prescriptions were issued outside the normal course of professional practice and not for a legitimate medical purpose. The United States Attorneys allege that the orders that McKesson received from these pharmacies were unusually large, unusually frequent, and/or deviated substantially from the normal pattern. As a result, millions of dosage units of controlled substances were diverted from legitimate channels of distribution.[73]

267. As part of the 2008 agreement, McKesson was required to "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders . . . and follow procedures established by [McKesson's] Controlled Substance Monitoring Program ("CSMP")." McKesson flagrantly violated those provisions of the agreement.[74]

---

[72] Press Release, McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims that it Failed to Report Suspicious Sales of Prescription Medications, Dept. of Justice, May 2, 2008. Available at: https://www.justice.gov/archive/opa/pr/2008/May/08-opa-374.html.
[73] Id.
[74] 2017 Administrative Memorandum of Agreement (DOJ, DEA and McKesson). Available at: https://www.justice.gov/opa/press-release/file/928476/download. (Hereinafter "2017 McKesson MOA").

268. A federal government investigation revealed that, from 2008 to 2013, McKesson did not fully implement its compliance program, and, instead, supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills.[75] For example, in Colorado, McKesson processed more than 1.6 million orders for controlled substances from June 2008 through May 2013, but reported just 16 orders as suspicious.[76] This included filling every order by a pharmacist who was selling up to 2,000 pills per day in a suburban community of 38,000 people.[77] It failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records, and bypassed suspicious order reporting procedures.

269. When confronted with the evidence gathered in the government's investigation, McKesson conceded that, following the 2008 agreement, the company:

- "[F]ailed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA . . . at the McKesson Distribution Centers" located in: Aurora, Colorado; Aurora, Illinois; Delran, New Jersey; LaCrosse, Wisconsin; Lakeland, Florida; Landover, Maryland; La Vista, Nebraska; Livonia, Michigan; Methuen, Massachusetts; Santa Fe Springs California; Washington Courthouse, Ohio; and West Sacramento, California;[78]

- "[F]ailed to properly monitor its sales of all controlled substances and report suspicious orders to DEA, in accordance with McKesson's obligations under the 2008 Agreements";[79]

---

[75] Press Release, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, Dept. of Justice, January 17, 2017. Available at: https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

[76] *Id.*

[77] https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html?noredirect=on&utm_term=.827ab6d7a014

[78] 2017 McKesson MOA at 3.

[79] *Id.* at 4

- "[F]ailed to conduct due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers, and bypassed suspicious reporting procedures set forth in the McKesson CSMP";[80]

- "[F]ailed to inform the DEA Field Division Offices and/or DEA Headquarters of certain suspicious orders of controlled substances made by its customers during the relevant time period, including orders of unusual size, orders deviating substantially from normal patterns, and orders of unusual frequency";[81]

- "[F]ailed to report suspicious orders for certain controlled substances in accordance with the standards identified and outlined in the DEA Letters";[82] and

- "[D]istributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners in the usual course of their professional practice."[83]

270. Following the federal government's investigation, in January 2017, McKesson entered into an Administrative Memorandum of Agreement with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 agreement as well as failure to identify and report suspicious orders of controlled substances at its drug distribution centers across the country.[84] One of McKesson's largest sources of opioids, Mallinckrodt, admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017), it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson further admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its

---

[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.* at 8.

customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 et seq., at the McKesson Distributions Centers" including the McKesson Distribution Center located in Washington County, Ohio. Due to these violations, McKesson agreed to a partial suspension of its authority to distribute controlled substances from certain of its facilities. The 2017 agreement further required McKesson to suspend sales of controlled substances from its distribution centers in Colorado, Ohio, Michigan and Florida for multiple years.[85] The suspensions are among the most severe sanctions ever agreed to by a DEA registered distributor.

271.     As explained in the Washington Post and on 60 Minutes, the DEA investigation had demonstrated that McKesson had taken acts to support criminal diversion.[86] For example, the DEA found evidence that McKesson had shipped suspicious orders of millions of painkillers to pharmacies across the country that supplied drug rings. A DEA memo outlined its investigative findings concluded that McKesson "[i]gnored blatant diversion," had a "pattern of raising thresholds arbitrarily," "[f]ailed to review orders for suspicious activity," "[i]gnored its own procedures designed to prevent diversion," and "[s]upplied controlled substances in support of criminal diversion."[87]

272.     On December 17, 2017, Assistant Special Agent David Schiller spoke on 60 Minutes:

> If they woulda stayed compliance with authority and held those that they're supplying the pills to, the epidemic would be nowhere near where it is right now. Nowhere near. . . . They had hundreds of thousands of suspicious orders they should have reported, and they didn't report any. There's not a day that goes by in

---

[85] *Id.* at 5-7.

[86] Lenny Bernstein & Scott Higham, *'We feel like our system was hijacked': DEA agents say a huge opioid case ended in a wimper*, Washington Post, Dec. 17, 2017, https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html

[87] *Id.*

the pharmaceutical world, in the McKesson world, in the distribution world, where there's not something suspicious. It happens every day.[88]

273.    Moreover, the DEA found evidence that McKesson raised distribution thresholds to high-volume pharmacies purposely to get around its suspicious order reporting obligations. When a pharmacy began to exceed its threshold, it would just raise the threshold again.[89] According to DEA officials, McKesson "paid little or no attention to the unusually large and frequent orders placed by pharmacies, some of them knowingly supplying drug rings."[90] Instead, "the company raised its own self-imposed limits, known as thresholds, orders from pharmacies and continued to ship increasing amounts of drugs in the face of numerous red flags."

274.    Upon information and belief, McKesson had a sales force responsible for establishing relationships with pharmacies and dispensing physicians, and compensated sales personnel at least in part based on volume – providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

275.    McKesson failed to report suspicious orders, shipped opioids even after flagging an order as suspicious, and did not maintain effective controls against diversion.

276.    Before 2013, McKesson did not have any employees overseeing the day-to-day implement of its SOM program.

277.    Upon information and belief, McKesson engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious

---

[88] Bill Whitaker, *Whistleblowers: DEA Attorneys Went Easy on McKesson, the Country's Largest Distributor*, 60 Minutes, Dec. 17, 2017, https://www.cbsnews.com/news/whistleblowers-dea-attorneys-went-easy-on-mckesson-the-countrys-largest-drug-distributor/.
[89] *Id.*
[90] Lenny Bernstein & Scott Higham, *'We feel like our system was hijacked': DEA agents say a huge opioid case ended in a wimper*, Washington Post, Dec. 17, 2017, https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html

order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to be ineffective), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

278. Upon information and belief, McKesson was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

279. McKesson also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.[91]

280. Upon information and belief, McKesson also knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.[92]

---

[91] As noted in the Disclaimer below, these allegations do not pertain to opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.
[92] As noted in the Disclaimer below, these allegations do not pertain to opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

## IV. The Pharmacy Chain Defendants' Self-Distribution of Opioids Facilitated the Illegal Opioid Market in Tennessee

281. The Pharmacy Chain Defendants, in addition to purchasing opioid medications from the Distributor Defendants, also self-distributed opioid medications to their pharmacy locations.

282. The Pharmacy Chain Defendants had the same obligations under Tennessee law to monitor, detect, and halt suspicious orders as the Distributor Defendants.

283. Similarly, upon information and belief, the Pharmacy Chain Defendants failed to identify, investigate, report, and/or halt suspicious opioid orders across the country, including orders going to Tennessee, and otherwise failed to maintain effective controls against diversion for shipments into and within Tennessee.

284. The numbers that each Pharmacy Chain Defendant distributed into the State of Tennessee were staggering. From just 2006 to 2014:

    a. Walgreens distributed 642,704,930 dosage units of opioids into Tennessee;

    b. CVS distributed 186,897,900 dosage units into Tennessee; and

    c. Walmart distributed 251,048,435 dosage units into Tennessee.

285. Upon information and belief, the Pharmacy Chain Defendants did not implement effective diversion control measures when shipping these pills. Instead, they put in place policies and protocols that ensured that the flow of drugs into the illegal market would continue.

### A. CVS Knowingly Fueled the Illegal Opioid Market

286. Before 2009, CVS had no suspicious order monitoring system at all. Instead, it relied on individual "Pickers and Packers" to identify orders of unusual size, frequency, or

pattern without clear criteria. CVS had no written policies, procedures, or protocols for the Pickers and Packers, no formal qualifications for the position, and no training.

287. In 2009, CVS at least began using a computer algorithm to flag suspicious orders, but that algorithm was flawed from the outset. The SOM did not function properly because it monitored by drug rather than active ingredient, such that changes in a drug's description or name caused the historical data (necessary for valid calculations) to be lost. The system also failed to account for orders made by and shipped to CVS pharmacies from third parties. Thus, as CVS itself admitted, a particular store could defeat the computer threshold simply by purchasing excess of the threshold from someone other than CVS. CVS knew that this resulted in filling suspicious orders from its pharmacies. At least as of July 2013, CVS internally had identified that CVS's supposed SOM process was irrelevant and pointless. CVS did not implement a SOM system until mid to late 2014, at which point its distribution centers stopped distributing Schedule II opioids at the whole level.

288. CVS did not conduct appropriate due diligence on flagged orders. It did not conduct meaningful diligence on more than a small fraction of flagged orders. In 2012 and 2013, CVS at times had only one employee reviewing all potentially suspicious orders for every CVS pharmacy in the country. In other words, CVS designed this program to fail, knowing that it would allow for suspicious orders to be filled unabated.

289. Upon information and belief, CVS has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs.

290. Upon information and belief, CVS never reported a single suspicious order to the Tennessee Board of Pharmacy.

291. Upon information and belief, CVS has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

292. Upon information and belief, CVS was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and CVS knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

293. CVS also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

294. Also, upon information and belief, CVS knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

**B. Walgreens Knowingly Fueled the Illegal Opioid Market**

295. Nationally, from 2006 to 2012, according to a Washington Post analysis, "Walgreens dominated the nation's retail opioids market."[93] During that period, Walgreens acted as its own wholesaler, obtaining 97 percent of pain pills directly from drug manufacturers, which allowed it to have more control over how many pain pills it sent to its stores.[94] Edward Bratton, Walgreens' manager of pharmaceutical integrity, described the company's SOM system prior to 2013 as a "system [that] would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing of products like Oxycodone[.]"[95]

296. For example, Walgreens used rigid formulas to "detect" suspicious orders. The formulas simply utilized an average number based on historical orders, applied a three times multiplier on that base number, and then flagged an order if it exceeded that multiplier. From 2007 forward, an order would have been flagged only if it exceeded that multiplier for two consecutive months. The formulas were not scaled to the size of the community served. Nor were they informed by geography, population, news reports, local information (provided by pharmacists or news reports), outside investigation, or any form of human input that would actually be effective at slowing the flow of opioids into the illegal drug market in Tennessee. Instead, by setting these thresholds artificially high, Walgreens ensured that it would keep shipping orders below the threshold even though it should have halted those orders (rather than fill them).

---

[93] Jenn Abelson, Aaron Williams, Andrew Ba Tran, & Meryl Kornfield, *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids*, Wash. Post, Nov. 7, 2019, https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/.

[94] *Id.*

[95] *Id.*

297. Even at the exceedingly high threshold it had set, Walgreens still identified thousands of orders each week that hit that threshold. Those orders were obviously suspicious. Yet rather than halt the orders, Walgreens elected to ship them. By shipping orders that Walgreens itself had identified as suspicious, it committed an act intended to facilitate the distribution of drugs into the illegal market.

298. Walgreens then waited until after shipping the orders to report them to anyone. By waiting until after filling an order to report it, Walgreens was able to facilitate the flow of drugs into Tennessee's illegal market.

299. In September 2012, the DEA issued an immediate suspension order ("ISO") for Walgreens' Schedule II distribution facility in Jupiter, Florida.[96] In the ISO, the DEA found that Walgreens' distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest." The ISO made the following findings:

    a. In violation of its duty report under 21 CFR 1301.74 and a 2007 letter from the DEA, Walgreens had not reported suspicious orders as they were discovered, but instead had shipped the orders without due diligence to determine if the order was actually being made to serve legitimate medical needs;

    b. Even though the facility served 12 states and Puerto Rico, the formula was the same regardless of a pharmacy's location, the population it serves, or the number of other pharmacies in the area;

    c. Walgreens had failed to maintain an adequate suspicious order reporting system, ignored readily identifiable orders and ordering patterns that obviously reflected diversion at Walgreens pharmacies; and

    d. Walgreens had distributed large amounts of opioids to pharmacies that it knew or should have known were dispensing the drugs to fill prescriptions that were not intended to serve a legitimate medical purpose.

---

[96] https://www.dea.gov/press-releases/2012/09/14/dea-serves-suspension-order-walgreens-distribution-center-jupiter-florida.

300.     Despite these and other warnings, Walgreens continued to commit acts intended to facilitate the distribution and dispensing of drugs by its pharmacies into the illegal market. It has admitted that it is unaware of ever performing a due diligence review before shipment on orders listed on its Suspicious Drug Control Order report.

301.     At the distribution center level, Walgreens purposely designed its system simply to supply whatever quantities of drugs its pharmacies requested, rather than to identify red flags of potential diversion.

302.     Moreover, when Walgreens purported to implement anti-diversion measure in 2010 (for the first time), it designed the program to have significant holes. For years, the program did not include orders that Walgreens stores were also placing to outside vendors, like Cardinal and AmerisourceBergen, allowing stores to order opioids from Walgreens distribution centers and from Cardinal and AmerisourceBergen, effectively permitting double dipping. Walgreens stores also could transfer controlled substances between stores and did not review these transfers (known as "interstores") within the SOM program, allowing transfer for which Walgreens' SOM system did not account. Stores could also place ad hoc "PDQ" (short for "pretty darn quick") orders for controlled substances outside of their normal orders days and outside of the SOM analysis and limits. Walgreens even could remove a store entirely from its SOM review.

303.     Furthermore, at times when a store would submit an order that exceeded Walgreens' exceedingly high threshold, Walgreens would reduce the order to the threshold and ship it without conducting further investigation into why its pharmacies were making suspicious orders.

304. Walgreens also intentionally understaffed the department that was supposed to conduct diligence and intentionally did not give that group proper training. Despite thousands of orders being flagged each week (even under Walgreens' improperly high threshold), Walgreens officials reviewed only a small fraction. It therefore continued to ship even those orders that it had identified as suspicious.

305. In November 2012, Walgreens simply began reducing orders down to threshold rather than halting the orders, investigating them, and reporting them to an appropriate official.

306. According to Walgreens witnesses, the company did not confirm a single suspicious order that it shipped to its stores.[97]

307. Walgreens has been repeatedly cited and penalized for shipping without effective controls against diversion. For example, in April 2013, it agreed to a then-record $80 million settlement with the DEA to resolve allegations that it had shipped oxycodone and other prescription painkillers that were diverted into the black market. The agreement mandated that, at a corporate level, Walgreens had to maintain a "Department of Pharmaceutical Integrity, a Suspicious Order Monitoring system, remove controlled substance from the calculation of bonuses for pharmacists and technicians, and verify prescribers' DEA numbers to ensure their validity.

308. Upon information and belief, despite these warnings, Walgreens continued to violate its responsibilities as a Tennessee registrant.

309. In particular, Walgreens' conduct facilitated the illegal distribution of opioids into the black market in Tennessee.

---

[97] Bratton 65:20-66:11.

310. Even when pharmacies did hit internal limits imposed by Walgreens, "they could still transfer pills from other stores or order from outside suppliers[,]"[98] Walgreens officials intentionally authorized pharmacies to exceed the internal limits to maintain sales volume.

311. "Pharmacies could also find workarounds by placing special PDQ orders, meaning 'pretty darn quick,' from Walgreens internal network[,]"[99] a technique used repeatedly by Walgreens pharmacies in Tennessee. In 2012, Walgreens suggested forbidding PDQ orders for oxycodone products.[100] Pharmacy executive Kermit Crawford vehemently objected to the proposed change, writing, "I was not under the impression this was a done deal. Concerned we are 'all or none.' We have to do what's right for patients also."[101]

312. Upon information and belief, Walgreens has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

313. Upon information and belief, Walgreens was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

314. Walgreens also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose

---

[98] Abelson, et al., supra note ___.
[99] Abelson, et al., supra note ___.
[100] Abelson, et al., supra note ___.
[101] Abelson, et al., supra note 192.

prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

315.   Also, upon information and belief, Walgreens knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community.

### C. Walmart Knowingly Fueled the Illegal Opioid Market

316.   From 2000 to approximately May 2018, Walmart self-distributed tens of millions of shipments of controlled substances to Walmart-branded and Sam's Club-branded pharmacies. Throughout the period from 2012 to 2018, Walmart was the largest self-distributor in the country for oxycodone, hydromorphone, and hydrocodone in terms of both dosage units and grams.

317.   Because Walmart acted as its own distributor, it had access to extensive data and other information that independent distributors would not ordinarily have. In particular, Walmart had a wealth of dispensing information that gave it the ability to investigate the circumstances underlying orders for controlled substances. Walmart had data about individuals who filled controlled-substance prescriptions at its pharmacies, the identities of medical providers who were prescribing controlled substances for those individuals, and reports from its own pharmacists raising concerns.

318.   Despite having information about how often and how much Walmart-branded pharmacies and Sam's Club-branded pharmacies ordered from third-party distributors, Walmart did not account for these orders and shipments in its SOM program.

319.   Before 2011, Walmart did not even have a SOM system in place.

320.   In November 2010, Walmart adopted Pharmacy Manual 21-402 ("Controlled Substance Monitoring"). This policy simply required certain Walmart employees to review a

monthly report, known as a "control drug stock exception report," after the controlled substances had been shipped to the pharmacies and identify any controlled substances that constituted more than 3.99% of a pharmacy's total controlled and non-controlled substance purchases during the prior month.

321.    Under Pharmacy Manual 21-402 (November 2010), Walmart failed to detect many unusual orders. First, the monthly reports did not identify specific controlled substance orders that were unusually large. Instead, the reports aggregated all shipments of particular controlled substances and then compared those aggregated totals to see if they exceeded 3.99% of a pharmacy's total shipments that month. As a result, many unusually large orders were not flagged because they were not subsumed in the aggregated totals. Second, the policy did not require Walmart to flag any orders that were otherwise suspicious (e.g., exhibiting an unusual frequency or unusual pattern).

322.    Pharmacy Manual 21-402 (November 2010) did not describe these aggregated totals as "suspicious orders" or even state that Walmart was required to detect and report suspicious orders to DEA.

323.    In a June 12, 2014 email, Walmart attached a risk assessment in which it observed that its system for monitoring suspicious orders was an "existing risk" and "emerging risk" for which it had "no processes in place." Walmart's own assessment was that the risk that its pharmacies would place suspicious orders with its own distribution centers was "likely," the second-highest of five levels on Walmart's scale of likelihood of risks.

324.    In July 2014, Walmart revised Pharmacy Manual 21-402 and titled the revised policy "Evaluating Orders of Interest and Suspicious Order Reporting." Unlike the 2010 version of the policy, Pharmacy Manual 21-402 (July 2014) instructed compliance unit personnel to

evaluate individual orders as they were placed—rather than monthly aggregated totals after Walmart's distribution centers had already shipped the controlled substances—and report any suspicious orders to DEA.

325. Pharmacy Manual 21-402 (July 2014) called for Walmart first to identify "orders of interest" from among all controlled substance orders, and then to investigate those "orders of interest" to determine whether they were indeed "suspicious orders" subject to reporting to DEA.

326. Both steps of this system failed. The criteria Walmart adopted for flagging "orders of interest in the first instance were plainly inadequate, allowing many suspicious orders to evade any scrutiny. And Walmart routinely failed to investigate orders that were flagged as "orders of interest" to ascertain whether they were suspicious, prioritizing expeditious distribution of controlled substances to meet its pharmacies' and pharmacists' demands over compliance with state and DEA regulations.

327. Walmart failed to detect and report at least hundreds of thousands of suspicious orders of controlled substances. Over an approximately four-year period from 2013 to 2018, a time during which Walmart shipped an estimated 37.5 million controlled-substance orders to its pharmacies, it reported only 204 suspicious orders to the DEA—in other words, almost none. By comparison, during the same time period, Walmart's back-up distributor McKesson Corporation, which filled orders only when Walmart could not, reported to the DEA more than 13,000 suspicious orders from Walmart pharmacies.[102]

328. Upon information and belief, Walmart has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a

---

[102] Despite even reporting that many (and that is just for the single customer Walmart), in 2017, McKesson was fined $150,000,000 by the DEA for its systemic failure to report suspicious orders during roughly the same period that Walmart reported only 204.   .

suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

329. Upon information and belief, Walmart was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

330. Walmart also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

331. Also, upon information and belief, Walmart knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community.

## V. The Drug Producer Defendants Helped Create the Illegal Drug Market

### A. In the 1990s, the Drug Producer Defendants Knew that Using Opioids for Non-Malignant Pain Creates a Serious Risk of Abuse and Diversion Yet Encouraged Opioid Sales and Distribution Practices That It Knew Have Those Effects

332. As stated by Tennessee's Commissioner of Health Dr. John Dreyzehener, "in the 1990's, MDs started prescribing opioids in large volume to treat [nonmalignant] pain which has

caused an opioid addiction problem."[103] Douglas Varney, Commissioner of the Tennessee Department of Mental Health, speaking at a meeting of the Governor's Working Group, similarly concluded that "[b]asically we are dealing with the fallout from the medical profession overprescribing opioids."[104]

333. Up until the mid-1990s, physicians prescribed opioids primarily to cancer patients and persons recovering from surgery. Fearful of the addictive qualities of opioids, physicians would not generally prescribe them for long term chronic pain. As detailed in a review of the development of the opioid crisis published in the 2015 Annual Review of Public Health, "[p]rior to the introduction of OxyContin [by Purdue in 1995], many physicians were reluctant to prescribe OPRs [opioid pain relievers] on a long-term basis for common chronic conditions because of their concerns about addiction, tolerance, and physiological dependence."[105]

334. This research confirmed the mid-1990s consensus of medical providers regarding the dangers of opioids. According to the Agreed Statement of Facts signed by Purdue in connection with its 2007 guilty plea to federal criminal charges for misbranding OxyContin: "During the period February through March 1995, Purdue supervisors and employees obtained market research that included focus groups of forty primary care physicians, rheumatologists, and surgeons to determine their receptivity to using OxyContin for non-cancer pain... '[t]he biggest negative of [OxyContin] was the abuse potential.'"[106]

---

[103] Tenn. Dep't of Mental Health and Substance Abuse Services, *Opioid Abuse Reduction Act Working Group*, at 22 (Nov. 10, 2015) [hereinafter *Working Group Report*] (emphasis added).
[104] *Id.* (emphasis added).
[105] Andrew Kolodny, et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, 36 Ann. Rev. Pub. Health 559, 562. (2015).
[106] Information as to Purdue Frederick Co., Inc., U.S.A v. Purdue Frederick Co., Inc., No. 1:07-cr-00029 W.D. Va. May 10, 2007, ECF No. 5-2 at ¶19 (emphasis in original).

335. When branded opioids were introduced to the U.S. market, including Tennessee, the Producer Defendants carefully evaluated physicians' concerns about the risks of addiction associated with opioids and embarked on a highly successful campaign to convince physicians that opioids created minimal risk of addiction. Upon information and belief, the Producer Defendants knew that, if its efforts were successful, many people would become addicted to prescription opioids and that, as a consequence, abuse and illegal diversion would follow.

336. As the Producer Defendants' efforts demonstrated success in the form of rapid increases in opioid prescribing, other opioid producers joined in their efforts to expand the market for opioids.

## B. The Drug Producer Defendants Funded "Key Opinion Leaders" to Spread Misinformation Regarding Opioids

337. The Producer Defendants engaged "key opinion leaders" to promote the use of their opioids in a variety of ways. Each Producer Defendant would pay a key opinion leader an honorarium each time he or she agreed to attend a variety of functions, from intimate meals with a single pain management clinic's staff to presenting at huge national and international symposia. Key opinion leaders were selected based on a number of criteria such as the prestige of their affiliated hospitals and the quantity of their published articles, but most importantly their willingness to promote the prescription of opioids.

## C. The Drug Producer Defendants Funded Dr. Russell Portenoy, Who Facilitated the Widespread Distribution and Abuse of Opioids by Acting as a Vocal Proponent of Opioid Use

338. The Drug Producer Defendants funded and worked closely with Dr. Russell Portenoy, a physician who emerged as one of the industry's most vocal proponents of long-term

opioid use.[107] According to a Wall Street Journal article, Portenoy essentially made it "his life's work" to campaign for the movement to increase use of prescription opioids.[108] To this end, speaking on Good Morning America in 2010, Portenoy stated categorically that "[a]ddiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted." This program was broadcasted across the country and, upon information and belief, was widely watched, including within Tennessee and in Plaintiffs' community. Portenoy, who himself is facing lawsuits for his work as a paid opioid pitchman, has now conceded that this promotion of opioids for chronic pain was "clearly the wrong thing to do."[109] He is on record stating: "I gave innumerable lectures in the late 1980s and 90's about addiction that weren't true."[110]

339.    The Drug Producer Defendants paid Dr. Portenoy millions of dollars from 1997 to 2007 to continue publicizing information that they knew would continue to create opioid addicts and would fuel the secondary illegal market for opioids. For example, in approximately 2004, Endo published an education pamphlet edited by Dr. Portenoy, called Understanding Your Pain: Taking Oral Opioid Analgesics, which claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems."[111] In funding Dr. Portenoy, the Drug Producer Defendants yet again knowingly helped foster the growing population of opioids

---

[107] Thomas Catan & Evan Perez, *A Pain Champion has Second Thoughts*, wsj.com (Dec. 17, 2012). Available at:
https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] http://www.thblack.com/links/RSD/Understand_Pain_Opioid_Analgesics.pdf.

addicts and perpetuated the illegal opioids market that serviced them and which would carry forward into the late 2010's.

340. Teva listed Dr. Portenoy as a "Key Opinion Leader" at various times.

**D. The Drug Producer Defendants Funded the American Pain Foundation, Which Claimed (Among Other Things) That the Belief That "Opioid Pain Medications are Universally Addictive" was a Common Misconception**

341. The Drug Producer Defendants also funded the American Pain Foundation ("APF"), which has been described by the President of Physicians for Responsible Opioid Prescribing as "a front for opioid manufacturers."[112] The APF's 2010 annual report details thousands of pro-opioid advertisements, public statements, letters, Facebook Posts, and similar communications. It states that: "Through online, print, radio, and television outlets, APF's local and national media outreach efforts secured 1,600 media stories on pain in 2010 – an increase of 1,255% from 2009. Reaching more than 600 million people with important pain-related messages, APF spokespeople and advocates provided education, information and assistance to people with pain and combated the negative stereotypes and stigmas associated with pain."[113] Upon information and belief, APF distributed the types of messages referenced in its 2010 Annual Report to physicians within Tennessee.

342. For example, in or around 2011, the APF published "Policymaker's Guide," which characterized the notion that "strong pain medication leads to addiction" as a "common misconception[]":

---

[112] Charles Ornstein and Tracy Weber, *Patient Advocacy Group Funded by Success of Painkiller Drugs, Probe Fins,* washingtonpost.com, Dec. 23, 2011. Available at: https://www.washingtonpost.com/national/health-science-/patient-advocacy-group-funded-by-success-of-painkiller-drugs-probe-finds/2011/12/20/gIQAgvczDP_story.html.
[113] American Pain Fund 2010 Annual Report. Available at: https://archive.org/stream/277604-apf-2010-annual-report/277604-apf-2010-annual-report_djvu.txt.

Many people living with pain, and even some health care practitioners, falsely believe that opioid pain medicines are universally addictive. As with any medication, there are risks, but these risks can be managed when these medicines are properly prescribed and taken as directed. For more information about safety issues related to opioids and other pain therapies, visit http://www.painsafe.org.[114]

The guide describes "pain in America" as "an evolving public health crisis" and characterizes concerns about opioid addiction as misconceptions: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include: . . . *Misconceptions about opioid addiction*."[115] It even characterizes as a "*myth*" that "*[c]hildren can easily become addicted to pain medications*."[116] This message is just one example of the types of messages that APF published with substantial financial support from the Drug Producer Defendants.

343. Upon information and belief, the Drug Producer Defendants funded the APF and supported it with the intention and expectation that APF's messaging would continue to create more opioid addicts and necessarily result in more illegal abuse and distribution of opioids – and knowing that precisely those effects were occurring nationwide, in Tennessee, and in the communities at issue in this case.

## VI. Teva Also Contributed to the Illegal Prescription Opioid Market that Fuels Tennessee's Opioid Epidemic

### A. Teva Pushed Opioid Drugs for Unapproved Purposes

344. As described herein, Teva knowingly participated in the distribution chain of illegal opioids in Tennessee and in Baby Doe Plaintiffs' community by various means.

---

[114] *A Policymaker's Guide to Understanding Pain & Its Management*, American Pain Foundation at 5. Available at: http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last visited Dec 1, 2021).
[115] *Id.* at 6 (emphasis added).
[116] *Id.* at 40 (emphasis added).

345.     According to a DOJ press release that summarizes Teva's guilty plea for criminal violations of the Food and Drug Act, Teva trained its sales representatives to disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of Teva opioids and funded Continuing Medical Education ("CME") Courses to promote off-label uses. Specifically, the DOJ stated:

> From 2001 through at least 2006, *[Teva] was allegedly promoting [Actiq] for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy. [Teva] also promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening results.*[117]

346.     As a result of this unlawful marketing of Actiq, almost 90% of Actiq prescriptions were to patients for off-label, non-cancer use.

347.     Then-acting U.S. Attorney Laurie Magid commented on the dangers of Teva's unlawful practices:

> This company subverted the very process put in place to protect the public from harm, and put patients' health at risk for nothing more than boosting its bottom line. People have an absolute right to their doctors' best medical judgment. They need to know the recommendations a doctor makes are not influenced by sales tactics designed to convince the doctor that the drug being prescribed is safe for uses beyond what the FDA has approved.[118]

### B. Teva Funded Pro-Opioid Publications and Presentations

348.     In addition to its direct marketing, Teva indirectly marketed through third parties to change the way doctors viewed and prescribed opioids - disseminating the messages that opioids were safe for the treatment of chronic, long-term pain, that they were non-addictive, and

---

[117] Press Release, U.S. Department of Justice, Pharmaceutical Company Teva To Pay $425 Million for Off-Label Drug Marketing (Sept. 29, 2008). Available at: https://www.justice.gov/sites/default/files/civil/legacy/2014/01/09/Cephalon%20Press%20Releas e.pdf (emphasis added).
[118] *Id.*

that they were under-prescribed to the detriment of patients who were needlessly suffering. Teva did so by sponsoring pro-opioid front groups, prescription guidelines, articles, and CMEs, and Teva paid physicians thousands of dollars every year to publicly opine that opioids were safe, effective and non-addictive for a wide variety of uses.

349. Through its sponsorship of the FSMB's "Responsible Opioid Prescribing: A Physician's Guide," Teva continued to encourage the prescribing of opioid medication to "reverse ... and improve" patient function, attributing patients' displays of traditional drug-seeking behaviors as merely "pseudoaddiction."

350. Teva sponsored APF's guide, which warned against the purported under-prescribing of opioids, taught that addiction is rare and suggested that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.

351. A summary of the February 12-16, 2008 AAPM annual meeting reinforced the message, promoted both by the AAPM and the APS, that "the undertreatment of pain is unjustified." It continues:

> *Pain management is a fundamental human right* in all patients not only with acute postoperative pain but also *in patients suffering from chronic pain*. Treating the underlying cause of pain does not usually treat all of the ongoing pain. Minimal pathology with maximum dysfunction remains the enigma of chronic pain. Chronic pain is only recently being explored as a complex condition that requires individual treatment and a multidisciplinary approach. It is considered to be a disease entity.[119]

352. Teva also sponsored, through an educational grant, the regularly published journal *Advances in Pain Management*. In a single 2008 issue of the journal, there are numerous articles from Portenoy, Dr. Steven Passik, Dr. Kenneth L. Kirsh, and Webster, all advancing the safety

---

[119] Mohamed A. Elkersh & Zahid H. Bajwa, Highlights From the American Academy of Pain Medicine 24th Annual Meeting, 2(1) Advances in Pain Management 50-52 (2008) (emphasis added).

and efficacy of opioids. In an article titled "Screening and Stratification Methods to Minimize Opioid Abuse in Cancer Patients," Webster expresses disdain for the prior 20 years of opioid phobia.

353.    In another article from the same issue, "Appropriate Prescribing of Opioids and Associated Risk Minimization," Passik and Kirsh state: "[c]hronic pain, currently experienced by approximately 75 million Americans, is becoming one of the biggest public health problems in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed opioids for long periods of time with success demonstrated by an improvement in function" and that then-recent work had shown "that opioids do have efficacy for subsets of patients who can remain on them long term and have very little risk of addiction."[120]

354.    In November 2010, Fine and others published an article presenting the results of another Teva-sponsored study, concluding that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[121] They also conclude that the number of abuse-related events was "small."[122]

---

[120] Steven D. Passik & Kenneth L. Kirsh, *Appropriate Prescribing of Opioids and Associated Risk Minimization,* 2(1) Advances in Pain Management 9-16 (2008).
[121] Perry G. Fine, et al., Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).
[122] *Id.*

355.    From 2000 forward, Teva has paid doctors nationwide millions of dollars for programs relating to its opioids, many of whom were not oncologists and did not treat cancer pain. These doctors included Portenoy, Fine, Passik, Kirsh, and others.

## VII.    From 2012-2017, the Drug Producer Defendants Helped Funnel Millions of Dollars to Advocacy Groups that Promoted Opioid Use

356.    On February 13, 2018, Senator Claire McCaskill, released a report showing that Jannsen and other producers funneled over $10 million to 14 advocacy groups and affiliated doctors who took "industry friendly positions," which included issuing medical guidelines promoting opioids for chronic pain, lobbying to defeat or include exceptions to state limits on opioid prescribing, and criticizing prescribing guidelines from the U.S. Centers for Disease Control and Prevention.  The Report states that as these industry-funded entities and affiliated physicians:

> [o]ften echoed and amplified messages favorable to increased opioid use – and ultimately the financial interest of opioid manufacturers. These groups have issued guidelines and policy minimizing the risk of opioid addiction and promoting opioids for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for over-prescription and misbranding. Notably, a majority of these groups also strongly criticized 2016 guidelines from the Centers for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain – the first national standards for prescription opioids and a key federal response to the ongoing epidemic.
>
> The fact that these same manufacturers provided millions of dollars to the group described [in this report] suggests, at the very least, a direct link between corporate donations and the advancement of opioids-friendly messaging. By aligning medical culture with industry goals this way, the groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioids epidemic.[123]

---

[123] Fueling an Epidemic, Report Two: *Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Group*, U.S. Homeland Security & Governmental Affairs Committee, Ranking Member's Office, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/REPORT-Fueling%20an%20Epidemic-

## VIII. The Drug Producer Defendants Knowingly Fostered Opioid Addiction and Fueled the Illegal Opioids Market in Which They are Now Knowingly Participating

357.    The Drug Producer Defendants' promotion of opioids gave rise to and fueled the illegal drug market that existed in Plaintiffs' community during all periods relevant to this suit. Their representations regarding the risks of opioids and actions taken to push opioids through aggressive marketing of their collective message contributed to the market for both illegally prescribed opioids and for diverted opioids (and heroin for those addicts who could no longer obtain or afford prescription opioids).

358.    As set forth in the examples above, the Drug Producer Defendants operated websites and/or funded third party physicians, organizations, and websites that all pushed the message that opioids were not highly addictive and/or were appropriate for long-term use to treat chronic pain.

359.    Upon information and belief, the Drug Producer Defendants chose not to fund any organizations and third parties who promoted the contrary (and scientifically supported) message that opioids were highly addictive and not suitable for long-term use to treat chronic pain. It also chose not to pull funding from the pro-opioids organizations.

360.    Upon information and belief, the Drug Producer Defendants made these choices knowing and expecting that by doing so, the opioids market would continue to expand and continue to create more opioid addicts dependent on the illegal diversion of their products.

Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20
Third%20Party%20Advocacy%20Groups.pdf.

361. Speaking before the House Opioid Task Force in 2017, Dr. Michael Baron of the Tennessee Board of Medical Examiners summed up the cumulative effect of the opioid producers' multi-year campaign:

> We came out with what I call 'Generation O.' A whole generation of physicians that were taught it's ok to prescribe opiates, that they're safe, and that it's what the patient wants. But we bypassed evidence-based medicine. The whole medical system was hijacked by industry and really agreed.
>
> [***]
>
> The triggers of the opioid epidemic were really the pharmaceutical industry and pain experts that were on the payroll of the pharmaceutical industry. And they preached that opioids are safe and effective for chronic, non-cancer pain, the risk of addiction is rare, and opioid therapy can be easily discontinued, all of which is nonsense.[124]

## IX. The Drug Producer Defendants, the Drug Distributor Defendants, and the Pharmacy Chain Defendants Engaged in a Conspiracy to Profit from the Illegal Opioid Market by Any Means Necessary Which Exacerbated the Opioid Epidemic

362. Through chargeback data, the Drug Producer Defendants had visibility into the extravagant opioid orders being placed by independent and retail chain pharmacies, including those owned and operated by the Pharmacy Chain Defendants.

363. Upon information and belief, instead of reporting these orders to law enforcement and refusing to honor these rebates, the Drug Producer Defendants almost always continued to supply the Pharmacy Chain Defendants and others with opioids at a discounted rate to maximize their profits.

364. Upon information and belief, the Distributor Defendants were in regular contact with the Drug Producer Defendants about potentially suspicious pharmacies; but as long as the

---

[124] House Opioid Task Force, February 23, 2017.

Drug Producer Defendants continued to honor chargebacks, the Distributor Defendants continued to fill these pharmacies' suspicious orders, especially if the pharmacy at issue was one of the Pharmacy Chain Defendants.

365. Upon information and belief, the Pharmacy Chain Defendants knew that the Distributor Defendants fiercely competed with one another for their substantial books of business. As a prerequisite to gifting the Distributor Defendants their accounts, the Pharmacy Chain Defendants would demand that all of their locations be exempted from the Distributor Defendant's SOM system until their exorbitant monthly orders of opioids would not be identified as "suspicious" by the Distributor Defendants. Even when an order for a Pharmacy Chain Defendant was identified by a Distributor Defendant's SOM system, the Distributor Defendant would expediate a threshold increase to clear the order. The Distributor Defendants were so worried about losing the Pharmacy Chain Defendants' business that they would proactively reach out to the Pharmacy Chain Defendants when their SOM team saw a Pharmacy Chain Defendant location nearing its threshold for opioids.

366. Upon information and belief, as self-distributors of opioids themselves at certain points, the Pharmacy Chain Defendants understood that the Distributor Defendants had obligations to monitor for suspicious orders, but nevertheless demanded (and received) threshold increases for what the Pharmacy Chain Defendants clearly knew were suspicious orders for opioids. The Drug Producer Defendants witnessed and enabled these unlawful ordering tactics by continuing to grant chargebacks for the Pharmacy Chain Defendants, and encouraged the Distributor Defendants to keep the opioids flowing to these suspicious pharmacies.

367. The Drug Producer Defendants, the Distributor Defendants, and the Pharmacy Chain Defendants knew or should have known that their concerted and coordinated effort to

subvert Tennessee state law resulted in the diversion of opioids into the illegal drug market, including the illegal drug markets in Tennessee and Baby Doe Plaintiffs' community.

## X. The Individual Dealer Defendants Also Participated in the Illegal Market

### A. Brian Brewster

368. Brian Brewster is an individual who dealt drugs in the illegal market in or around Roane County.

369. Brewster was arrested on drug charges in Monroe County in May 2016.

370. Brewster was also convicted in June 2016 in Loudon County for illegally selling/dealing oxycodone.

371. Brewster participated in the same illegal drug market from which Mary Doe obtained drugs illegally.

372. Brewster participated in the illegal market during the same time frame in which Mary Doe obtained drugs illegally during pregnancy. Furthermore, per T.C.A. § 29-38-113, his conviction is prima facie evidence of his participation in the illegal drug market during the two years preceding the acts for which he was convicted.

373. Brewster dealt illegal drugs of the same type that Mary Doe ingested during pregnancy.

374. The drugs that Brewster sold illegally (including oxycodone) also included drugs that were the same type as those manufactured, distributed, and sold by the Manufacturer Defendants, Distributor Defendants, and Pharmacy Chain Defendants.

### B. Jacob Dalton

375. Jacob Dalton is an individual who dealt drugs in the illegal market in or around Roane County.

376.    Dalton was arrested on November 1, 2016 by agents of the Loudon County Sheriff's Office and the Lenoir City Police Department following execution of a search warrant at a hotel room.

377.    Dalton had rented out a hotel room where he and four other individuals were found with drug paraphernalia, pill grinders, plastic baggies and other items, including Opana pills. Agents observed the occupants of the room leave the room to deal drugs through hand-to-hand transactions, and they found Dalton with Opana pills for which he had no prescription.

378.    Dalton was arrested and booked for manufacturing/selling/dealing/reselling Schedule II opioids, possession of drug paraphernalia, and for maintaining a dwelling from which illegal drugs were sold. In other words, Dalton was illegally dealing opioid pills and working with others to illegally deal opioid pills.

379.    On February 3, 2017, Dalton pleaded guilty to possession of Opana with attempt to distribute.

380.    Dalton participated in the same illegal drug market from which Mary Doe obtained drugs illegally.

381.    Dalton participated in the illegal market during the same time frame in which Mary Doe obtained drugs illegally during pregnancy. Furthermore, per T.C.A. § 29-38-113, his conviction is prima facie evidence of his participation in the illegal drug market during the two years preceding the acts for which he was convicted.

382.    Dalton dealt illegal drugs of the same type that Mary Doe ingested during pregnancy.

383.    The drugs that Dalton sold illegally (including Opana) also included drugs that were the same type as those manufactured, distributed, and sold by the Manufacturer Defendants, Distributor Defendants, and Pharmacy Chain Defendants.

### C. **William Baird**

384.    William Baird is an individual who dealt drugs in the illegal market in or around Roane County.

385.    Baird was charged for dealing oxycodone in Roane County in January 2018, February 2018, and March 2018.

386.    Baird later pleaded guilty for dealing oxycodone in Roane County in January 2018. Upon information and belief, he dealt oxycodone at least through March 2018.

387.    Baird participated in the same illegal drug market from which Mary Doe obtained drugs illegally.

388.    Baird participated in the illegal market during the same time frame in which Mary Doe obtained drugs illegally during pregnancy. Furthermore, per T.C.A. § 29-38-113, his conviction is prima facie evidence of his participation in the illegal drug market during the two years preceding the acts for which he was convicted.

389.    Baird dealt illegal drugs of the same type that Mary Doe ingested during pregnancy.

390.    The drugs that Baird sold illegally (including oxycodone) also included drugs that were the same type as those manufactured, distributed, and sold by the Manufacturer Defendants, Distributor Defendants, and Pharmacy Chain Defendants.

391.    Collectively, the Defendants facilitated the illegal distribution of drugs into and within the illegal drug market that harmed the Baby Does.

**XI.** **The United States, and Tennessee in Particular, is Plagued by Rampant Opioid Abuse Driven by Defendants Perpetuating an Illegal Market for Prescription Opioids**

### A. Opioids are Abused and Diverted at Alarming Rates

392.    The increasing demand, and high availability, of prescription opioids correlates with increased addiction, abuse, and diversion (a term used to describe redistribution of prescription drugs for illegal uses) throughout the country, including Tennessee and Baby Doe Plaintiffs' community. According to the Centers for Medicare & Medicaid Services, "'[d]rug diversion' is best defined as the diversion of licit drugs for illicit purposes. It involves the diversion of drugs from legal and medically necessary uses towards uses that are illegal and typically not medically authorized or necessary."[125]

393.    Opioid misuse is a national epidemic. For example, the federal government estimated that 11.5 million people had abused opioid pain relievers in 2016, including approximately 4.4% of all people in the United States aged 12 or older.[126] These statistics are disturbing, indicating that about 1 in 20 people in the U.S. are abusing opioids.

394.    Unfortunately, the situation in Tennessee is no better, and indeed may be worse. During 2013 – 2014, the State of Tennessee estimated that nearly 5% (221,000) of adults in Tennessee used pain relievers for non-medical purposes. Of these, the State estimated that 69,100 Tennesseans were addicted to prescription opioids and required treatment for prescription opioid abuse. The other 151,900 were using prescription opioids in ways that could be harmful

---

[125] "Drug Diversion in the Medicaid Program: State Strategies for Reducing Prescription Drug Diversion in Medicaid," Centers for Medicare & Medicaid Services (Baltimore, MD: January 2012), p. 1., accessible at https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud Prevention/MedicaidIntegrityProgram/downloads/drugdiversion.pdf.
[126]          https://www.samhsa.gov/data/sites/default/files/NSDUH-FFR1-2016/NSDUH-FFR1-2016.htm#opioid.

and may benefit from early intervention strategies.[127] Not surprisingly, opioids abuse continues

to go hand in hand with an illegal drug market from which the Defendants are knowingly

deriving substantial profits.



**B. The Defendants are Aware of a Nationwide Problem**

395.    Trends in opioid production, prescriptions, and usage over the last decade put

drug producers and distributors on notice of a heightened risk of abuse and diversion nationwide.

For example:

> a.  according to the Working Group Report, "[s]ince 1999, there has been no
>     overall change in the amount of pain experienced by Americans, yet the
>     number of prescriptions for opioids has quadrupled[;]"[128]

---

[127] "Prescription for Success: Statewide Strategies to Prevent and Treat the Prescription Drug Abuse Epidemic in Tennessee," Tennessee Department of Mental Health and Substance Abuse Services et al., (Summer, 2014), pg. 9, accessible at https://web.archive.org/web/20160414040557/https://www.tn.gov/assets/entities/behavioral-health/sa/attachments/Prescription_For_Success_Full_Report.pdf ("Prescription for Success").
[128] *Working Group Report* at 3.

b. in the past two decades, the rate of opioid prescribing in the United States has increased 600%. The United States accounts for 4.6% of the world population but its citizens, by 2011, were consuming 80% of the world's opioid production;[129]

c. between 2009 and 2013, both the number of prescriptions filled per patient and the number of days of medication per prescription increased by approximately 8.4%;[130]

d. nearly half (46.9%) of new opioid users who take these medications for more than 30 days in the first year continue using them for three years or longer. Signaling a particularly alarming trend, nearly 50% of these patients are only taking short-acting opioids — which can make them more prone to addiction — rather than long-acting formulations, which are designed for extended pain relief; [131]

e. on average, the patients who chronically used these medications filled 56 short-acting opioid prescriptions over three years — nearly 19 prescriptions each year;[132] and

f. prescription opioid overdose deaths quadrupled in parallel with prescription opioid sales in the United States between 1999 and 2010.[133]

396. Defendants know that production volumes of opioids skyrocketed in the last twenty-five years. In 1993, the DEA allowed pharmaceutical companies to produce 3,520 kilograms of oxycodone. In 2015, the DEA authorized production of 137,500 kilograms of oxycodone. That's a 39-fold increase in 22 years.

397. Defendants are also well-aware that for 2018, the DEA proposed a 20% reduction in the number of prescribed schedule II opioid painkillers that can be produced in the United States, with Acting Administrator Chuck Rosenberg warning that "Physicians, pharmacists, and

---

[129] *Id.* (citing Daneshvari R. Solanki et al., *Monitoring Opioid Adherence in Chronic Pain Patients: Assessment of Risk of Substance Misuse*, 14 Pain Physician J. 119, 120 (2011)).
[130] "A Nation in Pain" by Express Scripts, 2015.
[131] *Id.*
[132] *Id.*
[133] *Id.*

patients must recognize the inherent risks of these powerful medications, especially for long-term use."

### C. The Stream of Opioids into Tennessee is Alarmingly High and Put Defendants on Notice of Abuse and Diversion

398.    Tennessee currently has the third highest statewide opioid prescription rate in the nation.[134] Indeed, Tennessee doctors in 2015 wrote more than 7.8 million opioid prescriptions — or 1.18 prescriptions for every man, woman and child in the State, placing Tennessee number 2 in the nation among all States for the number of opioid prescriptions per capita according to IMS Health data. By contrast, California with its population of 38.8 million people only had 0.48 prescriptions per capita in 2015. As reported by the CDC, Tennessee's oxycodone prescription rate is twenty-two times that of Minnesota's. As reported by Commissioner of Health Dreyzehner in 2015 his presentation "Neonatal Abstinence Syndrome, a Tennessee Perspective," 51 hydrocodone pills and 21 oxycodone pills were prescribed for every Tennessean during the period covered by that report. The same report details the dramatic, multi-fold increase in opioid prescriptions since 1999, in the absence of any meaningful increase in patients experiencing chronic pain.

399.    According to the Tennessee Department of Health's Drug Overdose Dashboard, there were 7,636,112 opioid prescriptions written in Tennessee in 2016 alone.[135] The State is currently dispensing opioids at rate of 68.5 opioid prescriptions per 100 persons.[136]

400.    According to IMS Health Data, the number of prescriptions of popular branded and generic opioid products containing hydromorphone, oxymorphone, oxycodone, and

---

[134] See https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.
[135] Tennessee Drug Overdose Dashboard.
[136] Center for Disease Control, *U.S. State Opioid Dispensing Rates, 2020*, https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.

hydrocodone in the State of Tennessee totaled 6,148,823 for the 12-month period of September 2015 through August 2016, and 5,639,429 for the 12-month period of September 2016 through August 2017. This means in just over a two-year period, Tennesseans received more than 11.7 million of these prescriptions.

### D. The Opioid Epidemic Has Devastated Tennessee Communities

401.    It is difficult to overstate the human, economic, and societal toll that the opioid epidemic and associated abuse and diversion have wrought in Tennessee. The levels of opioid abuse in Tennessee are staggering: Tennessee and Plaintiffs' community are awash in opioids, plagued by high levels of opioid-induced deaths and babies born with NAS, and racked by an illegal opioids market. The flood of opioids has had – and continues to have – predictably devastating effects on Tennessee communities, including Plaintiffs' community. This includes staggering rates of addiction, opioid-related deaths, and babies born with NAS, along with the presence of criminal drug trafficking rings.

402.    "Opioid overdoses, mainly from prescription drugs, are … the leading cause of the recent unexpected rise in the mortality rate of middle-aged white Americans, particularly women in rural areas, after decades of steady decline."[137]

403.    As recently as 2016, the preeminent medical journal in the United States concluded that "[t][wo major facts can no longer be questioned. First, opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions….Second, the major source of

---

[137] Lenny Bernstein, et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'*, washingtonpost.com, Oct. 22, 2016, available at: https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

diverted opioids is physician prescriptions."[138] Overdose deaths increased in Tennessee from 342 in 1999 to 2,388 in 2020, the last year for which overdoses have been calculated.[139] That represents a nearly 600% increase. Tragically, the rates of opioid deaths in Tennessee outpace the national average by a wide margin. The vast majority of overdose deaths in Tennessee – nearly 72% in 2015 – involved opioids.[140]  From 2012 to 2020 (the last year for which data has been reported), Tennessee set a new record each year for the number of opioid overdose deaths, with 2,388 in 2020 alone.[141] The rate in 2020 equated to more than 6 opioid overdose deaths in Tennessee every single day.



**Rates of Opioid Related Overdose Deaths (rate per 100,000 Population)
Tennessee and United States, 1999-2010**



---

[138] "Opioid Abuse in Chronic Pain — Misconceptions and Mitigation Strategies," Nora D. Volkow, M.D., and A. Thomas McLellan, Ph.D., N Engl J Med 2016; 374:1253-1263 (March 31, 2016), accessible at http://www.nejm.org/doi/full/10.1056/NEJMra1507771.
[139] Tennessee Drug Overdose Dashboard.
[140] *Id.*
[141] *Id.*

Between 2005 and 2015, just one decade, unintentional overdose deaths in Tennessee increased over 250%. Unintentional overdose deaths now account for more early deaths in Tennessee than automobile accidents, suicides, or homicides.[142]

404.    Defendants also contributed to NAS deaths in Tennessee. NAS is a clinical diagnosis, and "a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy."[143]

405.    According to a report produced by Governor Bill Haslam's Opioid Abuse Working Group pursuant to 2015 Tenn. Pub. Acts Ch. 389 ("Governor's Working Group Report"), "[t]he number of babies born with Neonatal Abstinence Syndrome (NAS). . . increased tenfold from 2000 to 2010."[144] Since 2010, the problem has only gotten worse.

406.    Along with overdose deaths, the number and rate of NAS has also increased dramatically in Tennessee since 2007:



NAS Hospitalizations in TN: 1999-2012

---

[142] *Working Group Report* at 4.
[143] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome*, 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.
[144] *Working Group Report* at 4 (emphasis added).

407.    As illustrated by the following map, researchers analyzing hospital discharge data have determined that Tennessee, along with its border states Kentucky, Alabama, and Mississippi, have the highest rates of NAS births in the nation[145]



408.    The percentage of pregnant women served by the Tennessee Department of Mental Health & Substance Abuse Services—42.3% in 2012—listing prescription opioids as their primary substance of abuse was over twice the percentage in the United States overall (18.4% in 2012).

409.    TennCare eligibility records establish that 24.3% of babies born with NAS in 2012 were placed in the Department of Children's Services' custody within one year of birth.[146]

---

[145] Stephen W. Patrick et al., *Increasing Incidence of Neonatal Abstinence Syndrome: United States 2009-2012*, 35(8) J. Peronatol. 650, 650-55.
[146] *Working Group Report* at 4.

410. The epidemic of NAS babies is an outgrowth of the explosion in the amount of opioids in Tennessee since the mid-1990s. As the Appalachia HIDTA recognized in its 2015 Annual Report:

> [T]he state of Tennessee and east Tennessee in particular, is plagued by an epidemic of opioid abuse, which has unfortunately now resulted in a resurgence of heroin as a growing threat. A consequence of this opioid abuse is the alarming number of children being born dependent on opioids, afflicted with Neonatal Abstinence Syndrome (NAS). Children born with NAS suffer extreme physical symptoms of withdrawal and require specialized care in the neonatal wards of hospitals. This treatment often consists of children being given smaller doses of methadone or similar drugs, over time, to break their addiction to opioids.[147]

411. The direct link between the flood of prescription opioids and the NAS baby crisis in Tennessee has been clearly stated by Tennessee's Commissioner of Health Dr. John Dreyzehner. In a 2015 presentation entitled "Neonatal Abstinence Syndrome: A Tennessee Perspective," Commissioner Dreyzehner addressed "the Substance Abuse Epidemic and resulting NAS epidemic."[148]

412. In his NAS presentation, Commissioner Dreyzehner identified the obvious link between opioid sales and opioid related health problems, noting "the incredible correlation between sales and supply and availability [of opioids] and opioid related deaths and opioid treatment admissions."[149]

413. Additionally, Dr. Stephen Loyd, Medical Director of the Tennessee Department of Mental Health and Substance Abuse Services, recently testified before the Tennessee House of Representatives' Opioid Task Force ("House Opioid Task Force") that: "[m]arketing of

---

[147] U.S. Dep't of Justice, Appalachia High Intensity Drug Trafficking Area, CY2015 Annual Report, at 4 (2015).

[148] National DEC, "Neonatal Abstinence Syndrome A Tennessee Perspective," Vimeo, May 4, 2015. Available at: https://vimeo.com/126839454 (emphasis added).

[149] Id.

opioids as having a low addictive potential when used for the treatment of chronic pain" resulted in "opioids prescribed more freely by practitioners," and, in turn, an "increase in number of babies born drug dependent."[150]

414.    The Nationwide epidemic of NAS has a focal point in Tennessee.[151] The statistics are alarming:[152]

> a.  in 2015, 12.1 of every 1,000 babies were born with NAS in Tennessee;
>
> b.  in 2016, 12.2 of every 1,000 babies were born with NAS in Tennessee;
>
> c.  in 2017, 13.5 of every 1,000 babies were born with NAS in Tennessee;

415.    Among other issues, NAS babies experience long-term difficulties, including but not limited to the following types of effects: poor performance in school;[153] higher risk of developmental disabilities and the accompanying need for special needs services;[154] and lower cognitive function.[155] Thus, the Baby Doe Plaintiffs will likely suffer long-term effects that will require lifelong treatment and special education expenses, and the Baby Doe Plaintiffs may suffer sustained (perhaps lifelong) cognitive impairments.

### E.  In Addition to Death and NAS, the Opioid Abuse and Diversion Enabled by Defendants has Other Deleterious Economic and Societal Consequences

---

[150] House Opioid Task Force, February 23, 2017.

[151] The TN Department of Health has tracked statistics related to babies with NAS from which the following statistical data has been gathered. Available at: https://www.tn.gov/health/article/nas-update-archive.html.

[152] Id.

[153] Neonatal Abstinence Syndrome and High School Performance (Jan. 16, 2017), available at: http://i2.cdn.turner.com/cnn/2017/images/01/16/neonatal.abstinence.syndrome.and.high.school.performance.pdf.

[154] https://consumer.healthday.com/pregnancy-information-29/pregnancy-drugs-news-545/babies-born-addicted-to-opioids-often-struggle-with-learning-722293.html (summarizing results of CDC study of NAS-born babies in Tennessee).

[155] Nygaard, Egil, et al., Longitudinal Cognitive Development of Children Born to Mothers with Opioids and Polysubstance Abuse, Pediatric RESEARCH, Vol. 28 No. 3 (Sept. 2015).

416.    In addition to these health effects, the flood of opioids into Tennessee corresponds to lost productivity and increases in crime, children in State custody, and treatment and healthcare costs.[156] In a 2013 report, the State of Tennessee itself identified prescription drug as the cause of these deleterious effects:[157]

## SUMMARY OF THE PRESCRIPTION DRUG EPIDEMIC IN TENNESSEE

### Who Abuses Prescription Drugs?
- In 2012, prescription opioids became the primary substance of abuse for people in Department of Mental Health and Substance Abuse Services-funded treatment, overtaking alcohol for the first time.
- Almost 5% of Tennesseans have used pain relievers in the past year for non-medical purposes.
- Young adults (18-25-year-olds) in Tennessee are using prescription opioids at a 30% higher rate than the national average.

### Access to Prescription Drugs
- **High Number of Prescriptions Dispensed**
  - There were 25% more controlled substances dispensed in Tennessee in 2012 than in 2010.
- **Doctor Shopping**
  - In March 2013, 2,010 people received prescriptions for opioids or benzodiazepines from four or more prescribers.
- **Prescribing Practices**
  - As of August 1, 2013, 25 physicians had been prosecuted for overprescribing during 2013.
- **Sources of Prescription Drugs**
  - More than 70% of people who use prescription drugs for non-medical reasons got them from a friend or relative.

### Consequences of Prescription Drug Abuse
- **Healthcare Costs**
  - The number of emergency department visits for prescription drug poisoning has increased by approximately 40% from 2005 to 2010.
- **Overdose Deaths**
  - There has been a 220% increase in the number of drug overdose deaths from 1999 to 2012 (342 in 1999 to 1,094 in 2012).
- **Criminal Justice System Involvement**
  - Drug-related crimes against property, people and society have increased by 33% from 2005 to 2012.
- **Lost Productivity**
  - The cost of lost productivity due to prescription drug abuse in Tennessee was $142.9 million in 2008. This number adjusted for 2013 inflation is $155.2 million.
- **Children in State Custody**
  - About 50% of the youth taken into Department of Children's Services custody resulted from parental drug use.
- **Neonatal Abstinence Syndrome**
  - Over the past decade, we have seen a nearly ten-fold rise in the incidence of babies born with Neonatal Abstinence Syndrome in Tennessee.
- **Treatment Costs**
  - It is estimated that the cost of providing state-funded treatment services to individuals that abuse prescription drugs and live below the poverty level would cost $27,933,600.

---

[156] "Prescription for Success" at p. 9.

[157] *Id.*

417.    As the graphic below reflects, opioid overdose deaths represent only the "tip of the iceberg" of the human and societal costs of the opioid epidemic:[158]





418.    According to a recent article by the Tennessean, the "substance abuse epidemic – most notably involving opioids" -- costs Tennessee more than $2 billion annually.[159] That $2 billion annual price tag includes $46 million for babies born in Tennessee with NAS; $422.5 million for hospitalizations associated with opioid abuse; and another $372,440 in emergency room visits associated with opioid abuse.[160] However, the largest component of the substantial yearly costs is the $1.29 billion in "lost income from having an estimated 31,000 people, or 1 percent of the workforce, out of jobs.[161] As the article further explains:

---

[158] Benjamin Schachtman, *'Closer to Home' – The Cost of the Opioid Epidemic May be the Tip of the Iceberg*, portcitydaily.com, Apr. 3, 2017 (attributing graphic chart to the N.C. Public Health Department). Available at: http://portcitydaily.com/2017/04/03/closer-to-home-the-cost-of-the-opioid-epidemic-may-be-the-tip-of-the-iceberg/.

[159] Holly Fletcher, *Drug, alcohol abuse saps $2 billion from Tennessee annually – an under-the-radar impact of the opioid epidemic*, USA TODAY NETWORK – Tennessee (Dec. 3, 2017). Available at: https://www.tennessean.com/story/money/industries/health-care/2017/12/04/drug-alcohol-abuse-saps-2-billion-tennessee-annually-under-the-radar-impac.

[160] *Id.*

[161] *Id.*

Teresa Waters, the chair of preventive medicine at the University of Tennessee Health Sciences Center and person responsible for compiling the data used in the Tennessean article, said she "took a conservative approach to the analysis so the overall economic impact and state spending is likely higher." In particular, Waters noted that "she didn't include costs associated with substance abuse overdoses because of debate over how to estimate economic impact from early loss of life."[162]

419.     Defendants' creation and/or expansion of the opioid market has given rise to a market for heroin in Tennessee, made up largely of addicts who can no longer afford diverted prescription opioids available on the black market. There is a relationship between opioid pain reliever use and heroin use. According to the federal government's National Survey on Drug Use and Health, four out of five heroin addictions begin with opioid prescription pain relievers.[163]

420.     On November 13, 2015, E. Douglas Varney, Commissioner of the Tennessee Department of Mental Health, issued a message detailing the recent rise of heroin abuse in Tennessee.[164] In the message, Varney explained that, as the state "forged efforts to reduce availability of opioid based pain remedies, in the shadows, heroin arrived on the scene. It arrived like a tidal wave in Tennessee. It's a far more potent form of opioids, cheaper, more dangerous and more lethal."[165] Varney referenced data from multiple sources showing heroin, and heroin-related criminal activity, sharply on the rise, and said: "I'm saddened to see our friends and

---

[162] *Id.*

[163] Pradip K. Muhuri et al., Substance Abuse and Mental Health Services Administration, *Associations of Nonmedical Pain Reliever Use and Initiation of Heroin Use in the United States* (August 2013), *available at*: http://www.samhsa.gov/data/sites/default/files/DR006/DR006/nonmedical-pain-reliever-use-2013.htm.

[164] TN Dep't of Mental Health and Substance Abuse Services, *Message from Commissioner E. Douglas Varney on Heroin's Grip in our Cities and Suburbs* (Nov. 13, 2015), *available at*: https://www.tn.gov/behavioral-health/news/20176.

[165] *Id.*

neighbors that have been struggling with opioid addiction now transitioning to heroin which is coming from the criminal underground street dealer."[166]

421.    In a December 2016 publication of the Tennessee Medical Association titled "No Easy Fix: Tennessee's Doctors Take on The Opioid Abuse Epidemic," Dr. Roland W. Gray described the opioid epidemic as the "worst and deadliest drug epidemic in our nation's history."[167] He went on to say that "[t]here's good news in that we are prescribing significantly fewer opiates in Tennessee; the bad news is they are being replaced by a heroin epidemic. Tennesseans are rapidly turning to those drugs – they're available on the street and are cheaper and far more powerful than prescription opiates."[168]

422.    According to the Tennessee Department of Health, heroin-associated overdose deaths are also on the rise, increasing from 147 in 2014 to 205 in 2015.[169]

423.    Commissioner Dreyzehner has determined that "[t]here is a direct correlation between opioid addiction and heroin use."[170]

424.    As set forth in a September 2016 report by the Tennessee Department of Mental Health and Substance Abuse Services, people with prior treatment admissions, people who inject opioids, people ages 25-34, and people who started opioid use after age 18 are all at increased risk for switching from prescription opioids to heroin.[171]

---

[166] *Id.*

[167] Roland W. Gray, *The Good News/Bad News About Tennessee's Opioid Epidemic*, 109 Tenn. Med.. 4, 23 (2016), *available at:*
https://www.tnmed.org/Documents/TennMed-Qtr4-05FINAL.pdf.

[168] *Id.*

[169] Tenn. Dep't of Health, *1,451 Tennesseans Die from Drug Overdoses in 2015*, tn.gov (Nov. 15, 2016). Available at: http://tn.gov/health/news/46773.

[170] *Working Group Report.*

[171] K. Edwards, Tennessee Department of Mental Health & Substance Abuse Services, *Turning the Curve on Opioid and Heroin Abuse in Tennessee*, 14 (September 14, 2016).

## XII.   Plaintiffs' Neonatal Abstinence Syndrome was a Result of Defendants' Participation in the Illegal Drug Market

425.   Mary Doe became addicted to opioids (and maintained her addiction using diverted opioids) as a result of Defendants' participation in the illegal drug market. Defendants callously and cynically profited from that illegal market.

426.   Plaintiffs are three children born opioid dependent. Each has suffered from their in utero exposure to opioids.

427.   Plaintiffs' NAS and associated conditions are consequences of the illegal market in which the Defendants participated.

428.   Defendants knew that their acts and omissions in marketing, distributing, and dispensing opioids would result in a community of people addicted to opioids. Defendants knew that those people would likely seek opioids through illegal distribution channels. They also knew that a significant number of those individuals are women of child-bearing ages who would give (and have given) birth to babies dependent upon opioids with alarming frequency in Eastern Tennessee.

429.   Plaintiffs are just three of the thousands of innocent infants victimized by Defendants' unlawful conduct. These children will suffer the psychological, physical, and financial burdens of Defendants' campaign to addict America to opioids.

### THE THCLA DOES NOT APPLY

430.   Tennessee's Healthcare Liability Act does not apply to this DDLA action or any other claims made in this lawsuit. While the THCLA applies to "any civil action…alleging that a health care provider or providers have caused an injury relating to the provision of, or failure to provide, health care services to a person," Tenn. Code Ann. § 29-26-101(a)(1), the DDLA is distinct in that defendants are liable only for "injury resulting from an individual's use of an

illegal drug." Tenn. Code Ann. § 29-38-105(a). Plaintiffs have no burden of establishing direct or proximate causation between defendants' alleged provision of health care services; instead, Plaintiffs' evidentiary burden with regard to Defendants' conduct is to show "[t]he defendant's participation in the illegal drug market was connected with the same type of illegal drug used by the individual drug user." Tenn. Code Ann. § 29-38-106(b)(2)(B). Absent a causal link to the damages alleged herein, Defendants' conduct does not fall under the umbrella of the THCLA.

431. Without conceding that Tennessee's Healthcare Liability Act applies to any claim brought in this action, or that a certificate is required under the Tennessee Healthcare Liability Act for any claim brought in this action, and pled in the alternative, to the extent necessary, Plaintiffs have complied with the certificate of good faith requirement of the Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101, et seq, which has been interpreted as a jurisdictional requirement. Pursuant to Tenn. Code Ann. § 29-26-122(a), a Certificate of Good Faith signed by the undersigned counsel is included as Exhibit A and incorporated herein by reference.

## DISCLAIMER

432. For the sake of clarity, and in the event any defendant seeks to remove this case or asserts that this pleading (or any other paper) raises any federal claim or federal question, the Baby Doe Plaintiffs expressly disavow any and all federal claims or questions related to opioids distributed by defendants as being a part of this lawsuit. Specifically, the Baby Doe Plaintiffs hereby expressly disavow any cause of action or claim for recovery related to opioids distributed by defendants that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. §1442(a)(1) (federal officer). The Baby Doe Plaintiffs also disavow any cause of action or claim for recovery related to opioids distributed by

defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract including but not limited to any Pharmaceutical Prime Vendor Contract.

## CAUSES OF ACTION

### COUNT I
### TENNESSEE DRUG DEALER LIABILITY ACT

433.     Plaintiffs incorporate all preceding and subsequent paragraphs by reference.

434.     Tennessee's Drug Dealer Liability Act ("DDLA") Tenn. Code Ann. § 29-38-101, et seq., provides a civil remedy for "damages to persons in a community as a result of illegal drug use," including "infants injured as a result of exposure to drugs in utero." Tenn. Code Ann. § 29-38-102.

435.     Plaintiffs have been exposed to illegal opioids in utero because of their birth mother's addiction to, purchase, and use of those illegal drugs. Those exposures provide them the right to sue for damages under the DDLA. Tenn. Code Ann. § 29-38-106(a)(2).

436.     Mary Doe, the birth mother of each Plaintiff, was an "individual drug user" under Tenn. Code Ann. § 29-38-104(4) whose illegal drug use attributable to illegal opioids resulted in in utero opioid exposure during her respective pregnancy with each baby. Tenn. Code Ann. § 29-38-104(4).

437.     Mary Doe's opioid use was illegal in that she used opioids obtained without a valid prescription as required by Tenn. Code Ann. § 53-11-308(a).

438.     Mary Doe bought and used legal and illegal opioids throughout Roane County, Tennessee, including but not limited to, Oxycodone, Oxycontin, Roxicodone, and Hydrocodone. Under the DDLA, the legislative district in Roane County is a "place of illegal drug activity." Tenn. Code Ann. § 29-38-104(12).

439.    Defendants knowingly participated in the production, procurement of the originally diverted prescription, and/or distribution of prescription opioids into the illegal market that reached Plaintiffs' community during all times relevant to this complaint. For purposes of the DDLA, Defendants' "illegal drug market target community" is the entire state of Tennessee, because Defendants participated in the illegal drug market by distributing 4 ounces or more of a "specified illegal drug." Tenn. Code Ann §§ 29-38-104(8), 29-38-109(4). As noted by the Tennessee Department of Health in a 2015 presentation, the Tennessee market for hydrocodone and oxycodone pills comprised of 51 hydrocodone pills and 21 oxycodone pills for every Tennessean. Commissioner of Health Dreyzehner noted that 50% of mothers of NAS babies obtained their pills, in whole or in part, from diverted pills (28.7% solely from diverted drugs). Given that a single oxycodone tablet, on information and belief, weighs approximately 135 mg and contains at least 10 mg of opioid, there can be no question that each of the Drug Producer Defendants far exceeded the four-ounce level, and the same holds true as to the Distributor Defendants and Pharmacy Chain Defendants.

440.    The Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants all recognized that they had a responsibility not to procure or fill suspicious orders, not to convince prescribers to write scripts without a valid medical purpose, and not to supply channels of distribution that they knew or reasonably expected would result in diversion. Nevertheless, they violated these responsibilities through the various acts referenced herein.

441.    Under Tennessee criminal laws, including, but not limited to, Tenn. Code Ann. § 39-17-417 and Tenn. Code Ann. § 39-17-418, opioids (including prescription opioids) are illegal drugs if possessed, sold, and distributed without a valid prescription.

442. The Individual Dealer Defendants each sold prescription opioids illegally in the illegal market that included Roane County.

443. The place of illegal drug activity by the individual drug user (here, Mary Doe) is within the illegal drug market target community of the Defendants.

444. The Defendants' participation in the illegal drug market was connected with the same type of illegal drug, an opioid, used by the individual drug user (Mary Doe).

445. The Defendants participated in the illegal drug market during Mary Doe's period of illegal drug use.

446. Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence." For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes. If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain. The Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants did not lawfully distribute prescription opioids into or within Tennessee. Instead, using their licenses as a cover, they unlawfully distributed drugs without maintaining necessary controls (rendering the distribution unlawful), knowingly distributed those drugs into channels that they knew were resulting in diversion, knowingly encouraged high-volume pill mill prescribers to prescribe opioids without a legitimate medical purpose to feed drug abusers, pill seekers, and drug dealers, knowingly supplied

pharmacies serving pill mills, and knowingly dispensed prescriptions that were not made for a legitimate medical purpose.

447. The Producer Defendants also committed various other acts intended to facilitate the marketing or distribution of illegal opioids (including opioids that reached Plaintiffs) for purposes of Tenn. Code Ann. § 29-38-104(9). These acts are detailed in the preceding paragraphs, which are incorporated by reference. Those acts include, but are not limited to:

   a. engaging in a mass marketing campaign to downplay the risks of addiction from long-term use of opioids of non-cancer pain;

   b. taking actions that violated DEA and FDA requirement or guidelines regarding the marketing and promotion of their drugs and/or suspicious order monitoring;

   c. utilizing front groups and key opinion leaders to spread misinformation regarding the risks of addiction and the signs of addiction;

   d. utilizing marketing teams to devise ways to overcome the legitimate concerns of Tennessee prescribers regarding long-term use of opioids;

   e. successfully encouraging Tennessee prescribers to engage in prescription practices that defendants knew and expected would drive up addiction rates;

   f. oversupplying Tennessee and Plaintiffs' community with opioids, knowing that the oversupply would necessarily feed and expand the black market;

   g. targeting the highest-volume Tennessee prescribers for sales efforts and calling on these prescribers repeatedly to convince them to prescribe more opioids;

   h. using volume-based bonuses and commissions for sales representatives with respect to a highly addictive and widely abused narcotic, and otherwise encouraging and rewarding sales representatives for doing business with Tennessee pill mills and other over-prescribers;

   i. knowingly establishing business relationships with Tennessee pill mills and over-prescribers to compete for their business by convincing them to prescribe more opioids, including high-volume prescribers in small, rural Tennessee communities who were prescribing opioids at unjustifiable levels;

j.  directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after it was clear, even by defendants' own stated criteria, that those prescribers were engaging in highly suspicious prescribing practices or criminal conduct;

k.  directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after receiving reports from law enforcement that the prescribers and pharmacies were supplying drug addicts and the illegal market;

l.  establishing new accounts with high-volume opioid prescribers without due diligence, knowing that the new account may be a pill mill;

m.  providing patients or Tennessee prescribers incentives to prescribe more opioids;

n.  convincing naïve Tennessee doctors willingly to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale;

o.  directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids when defendants knew that those prescribers were likely engaging in unlawful conduct and feeding the illegal drug market;

p.  incentivizing sales representatives to do business both with Tennessee pill mills and with pharmacies supplying pill mills (and financially rewarding those sales associates for doing so);

q.  filling suspicious orders intended for distribution in Tennessee despite knowing that the orders reflected diversion;

r.  implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded in Tennessee and elsewhere;

s.  filling orders that defendants had subjectively identified as suspicious before undertaking or completing an investigation into those orders;

t.  permitting sales representatives to call on or prescriber or pharmacy even after internally recommending that the entity be reported to the DEA;

u.  continuing to call on pill mill prescribers and associated pharmacies even after being told by law enforcement that they were likely feeding the illegal drug market;

v. collaborating with the Drug Distributors to provide sham justifications to fill suspicious orders;

w. placing primary or sole responsibility for suspicious order monitoring in the hands of a commission/volume bonus-based sales force with an inherent conflict of interest;

x. allowing inherently conflicted sales representatives to "clear" suspicious orders without any independent investigation;

y. choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

z. allowing sales associates to determine whether to self-report their best customers even where the stated criteria for reporting diversion are met; and

aa. supplying outlandish volumes of prescription opioids to rural Tennessee communities far exceeding any conceivable medical need.

448.    The Distributor Defendants and the Pharmacy Chain Defendants also committed acts intended to facilitate the marketing or distribution of illegal opioids that reached the Baby Doe Plaintiffs for purposes of Tenn. Code Ann. § 29-38-104(9).[172] These acts are detailed in the preceding paragraphs, which are incorporated by reference. Those acts include, but are not limited to:

a. providing volume-based bonuses or commissions to sales representatives relating to shipment of a highly addictive and widely abused narcotic;

b. incentivizing or otherwise rewarding sales personnel who did business with pharmacies that supply pill mills and other over-prescribers;

c. routinely filling suspicious orders, including that should have been flagged as suspicious and impounded based on their own stated criteria (such as orders of unusual size or frequency);

---

[172] As noted in the Disclaimer below, this distribution does not include opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

d.  routinely filling orders, including plainly suspicious orders, without due diligence;

e.  establishing new accounts without due diligence;

f.  implementing a suspicious order marketing program that was designed to fail;

g.  making adjustments to the suspicious order monitoring program to make it less effective on purpose, such as changing thresholds for customers that initially exceeded them;

h.  providing sham justifications to "clear" orders from being impounded or accounts from being frozen through chargeback restrictions;

i.  intentionally seeking out relationships with pain clinics or pharmacies that serve pain clinics;

j.  Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities;

k.  shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need, where the volume of pills far exceeded the number of people, and where the prescription per capita rate was exceedingly high; and

l.  shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee, despite reports from law enforcement, firsthand observations, or other knowledge that the pharmacy was honoring pill mill prescriptions en masse.

449.  As a result, the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants knowingly disseminated massive quantities of prescription opioids to suspect physicians, pharmacies, and into the black market, including to "pill mills".

450.  Similarly, the Individual Dealer Defendants illegally sold and distributed opioids (including opioids of the same type that the other Defendants manufactured, sold, or distributed in Tennessee) within the relevant illegal drug market during the relevant time frame.

451. The Defendants committed acts intended to facilitate the marketing or distribution of illegal opioids (or otherwise illegally sold or distributed opioids) that resulted in the minor children being exposed to opioids in utero. Tenn. Code Ann. § 29-38-104(9).

## COUNT II

### Civil Conspiracy (Tennessee Common Law)

452. Plaintiffs incorporate all preceding and subsequent paragraphs by reference.

453. Defendants in the case conspired with each other and with other large drug companies (including Purdue, Mallinckrodt, and Endo) to expand and supply the illegal market for opioids in Tennessee. They shared a common design to achieve this unlawful purpose.

454. Purdue, Mallinckrodt, and Endo did not comply with their Tennessee duties, including their duty to monitor, report, and refuse to fill suspicious orders – or their duty to have an adequate suspicious order monitoring program. Neither did the Defendants in this action. Among other things, Defendants conspired with each other and with Purdue, Mallinckrodt, and Endo to turn a blind eye to regulatory violations and keep opioids flowing. Defendants also worked to ensure that drugs they knew were feeding the illegal market continued flow unimpeded. These actions were illegal and tortious. Defendants accordingly engaged in concerted action to achieve an unlawful purpose, and engaged in overt acts in furtherance of that conspiracy.

455. This civil conspiracy damaged the Baby Does for the reasons set forth above. While pregnant, Mary Doe illegally obtained and consumed opioids made by one or more Defendants (at least including KVK) and drugs manufactured by Purdue, Mallinckrodt, and Endo. Furthermore, Mary Doe while pregnant otherwise illegally obtained and consumed opioids from the illegal market that Defendants' unlawful conspiracy created and perpetuated.

## PUNITIVE DAMAGES

456. Plaintiffs reassert each and every allegation set forth in all preceding and subsequent paragraphs as if fully restated herein.

457. The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants.

458. The conduct of Defendants as set forth herein clearly and convincingly demonstrates that Defendants acted maliciously, intentionally, fraudulently, and/or recklessly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

1. Economic damages in an amount to be proven at trial. Under the DDLA, "[e]conomic damages, including, but not limited to: the cost of treatment and rehabilitation, medical expenses, loss of economic or educational potential, loss of productivity, absenteeism, support expenses, accidents or injury, and any other pecuniary loss proximately caused by the illegal drug use" described in this Complaint. Tenn. Code Ann. § 29-38-106(c)(1);

2. Non-economic damages in an amount to be proven at trial. Under the DDLA, "[n]on-economic damages, including, but not limited to, physical and emotional pain, suffering, physical impairment, emotional distress, mental anguish, disfigurement, loss of enjoyment, loss of companionship, services and consortium and other nonpecuniary losses proximately caused by an individual's use of an illegal drug." Tenn. Code Ann. § 29-38-106(c)(2);

3. Exemplary/punitive damages;

4.    Awards from all Defendants, including but not limited to costs, attorney's fees, an and other expenses accountants' and experts' fees, costs, and expenses recoverable in this action, including under Tenn. Code Ann. § 29-38-106(c)(3) (4)-(5);

5.    Declaratory relief;

6.    All other remedies and relief available under law; and

7.    Such other and further relief as the Court deems just and proper.

**The Plaintiffs demand a trial by jury on all issues <u>except</u> for attorney's fees and costs.**

Dated: April 24, 2025

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

Kevin W. Thompson (WVSB 5062)
David R. Barney, Jr. (WVSB 7958)
**THOMPSON BARNEY**
2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompsonwv@gmail.com
Email: drbarneywv@gmail.com

Donald E. Creadore (NYS Bar. Regis. No. 2090702)
**CREADORE LAW FIRM, P.C.**
450 Seventh Avenue - Suite 1901
New York, New York 10123
(O) 212.355.7200
(C) 917.226.1881
donald@creadorelawfirm.com

Stephen P. New (WVSB 7756)
STEPHEN NEW & ASSOCIATES
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newlawoffice.com

Kent H. Robbins
242 Northeast 27th Street
Miami, Florida 33137
Telephone: (305) 532-0500
Facsimile: (305) 531-0150
Cell: (305) 632-1770
Email: khr@khrlawoffices.com

# EXHIBIT A

# IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian *ad litem*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: _____  JURY DEMAND |
| Defendants. | ) ) ) ) | |

## CERTIFICATE OF GOOD FAITH

Without conceding that T.C.A. § 29-26-122 applied to the claims asserted by the Plaintiffs in the above-styled action and without conceding that the above-styled case is a "healthcare liability action" as that term is defined by Tenn. Code Ann. § 29-26-101, Plaintiffs submit the following Certificate of Good Faith to comply with that statute's requirements. This is done out of an abundance of caution and should not be construed in any way as an admission that Tenn. Code Ann. § 29-26-122 applies to any claims advanced in the above-styled lawsuit.

A.     In accordance with T.C.A. § 29-26-122, I hereby state the following: (Check item 1 or 2 below and sign your name beneath the item you have checked, verifying the information you have checked. Failure to check item 1 or 2 and/or not signing item 1 or 2 will make this case subject to dismissal with prejudice.)

☒     1.     The plaintiff or plaintiff's counsel has consulted with one (1) or more experts who have provided a signed written statement confirming that upon information and belief they:

(A)     Are competent under § 29-26-115 to express opinion(s) in the case; and

(B)     Believe, based on the information available from the medical records concerning the care and treatment of the Plaintiff for the incident(s) at issue, that there is a good faith basis to maintain the action consistent with the requirements of § 29-26-115.

_____

Signature of Plaintiff if not represented, or Signature of Plaintiff's Counsel

or

☒     2.     The Plaintiff or Plaintiff's counsel has consulted with one (1) or more experts who have provided a signed written statement confirming that upon information and belief they:

(A)     Are competent under § 29-26-115 to express opinion(s) in the case; and
(B)     Believe, based on the information available from the medical records reviewed concerning the care and treatment of the Plaintiff for the incident(s) at issue and, as appropriate, information from the Plaintiff or others with knowledge of the incident(s) at issue, that there are facts material to the resolution of the case that cannot be reasonably ascertained

2

from the medical records or information reasonably available to the Plaintiff or Plaintiff's counsel; and that despite the absence of this information there is a good faith basis for maintaining the action as to each Defendant consistent with the requirements of § 29-26-115. Refusal of the defendant to release the medical records in a timely fashion, or where it is impossible for the plaintiff to obtain the medical records shall waive the requirement that the expert review the medical records prior to expert certification.

_Theresa R Hayfield_

Signature of Plaintiff if not represented, or Signature of Plaintiff's Counsel

B.    You MUST complete the information below and sign:

I have been found in violation of T.C.A. § 29-26-122 _0_ prior times. (Insert number of prior violations by you.)

_Theresa R Hayfield_

Signature of Person Executing This Document

_04/25/2025_

Date



**Herzfeld Suetholz Gastel Leniski and Wall PLLC**

Tricia R. Herzfeld
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Tel: (615) 800-6225
tricia@hsglawgroup.com

April 25, 2025

**Via Fed Ex**
Roane County Circuit Court
200 East Race Street, Ste. 16
Kingston, TN 37763

   RE: *Baby Doe et al. v. Teva Pharmaceuticals, et al.*

Dear Clerk,

   Enclosed please find the following initial pleadings and motions and check in the amount of $324.50 for the filing fee in the above-mentioned matter. Please file and return the copies to our office in the provided self-addressed stamped envelope, including the Summons to Defendants for which we will coordinate service via process server.

1. Complaint;
2. Summons to Defendants;
3. Motions for Admission Pro Hac Vice and Proposed Orders;
4. Motion to Proceed by Pseudonym with corresponding Declaration of Tricia Herzfeld and Proposed Order; and
5. Motion to Appoint Guardian ad Litem and Proposed Order.

Thank you kindly for your attention to this matter.

      Sincerely,

      *s/ Amber N. Szuch*

      Amber Szuch, Paralegal

Enclosures

---

Nashville, TN · Louisville, KY · Cincinnati, OH · Washington, D.C.

hsglawgroup.com


Return

| Roane County Circuit Court | STATE OF TENNESSEE CIVIL ALIAS SUMMONS page 1 of 2 | Case Number 2025CV46 |
|---|---|---|

**Baby Doe 1, et al,**  Vs.  **Allergan Finances, LLC., et al,**

Served On:

**Actavis, LLC**  **Corporation Service Company, 251 Little Falls Drive Wilmington, DE 19808**

You are hereby summoned to defend a civil action filed against you in Circuit Court, Roane County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _July 23, 2025_

Clerk / Deputy Clerk

Attorney for Plaintiff:  Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____  By: _____

Please Print: Officer, Title

Agency Address  Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

Signature of Plaintiff  Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

543-7130-6259, v. 1

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

4843-7130-6259, v. 1

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al, |

Served On:

**CVS Indiana LLC** **c/o CT Corporation System at 334 North Senate Avenue, Indianapolis, IN**

You are hereby summoned to defend a civil action filed against you in Circuit Court, Roane County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: July 22, 2025

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____

By: _____
Please Print: Officer, Title

Agency Address

Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

Signature of Plaintiff

Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| Roane County Circuit Court | STATE OF TENNESSEE CIVIL ALIAS SUMMONS page 1 of 2 | Case Number 2025-CV-46 |
| --- | --- | --- |

**Baby Doe 1, et al.**     Vs.     **Allergan Finances, LLC., et al.**

Served On:

**Johnson & Johnson, Inc.**    **One Johnson and Johnson Plaza, New Brunswick, NJ 08933**

You are hereby summoned to defend a civil action filed against you in Circuit Court, Roane County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _July 22, 2025_        _Lucy Guy_
                                             Clerk / Deputy Clerk

Attorney for Plaintiff:   Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to    _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____          _____
                                 Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date: _____          By: _____
                                       Please Print: Officer, Title

_____          _____
Agency Address                                Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____          _____
                                   Notary Public / Deputy Clerk (Comm. Expires _____ )

_____      _____
Signature of Plaintiff                 Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

Return

<table>
<tr><td>**Roane County**<br>**Circuit Court**</td><td>**STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2</td><td>**Case Number**<br>**2025 CV 46**<br>25-CV-46</td></tr>
</table>

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al,** |

Served On:

**Michael Puckett**    1353 BYRD CIR, KINGSTON, TN 37763

You are hereby summoned to defend a civil action filed against you in Circuit Court, Roane County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____2-8-25_____

Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to    _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____    By: _____
                                Please Print: Officer, Title

Agency Address                   Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

Signature of Plaintiff                   Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11

4883-7130-

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at (   ) _____.*

*Rev. 03/11*

4883-7130-

| Roane County<br>Circuit Court | # STATE OF TENNESSEE<br>## CIVIL SUMMONS<br>page 1 of 2 | Case Number<br>**2025 CV 46**<br>25·CV·46 |

| **Baby Doe 1, et al.** | Vs. | **Allergan Finances, LLC., et al,** |

Served On:

**Stephanie Puckett**    **1353 BYRD CIR, KINGSTON, TN 37763**

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Roane</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: ___7-8-25___

Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to    _____, _____ Clerk, _____County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date:_____    By:_____
Please Print: Officer, Title

_____
Agency Address    Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

_____
Signature of Plaintiff    Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al, |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 134 of 454    *Rev. 03/11*
PageID #: 569
4883-7130-

| **Roane County** Circuit Court | **STATE OF TENNESSEE** **CIVIL SUMMONS** page 1 of 2 | **Case Number** 2025CV46 |
|---|---|---|

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al.** |
|---|---|---|

Served On:

**Allergan Finances, LLC**   c/o Corporation Trust Company of Nevada, 701 S. Carson Street, Suite 200, Carson City, Nevada 89701

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _4.29.2025_

Clerk / Deputy Clerk

Attorney for Plaintiff: _Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212_

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____   By: _____

Please Print: Officer, Title

Agency Address _____   Signature _____

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff _____   Plaintiff's Attorney (Or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

Baby Doe 1, et al.          Vs.          Allergan Finances, LLC., et al.

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

Case 3:25-cv-00383-TAV-JEM     Document 1-7     Filed 08/07/25     Page 136 of 454
PageID #: 571

4883-7130-

*Return*

| Baby Doe 1, et al. | **Vs.** | Allergan Finances, LLC., et al, |
| --- | --- | --- |

Served On:

___Actavis Pharma, Inc.___  **c/o Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203**

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: ___4.29.2025___

<u>Clerk / Deputy Clerk</u>

Attorney for Plaintiff: ___Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212___

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____                By:_____
                                                     Please Print: Officer, Title

_____                _____
Agency Address                                           Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Signature of Plaintiff

_____
Notary Public / Deputy Clerk (Comm. Expires _____)

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

4883-7130-

| **Roane County** Circuit Court | **STATE OF TENNESSEE** **CIVIL SUMMONS** page 1 of 2 | **Case Number** 2025CV46 |
|---|---|---|
| **Baby Doe 1, et al.** | Vs. | **Allergan Finances, LLC., et al,** |

Served On:

_____**Actavis, LLC.**_____ **c/o Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203**

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____4.29.2025_____

Clerk / Deputy Clerk

Attorney for Plaintiff: ___Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212___

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____

By: _____
Please Print: Officer, Title

Agency Address _____

Signature _____

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

Signature of Plaintiff _____

Plaintiff's Attorney (Or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

| Roane County Circuit Court | # STATE OF TENNESSEE CIVIL SUMMONS page 1 of 2 | Case Number 2025CV46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

**Amerisourcebergen Drug Corp.**    c/o C T Corporation System, 300 Montvue Rd, Knoxville, TN 37919

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:  4.29.2025

_____
Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to  _____, _____ Clerk, _____County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____    By:_____
                                     Please Print: Officer, Title

_____        _____
Agency Address                   Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Signature of Plaintiff

_____
Notary Public / Deputy Clerk (Comm. Expires _____ )

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br>2025SCV46 |
|---|---|---|
| __Baby Doe 1, et al.__ | Vs. | __Allergan Finances, LLC., et al.__ |

Served On:

__Cardinal Health, Inc.__ __c/o CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219__

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: __4.29.2025__

Clerk / Deputy Clerk

Attorney for Plaintiff: __Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212__

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of_____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____ By:_____

Please Print: Officer, Title

Agency Address _____ _____

Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant_____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff

Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____ _____, ADA Coordinator, at ( ) _____.*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 144 of 454    *Rev. 03/11*
PageID #: 579

4883-7130-

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br>2025 CV 46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

CVS Indiana LLC     c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff:  Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to  _____, _____ Clerk, _____County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____            _____
                                        Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____            By:_____
                                        Please Print: Officer, Title

_____            _____
Agency Address                              Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____            _____
                                 Notary Public / Deputy Clerk (Comm. Expires _____ )

_____            _____
Signature of Plaintiff                     Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
| --- | --- | --- |

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

4883-7130-

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br><br>_2025CV46_ |
|---|---|---|

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al,** |
|---|---|---|

Served On:

**CVS Pharmacy, Inc.** c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _4.29.2025_

_Clerk / Deputy Clerk_

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____    By:_____
                               Please Print: Officer, Title

_____        _____
Agency Address                    Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____        Notary Public / Deputy Clerk (Comm. Expires _____ )
Signature of Plaintiff

                                 _____
                                 Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

4883-7130-

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
| --- | --- | --- |

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |

Served On:

CVS TN Distribution LLC    c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____4.29.2025_____          _____
                                              Clerk / Deputy Clerk

Attorney for Plaintiff: _Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212_

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____          By:_____
                                                   Please Print: Officer, Title

_____Agency Address_____          _____Signature_____

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____Signature of Plaintiff_____          Notary Public / Deputy Clerk (Comm. Expires _____)

_____          _____Plaintiff's Attorney (or Person Authorized to Serve Process)_____

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11

4883-7130-

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 150 of 454    *Rev. 03/11*
PageID #: 585

4883-7130-

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br>2025CV46 |
|---|---|---|

| **Baby Doe 1, et al.** | Vs. | **Allergan Finances, LLC., et al.** |
|---|---|---|

Served On:

**Janssen Pharmaceuticals,**     c/o CT Corporation Systems, 300 Montvue Road, Knoxville, Tennessee 37919
**Inc.**

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _4.29.2025_                                   _[signature]_
                                                     Clerk / Deputy Clerk

Attorney for Plaintiff: _Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212_

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County
_____

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____
                                 Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____
_____

Date:_____                    By:_____
                                           Please Print: Officer, Title

_____
Agency Address                          Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____                        _____
Signature of Plaintiff                  Notary Public / Deputy Clerk (Comm. Expires _____)

                                       _____
                                       Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 152 of 454    Rev. 03/11
PageID #: 587

4883-7130-

# STATE OF TENNESSEE
# CIVIL SUMMONS
page 1 of 2

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |

Served On:

__Johnson & Johnson, Inc.__   __c/o CT Corporation Systems, 300 Montvue Road, Knoxville, Tennessee 37919__

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____4.29.2025_____                                     _____
                                                                                          Clerk / Deputy Clerk

Attorney for Plaintiff: __Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212__

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____                    _____
                                                                    Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____
_____

Date:_____                          By:_____
                                                            Please Print: Officer, Title

_____                          _____
Agency Address                                          Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____                          _____
                                                            Notary Public / Deputy Clerk (Comm. Expires _____)

_____                          _____
Signature of Plaintiff                               Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____ _____.*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 154 of 454 *Rev. 03/11*
PageID #: 589

4883-7130-

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | **Case Number**<br>2025CV46 |
|---|---|---|

| _Baby Doe 1, et al._ | **Vs.** | _Allergan Finances, LLC., et al._ |
|---|---|---|

Served On:

___KVK Tech, Inc.___     ___110 Terry Drive Newtown, PA 18940___

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: ___4.29.2025___

_Clerk / Deputy Clerk_

Attorney for Plaintiff: ___Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212___

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_Clerk / Deputy Clerk_

---

**OFFICER'S RETURN: Please execute this summons and make your return within ninety (90) days of issuance as provided by law.**

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____          By:_____
                                        Please Print: Officer, Title

___Agency Address___          _____
                               Signature

---

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____          _____
                                        Notary Public / Deputy Clerk (Comm. Expires _____)

___Signature of Plaintiff___          _____
                                        Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

4883-7130-

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

4883-7130-

**Baby Doe 1, et al.**     Vs.     **Allergan Finances, LLC., et al.**

Served On:

**McKesson Corporation**     **2908 Poston Ave., Nashville, TN 37203**

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____ 4.29.2025 _____

_____
Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____     _____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____    By:_____
Please Print: Officer, Title

_____
Agency Address     _____
Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Signature of Plaintiff

Notary Public / Deputy Clerk (Comm. Expires _____)

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

4883-7130-

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al.** |

Served On:

**Tennessee CVS Pharmacy**
**LLC**    c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____4.29.2025_____      _____
                                         (Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to   _____, _____ Clerk, _____County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
                    Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____
_____

Date:_____      By:_____
                                          Please Print: Officer, Title

___Agency Address___                Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____        _____
Signature of Plaintiff             Notary Public / Deputy Clerk (Comm. Expires _____ )

_____        _____
Signature of Plaintiff            Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
| --- | --- | --- |

**(Attach return receipt on back)**

ADA: *If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br>2025CV46 |
|---|---|---|
| **Baby Doe 1, et al.** | Vs.     **Allergan Finances, LLC., et al,** | |

Served On:

**Teva Pharmaceuticals**    c/o Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, STE 104,
**USA, Inc.**      Wilmington, DE 19810

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:    4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to   _____, _____ Clerk, _____County
_____

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____
_____

Date:_____      By:_____
Please Print: Officer, Title

___Agency Address___      Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____      Notary Public / Deputy Clerk (Comm. Expires _____ )
Signature of Plaintiff

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

| **Roane County** Circuit Court | **STATE OF TENNESSEE** **CIVIL SUMMONS** page 1 of 2 | **Case Number** 2025CV46 |
|---|---|---|
| **Baby Doe 1, et al.** | Vs. | **Allergan Finances, LLC., et al.** |

Served On:

**Walgreen, Co.**   c/o Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois, 62701

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:  4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff:  Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date:_____

By:_____
   Please Print: Officer, Title

_____   _____
Agency Address            Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Signature of Plaintiff

Notary Public / Deputy Clerk (Comm. Expires _____ )

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-

| **Roane County**<br>**Circuit Court** | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | **Case Number**<br>_2025CV46_ |
|---|---|---|
| **Baby Doe 1, et al.** | **Vs.** **Allergan Finances, LLC., et al,** | |

Served On:

Wal-Mart Stores East L.P.    **c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919**

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _4-29-2025_                                          _[signature]_
                                                    Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and the list may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____                    _____
                                                    Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date:_____                    By:_____
                                          Please Print: Officer, Title

_____                    _____
Agency Address                              Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____                    Notary Public / Deputy Clerk (Comm. Expires _____)
Signature of Plaintiff                      Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 166 of 454    *Rev. 03/11*
PageID #: 601

4883-7130-

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br>_2025CV46_ |
|---|---|---|

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al.** |
|---|---|---|

Served On:

_____Walmart, Inc._____ __c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919__

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____4·29·2025_____                    _[signature]_
                                                 Clerk / Deputy Clerk

Attorney for Plaintiff: __Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212__

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____                    _____
                                           Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date:_____

By:_____
   Please Print: Officer, Title

__Agency Address__                        _____
                                           Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____                    _____
                                           Notary Public / Deputy Clerk (Comm. Expires _____)

__Signature of Plaintiff__                 _____
                                           Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

4883-7130-

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at (   ) _____*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 168 of 454  *Rev. 03/11*
PageID #: 603

4883-7130-

| **Roane County** **Circuit Court** | **STATE OF TENNESSEE** **CIVIL SUMMONS** page 1 of 2 | **Case Number** 2025CV46 |
|---|---|---|

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al.** |
|---|---|---|

Served On:

**Watson Laboratories, Inc.**   c/o Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, Nevada 89123

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default will be rendered against you for the relief sought in the complaint.

Issued: _4.29.2025_

_Clerk / Deputy Clerk_

Attorney for Plaintiff: _Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212_

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date:_____   By:_____
  Please Print: Officer, Title

_Agency Address_   _Signature_

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____   _____
  Notary Public / Deputy Clerk (Comm. Expires _____ )

_Signature of Plaintiff_   _Plaintiff's Attorney (or Person Authorized to Serve Process)_

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

4883-7130-



Herzfeld
Suetholz
Gastel
Leniski
and Wall
PLLC

Tricia R. Herzfeld
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Tel: (615) 800-6225
tricia@hsglawgroup.com

June 6, 2025

**Via Fedex Overnight**
Roane County Circuit Court
200 East Race Street, Ste. 16
Kingston, TN 37763

      RE:   *Baby Doe et al. v. Teva Pharmaceuticals, et al.*

Dear Clerk,

      Enclosed please find the following summonses to Jacob Dalton, Brian Brewster and William Baird for filing in the above-mentioned matter. Please file and return the copies to our office in the provided self-addressed stamped envelope. We will coordinate service via process server.

      Thank you kindly for your attention to this matter.

            Sincerely,

            *s/ Amber N. Szuch*

            Amber Szuch, Paralegal

Enclosures

# Printer Settings (2/4)

DCP-L2640DW    Serial No.=U67268E4N860972
Main Version: 1.18
Sub1 Version: 1.05
Security Version: 1.00.00
RAM Size = 256Mbyte

## Remaining life of:

*Toner Cartridge



**Drum Unit

\<Device Status(Total/2-sided)\>
Total Page Count: 540/208
Copy Count: 53/0
PC-Print Count: 472/208
Other Count: 15/0
 ***Average Coverage: 3.73%

\<Total Pages Printed\>
 Manual Feed: 0          2-sided: 104
 Tray 1: 437             Std.Output: 436

\<Total Pages Printed\>
 A4/Letter: 540          Envelope: 0
 Legal/Folio: 0          A5: 0
 B5/Executive: 0         Others: 0

\<Total Pages Printed\>
 Plain/Thin/Recycled: 540
 Thick/Thicker/Bond: 0
 Envelope/Env.Thick/Env.Thin: 0
 Label: 0                Hagaki: 0

\<Total Paper Jams: 2\>
 Jam Inside: 1
 Jam Tray 1: 1           Jam Rear: 0
 Jam 2-sided: 0

\<Error History (last 10 errors)\>
 1: Jam Inside          Page: 434
 2: Jam Tray 1          Page: 434
 3: 2-sided Disabled    Page: 398
 4:
 5:
 6:
 7:
 8:
 9:
10:

\<Replace Count\>
 Toner Cartridge: 1
 Drum Unit: 0

\<Toner Kind\>
 Inbox Toner

  *   Remaining life will vary depending on the types of documents printed,
  **  Based on A4/Letter printing.
  *** Calculated coverage.

| **Roane County** **Circuit Court** | # STATE OF TENNESSEE # CIVIL SUMMONS page 1 of 2 | **Case Number** **2025 CV 46** |
|---|---|---|

| **Baby Doe 1, et al.** | Vs. | **Allergan Finances, LLC., et al,** |
|---|---|---|

Served On:

**Jacob Dalton**   **276 Hot Water Road Tellico Plains, TN 37385.**

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____6.9.2025_____

Clerk / Deputy Clerk

Attorney for Plaintiff:   Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date:_____   By:_____
                              Please Print: Officer, Title

_____   _____
Agency Address                 Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____   _____
                              Notary Public / Deputy Clerk (Comm. Expires _____ )

_____   _____
Signature of Plaintiff         Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11
4883-7130-

# Printer Settings (3/4)

DCP-L2640DW    Serial No.=U67268E4N860972
<<NETWORK CONFIGURATION>>

```
<Node Firmware Ver.>        Firmware Ver.1.18  (Jan 24 2024 14:58:44)
<sysUpTime>                 40 days 12h:28m:55s

<mDNS Service Name>         Brother DCP-L2640DW
<WebServices Name>          Brother DCP-L2640DW [94ddf8241ffa]

<Protocols>
 TCP/IP          on     IPv6          on     NetBIOS/IP      on
 mDNS            on     LLMNR         on     SNTP            on
 Proxy           off    Web Server    on     SNMP            on
 LPD             on     Raw Port      on     IPP             on
 AirPrint        on     Mopria        on     WebServices     on
 Network Scan    on     FTPServer     off    FTPClient       on
 TFTP            off    SMTPCli.      on


<Send E-mail Settings(SMTP)> Port: 25
 Device Mail Address         brn94ddf8241ffa@example.com
 Server                      0.0.0.0

<Certificate>               Status: None
<Global Network Detection>  Detection : on (private)
                            Access Filter : off
<IP Filter>                 Disabled
<SNMP Settings>             Communication Mode: v1/v2c(RO)


<Interface>                 WiredLAN off    MAC Address: 94-dd-f8-24-1f-fa
<Node Type>                 Brother NC-9800h, Ethernet 10/100BASE-TX (Inactive)
<Node name>                 BRN94DDF8241FFA

<IP Settings>               Boot Method: AUTO    3 times    APIPA: Enabled
 IP Address                 0.0.0.0             Subnet Mask: 0.0.0.0
 Gateway                    0.0.0.0
 IPv6 Address               Not Assigned

<DNS Settings>              DNS Address Config: AUTO      Priority: IPv4
 IPv4 DNS Server            Primary:  0.0.0.0  Secondary: 0.0.0.0

<NetBIOS Name>              BRN94DDF8241FFA
<WINS Settings>             WINS Address Config: AUTO
 WINS Server                Primary:  0.0.0.0  Secondary: 0.0.0.0

<Wired IEEE 802.1x>         Status: Off
<Ethernet Link Mode>        Auto
<Ethernet Link Status>      Link DOWN, 10 Half, a0, e0, Link drops=0, r0
<Network Statistics>
 Packets Received           0         Receive Error          0
 Packets Transmitted        0         Transmit Error         0

<Default Password>
 Pwd:                       hW$x#u0F
```

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 2 of 2 | Case Number<br>**2025 CV 46** |
|---|---|---|
| _Baby Doe 1, et al._ | Vs. _Allergan Finances, LLC., et al._ | |

**(Attach return receipt on back)**

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

_Rev. 03/11_
4883-7130-

*Return*

<table>
<tr>
<td><strong>Roane County<br>Circuit Court</strong></td>
<td align="center"><h1>STATE OF TENNESSEE<br>CIVIL SUMMONS</h1>page 1 of 2</td>
<td align="center"><strong>Case Number<br>2025 CV 46</strong></td>
</tr>
</table>

**Baby Doe 1, et al.** _____ **Vs.** _____ **Allergan Finances, LLC., et al,** _____

Served On:

_____ **Brian Brewster** _____ **123 Parris Road Sweetwater, TN 37874.**

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____ 6 . 9 . 2025 _____

_____
Clerk / Deputy Clerk

Attorney for Plaintiff: _____ Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you should have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____ By: _____
Please Print: Officer, Title

_____
Agency Address

_____
Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Notary Public / Deputy Clerk (Comm. Expires _____ )

_____
Signature of Plaintiff

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

*Rev. 03/11*
4883-7130-

| Roane County<br>Circuit Court | STATE OF TENNESSEE<br>CIVIL SUMMONS<br>page 2 of 2 | Case Number<br>2025 CV 46 |
|---|---|---|
| Baby Doe 1, et al. | Vs.    Allergan Finances, LLC., et al. | |

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 177 of 454
PageID #: 612

4883-7130-

_Return_

<table>
<tr>
<td>**Roane County**<br>**Circuit Court**</td>
<td>**STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2</td>
<td>**Case Number**<br>**2025 CV 46**</td>
</tr>
<tr>
<td colspan="3">**Baby Doe 1, et al.**     **Vs.**     **Allergan Finances, LLC., et al,**</td>
</tr>
</table>

Served On:

__William Juston Baird__    431 Ashe Cabin Hollow Road Harriman, TN 37748

You are hereby summoned to defend a civil action filed against you in <u>Circuit</u> Court, <u>Sevier</u> County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: ___6 . 9 . 2025___

_____
Clerk / Deputy Clerk

Attorney for Plaintiff:   Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to    _____, _____ Clerk, _____ County
_____

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____    By: _____
       Please Print: Officer, Title

_____
Agency Address       Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

_____
Signature of Plaintiff       Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

Rev. 03/11

4883-7130-

| Roane County<br>Circuit Court | STATE OF TENNESSEE<br>CIVIL SUMMONS<br>page 2 of 2 | Case Number<br>2025 CV 46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

4883-7130-

BABY DOE 1, BABY DOE 2, and BABY )
DOE 3, by and through their guardian *ad* )
*litem*, )
                   )
       Plaintiffs, )        Civil Action No. 2025CV46
                   )
v. )        JURY DEMAND
                   )
TEVA PHARMACEUTICALS USA, )
INC., et al )
                   )
       Defendants. )

## MOTION FOR ADMISSION *PRO HAC VICE* OF DAVID R. BARNEY, JR.

Pursuant to Rule 19 of the Supreme Court of the State of Tennessee, Anthony Orlandi of the firm Herzfeld, Suetholz, Gastel, Leniski and Wall PLLC, hereby moves the Court to admit David R. Barney, Jr., of the firm Thompson Barney, located at 2030 Kanawha Boulevard, East, in Charleston, West Virginia (25311), *pro hac vice* for purposes of this matter only. In support of this Motion, movant submits to this Court the Affidavit of David R. Barney, Jr., attached as Exhibit A and correspondence to the Board of Professional Responsibility.

For these reasons, Movant respectfully requests that this Court admit David R. Barney, Jr., *pro hac vice* for purposes of this case.

Filed___4 09___20 25
ANN GOLDSTON Time 9 00
By_____D.C.

1

Dated: April 24, 2025   Respectfully submitted,

/s/Anthony Orlandi
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

2

AFFIDAVIT OF DAVID R. BARNEY, JR.
*(Pro Hac Vice Applicant)*

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA

Before me, the undersigned, personally appeared David R. Barney, Jr.                ,
*(Pro Hac Vice Applicant)*
who after being duly sworn makes oath and states as follows:

(1)     My full name is: David R. Barney, Jr.

My residence address is: 110 Whispering Woods Road; Charleston, WV 25304

My firm name is: Thompson Barney

My office address is: 2030 Kanawha Boulevard, East; Charleston, WV 25311-2204

My email address is: drbarneywv@gmail.com

My telephone number is: (304) 343-4401

Other jurisdictions licensed & registration/identifying numbers are:

West Virginia (#7958)

Full name or style of case in which I seek to appear:

Baby Doe 1, Baby Doe 2, & Baby Doe 3, by and through their guardian ad litem

v. Teva Pharmaceuticals USA, Inc., et al.

Name of the client or clients I seek to represent:

Plaintiffs

(2)     The jurisdiction(s) in which licensed to practice law, with date(s) of admission:

West Virginia - 09/29/1999

–1–

Any other courts in which admitted to practice, with date(s) of admission:

None.

Statement of good standing in all other jurisdictions in which applicant is licensed to practice law:

See attached Certificate of Good Standing

(3) Full name or style of each case in which applicant was previously admitted or sought to be admitted *pro hac vice* in any trial or appellate court of Tennessee within the preceding three years, date of any such admission or the date of any such motion that was filed but not granted, and the status of any such case in which not admitted:

None.

(4) Statement concerning whether the applicant lawyer has previously been denied admission *pro hac vice* or has had an admission *pro hac vice* revoked by any court in any jurisdiction and, if so, a full description of the circumstances, including the full name or style of the case:

None.

(5) Statement concerning whether the applicant lawyer has ever been disciplined or sanctioned by the Board of Professional Responsibility of the Supreme Court of Tennessee, by any similar lawyer disciplinary agency in any jurisdiction, or by any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

None.

–2–

(6) Statement concerning whether any disciplinary action or investigation concerning the applicant lawyer's conduct is pending before the Board of Professional Responsibility of the Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any jurisdiction, or before any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

None.

(7) Statement that the applicant lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court before which the lawyer seeks to practice:

I agree with the foregoing statement.

(8) Statement that the applicant lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee:

I agree and consent to the foregoing statement.

(9) Tennessee lawyer with whom the applicant lawyer is associated:

Name: Anthony Orlandi

Address: 1920 Adelicia Street, Suite 300; Nashville, TN 37203

Telephone No.: (615) 800-6225          TN BPR No.: 33988

(10) Statement that the applicant lawyer has paid all fees required by this Rule in connection with the motion for admission:

The fees have been paid.

–3–

(11) At the option of the applicant lawyer, any other information supporting the lawyer's admission:

None.

(12) Statement indicating service of the *pro hac vice* motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee:

I agree with the foregoing statement.

(13) A certificate of good standing from the court of last resort of the licensing jurisdiction in which the applicant principally practices, or resides, is <u>attached as an Exhibit</u> to this affidavit and incorporated herein.

I declare under penalty of perjury that the foregoing is true and correct.

_____
*Pro Hac Vice* Applicant

Sworn to and subscribed before me this ⟨14⟩ day of ⟨February⟩, 20 ⟨25⟩.

_____
Notary Public

My commission expires: ⟨March 6 2028⟩

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PATRICIA GAIL GOFF
1498 Valley Dr
South Charleston, WV 25303
My Commission Expires March 6, 2028

–4–

STATE OF WEST VIRGINIA

    I, Jennelle H. Jones, Deputy Clerk of the Supreme Court of Appeals of West Virginia, hereby do certify that David R. Barney Jr., of Charleston, West Virginia, an attorney duly licensed to practice law in this State, was admitted to practice law before the Supreme Court of Appeals of West Virginia, the highest court of the State, on the 29th day of September, 1999, is an attorney in good standing in said Court, and is currently on active status.

    Given under my hand and seal of said Court, at Charleston, West Virginia, this 12th day of February 2025, and in the 162nd year of the State.

_____
Deputy Clerk, Supreme Court of Appeals of West Virginia



# EXHIBIT A

| From: | Amber Szuch |
| To: | Registration - Board of Professional Resp. |
| Cc: | "drbarneywv@gmail.com"; Tricia Herzfeld; Tony Orlandi |
| Subject: | Pro Hac Vice Motion - David Barney, Jr. |
| Date: | Thursday, April 24, 2025 12:12:00 PM |
| Attachments: | image001.png |
| | PHV, David Barney, Jr. for Plaintiffs .pdf |

Good afternoon,

Please see the attached Motion, Affidavit and COGS for David Barney, Jr. for approval to be filed with Roane County Circuit Court.

Thank you,



**Amber Szuch**
Paralegal
P: (615) 800-6225
223 Rosa L Parks Ave.,
Suite 300
Nashville, TN 37203

IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT
ROANE COUNTY, TENNESSEE

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem,* | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 2025CV46 |
| v. | ) ) | JURY DEMAND |
| TEVA PHARMACEUTICALS USA, INC., et al | ) ) ) | |
| Defendants. | ) ) | |

### PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF DAVID BARNEY, JR.

The Motion for Admission *Pro Hac Vice* of David Barney, Jr. having been made by the Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that David Barney, Jr. be admitted *pro hac vice* with regard to the representation of the Plaintiffs, and that Mr. Barney shall be bound by the Rules of this Court with regard to this litigation.

_____

Circuit Court Judge

Filed_____4·29_____, 20 25
ANN GOLDSTON Time 1020
By_____D.C.

1

Submitted for Entry by:

*/s/Anthony Orlandi*
**HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

**IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL DISTRICT**
**ROANE COUNTY, TENNESSEE**

|  |  |  |
|---|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | Civil Action No.: 2025CV46 |
| **v.** | ) ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** | ) ) ) | |
| **Defendants.** | ) ) | |

## MOTION FOR ADMISSION *PRO HAC VICE* OF DONALD CREADORE

Pursuant to Rule 19 of the Supreme Court of the State of Tennessee, Anthony Orlandi of the firm Herzfeld, Suetholz, Gastel, Leniski and Wall PLLC, hereby moves the Court to admit Donald Creadore, of the firm Creadore Law Firm, PC, located at 450 Seventh Avenue, Ste. 1901, in New York, New York (10123), *pro hac vice* for purposes of this matter only. In support of this Motion, movant submits to this Court the Affidavit of Donald Creadore, attached as Exhibit A and correspondence to the Board of Professional Responsibility.

For these reasons, Movant respectfully requests that this Court admit Donald Creadore, *pro hac vice* for purposes of this case.

Filed_____4.29____,2025
ANN GOLDSTON Time _022_
By_____ D.C.

1

Dated: April 24, 2025                    Respectfully submitted,


                                         /s/Anthony Orlandi
                                         **HERZFELD, SUETHOLZ, GASTEL,**
                                         **LENISKI & WALL PLLC**
                                         Tricia Herzfeld (TN BPR #26014)
                                         Anthony Orlandi (TN BPR #33988)
                                         1920 Adelicia St., Ste. 300
                                         Nashville, TN 37212
                                         Telephone: (615) 800-6225
                                         Email: tricia@hsglawgroup.com
                                         Email: tony@hsglawgroup.com

                                         *Counsel for Plaintiffs*

2

AFFIDAVIT OF __DONALD CREADORE__
*(Pro Hac Vice Applicant)*

STATE OF __NEW YORK__

COUNTY OF __NEW YORK__

Before me, the undersigned, personally appeared __DONALD CREADORE__,
*(Pro Hac Vice Applicant)*
who after being duly sworn makes oath and states as follows:

(1)    My full name is: __DONALD CREADORE__

My residence address is: __475 PARK AVENUE, NY, NY 10123__

My firm name is: __CREADORE LAW FIRM PC__

My office address is: __450 SEVENTH AVENUE, SUITE 1901, NEW YORK, NY 10123__

My email address is: __donald@creadorelawfirm.com__

My telephone number is: __212.355.7200__

Other jurisdictions licensed & registration/identifying numbers are:

__NY: 2090702; CT: 305559; MO: 62708__

Full name or style of case in which I seek to appear:

__BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian ad litem,__

__Plaintiffs,   V. TEVA PHARMACEUTICALS USA, INC., ET AL.__

Name of the client or clients I seek to represent:

__BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian ad litem__

(2)    The jurisdiction(s) in which licensed to practice law, with date(s) of admission:

__NY 1987; CT 1988; MO 2012__

–1–

Any other courts in which admitted to practice, with date(s) of admission:

United States District Court, Southern District of New York; Feb. 1990

Statement of good standing in all other jurisdictions in which applicant is licensed to practice law:
ATTACHED

(3) Full name or style of each case in which applicant was previously admitted or sought to be admitted *pro hac vice* in any trial or appellate court of Tennessee within the preceding three years, date of any such admission or the date of any such motion that was filed but not granted, and the status of any such case in which not admitted:

NONE

(4) Statement concerning whether the applicant lawyer has previously been denied admission *pro hac vice* or has had an admission *pro hac vice* revoked by any court in any jurisdiction and, if so, a full description of the circumstances, including the full name or style of the case:

NONE

(5) Statement concerning whether the applicant lawyer has ever been disciplined or sanctioned by the Board of Professional Responsibility of the Supreme Court of Tennessee, by any similar lawyer disciplinary agency in any jurisdiction, or by any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

NOT APPLICABLE

–2–

(6)     Statement concerning whether any disciplinary action or investigation concerning the applicant lawyer's conduct is pending before the Board of Professional Responsibility of the Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any jurisdiction, or before any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

NOT APPLICABLE

(7)     Statement that the applicant lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court before which the lawyer seeks to practice:

THE APPLICANT HAS MADE HIMSELF FAMILIAR WITH THE PREVAILING TENNESSEE

RULES OF PROFESSIONAL CONDUCT

(8)     Statement that the applicant lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee:

APPLICANT CONSENTS TO THE DISCIPLINARY JURISDICTION OF THE BOARD OF

PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE AND THE COURT OF TENNESSEE IN ANY MATTER ARISING OUT OF THE LAWYER'S CONDUCT IN A PROCEEDING OCCURRING IN TENNESSEE.

(9)     Tennessee lawyer with whom the applicant lawyer is associated:

Name: __TRICIA HERZFELD__

Address: __223 Rosa L Parks Ave., Ste 300, NASHVILLE TN 37203__

Telephone No.: __Nashville, TN 37203__     TN BPR No.: __26014__

(10)    Statement that the applicant lawyer has paid all fees required by this Rule in connection with the motion for admission:

ALL FEES REQUIRED BY THIS RULE HAVE BEEN PAID

-3-

(11)    At the option of the applicant lawyer, any other information supporting the lawyer's admission:

   NONE

(12)    Statement indicating service of the *pro hac vice* motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee:

   SERVICE OF THE PRO HAC VICE MOITON AND SUPPORTING PAPERS HAVE BEEN SERVED UPON ALL COUNSEL OF RECORD IN THE PROCEEDING.

(13)    A certificate of good standing from the court of last resort of the licensing jurisdiction in which the applicant principally practices, or resides, is attached as an Exhibit to this affidavit and incorporated herein.

   I declare under penalty of perjury that the foregoing is true and correct.

   _____
   *Pro Hac Vice* Applicant

   Sworn to and subscribed before me this _10_ day of __February__ 20_25_.

   _____
   Notary Public

   My commission expires: _03/31/27_

   HENRY CHEN
   Notary Public - State of New York
   NO. 01CH0004648
   Qualified in New York County
   My Commission Expires Mar 31, 2027

—4—



Appellate Division of the Supreme Court
of the State of New York
Second Judicial Department

I, Darrell M. Joseph, Clerk of the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department, do hereby certify that

## Donald E. Creadore, Jr

was duly licensed and admitted to practice as an Attorney and Counselor at Law in all the courts of this State on **February 4, 1987**, has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counselors at Law on file in this office, is duly registered with the Office of Court Administration, and according to the records of this Court is currently in good standing as an Attorney and Counselor-at-Law.



In Witness Whereof, I have hereunto set my hand in the City of Brooklyn on February 10, 2025.

Clerk of the Court

CertID-00213687

# State of Connecticut

# Supreme Court

I, *Carl D. Cicchetti*, *Chief Clerk of the Supreme Court of the State of Connecticut and keeper of the Seal thereof,*

*Do hereby certify,* *that, in the Superior Court at*                    **Bridgeport**

*on the*      **19th** *day of*      **November, 1986**

**Donald E. Creadore, Jr.**

*of*

**New York, NY**

*having been examined and found duly qualified, was sworn as an attorney and admitted to practice before all courts of this state, and that said attorney is a member of in good standing of the Bar of this State pursuant to Practice Book §2-65.*

*In Testimony Whereof,* *I have hereunto set my hand and affix the Seal of the Supreme Court of the State of Connecticut, at Hartford, this day*      **February 14, 2025**

*Carl D. Cicchetti*
*Chief Clerk*

# EXHIBIT A

| From: | Amber Szuch |
| --- | --- |
| To: | Registration - Board of Professional Resp. |
| Cc: | donald@creadorelawfirm.com; Tony Orlandi; Tricia Herzfeld |
| Subject: | Pro Hac Vice Motion - Donald Creadore |
| Date: | Thursday, April 24, 2025 12:09:00 PM |
| Attachments: | image001.png |
| | PHV, Donald Creadore for Plaintiffs .pdf |

Good afternoon,

Please see the attached Motion, Affidavit and COGS for Donald Creadore for approval to be filed with Roane County Circuit Court.

Thank you,



**Herzfeld Suetholz Gastel Leniski and Wall PLLC**

**Amber Szuch**
Paralegal
P: (615) 800-6225
223 Rosa L Parks Ave.,
Suite 300
Nashville, TN 37203

IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT
ROANE COUNTY, TENNESSEE

| | | |
|---|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil Action No.:** 2025CV46 |
| **v.** | ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** | ) ) ) | |
| **Defendants.** | ) ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF DONALD CREADORE

The Motion for Admission *Pro Hac Vice* of Donald Creadore having been made by the

Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that Donald Creadore be admitted *pro hac vice* with

regard to the representation of the Plaintiffs, and that Mr. Creadore shall be bound by the Rules

of this Court with regard to this litigation.

_____

Circuit Court Judge

Filed 4.29 , 20 25
ANN GOLDSTON Time 10:20
By _____ D.C.

1

Submitted for Entry by:

*/s/Anthony Orlandi*

**HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

**IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ Ninth JUDICIAL DISTRICT**
**ROANE COUNTY, TENNESSEE**

|  |  |
|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*, ) ) ) ) | |
| Plaintiffs, ) ) | Civil Action No.: 2025CV46 |
| v. ) ) | JURY DEMAND |
| TEVA PHARMACEUTICALS USA, INC., et al ) ) ) | |
| Defendants. ) | |

## MOTION FOR ADMISSION *PRO HAC VICE* OF KENT HARRISON ROBBINS

Pursuant to Rule 19 of the Supreme Court of the State of Tennessee, Anthony Orlandi of the firm Herzfeld, Suetholz, Gastel, Leniski and Wall PLLC, hereby moves the Court to admit **Kent Harrison Robbins** of the firm **the Law Offices of Kent Harrison Robbins, 242 NE 27th Street, Miami, Florida 33137**, *pro hac vice* for purposes of this matter only. In support of this Motion, movant submits to this Court the Affidavit of Kent Harrison Robbins attached as Exhibit A and correspondence to the Board of Professional Responsibility.

For these reasons, Movant respectfully requests that this Court Kent Harrison Robbins *pro hac vice* for purposes of this case.

Filed 4.29 2025
ANN GOLDSTON Time 070
By _____ D.C.

1

Dated: April 24, 2025

Respectfully submitted,

/s/Anthony Orlandi
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

2

AFFIDAVIT OF Kent Harrison Robbins
*(Pro Hac Vice Applicant)*

STATE OF Florida

COUNTY OF Miami-Dade

Before me, the undersigned, personally appeared Kent Harrison Robbins,
*(Pro Hac Vice Applicant)*
who after being duly sworn makes oath and states as follows:

(1)     My full name is: Kent Harrison Robbins

My residence address is: 242 NE 27th Street, Miami, Florida 33137

My firm name is: The Law Offices of Kent Harrison Robbins, P.A.

My office address is: 242 NE 27th Street, Miami, Florida 33137

My email address is: khr@khrlawoffices.com

My telephone number is: (305) 532-0500

Other jurisdictions licensed & registration/identifying numbers are:

Florida.  Florida Bar No. 275484

Full name or style of case in which I seek to appear:

Baby Doe 1, et al v. Teva Pharmaceuticals USA., et al

Copy of the Case Style is attached hereto.

Name of the client or clients I seek to represent:

Baby Doe 1, Baby Doe 2 and Baby Doe 3 by and through their guardian ad litem

(2)     The jurisdiction(s) in which licensed to practice law, with date(s) of admission:

Florida, admitted June 13,1979

–1–

Any other courts in which admitted to practice, with date(s) of admission:

United States Supreme Court, 1979
_____

Statement of good standing in all other jurisdictions in which applicant is licensed to practice law:
A Statement of Good Standing dated February 7, 2025 is attached
_____

_____

(3) Full name or style of each case in which applicant was previously admitted or sought to be admitted *pro hac vice* in any trial or appellate court of Tennessee within the preceding three years, date of any such admission or the date of any such motion that was filed but not granted, and the status of any such case in which not admitted:

None
_____

_____

_____

(4) Statement concerning whether the applicant lawyer has previously been denied admission *pro hac vice* or has had an admission *pro hac vice* revoked by any court in any jurisdiction and, if so, a full description of the circumstances, including the full name or style of the case:

None
_____

_____

_____

(5) Statement concerning whether the applicant lawyer has ever been disciplined or sanctioned by the Board of Professional Responsibility of the Supreme Court of Tennessee, by any similar lawyer disciplinary agency in any jurisdiction, or by any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

None
_____

_____

_____

_____

–2–

(6) Statement concerning whether any disciplinary action or investigation concerning the applicant lawyer's conduct is pending before the Board of Professional Responsibility of the Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any jurisdiction, or before any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

None

(7) Statement that the applicant lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court before which the lawyer seeks to practice:

The undersigned has read the Tennessee Rules of Professional Conduct and applicable

rules of procedure.

(8) Statement that the applicant lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee:

The applicant lawyer consents to the jurisdiction and agrees to be bound by the rules.

(9) Tennessee lawyer with whom the applicant lawyer is associated:

Name: Tricia Herzfeld

Address: 1920 Adelicia St., Ste 300, Nashville, TN 37212

Telephone No.: (813) 800-6225        TN BPR No.: 26014

(10) Statement that the applicant lawyer has paid all fees required by this Rule in connection with the motion for admission:
The applicant lawyer will pay all fees required by this rule immediatly before or simultaneously with the filing of the motion.

–3–

(11) At the option of the applicant lawyer, any other information supporting the lawyer's admission:

_____

(12) Statement indicating service of the *pro hac vice* motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee:

Service of the Pro Hac Vice motion and all associated papers will be served timely.

_____

(13) A certificate of good standing from the court of last resort of the licensing jurisdiction in which the applicant principally practices, or resides, is <u>attached as an Exhibit</u> to this affidavit and incorporated herein.

I declare under penalty of perjury that the foregoing is true and correct.

_____
*Pro Hac Vice* Applicant

Sworn to and subscribed before me this 19TH day of February, 2025.

_____
Notary Public

My commission expires: 6/3/2028

KATHRYN ANN MURPHY
Notary Public - State of Florida
Commission # HH 528656
My Comm. Expires Jun 3, 2028
Bonded through National Notary Assn.

–4–



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

State of Florida          )

County of Leon           )

In Re:   0275484
Kent Harrison Robbins
Law Offices of Kent Harrison Robbins
242 NE 27th St
Miami, FL 33137-4522

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **June 13, 1979**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this  7th  day of **February, 2025**.

*Cynthia B. Jackson*

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-329304

# EXHIBIT A

| From: | Amber Szuch |
|---|---|
| To: | Registration - Board of Professional Resp. |
| Cc: | Tricia Herzfeld; Tony Orlandi; khr@khrlawoffices.com |
| Subject: | Pro Hac Vice Motion - Kent Harrison Robbins |
| Date: | Thursday, April 24, 2025 12:17:00 PM |
| Attachments: | PHV, Kent Harrison Robbins for Plaintiffs .pdf |
| | image001.png |

Good afternoon,

Please see the attached Motion, Affidavit and COGS for Kent Harrison Robbins for approval to
be filed with Roane County Circuit Court.

Thank you,



**Herzfeld Suetholz Gastel Leniski and Wall PLLC**

**Amber Szuch**
Paralegal
P: (615) 800-6225
223 Rosa L Parks Ave.,
Suite 300
Nashville, TN 37203

# IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

| | | |
|---|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem,*** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil Action No.: 2025CV46** |
| **v.** | ) ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** | ) ) ) | |
| **Defendants.** | ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF KENT HARRISON ROBBINS

The Motion for Admission *Pro Hac Vice* of Kent Harrison Robbins having been made by

the Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that Kent Harrison Robbins be admitted *pro hac vice*

with regard to the representation of the Plaintiffs, and that Mr. Robbins shall be bound by the

Rules of this Court with regard to this litigation.

_____

Circuit Court Judge

Filed _____4.29____, 20_25_
ANN GOLDSTON Time _030_
By _____ D.C.

1

Submitted for Entry by:

*/s/Anthony Orlandi*
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

2

# IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ _Ninth_ JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

**BABY DOE 1, BABY DOE 2, and BABY** )
**DOE 3, by and through their guardian** *ad* )
*litem,* )
     )
    **Plaintiffs,** )
     )
**v.** )
     )
**TEVA PHARMACEUTICALS USA,** )
**INC., et al** )
     )
    **Defendants.** )

Civil Action No.: 2025CV46

**JURY DEMAND**

## MOTION FOR ADMISSION *PRO HAC VICE* OF KEVIN W. THOMPSON

Pursuant to Rule 19 of the Supreme Court of the State of Tennessee, Anthony Orlandi of the firm Herzfeld, Suetholz, Gastel, Leniski and Wall PLLC, hereby moves the Court to admit Kevin W. Thompson of the firm Thompson Barney, located at 2030 Kanawha Boulevard, East, in Charleston, West Virginia (25311), *pro hac vice* for purposes of this matter only. In support of this Motion, movant submits to this Court the Affidavit of Kevin W. Thompson attached as Exhibit A and correspondence to the Board of Professional Responsibility.

For these reasons, Movant respectfully requests that this Court admit Kevin W. Thompson *pro hac vice* for purposes of this case.

Dated: April 24, 2025                    Respectfully submitted,

                                         /s/Anthony Orlandi
                                         **HERZFELD, SUETHOLZ, GASTEL,**
                                         **LENISKI & WALL PLLC**
                                         Tricia Herzfeld (TN BPR #26014)
                                         Anthony Orlandi (TN BPR #33988)
                                         1920 Adelicia St., Ste. 300
                                         Nashville, TN 37212
                                         Telephone: (615) 800-6225
                                         Email: tricia@hsglawgroup.com
                                         Email: tony@hsglawgroup.com

                                         *Counsel for Plaintiffs*

2

AFFIDAVIT OF KEVIN W. THOMPSON
*(Pro Hac Vice Applicant)*

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA

Before me, the undersigned, personally appeared Kevin W. Thompson ,
*(Pro Hac Vice Applicant)*
who after being duly sworn makes oath and states as follows:

(1) My full name is: Kevin W. Thompson

My residence address is: 1835 Upperline Street; New Orleans, LA 70115

My firm name is: Thompson Barney

My office address is: 2030 Kanawha Boulevard, East; Charleston, WV 25311-2204

My email address is: kwthompsonwv@gmail.com

My telephone number is: (304) 343-4401

Other jurisdictions licensed & registration/identifying numbers are:

West Virginia (#5062)

Full name or style of case in which I seek to appear:

Baby Doe 1, Baby Doe 2, & Baby Doe 3, by and through their guardian ad litem

v. Teva Pharmaceuticals USA, Inc., et al.

Name of the client or clients I seek to represent:

Plaintiffs

(2) The jurisdiction(s) in which licensed to practice law, with date(s) of admission:

West Virginia - 11/01/1988

–1–

Any other courts in which admitted to practice, with date(s) of admission:

None.

Statement of good standing in all other jurisdictions in which applicant is licensed to practice law:
See attached Certificate of Good Standing

(3)     Full name or style of each case in which applicant was previously admitted or sought to be admitted *pro hac vice* in any trial or appellate court of Tennessee within the preceding three years, date of any such admission or the date of any such motion that was filed but not granted, and the status of any such case in which not admitted:

None.

(4)     Statement concerning whether the applicant lawyer has previously been denied admission *pro hac vice* or has had an admission *pro hac vice* revoked by any court in any jurisdiction and, if so, a full description of the circumstances, including the full name or style of the case:

None.

(5)     Statement concerning whether the applicant lawyer has ever been disciplined or sanctioned by the Board of Professional Responsibility of the Supreme Court of Tennessee, by any similar lawyer disciplinary agency in any jurisdiction, or by any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

None.

–2–

(6) Statement concerning whether any disciplinary action or investigation concerning the applicant lawyer's conduct is pending before the Board of Professional Responsibility of the Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any jurisdiction, or before any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

None.

(7) Statement that the applicant lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court before which the lawyer seeks to practice:

I agree with the foregoing statement.

(8) Statement that the applicant lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee:

I agree and consent to the foregoing statement.

(9) Tennessee lawyer with whom the applicant lawyer is associated:

Name: Anthony Orlandi

Address: 1920 Adelicia Street, Suite 300; Nashville, TN 37212

Telephone No.: (615) 800-6225        TN BPR No.: 33988

(10) Statement that the applicant lawyer has paid all fees required by this Rule in connection with the motion for admission:

The fees have been paid.

–3–

(11) At the option of the applicant lawyer, any other information supporting the lawyer's admission:

None.

(12) Statement indicating service of the *pro hac vice* motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee:

I agree with the foregoing statement.

(13) A certificate of good standing from the court of last resort of the licensing jurisdiction in which the applicant principally practices, or resides, is attached as an Exhibit to this affidavit and incorporated herein.

I declare under penalty of perjury that the foregoing is true and correct.

*Pro Hac Vice* Applicant

Sworn to and subscribed before me this 14 day of February, 2025.

Notary Public

My commission expires: March 6, 2028

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PATRICIA GAIL GOFF
1498 Valley Dr
South Charleston, WV 25303
My Commission Expires March 6, 2028

–4–

STATE OF WEST VIRGINIA

I, Jennelle H. Jones, Deputy Clerk of the Supreme Court of Appeals of West Virginia, hereby do certify that Kevin W. Thompson, of Charleston, West Virginia, an attorney duly licensed to practice law in this State, was admitted to practice law before the Supreme Court of Appeals of West Virginia, the highest court of the State, on the 1st day of November, 1988, is an attorney in good standing in said Court, and is currently on active status.

Given under my hand and seal of said Court, at Charleston, West Virginia, this 12th day of February 2025, and in the 162nd year of the State.

_____

Deputy Clerk, Supreme Court of Appeals of West Virginia



# EXHIBIT A

| From: | Amber Szuch |
|---|---|
| To: | Registration - Board of Professional Resp. |
| Cc: | Tricia Herzfeld; Tony Orlandi; kwthompsonwv@thompsonbarneylaw.com |
| Subject: | Pro Hac Vice Motion - Kevin Thompson |
| Date: | Thursday, April 24, 2025 12:13:00 PM |
| Attachments: | PHV, Kevin Thompson for Plaintiffs.pdf |
| | image001.png |

Good afternoon,

Please see the attached Motion, Affidavit and COGS for Kevin Thompson for approval to be filed with Roane County Circuit Court.

Thank you,



**Herzfeld Suetholz Gastel Leniski and Wall PLLC**

**Amber Szuch**
Paralegal
P: (615) 800-6225
223 Rosa L Parks Ave.,
Suite 300
Nashville, TN 37203

# IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ Ninth JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

**BABY DOE 1, BABY DOE 2, and BABY**
**DOE 3, by and through their guardian *ad***
***litem,***

     **Plaintiffs,**

**v.**

**TEVA PHARMACEUTICALS USA,**
**INC., et al**

     **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No.:** 2025CV46

**JURY DEMAND**

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF KEVIN W. THOMPSON

    The Motion for Admission *Pro Hac Vice* of Kevin Thompson having been made by the

Plaintiffs, by Counsel, and the Court being sufficiently advised;

    **IT IS THEREFORE ORDERED** that Kevin W. Thompson be admitted *pro hac vice*

with regard to the representation of the Plaintiffs, and that Mr. Johns shall be bound by the Rules

of this Court with regard to this litigation.

                                   _____

                                   Circuit Court Judge

Filed ___4 . 29___, 20_25_
ANN GOLDSTON Time _020_
By _____ D.C.

Submitted for Entry by:

*/s/Anthony Orlandi*
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

2

# IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ Ninth JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

BABY DOE 1, BABY DOE 2, and BABY )
DOE 3, by and through their guardian *ad* )
*litem*, )
                          )
      Plaintiffs, )
                          )
v.                            )
                          )
TEVA PHARMACEUTICALS USA, )
INC., et al )
                          )
      Defendants. )

Civil Action No.: 2025CV 46

**JURY DEMAND**

## MOTION FOR ADMISSION *PRO HAC VICE* OF STEPHEN P. NEW

Pursuant to Rule 19 of the Supreme Court of the State of Tennessee, Anthony Orlandi of the firm Herzfeld, Suetholz, Gastel, Leniski and Wall PLLC, hereby moves the Court to admit **Stephen P. New** of the firm **Stephen New & Associates,** *pro hac vice* for purposes of this matter only. In support of this Motion, movant submits to this Court the Affidavit of Stephen P. New attached as Exhibit A and correspondence to the Board of Professional Responsibility.

For these reasons, Movant respectfully requests that this Court admit Stephen P. New *pro hac vice* for purposes of this case.

Filed 4.29, 2025
ANN GOLDSTON Time 1020
By_____ D.C.

1

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 225 of 454
PageID #: 660

Dated: April 24, 2025                                  Respectfully submitted,

                                                       /s/Anthony Orlandi
                                                       **HERZFELD, SUETHOLZ, GASTEL,**
                                                       **LENISKI & WALL PLLC**
                                                       Tricia Herzfeld (TN BPR #26014)
                                                       Anthony Orlandi (TN BPR #33988)
                                                       1920 Adelicia St., Suite 300
                                                       Nashville, Tennessee 37212
                                                       Telephone: (615) 800-6225
                                                       Email: tricia@hsglawgroup.com
                                                       Email: tony@hsglawgroup.com

                                                       *Counsel for Plaintiffs*

2

IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT
ROANE COUNTY, TENNESSEE

|  |  |  |
|---|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil Action No.: 2025CV46** |
| **v.** | ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** | ) ) ) | |
| **Defendants.** | ) ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF STEPHEN NEW

The Motion for Admission *Pro Hac Vice* of Stephen New having been made by the

Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that Stephen New be admitted *pro hac vice* with

regard to the representation of the Plaintiffs, and that Mr. New shall be bound by the Rules of

this Court with regard to this litigation.

_____

Circuit Court Judge

Filed 4.29, 2025
ANN GOLDSTON Time 05
By_____ D.C.

1

Submitted for Entry by:

*/s/Anthony Orlandi*

**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

2

**IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL DISTRICT**
*Ninth* (handwritten)
**ROANE COUNTY, TENNESSEE**

| | |
|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** ) ) ) ) | |
| **Plaintiffs,** ) ) | **Civil Action No.:** 2025CV46 |
| **v.** ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** ) ) ) | |
| **Defendants.** ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF KEVIN W. THOMPSON

The Motion for Admission *Pro Hac Vice* of Kevin Thompson having been made by the

Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that Kevin W. Thompson be admitted *pro hac vice*

with regard to the representation of the Plaintiffs, and that Mr. Johns shall be bound by the Rules

of this Court with regard to this litigation.

_____
Circuit Court Judge

Filed 4.29, 2025
ANN GOLDSTON Time 020
By _____

ENTERED
DATE: 5-7-25
TIME: 10:00 Am
BY: _____

Submitted for Entry by:

*/s/Anthony Orlandi*
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT
ROANE COUNTY, TENNESSEE

| | | |
|---|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil Action No.: 2025CV46** |
| **v.** | ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** | ) ) ) | |
| **Defendants.** | ) ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF STEPHEN NEW

The Motion for Admission *Pro Hac Vice* of Stephen New having been made by the Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that Stephen New be admitted *pro hac vice* with regard to the representation of the Plaintiffs, and that Mr. New shall be bound by the Rules of this Court with regard to this litigation.

_____
Circuit Court Judge

Filed 4.29, 2025
ANN GOLDSTON Time 0.00
By _____ D.C.

1

DATE: 5-7-25  ENTERED
TIME: 10:00 Am
BY: _____

Case 3:25-cv-00383-TAV-JEM    Document 1-7    Filed 08/07/25    Page 231 of 454
PageID #: 666

Submitted for Entry by:

*/s/Anthony Orlandi*
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

# IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

BABY DOE 1, BABY DOE 2, and BABY )
DOE 3, by and through their guardian *ad* )
*litem,* )
               )
       Plaintiffs, )     Civil Action No.: 2025 CV 46
               )
v. )     **JURY DEMAND**
               )
TEVA PHARMACEUTICALS USA, )
INC., et al )
               )
       Defendants. )

## PROPOSED ORDER APPOINTING TIM HOUSEHOLDER AS GUARDIAN AD LITEM FOR THE BABY DOE PLAINTIFFS

This matter involves a lawsuit relating to the Baby Doe Plaintiffs' exposure to opioids *in utero*. The appointment of a guardian ad litem for the Baby Doe Plaintiffs is required pursuant to Tenn. Code Ann. § 37-1-149, because the Baby Doe Plaintiffs are parties to this lawsuit and their interests may conflict with those of their respective parents and legal guardians.

**IT IS THEREFORE ORDERED**:

1. Tim Householder is appointed Guardian Ad Litem for the Baby Doe Plaintiffs;

2. The guardian ad litem will represent the Baby Doe Plaintiffs' interests throughout the pendency of any lawsuit involving the minor child's drug exposure *in utero* (including any prelitigation investigation and throughout any potential appeals process); and

3. The guardian ad litem will not be compensated through the administrative office of the courts and instead shall keep accurate billing records of his/her billable time as he/she may be able to recoup his/her time through the litigation.

Filed_____4.29_____, 2025
ANN GOLDSTON Time 020
By_____ D.C.

ENTERED
DATE: 5-7-25
TIME: 10:00 Am
BY: _____

**IT IS FURTHER ORDERED** that Tim Householder is to represent the best interest of the Baby Doe Plaintiffs throughout the pendency of any litigation and any appeals and is fully empowered by this appointment to make all litigation decisions on behalf of the Baby Doe Plaintiffs.

Entered this the _____7th_____ day of _____May_____, 2025.

_____

Circuit Court Judge

IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT
ROANE COUNTY, TENNESSEE

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 2025CV46 |
| v. | ) ) | JURY DEMAND |
| TEVA PHARMACEUTICALS USA, INC., et al | ) ) ) | |
| Defendants. | ) ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF DONALD CREADORE

The Motion for Admission *Pro Hac Vice* of Donald Creadore having been made by the Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that Donald Creadore be admitted *pro hac vice* with regard to the representation of the Plaintiffs, and that Mr. Creadore shall be bound by the Rules of this Court with regard to this litigation.

_____
Circuit Court Judge

Filed 4.29, 20 25
ANN GOLDSTON Time 020
By_____ D.C.

ENTERED
DATE: 5-7-25
TIME: 10:00 AM
BY:_____

1

Submitted for Entry by:

*/s/Anthony Orlandi*

**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

2

IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ Ninth JUDICIAL DISTRICT
ROANE COUNTY, TENNESSEE

| | |
|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem,* ) ) ) ) | |
| Plaintiffs, ) ) | Civil Action No.: 2025CV46 |
| v. ) ) | JURY DEMAND |
| TEVA PHARMACEUTICALS USA, INC., et al ) ) ) | |
| Defendants. ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF KENT HARRISON ROBBINS

The Motion for Admission *Pro Hac Vice* of Kent Harrison Robbins having been made by the Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that Kent Harrison Robbins be admitted *pro hac vice* with regard to the representation of the Plaintiffs, and that Mr. Robbins shall be bound by the Rules of this Court with regard to this litigation.

_____
Circuit Court Judge

Filed _4.29_ 20_25_
ANN GOLDSTON Time _030_
By_____ D.C.

ENTERED
DATE: _5-7-25_
TIME: _10:00 AM_
BY:_____

1

Submitted for Entry by:

*/s/Anthony Orlandi*
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

**IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ Ninth JUDICIAL DISTRICT**
**ROANE COUNTY, TENNESSEE**

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem,* | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 2025CV46 |
| v. | ) ) | **JURY DEMAND** |
| TEVA PHARMACEUTICALS USA, INC., et al | ) ) ) | |
| Defendants. | ) ) | |

## PROPOSED ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF DAVID BARNEY, JR.

The Motion for Admission *Pro Hac Vice* of David Barney, Jr. having been made by the Plaintiffs, by Counsel, and the Court being sufficiently advised;

**IT IS THEREFORE ORDERED** that David Barney, Jr. be admitted *pro hac vice* with regard to the representation of the Plaintiffs, and that Mr. Barney shall be bound by the Rules of this Court with regard to this litigation.

_____
Circuit Court Judge

Filed 4.29 , 20 25
ANN GOLDSTON Time 020
By _____ D.C.

ENTERED
DATE: 5-7-25
TIME: 10:00 AM
BY: _____

1

Submitted for Entry by:

*/s/Anthony Orlandi*

**HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

2

| **Roane County** **Circuit Court** | **STATE OF TENNESSEE** **CIVIL SUMMONS** page 1 of 2 | **Case Number** **2025 CV 46** |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

   **Jacob Dalton**     276 Hot Water Road Tellico Plains, TN 37385.

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:   6.9.2025

                      Clerk / Deputy Clerk

Attorney for Plaintiff:   Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to              ,         Clerk,        County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

                 Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Served in hand to Jacob Dalton

MARK GENO
PROCESS SERVER
Date: 6-25-25    EAST TN INVESTIGATIONS
P.O. Box 482, TELLICO PL    7385
PH: 80?
Agency Address

By: Mack Geno
Please Print: Officer, Title

     Mark Geno  6-25-25
Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

       Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff          Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*Rev. 03/11*

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at (   ):_____.*

## AFFIDAVIT OF SERVICE

| Case:<br>2025 CV 46 | Court:<br>Roane County Circuit Court | County:<br>Roane, TN | Job:<br>13584783 |
|---|---|---|---|
| Plaintiff / Petitioner:<br>Baby Doe | | Defendant / Respondent:<br>Allergan Finances | |
| Received by:<br>East Tennessee Investigations and Services Inc. | | For:<br>Herzfeld, Suetholz, Gastel, Leniski and Wall | |
| To be served upon:<br>Jacob Dalton | | | |

I, Mark Geno, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**  Jacob Dalton, 276 Hot Water Road, Tellico Plains, TN 37385

**Manner of Service:**  Authorized, Jun 25, 2025, 5:11 pm EDT

**Documents:**  Jacob Dalton, Issued Summons.pdf, 25-04-29 - Motion to Appoint GAL and Proposed Order.pdf, 25-04-29 - Motion to Proceed by Pseudonym, Decl of TH and Proposed Order.pdf, 25-05-07 - Order granting GAL.pdf, 25-04-29 - Filed Complaint and Ex. A.pdf

**Additional Comments:**
1) Unsuccessful Attempt: Jun 24, 2025, 12:18 pm EDT at 276 Hot Water Road, Tellico Plains, TN 37385
Notice left, 2 vehicles in the yard and front door was open.

2) Successful Attempt: Jun 25, 2025, 5:11 pm EDT at 276 Hot Water Road, Tellico Plains, TN 37385 received by Jacob Dalton. Age: 42; Ethnicity: Caucasian; Gender: Male; Weight: 210; Height: 5'9"; Hair: Brown;

_____     6-30-25
Mark Geno                                Date

East Tennessee Investigations and Services Inc.
PO Box 482
Tellico Plains, Tn 37385
802-782-3316

**East Tennessee Investigations and Services Inc.**
PO Box 482
Tellico Plains, Tn 37385
Phone 9542754239

Job: 13584783    Due:
Party to Serve: Jacob Dalton
Server: Mark Geno    Fee:

| Case | 2025 CV 46 | Plaintiff | Baby Doe |
|------|-----------|-----------|----------|
| Court | Roane County Circuit Court | Defendant | Allergan Finances |
| Documents | Jacob Dalton, Issued Summons.pdf,25-04-29 - Motion to Appoint GAL and Proposed Order.pdf,25-04-29 - Motion to Proceed by Pseudonym, Decl of TH and Proposed Order.pdf,25-05-07 - Order granting GAL.pdf,25-04-29 - Filed Complaint and Ex. A.pdf | | |
| Instructions | | | |

**Address**
276 Hot Water Road, Tellico Plains, TN 37385

Jacob Dalton

Thrsdy -
704-807-9702

**Date & Time:**    **Description of Service / Recipient:**

6-24-25    1215    Non-Service - notice left

* 1910 - I received a call from the defendent 704-802-9702 stating he would call me tomorrow to arrange service. 6/25 as of 1432 I have called and left the defendant 2 messages

6-25-25    1711    Served in hand

Age: 42    Gender: Male    Ethnicity: Caucasian    Weight: 210
Height: 5'9    Hair: Brown    Eyes:    Relationship:

Mark Geno 6-25-25

MARK GENO
PROCESS SERVER
EAST TN INVESTIGATIONS
P.O. Box 482, TELLICO PLAINS, TN 37385
PH: 813-712-3316

| **Roane County**<br>**Circuit Court** | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | **Case Number**<br>**2025 CV 46**<br>25-CV 46 |
|---|---|---|

| **Baby Doe 1, et al.** | Vs. | **Allergan Finances, LLC., et al,** |
|---|---|---|

Served On:

**Michael Puckett**     1353 BYRD CIR, KINGSTON, TN 37763

You are hereby summoned to defend a civil action filed against you in Circuit Court, Roane County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:     7-8-25

Clerk / Deputy Clerk

Attorney for Plaintiff:     Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to     _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: By Abrand as sworn in the attached affidavit to Michael Packett at 913 hours

Date: 07/09/2025     SMOKY MOUNTAIN PROCESS<br>P. O. Box 9181<br>KNOXVILLE, TN 37940<br>865-347-7967     By: Zoen Grissino-Mayer, Process Server<br>Please Print: Officer, Title

Zaur Grissino-Mayer
Signature

Agency Address

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff

Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Filed _____, 20 __

ANN GOLDSTON Time 3:14

Rev. 03/11

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at (   ) _____.*

*Rev. 03/11*

## IN THE CIRCUIT COURT FOR ROANE COUNTY, TENNESSEE

| | |
|---|---|
| IN RE: BABY DOE 1,<br>BABY DOE 2,<br>BABY DOE 3, by and through their<br>Guardian ad litem,<br> PLAINTIFFS,<br>V.<br>ALLERGAN FINANCES, LLC;<br>ACTAVIS, LLC;<br>ACTAVIS PHARMA INC.;<br>TEVA PHARMACEUTICALS USA, INC.;<br>WATSON LABORATORIES;<br>JOHNSON & JOHNSON, INC.;<br>JANSSEN PHARMACEUTICALS, INC.,<br>KVK TECH, INC.;<br>AMERISOURCEBERGEN DRUG<br>CORPORATION;<br>CARDINAL HEALTH, INC.;<br>MCKESSON CORPORATION;<br>WALGREEN CO.;<br>CVS PHARMACY, INC;<br>CVS TN DISTRIBUTION, LLC;<br>CVS INDIANA, LLC;<br>TENNESSEE CVS PHARMACY, LLC;<br>WAL-MART, INC.;<br>WAL-MART STORES EAST, L.P.;<br>WILLIAM BAIRD,<br>BRIAN BREWSTER, JACOB DALTON,<br>STEPHANIE PUCKETT,<br>MICHAEL PUCKETT,<br>DEFENDANTS. | CASE NO: 25-CV-46 |

### AFFIDAVIT OF SERVICE:
### Michael Puckett

I, Zaen Grissino-Mayer, being sworn and deposed first say I am over the age of 18, not a party to this case, and am authorized to serve Process within the Boundaries of the State of TENNESSEE.

## NARRATIVE

I did serve by my hand a Summons, and Amended Complaint, filed in the above styled action in the above-entitled court for **Baby Doe 1, et al., on 8 July 2025 at 1913 hours upon Michael Puckett.** I received these documents from Herzfeld, Suetholz, Gastel, Leniski and Wall, PLLC, 1920 Adelicia St., Ste 300, Nashville, TN 37212 on 07/07/2025. I executed service at 111 Bowman Ln., CRAB ORCHARD, TENNESSEE 37723. **Michael Puckett verbally identified himself and gave a stated a date of birth of October 2, 1969 as a further identifier.** Puckett is a Caucasian male, with glasses, mostly bald with some grey hair, hazel eyes, weighs 250 lbs., and stands at 5'9". Puckett acknowledged service by affixing his signature to the Proof of Service. I swear these facts to be true and correct to the best of my knowledge under penalty of perjury.

Zaen Grissino-Mayer

Zaen Grissino-Mayer, Private Process Server
Smoky Mountain Process and Legal Services
P.O.BOX 9181
KNOXVILLE, TN 37940
865-347-7967

### COUNTY OF KNOX

### STATE OF TENNESSEE

Comes Now, Zaen Grissino-Mayer, Private Process Server, and was Sworn and Scribed before me Candice L. Welch , Notary Public, State of TENNESSEE, and witnessed my hand this the 9 th day of July, 2025 in the County of KNOX, State of TENNESSEE. The affiant further sayeth not. My Commission Expires 05 - 26 - 2027 .



| **Roane County** **Circuit Court** | # STATE OF TENNESSEE ## CIVIL SUMMONS page 1 of 2 | **Case Number** **2025 CV 46** 25-CV-46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al, |
|---|---|---|

Served On:

**Stephanie Puckett**     1353 BYRD CIR, KINGSTON, TN 37763

You are hereby summoned to defend a civil action filed against you in Circuit Court, Roane County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _____7-8-25_____                            _____
                                                                              Clerk / Deputy Clerk

Attorney for Plaintiff:     Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed: these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to     _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____
                        Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: By hand as sworn in the attached affidavit to Stephanie Puckett at 1818 hours

Date: 07/09/2025     By: Zaen Grissina-Mayer, Proces Server
                                  Please Print: Officer, Title

SMOKY MOUNTAIN PROCESS
P. O. BOX 9181
KNOXVILLE, TN 37940
865-347-7967

                        Zaen Grissina-Mayer
Agency Address                Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____
                        Notary Public / Deputy Clerk (Comm. Expires _____ )

_____                        _____
Signature of Plaintiff                        Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call* _____, ADA Coordinator, at ( ) _____

                        Filed _____ 17, 20 25                        Rev. 03/11
                        ANN GOLDSTON Time 3:14
                        D.C.

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

## IN THE CIRCUIT COURT FOR ROANE COUNTY, TENNESSEE

| | |
|---|---|
| IN RE: BABY DOE 1,<br>BABY DOE 2,<br>BABY DOE 3, by and through their<br>Guardian ad litem,<br> PLAINTIFFS,<br>V.<br>ALLERGAN FINANCES, LLC;<br>ACTAVIS, LLC;<br>ACTAVIS PHARMA INC.;<br>TEVA PHARMACEUTICALS USA, INC.;<br>WATSON LABORATORIES;<br>JOHNSON & JOHNSON, INC.;<br>JANSSEN PHARMACEUTICALS, INC.,<br>KVK TECH, INC.;<br>AMERISOURCEBERGEN DRUG<br>CORPORATION;<br>CARDINAL HEALTH, INC.;<br>MCKESSON CORPORATION;<br>WALGREEN CO.;<br>CVS PHARMACY, INC;<br>CVS TN DISTRIBUTION, LLC;<br>CVS INDIANA, LLC;<br>TENNESSEE CVS PHARMACY, LLC;<br>WAL-MART, INC.;<br>WAL-MART STORES EAST, L.P.;<br>WILLIAM BAIRD,<br>BRIAN BREWSTER, JACOB DALTON,<br>STEPHANIE PUCKETT,<br>MICHAEL PUCKETT,<br>DEFENDANTS. | CASE NO: 25-CV-46 |

### AFFIDAVIT OF SERVICE:
### Stephanie Puckett

I, Zaen Grissino-Mayer, being sworn and deposed first say I am over the age of 18, not a party to this case, and am authorized to serve Process within the Boundaries of the State of TENNESSEE.

## NARRATIVE

I did serve by my hand a Summons, and Amended Complaint, filed in the above styled action in the above-entitled court for **Baby Doe 1, et al., on 8 July 2025 at 1818 hours upon Stephanie Puckett.** I received these documents from Herzfeld, Suetholz, Gastel, Leniski and Wall, PLLC, 1920 Adelicia St., Ste 300, Nashville, TN 37212 on 07/07/2025. I executed service at 1112 Old North Kentucky St., KINGSTON, TENNESSEE 37763. **Stephanie Puckett verbally identified herself and gave a stated age of 56 years old as a further identifier.** Puckett is a Caucasian female, with glasses, blonde hair, blue eyes, weighs 230 lbs., and stands at 5'5". Puckett acknowledged service by affixing her signature to the Proof of Service. I swear these facts to be true and correct to the best of my knowledge under penalty of perjury.

*Zaen Grissino-Mayer*

Zaen Grissino-Mayer, Private Process Server
Smoky Mountain Process and Legal Services
P.O.BOX 9181
KNOXVILLE, TN 37940
865-347-7967

### COUNTY OF KNOX

### STATE OF TENNESSEE

Comes Now, Zaen Grissino-Mayer, Private Process Server, and was Sworn and Scribed before me Candice A. Welch, Notary Public, State of TENNESSEE, and witnessed my hand this the 9 th day of July, 2025 in the County of KNOX, State of TENNESSEE. The affiant further sayeth not. My Commission Expires **05 -26 -2027**.



_Return_ 

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br>2025 CV 46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

William Juston Baird    431 Ashe Cabin Hollow Road Harriman, TN 37748

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: ___6 · 9 · 2025_____     _____
                                                          Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County
                    _____

---

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

---

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date: 6/27/25 @ 6:43p Served in hand   By: **TERI DROSKE PROCESS SERVER**
                                                            **EAST TN INVESTIGATIONS**
                                                            Please Print: Officer, P.O. BOX 482
                                                            **TELLICO PLAINS, TN 37385**

_____                          Signature _Teri M. Droske_
Agency Address

---

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Signature of Plaintiff

_____
Notary Public / Deputy Clerk (Comm. Expires _____)

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

_Rev. 03/11_

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al, |
|---|---|---|

**(Attach return receipt on back)**



*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( )  _____*

## AFFIDAVIT OF SERVICE

| Case:<br>2025 CV 46 | Court:<br>Roane County Circuit Court | County:<br>Roane, TN | Job:<br>135#4990 |
|---|---|---|---|
| Plaintiff / Petitioner:<br>Baby Doe | | Defendant / Respondent:<br>A ergan Finances | |
| Received by:<br>East Tennessee Investigations and Services Inc. | | For:<br>Herzfe d, Suetho z, Gaste , eriski and Wa | |
| To be served upon:<br>Wi iam Baird | | | |

I, Teri Droske, being du y sworn, depose and say: I am over the age of 1# years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by aw to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Wi iam Baird, 431 Ash Cabih Ho ow Road, Harriman, TN 3774#

**Manner of Service:** Authorized, Jun 27, 2025, 7:13 pm EDT

**Documents:** Wi iam Baird, Issued Summons.pdf, 25-04-29 - Fi ed Comp aint and Ex. A.pdf, 25-05-07 - Order granting GA .pdf, 25-04-29 - Motion to Appoint GA and Proposed Order.pdf, 25-04-29 - Motion to Proceed by Pseudonym, Dec of TH and Proposed Order.pdf

**Additional Comments:**
1) Successfu Attempt: Jun 27, 2025, 7:13 pm EDT at 431 Ash Cabih Ho ow Road, Harriman, TN 3774# received by Wi iam Baird. Age: 53; Ethnicity: Caucasian; Gender: Ma e; Weight: 160; Height: 5'9"; Hair: B ack; Eyes: Brown;

*Teri M. Droske*  6/27/25

Teri Droske    Date

East Tennessee Investigations and Services Inc.
PO Box 482
Tellico Plains, Tn 37385
330-770-4337

**East Tennessee Investigations and Services Inc.**
PO Box 482
Tellico Plains, Tn 37385
Phone 9542754239

Job: 13584990
Party to Serve: William Baird
Server: Teri Droske
Due: _____
Fee: _____

| Case | 2025 CV 46 | Plaintiff | Baby Doe |
|------|------------|-----------|----------|
| Court | Roane County Circuit Court | Defendant | Allergan Finances |
| Documents | William Baird, Issued Summons.pdf,25-04-29 - Filed Complaint and Ex. A.pdf,25-05-07 - Order granting GAL.pdf,25-04-29 - Motion to Appoint GAL and Proposed Order.pdf,25-04-29 - Motion to Proceed by Pseudonym, Decl of TH and Proposed Order.pdf | | |
| Instructions | | | |

**Address**
431 Ash Cabin Hollow Road, Harriman, TN 37748

**William Baird**

**Date & Time:**      **Description of Service / Recipient:**

6/27/25 @ 6:43p  Ro Sucessfull Serve in hand

Age: 45   Gender: M   Ethnicity: W   Weight: 160
Height: 5 8   Hair: Bald   Eyes: Blue   Relationship: _____

Return

**Baby Doe 1, et al.**          Vs.          **Allergan Finances, LLC., et al,**

Served On:

**Allergan Finances, LLC**          **c/o Corporation Trust Company of Nevada, 701 S. Carson Street, Suite 200, Carson City, Nevada 89701**

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _4.29.2025_

Clerk / Deputy Clerk

Attorney for Plaintiff:          Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____          By: _____
                                      Please Print: Officer, Title

_Agency Address_          Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____          Notary Public / Deputy Clerk (Comm. Expires _____)

_Signature of Plaintiff_          Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

4883-7130-

# AFFIDAVIT OF SERVICE

| Case: 2025CV46 | Court: IN THE CIRCUIT COURT FOR THE NINTH JUDICIAL DISTRICT ROANE COUNTY, TENNESSEE | Job: 13700800 (Baby Doe 1, et al v. Teva, et al) |
|---|---|---|
| Plaintiff / Petitioner: BABY DOE 1, et al. | | Defendant / Respondent: ALLERGAN FINANCES, LLC, et al. |
| Received by: ACE Executive Services, LLC (NV #2021C) | | For: Herzfeld Suetholz Gastel Leniski and Wall PLLC |
| To be served upon: ALLERGAN FINANCES, LLC c/o CORPORATE CREATIONS NETWORK INC., REGISTERED AGENT | | |

I, Jennifer Harhay, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:  MARCI WYATT, 8275 SOUTH EASTERN AVENUE #200, LAS VEGAS, NV 89123

Manner of Service:  Registered Agent, Jul 10, 2025, 3:55 pm PDT

Documents:  Issued Summons, Filed Complaint and Ex. A, Motions, Filed Amended Complaint (Received Jul 9, 2025 at 10:37am PDT)

Additional Comments:
1) Successful Attempt: Jul 10, 2025, 3:55 pm PDT at 8275 SOUTH EASTERN AVENUE #200, LAS VEGAS, NV 89123 received by MARCI WYATT. Age: 50s; Ethnicity: Caucasian; Gender: Female; Hair: Blond; Other: Seated; glasses

Jennifer Harhay
2021

Date 7/14/2025

ACE Executive Services, LLC (NV #2021C)
8275 S EASTERN AVE STE 200
LAS VEGAS, NV 89123
702-919-7223

| Roane County
Circuit Court | STATE OF TENNESSEE
CIVIL SUMMONS
page 1 of 2 | Case Number
2025CV46 |

Baby Doe 1, et al.     Vs.    Allergan Finances, LLC., et al.

Served On:

___Actavis, LLC.___    c/o Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Corporate Serve by serving Registered Agent Colenda Shepherd e 1131 Am.

Date: 7-10-2025    By: Scott M Nance - Process Serve

448 N. Cedar Bluff Ste 102
Knoxvill, TN 37923
Agency Address

Please Print: Officer, Title

Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

Signature of Plaintiff

Plaintiff's Attorney (or Person Authorized to Serve Process)

ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.

Rev. 03/11

## AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job:<br>13688253 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:**<br>Tennessee Court Services | | **For:**<br>Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:**<br>Actavis, LLC c/o Corporation Service Company | | | |

I, Scott Nance, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Glenda Shepherd as Registered agent, 2908 Poston Avenue, Nashville, TN 37203

**Manner of Service:** Registered Agent, Jul 10, 2025, 11:31 am CDT

**Documents:** Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**
1) Successful Attempt: Jul 10, 2025, 11:31 am CDT at 2908 Poston Avenue, Nashville, TN 37203 received by Glenda Shepherd as Registered agent. Age: 55; Ethnicity: Caucasian; Gender: Female; Weight: 155; Height: 5'5"; Hair: Blond;

_____     7-10-2025
Scott Nance                 Date
058760447

Tennessee Court Services
448 N Cedar Bluff Road, Ste 102
Knoxville, TN 37923
(833) 862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

_____     7-10-25
Notary Public               My Commission Expires
7-10-25                                5/23/2028
Date                        Commission Expires

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | **Case Number**<br>2025CV46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al, |
|---|---|---|

Served On:

__Actavis Pharma, Inc.__    __c/o Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203__

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: __4.29.2025__    Clerk / Deputy Clerk

Attorney for Plaintiff: __Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212__

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Corporate Secte by Serving Registered Agent Glenda Shepherd @ 1131 Am

Date: 7-10-2025    By: Scott M Narr- Process Server
Please Print Name, Title

448 N.Cedar Blvd Ste 102
Knoxville, TN 37923
Agency Address

Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff    Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11

4883-7130-

# AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job:<br>13688012 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:**<br>Tennessee Court Services | | **For:**<br>Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:**<br>Actavis Pharma, Inc. c/o Corporation Service Company | | | |

I, Scott Nance, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**  Glenda Shepherd as Registered agent, 2908 Poston Avenue, Nashville, TN 37203

**Manner of Service:**  Registered Agent, Jul 10, 2025, 11:31 am CDT

**Documents:**  Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**
1) Successful Attempt: Jul 10, 2025, 11:31 am CDT at 2908 Poston Avenue, Nashville, TN 37203 received by Glenda Shepherd as Registered agent. Age: 55; Ethnicity: Caucasian; Gender: Female; Weight: 155; Height: 5'5"; Hair: Blond;

_____  7-10-2025
Scott Nance                Date
058760447

Tennessee Court Services
448 N Cedar Bluff Road, Ste 102
Knoxville, TN 37923
(833) 862-7827

Subscribed and sworn to before me by the affiant who Is
personally known to me.

_____  7-10-25
Notary Public

My Commission Expires
5/23/2028

Date          Commission Expires



| **Roane County** **Circuit Court** | **STATE OF TENNESSEE** **CIVIL SUMMONS** page 1 of 2 | **Case Number** 2025 CV 46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

**Teva Pharmaceuticals USA, Inc.**  c/o Corporate Creations Network, Inc,, 3411 Silverside Road, Tatnall Building, STE 104, Wilmington, DE 19810

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4.29.2005

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____                    By: _____
                                               Please Print: Officer, Title

Agency Address _____           Signature _____

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage

prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____          _____
                                Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff          Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11

4883-7130-

Baby Doe 1, et al.          Vs.          Allergan Finances, LLC., et al.

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*
4883-7130-

## AFFIDAVIT OF SERVICE

| Case: 2025CV46 | Court: In The Circuit Court of Tennesse in and for Roane County | | Job: 13717460 |
|---|---|---|---|
| **Plaintiff / Petitioner:** Baby Doe 1, et al. | | **Defendant / Respondent:** Allergan Finances, LLC, et al. | |
| **Received by:** Delaware Attorney Services, LLC | | **For:** Herzfeld Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:** Teva Pharmaceuticals USA, Inc. | | | |

I, Sharlene Brooks, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Left in the presence of Donna "Doe", registered agent representative (per agent policy they will no longer provide a name for acceptance)., Corporation Service Company, Registered Agent 251 Little Falls Drive, Wilmington, DE 19808

**Manner of Service:** Corporation, Jul 14, 2025, 3:20 pm EDT

**Documents:** Summons; Complaint and Exhibit A; Amended Complaint; Motion for Baby Doe Plaintiffs to Proceed by Pseudonym; Declaration of Tricia R. Herzfeld in Support of the Baby Doe Plaintiff's Motion to Proceed by Pseudonym with Exhibit A; [Proposed] Order Allowing The Baby Doe Plaintiffs to Proceed by Pseudonym; Motion to Appoint Guardian Ad Litem for the Baby Doe Plaintiffs; Proposed Order Appointing Tim Householder as Guardian Ad Litem for the Baby Doe Plaintiff's Entered 5/7/2025 (Received Jul 14, 2025 at 2:16pm EDT)

**Additional Comments:**

1) Successful Attempt: Jul 14, 2025, 3:20 pm EDT at Corporation Service Company, Registered Agent 251 Little Falls Drive, Wilmington, DE 19808 received by Left in the presence of Donna "Doe", registered agent representative (per agent policy they will no longer provide a name for acceptance).. Age: 58; Ethnicity: Caucasian; Gender: Female; Weight: 150 lb; Height: 5'6"; Hair: Brown;

_signature_          July 15, 2025

Sharlene Brooks          Date

Delaware Attorney Services, LLC
3516 Silverside Road, Unit 16
Wilmington, DE 19810
302-429-0657

_Subscribed and sworn to before me by the affiant who is personally known to me._

_signature_

**Notary Public**

July 15, 2025          March 31, 2028

**Date**          **Commission Expires**

KIMBERLY J. RYAN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires March 31, 2028

Return

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | **Case Number**<br>2025CV46 |
| --- | --- | --- |

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al,** |
| --- | --- | --- |

Served On:

Watson Laboratories, Inc.    c/o Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, Nevada 89123

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:    4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: SERVED KRIS KENNISON, CORPORATION

SERVICE COMPANY, REGISTERED AGENT AT 112 N CURRY ST, CARSON CITYNV 89703 ON 7/16/25 AT 12:21 P.M.

Date: 7/16/2025                    By: MICHELLE HARRIS, PROCESS SERVER

ACE Executive Services, LLC (NV #2021C)      Please Print: Officer, Title
8275 S EASTERN AVE STE 200
LAS VEGAS, NV 89123
Agency Address                         Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

Signature of Plaintiff                    Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11

(Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

## AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>IN THE CIRCUIT COURT FOR THE NINTH JUDICIAL DISTRICT<br>ROANE COUNTY, TENNESSEE | Job:<br>13700824 (Baby Doe 1, et al v. Teva, et al) |
|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, et al. | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC, et al. |
| **Received by:**<br>ACE Executive Services, LLC (NV #2021C) | | **For:**<br>Herzfeld Suetholz Gastel Leniski and Wall PLLC |
| **To be served upon:**<br>WATSON LABORATORIES, INC. c/o CORPORATION SERVICE COMPANY, REGISTERED AGENT | | |

I, Michelle Harris, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**    Kris Kennison , 112 N CURRY ST, CARSON CITY, NV 89703

**Manner of Service:**    Registered Agent, Jul 16, 2025, 12:21 pm PDT

**Documents:**    Issued Summons, Filed Complaint and Ex. A, Motions, Filed Amended Complaint (Received Jul 9, 2025 at 10:37am PDT)

**Additional Comments:**
1) Successful Attempt: Jul 16, 2025, 12:21 pm PDT at 112 N CURRY ST, CARSON CITY, NV 89703 received by Kris Kennison . Other: Age 34, white, female, 5'6, blonde, 180.;

_____    7/16/2025
Michelle Harris                                  **Date**
R-2019-09792

ACE Executive Services, LLC (NV #2021C)
8275 S EASTERN AVE STE 200
LAS VEGAS, NV 89123
702-919-7223

| Roane County<br>Circuit Court | STATE OF TENNESSEE<br>CIVIL SUMMONS<br>page 1 of 2 | Case Number<br>2025CV46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

Johnson & Johnson, Inc.   c/o CT Corporation Systems, 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

OFFICER'S RETURN: Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Served to Johnson & Johnson, Inc.
c/o CT Corporation System, Samantha Sutton (Registered Agent)

Date: 7/10/25   TN Court Services   448 North Cedar Bluff, Ste 102   Knoxville, TN 37923   By: Jared Lawrence Process Server
Please Print: Officer, Title

Agency Address   (865) 964-9762   Signature

RETURN ON SERVICE OF SUMMONS BY MAIL: I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

Signature of Plaintiff

Plaintiff's Attorney (or Person Authorized to Serve Process)

ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.

*Rev. 03/11*
4883-7130-

## AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job:<br>13692966 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:**<br>Tennessee Court Services | | **For:**<br>Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:**<br>Johnson & Johnson, Inc. c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**   Johnson & Johnson, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:**   Registered Agent, Jul 10, 2025, 1:16 pm EDT

**Documents:**   Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**
1) Successful Attempt: Jul 10, 2025, 1:16 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by Johnson & Johnson, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown;
Served to Johnson & Johnson, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent)

_____  _____  7/11/25
Jared Lawrence                           Date

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

_____
Notary Public

7/11/25                    6/5/28
Date                       Commission Expires

_Return_

| Baby Doe 1, et al. | **Vs.** | Allergan Finances, LLC., et al. |
| --- | --- | --- |

Served On:

Janssen Pharmaceuticals,
Inc.       c/o CT Corporation Systems, 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _4.29.2025_

_____ Clerk / Deputy Clerk

Attorney for Plaintiff:   Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to   _____, _____ Clerk, _____ County

**CERTIFICATION (IF APPLICABLE)**

I, _____, Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____          _____
                                       Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _Served to Janssen Pharmaceuticals, Inc. c/o CT Corporation System, Samantha Sutton (Registered Agent)_

Date: _7/1/25_          By: _Jared Lawrence Process Server_
                              Please Print: Officer, Title

TN Court Services
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923
Agency Address    (865) 964-9702          _____ Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____          _____
                                       Notary Public / Deputy Clerk (Comm. Expires _____ )

_____          _____
Signature of Plaintiff          Plaintiff's Attorney (or Person Authorized to Serve Process)

ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.

Rev. 03/11
4883-7130-

# AFFIDAVIT OF SERVICE

| Case: 2025CV46 | Court: In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job: 13688425 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:** BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:** ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | |
| **Received by:** Tennessee Court Services | | **For:** Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:** Janssen Pharmaceuticals, Inc. c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Janssen Pharmaceuticals, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:** Registered Agent, Jul 10, 2025, 1:14 pm EDT

**Documents:** Civil Summons, Complaint, Amended Complaint, and Motions

### Additional Comments:
1) Successful Attempt: Jul 10, 2025, 1:14 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by Janssen Pharmaceuticals, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown;

Served to Janssen Pharmaceuticals, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence

Date 7/11/25

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

Date 7/11/25

Commission Expires 6/5/28

_Return_

| Baby Doe 1, et al, | Vs. | Allergan Finances, LLC., et al, |

Served On:

KVK Tech, Inc.     110 Terry Drive Newtown, PA 18940

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:    4 , 29 . 2025

                   Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to             ,        Clerk,       County

---

### CERTIFICATION (IF APPLICABLE)

I,       ,       Clerk of       County do certify this to be a true and correct copy of the original summons issued in this case.

Date:      
            Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____       By: _____
                          Please Print: Officer, Title

Agency Address                     Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____ , I sent postage

prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____ . On _____ I received the return receipt, which had been signed by _____ on _____ . The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____       Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff       Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____ , ADA Coordinator, at ( ) _____ ._

_Rev. 03/11_
4883-7130-

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al, |
|---|---|---|

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*
4883-7130-

Client Ref.:

## AFFIDAVIT OF SERVICE

IN THE CIRCUIT COURT FOR THE NINTH JUDICIAL DISTRICT ROANE
COUNTY, TENNESSEE

Civil Action Number: 25-CV-46
Filed On: 4/29/2025

---

BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian ad litem
Plaintiff(s),

vs.

TEVA PHARMACEUTICALS USA, INC., et al
Defendant(s).

---

State of Pennsylvania: County of Montgomery ss: Brian Zavodnick, being duly sworn, deposes and says: that deponent is not a party to this action, is over 18 years of age and resides in the State of Pennsylvania.

That on 7/11/2025 at 10:56 AM., at 110 Terry Drive, Newtown, PA 18940
Deponent attempted to serve the within **Summons; Complaint and Ex. A; Amended Complaint; Motion for Baby Doe Plaintiff's to Proceed by Pseudonym; Declaration of Tricia R. Herzfeild in Support of Baby Doe Plaintiff's Motion to Proceed by Pseudonym; Exhibit A**
On **KVK-TECH, Inc.**

CORPORATION: a corporation by delivering thereat a true copy of each to **Diana J (Refused her last name)** personally, deponent knew said corporation so served to be the corporation described in legal papers and knew said individual to be **Receptionist / Authorized to accept service** thereof.

DESCRIPTION: Deponent further states that the description of the person actually served is as follows:
Gender: **Female** Race/Skin: White Age: **51 - 65 Yrs.** Weight: 160-180lbs Height: 5' 4" - 5' 8" Hair: **Brown/Blonde** Glasses: **Yes** Other:

COMMENTS: Diana accepted the documents without an issue. (She did call someone to confirm and get approval). She confirmed to me that she was authorized to accept service.
NOTE: She claimed that it is policy to not provide the last name. She was quite rude and dismissive

Commonwealth of Pennsylvania - Notary Seal
Stacy Dougherty, Notary Public
Montgomery County
My commission expires August 4, 2027
Commission number 1263946
Member, Pennsylvania Association of Notaries

Sworn to before me on 7/15/2025

NOTARY PUBLIC
Commission Expiration _Aug 4, 2027_



X_____
Brian Zavodnick
PPLS Ref# 25-19598

Process Plus Legal Service LLC
2800 Turnpike Drive, Suite 1, Hatboro, PA 19040

| Roane County<br>Circuit Court | STATE OF TENNESSEE<br>CIVIL SUMMONS<br>page 1 of 2 | Case Number<br>2025CV46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

Amerisourcebergen Drug    c/o C T Corporation System, 300 Montvue Rd, Knoxville, TN 37919
Corp.

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4.29.2025

_____
Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to    _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows:    Served to Amerisource bergen
Drvg Corp. c/o CT Corporation System, Samentha Sutton

Date: 7/10/25                              By: Jerel Lawrence Process Server (Registered Agent)
TN Court Services                         Please Print: Officer, Title
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923                        _____
Agency Address    (865) 964-9762          Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____                 _____
Signature of Plaintiff                    Notary Public / Deputy Clerk (Comm. Expires _____ )

_____                 _____
                                          Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

:Rev. 03/11

4883-7130-

# AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job:<br>13688336 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:**<br>Tennessee Court Services | | **For:**<br>Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:**<br>Amerisourcebergen Drug Corp. c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**  Amerisourcebergen Drug Corp. c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:**  Registered Agent, Jul 10, 2025, 1:13 pm EDT

**Documents:**  Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**

1) Successful Attempt: Jul 10, 2025, 1:13 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by Amerisourcebergen Drug Corp. c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown;

Served to Amerisourcebergen Drug Corp. c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence

Date 7/11/25

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

*Subscribed and sworn to before me by the affiant who is personally known to me.*

Notary Public

Date 7/11/25

Commission Expires 10/5/26

Return

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al, |

Served On:

Cardinal Health, Inc.    c/o CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:    4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff:    Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to    _____, _____ Clerk, _____ County

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____    By: _____

Please Print: Officer, Title

Agency Address _____    Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff _____    Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11
4883-7130-

| Baby Doe 1, et al. | **Vs.** | Allergan Finances, LLC., et al. |
| --- | --- | --- |

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

## AFFIDAVIT OF SERVICE

| State of Tennessee | County of Roane | Circuit Court |
|---|---|---|

Case Number: 2025 CV 46

Plaintiff(s):
**Baby Doe 1, et al.,**

vs.

Defendant(s):
**Allergan Finances, LLC, et al.,**

For:
Herzfeld Suetholz Gastel Leniski and Wall PLLC
1920 Adelcia Street
Suite 300
Nashville, TN 37212

ICI2025001211

Received by InfoCorp Investigative Services, LLC on the 10th day of July, 2025 at 9:35 am to be served on **Cardinal Health, Inc. c/o CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219.**

I, Michael A. Cozzi, being duly sworn, depose and say that on the **17th day of July, 2025** at **2:45 pm, I:**

served a **REGISTERED AGENT** by delivering a true copy of the **Summons; Complaint and Exhibit A, Amended Complaint and Service Packet - Motions** with the date and hour of service endorsed thereon by me, to: **Daylen Platt** as **Intake Specialist** at the address of: **4400 Easton Commons Way, Suite 125, Columbus, OH 43219** on behalf of **Cardinal Health, Inc.**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 35+, Sex: M, Race/Skin Color: W, Height: 5-08, Weight: 175, Hair: BLK, Glasses: Y

Being duly sworn, I dispose and say that on the above date and time, I served and or attempted to serve the above legal documents in the above matter at the above location in accordance with state statues. I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which the service was made.

Signed by Server this 17th day of July , 2025 .

Subscribed and Sworn to before me on the
17th day of July , 2025 by the
affiant who is personally known to me.

NOTARY PUBLIC

**TINA L. SCHROEDER**
NOTARY PUBLIC • STATE OF OHIO
My Commission Expires May 18, 2027

**Michael A. Cozzi**
Process Server

**InfoCorp Investigative Services, LLC**
**194 Oak Street**
**Columbus, OH 43235-6447**
**(877) 340-7179**

Our Job Serial Number: ICI-2025001211

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

| Roane County Circuit Court | STATE OF TENNESSEE CIVIL SUMMONS page 1 of 2 | Case Number 2025CV46 |
| --- | --- | --- |

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
| --- | --- | --- |

Served On:

**CVS Pharmacy, Inc.** c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Served to CVS pharmacy, Inc. c/o CT Corporation System, Samantha Sutton (Registered Agent)

Date: 7/10/25        By: Jared Lawrence Process Server
TN Court Services                Please Print: Officer, Title
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923
Agency Address    (865) 964-9762        Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____        Notary Public / Deputy Clerk (Comm. Expires _____ )
Signature of Plaintiff        Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11
4883-7130-

## AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job:<br>13688364 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:**<br>Tennessee Court Services | | **For:**<br>Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:**<br>CVS Pharmacy, Inc. c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** CVS Pharmacy, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:** Registered Agent, Jul 10, 2025, 1:13 pm EDT

**Documents:** Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**
1) Successful Attempt: Jul 10, 2025, 1:13 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by CVS Pharmacy, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown;

Served to CVS Pharmacy, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence                    Date

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

Date                    Commission Expires

_return_

**Baby Doe 1, et al.**    **Vs.**    **Allergan Finances, LLC., et al.**

Served On:

**CVS TN Distribution LLC**    c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4.29.2025

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Served to CVS TN Distribution LLC c/o CT Corporation System, Samantha Sutton (Registered Agent)

Date: 7/10/25    By: Jared Lawrence Process Server

TN Court Services
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923
Agency Address    (865) 964-9762

Please Print: Officer, Title

Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff    Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

_Rev. 03/11_

4883-7130-

# AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job:<br>13688393 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:**<br>Tennessee Court Services | | **For:**<br>Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:**<br>CVS TN Distribution LLC c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** CVS TN Distribution LLC c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:** Registered Agent, Jul 10, 2025, 1:14 pm EDT

**Documents:** Civil Summons, Complaint, Amended Complaint, and Motions

### Additional Comments:
1) Successful Attempt: Jul 10, 2025, 1:14 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by CVS TN Distribution LLC c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown;

Served to CVS TN Distribution LLC c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence                    Date    7/11/25

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

Date 7/11/25          Commission Expires 6/5/28

| Roane County<br>Circuit Court | STATE OF TENNESSEE<br>CIVIL SUMMONS<br>page 1 of 2 | Case Number<br>2025 CV46 |
|---|---|---|

| | Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. | |

Served On:

**CVS Indiana LLC**     c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: **4.29.2025** _____      _____ Clerk / Deputy Clerk

Attorney for Plaintiff:   Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____                    _____ Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: *Served to CVS Indiana LLC c/o CT Corporation System, Samantha Sutton (Registered Agent)*

Date: **7/10/25**          By: *Jared Lawrence Process Server*
                                 Please Print Officer Title

TN Court Services
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923
(865) 964-9702
Agency Address                         Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____                    _____
Notary Public / Deputy Clerk (Comm. Expires     )

_____                    _____
Signature of Plaintiff                    Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at (  )_____*

Rev. 03/11
4853-7130-

## AFFIDAVIT OF SERVICE

| Case: 2025CV46 | Court: In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job: 13703817 (2025CV46) |
|---|---|---|---|

| Plaintiff / Petitioner: BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | Defendant / Respondent: ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON |
|---|---|

| Received by: Tennessee Court Services | For: Herzfield Suetholz Gastel Leniski and Wall PLLC |
|---|---|

| To be served upon: CVS Indiana LLC c/o C T Corporation System |
|---|

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** CVS Indiana LLC c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:** Registered Agent, Jul 11, 2025, 11:43 am EDT

**Documents:** Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**
1) Successful Attempt: Jul 11, 2025, 11:43 am EDT at 300 Montvue Road, Knoxville, TN 37919 received by CVS Indiana LLC c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown; Served to CVS Indiana LLC c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence                          Date   7/11/25

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public   Frederick Logan Jackson

Date   7/11/25         Commission Expires   6/5/28

| **Roane County**<br>**Circuit Court** | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | **Case Number**<br>2025CV46 |
|---|---|---|

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al.** |
|---|---|---|

Served On:

**Tennessee CVS Pharmacy**        c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919
**LLC**

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4, 29, 2025

_Clerk / Deputy Clerk_

Attorney for Plaintiff:     Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk; _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____        _____
                                                    _Clerk / Deputy Clerk_

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Served to Tennesse CVS Pharmacy LLC c/o CT Corporation System, Samantha Buston (Registered Agent)

Date: 7/10/25        By: Jarrel Lawrence Process Server
TN Court Services        _Please Print: Officer, Title_
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923        _____
_Agency Address_  (865) 964-9762        _Signature_

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____        _____
_Signature of Plaintiff_        _Notary Public / Deputy Clerk (Comm. Expires _____)_

_____
_Plaintiff's Attorney (or Person Authorized to Serve Process)_

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____

Rev. 03/11
4883-7130-

## AFFIDAVIT OF SERVICE

| Case:<br>2025CV46 | Court:<br>In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job:<br>13688436 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:**<br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:**<br>Tennessee Court Services | | **For:**<br>Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:**<br>Tennessee CVS Pharmacy LLC c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**  Tennessee CVS Pharmacy LLC c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:**  Registered Agent, Jul 10, 2025, 1:14 pm EDT

**Documents:**  Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**
1) Successful Attempt: Jul 10, 2025, 1:14 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by Tennessee CVS Pharmacy LLC c/o C T Corporation System, Samantha Sutton (Registered Agent).
Served to Tennessee CVS Pharmacy LLC c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence                                   Date    7/11/25

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

Date  7/11/25                    Commission Expires  10/5/26

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | **Case Number**<br>2025CV46 |
|---|---|---|

| Baby Doe 1, et al, | Vs. | Allergan Finances, LLC., et al, |
|---|---|---|

Served On:

Walgreen, Co.      c/o Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois, 62701

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _4.29.2025_

Clerk / Deputy Clerk

Attorney for Plaintiff:      Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____              By: _____
                                              Please Print: Officer, Title

_____          _____
Agency Address                      Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage

prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____)

_____          _____
Signature of Plaintiff              Plaintiff's Attorney (or Person Authorized to Serve Process)

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____._

Rev. 03/11
4883-7130-

| Roane County Circuit Court | STATE OF TENNESSEE CIVIL SUMMONS page 2 of 2 | Case Number |
| --- | --- | --- |

Baby Doe 1, et al.          Vs.          Allergan Finances, LLC., et al,

**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

Case 3:25-cv-00383-TAV-JEM     Document 1-7     Filed 08/07/25     Page 292 of 454
PageID #: 727

4883-7130-

ClientCaseID: 80732    CaseReturnDate: 7/11/25

## ROANE COUNTY CIRCUIT COURT STATE OF TENNESSEE

Case Number **2025CV46**

I, JOHN PENNELL

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND LICENSED AS A PRIVATE DETECTIVE (LICENSE # 115.002074) UNDER THE PRIVATE DETECTIVE ACT OF 2004.

### CORPORATE SERVICE

THAT I SERVED THE WITHIN  SUMMONS & COMPLAINT
ON THE WITHIN NAMED DEFENDANT WALGREEN CO.
PERSON SERVED BAYLON ELFGEN, AUTHORIZED AGENT
BY LEAVING A COPY OF EACH WITH THE SAID DEFENDANT ON **7/14/25**

That the sex, race and approximate age of the whom I left the  SUMMONS & COMPLAINT are as follow:

Sex  MALE    Race  WHITE    Age  24    Height  6'3"    Build  250#    Hair  BRN

LOCATION OF SERVICE    **801  ADLAI STEVENSON DR.**
**SPRINGFIELD, IL, 62703**

Date Of Service    **7/14/25**    Time of Service    **12:10 PM**

JOHN  PENNELL                    7/14/2025
A PRIVATE INVESTIGATOR
PRIVATE DECTECTIVE # 115.002074

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

Pelnico

| Roane County<br>Circuit Court | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 2 | Case Number<br>2025CV46 |
|---|---|---|

| Baby Doe 1, et al. | Vs. | Allergan Finances, LLC., et al. |
|---|---|---|

Served On:

_Walmart, Inc._ c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 4-29-2025

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten-thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: Served to Walmart, Inc. c/o CT Corporation System, Samantha Sutton (Registered Agent)

Date: 7/10/25
TN Court Services
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923
Agency Address (865) 964-9762

By: Jarrod Lawrence Process Server
Please Print: Officer, Title

Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff

Plaintiff's Attorney (or Person Authorized to Serve Process)

ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.

Rev. 03/11
4883-7130-

## AFFIDAVIT OF SERVICE

| Case: 2025CV46 | Court: In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job: 13688502 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:** BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:** ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:** Tennessee Court Services | | **For:** Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:** Walmart, Inc. c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Walmart, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:** Registered Agent, Jul 10, 2025, 1:15 pm EDT

**Documents:** Civil Summons, Complaint, Amended Complaint, and Motions

### Additional Comments:

1) Successful Attempt: Jul 10, 2025, 1:15 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by Walmart, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown; Served to Walmart, Inc. c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence

Date 7/11/25

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

Date 7/11/25

Commission Expires 10/5/28

| **Roane County** **Circuit Court** | **STATE OF TENNESSEE** **CIVIL SUMMONS** page 1 of 2 | **Case Number** 2025CV46 |
|---|---|---|

| **Baby Doe 1, et al.** | **Vs.** | **Allergan Finances, LLC., et al.** |
|---|---|---|

Served On:

Wal-Mart Stores East L.P.   c/o CT Corporation System at 300 Montvue Road, Knoxville, Tennessee 37919

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:  4-29-2025

_____
Clerk / Deputy Clerk

Attorney for Plaintiff:   Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St, Ste 300, Nashville, TN 37212

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____          _____
                                        Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: *Served to Walmart Stores East L.P. c/o CT Corporation System Samantha Sutton (Registered Agent)*

Date: 7/10/25                        By: *Jared Lawrence Process Server*
                                        Please Print Officer, Title

TN Court Services
448 North Cedar Bluff, Ste 102
Knoxville, TN 37923
Agency Address    (865) 964-9762           _____
                                              Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____          _____
                                    Notary Public / Deputy Clerk (Comm. Expires _____ )

_____          _____
Signature of Plaintiff              Plaintiff's Attorney (or Person Authorized to Serve Process)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

Rev. 03/11
4883-7130-

# AFFIDAVIT OF SERVICE

| Case: 2025CV46 | Court: In The Circuit Court For The Ninth Judicial District Roane County, Tennessee | County: | Job: 13688472 (2025CV46) |
|---|---|---|---|
| **Plaintiff / Petitioner:** BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian ad litem | | **Defendant / Respondent:** ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON | | |
| **Received by:** Tennessee Court Services | | **For:** Herzfield Suetholz Gastel Leniski and Wall PLLC | |
| **To be served upon:** Wal-Mart Stores East L.P. c/o C T Corporation System | | | |

I, Jared Lawrence, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Wal-Mart Stores East L.P. c/o C T Corporation System, Samantha Sutton (Registered Agent), 300 Montvue Road, Knoxville, TN 37919

**Manner of Service:** Registered Agent, Jul 10, 2025, 1:15 pm EDT

**Documents:** Civil Summons, Complaint, Amended Complaint, and Motions

**Additional Comments:**
1) Successful Attempt: Jul 10, 2025, 1:15 pm EDT at 300 Montvue Road, Knoxville, TN 37919 received by Wal-Mart Stores East L.P. c/o C T Corporation System, Samantha Sutton (Registered Agent). Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 120; Height: 5'6"; Hair: Brown;
Served to Wal-Mart Stores East L.P. c/o C T Corporation System, Samantha Sutton (Registered Agent)

Jared Lawrence _____ Date 7/11/25

Tennessee Court Services
448 N Cedar Bluff Rd Ste 102
Knoxville, TN 37923
833-862-7827

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

Date 7/11/25

Commission Expires 6/5/28



**Herzfeld**
**Suetholz**
**Gastel**
**Leniski**
**and Wall**
**PLLC**

Tricia R. Herzfeld
1920 Adelicia St., Ste. 300
Nashville, TN 37212
Tel: (615) 800-6225
tricia@hsglawgroup.com

July 18, 2025

<u>**Via USPS**</u>
Roane County Circuit Court
200 East Race Street, Ste. 16
Kingston, TN 37763

    RE:  *Baby Doe et al. v. Teva Pharmaceuticals, et al.*
      Case No. 2025CV46

Dear Clerk,

   Enclosed please find the proofs of service for filing on the following Defendants:

1. Allergan Finance, LLC
2. Actavis  LLC
3. Actavis Pharma, Inc.
4. Teva Pharmaceuticals Usa, Inc.
5. Watson Laboratories, Inc.
6. Johnson & Johnson, Inc.
7. Janssen Pharmaceuticals, Inc.
8. KVK Tech, Inc.
9. Amerisourcebergen Drug Corp.
10. Cardinal Health, Inc.
11. CVS Pharmacy, Inc.
12. CVS Tn Distribution, LLC
13. CVS Indiana, LLC
14. Tennessee CVS Pharmacy, LLC
15. Walgreen Co.
16. Walmart Inc.
17. Wal-Mart Stores East, L.P.

Thank you kindly for your attention to this matter.

      Sincerely,
      *s/ Amber N. Szuch*
      Amber Szuch, Paralegal

Enclosures

Filed _____, 20___
ANN GOLDSTON Time_____
By_____ D.C.

| | |
|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian *ad litem*, <br><br> Plaintiffs, <br><br> v. <br><br> ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, JACOB DALTON, STEPHANIE PUCKETT and MICHAEL PUCKETT <br><br> Defendants. | **Civil Action No.: 2025 CV 46** <br><br> **JURY DEMAND** |

## MOTION TO EXTEND DATE FOR SERVICE OF PROCESS UPON BRIAN BREWSTER AND FOR A NEW SUMMONS

Filed _____ 7.25 , 20 25

ANN GOLDSTON Time 353

By _____ D.C.

1

Plaintiffs respectfully move the court to extend the date to serve Defendant Brian Brewster by 180 days and to issue a new summons for Plaintiffs to obtain service within that time frame.[1]

As detailed in the accompanying Declaration of Anthony A. Orlandi and attached exhibits, Plaintiffs have made numerous attempts to effectuate service of process on Mr. Brewster. Plaintiffs engaged a special process server and – after the special process server was unable to locate and serve Brewster – a Private Investigator. Despite extensive efforts, none have been able to effectuate service.

These extensive efforts have included: two attempts at an address associated with Brewster, calling phone numbers associated with Brewster, discussions with Brewster's parole officer, and discussions with the Monroe County Sheriff's Office (including with a detective there).[2] The private investigator attempted to serve Brewster at an address associated with Brewster but was told Brewster no longer lived there. The process server also conducted surveillance on July 25, 2025, but was unable to serve Brewster.

Plaintiffs respectfully move for an extension of 180 days to serve Brewster and for issuance of a new summons to Brewster. Plaintiffs have good cause for an extension: they have engaged in extensive efforts to locate Brewster (through two different companies) that have been unsuccessful thus far. Plaintiffs intend to continue efforts to serve Brewster.

---

[1] Per Tenn. R. Civ. P. 4.03(1), a return of the unserved Summons is included within Exhibit C to the accompanying Declaration of Anthony A. Orlandi. That return states a basis for non-service. This Motion and Orlandi Declaration exhibits outline additional reasons for non-service.
[2] The process server reported that the Sheriff's Office told the process server that someone had called the Sheriff's office asking who the process server had been attempting to serve. When the process server called that person and asked for Brewster, the person hung up immediately and would not answer any follow-up calls. This suggests that Brewster may be evading service.

2

Dated: July 25, 2025

/s/ Anthony A. Orlandi
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

Kevin W. Thompson (WVSB 5062)
David R. Barney, Jr. (WVSB 7958)
**THOMPSON BARNEY**
2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompsonwv@gmail.com
Email: drbarneywv@gmail.com

Donald E. Creadore (NYS Bar. Regis. No.
2090702)
**CREADORE LAW FIRM, P.C.**
450 Seventh Avenue - Suite 1901
New York, New York 10123
(O) 212.355.7200
(C) 917.226.1881
donald@creadorelawfirm.com

3

Stephen P. New (WVSB 7756)
STEPHEN NEW & ASSOCIATES
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newlawoffice.com

Kent Harrison Robbins (FL Bar No. 275484)
THE LAW OFFICES OF KENT HARRISON ROBBINS P.A.
242 Northeast 27th Street
Miami, Florida 33137
Telephone: (305) 532-0500
Facsimile: (305) 531-0150
Cell: (305) 632-1770
Email: khr@khrlawoffices.com

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document has been served by Email and/or U.S. Mail on this the 25th day of July, as follows:

The Corporation Trust Company of Nevada, 701 S. Carson Street, Suite 200, Carson City, Nevada 89701
*RA for Allergan Finance, LLC*

Corporation Service Company, 251 Little Falls Drive Wilmington, DE 19808
*RA for Actavis LLC*

Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203
*RA for Actavis Pharma, Inc. and Mckesson Corporation*

Corporate Creations Network, Inc., 1521 Concord Pipe, Ste. 201, Wilmington, DE 19803
*RA for Teva Pharmaceuticals USA, Inc.*

Corporate Creations Network Inc., 8275 South Eastern Ave, #200, Las Vegas, Nevada 89123
*RA for Watson Laboratories, Inc.*

CT Corporation System at 820 Bear Tavern Road in West Trenton, NJ 08628
*RA for Johnson & Johnson*

CT Corporation Systems, 300 Montvue Road, Knoxville, Tennessee 37919
*RA for Janssen Pharmaceuticals, Inc.; Amerisourcebergen Drug Corp.; CVS Pharmacy, Inc.; CVS TN Distribution, LLC; Tennessee CVS Pharmacy, LLC; Walmart, Inc.; Wal-Mart Stores East LLP*

110 Terry Drive, Newtown, PA 18940
*KVK Tech, Inc.*

CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219
*RA for Cardinal Health, Inc.*

Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois, 62701
*RA for Walgreen Co.*

Forrest L. Wallace
Law Office of Forrest Wallace

5

1518 N. Broadway Street
Knoxville, TN 37917
865-850-2302
fwallace@forrestwallace.com
***Attorney for Jacob Dalton***

Stephanie Puckett
1112 Old North Kentucky St.
Kingston, TN 37763

Michel Puckett
111 Bowman Ln.
Crab Orchard, TN 37723

William Baird
431 Ash Cabin Hollow Road
Harriman, TN 37748

*/s/ Anthony A. Orlandi*
Anthony A. Orlandi

IN THE CIRCUIT COURT FOR THE NINTH JUDICIAL DISTRICT
ROANE COUNTY, TENNESSEE

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian *ad litem*,<br><br>Plaintiffs,<br><br>v.<br><br>ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, JACOB DALTON, STEPHANIE PUCKETT and MICHAEL PUCKETT | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: 2025 CV 46<br><br>**JURY DEMAND** |

Defendants.

### DECLARATION OF ANTHONY A. ORLANDI IN SUPPORT OF PLAINTIFFS' MOTION TO EXTEND DATE FOR SERVICE OF PROCESS UPON BRIAN BREWSTER AND FOR NEW SUMMONS

Filed_____7.25_____20__
ANN GOLDSTON Time____
By_____D.C.

I, Anthony A. Orlandi, hereby declare and state as follows:

1. I am over 21 years of age.

2. I am competent to testify to the matters stated herein.

3. I have personal knowledge of the matters contained herein.

4. I am a member of Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC ("HSG") of Nashville, Tennessee. My firm represents Baby Doe 1, et al. ("Plaintiffs") in this lawsuit.

5. I respectfully submit this affidavit in support of the Plaintiffs' Motion to Extend Date for Service of Process Upon Brian Brewster.

6. Plaintiffs have engaged two different companies in an effort to serve Brewster.

7. Attached as **Exhibit A** is a true and accurate copy of a June 24, 2025 email from a process server describing multiple efforts to serve on Brewster.

8. Attached as **Exhibit B** is a true and accurate copy of July 1, 2025 email from the same process server describing additional efforts to serve Brewster.

9. Plaintiffs thereafter retained a private investigator to attempt service.

10. Attached as **Exhibit C** is a true and accurate copy of a July 19, 2025 Description of Non-Service by the private investigator.

11. I am informed that the private investigator has also conducted at least two hours of surveillance on July 25, 2025, but has been unable to serve Brewster despite those efforts. I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on this 25th day of July 2025.

_____
Anthony A. Orlandi

2

# EXHIBIT A

**From:** Paraclete Investigations
**To:** Amber Szuch
**Subject:** Attempted Service of Brian K. BREWSTER
**Date:** Tuesday, June 24, 2025 2:51:19 PM

---

**[EXTERNAL EMAIL]** Do not click links or attachments unless you recognize the sender and know the content is safe.

Good afternoon,

Today I made two attempts to serve Brian Keith BREWSTER at 123 Parrish Road in Sweetwater Tennessee.

**Off the record info:** *Prior to traveling to Sweetwater, I spoke to BREWSTER's "covering" probation officer who advised of an outstanding warrant for probation violation. They also validated the address on file for BREWSTER.*

I also checked all counties surrounding Sweetwater to determine if BREWSTER was currently in custody. Nothing found.

When I arrived there was only a black Chrysler 200 (TN: 382FNQ) parked in the driveway. This vehicle was not registered to BREWSTER. I knocked loudly 4 separate times however no one answered the door. I also knocked (several times) at one of the rundown campers on the property. No one answered. I talked to several construction workers across the dirt road from 123 Parrish Road and they advised that several males live in the house. There was one male who was later observed coming out of the camper who was "tweeking" real bad. He continued to walk up and down the street so I was able to visually determine that it was not BREWSTER. When I tried to speak with this male, he was so out of it that he would not even acknowledge me when I tried to speak with him.

I even tried to call several phone numbers listed for BREWSTER but they were not active or no one answered.

I then went to the Monroe Sheriff's Office to speak to them just to determine that BREWSTER was not in jail or being processed .

On my way back to 123 Parrish Road (for a second attempt), I received a call from the Sheriff's Office advising that someone had called them asking who I was attempting to serve. The Sheriff's Office gave me the phone number of the person who called and asked me to call them because they might be able to assist in getting BREWSTER served. When I called, I asked for them by name and they immediately hung up on me. I even tried to call back but they never answered again. I will research the number..

I completed the second attempt but no one ever answered and the Chrysler 200 was no longer in the driveway. I did speak with a detective at Monroe County and I am hoping he has enough interest in checking on the lead of the active warrant.

I will continue to check on jail access in Monroe county tonight.

All attempts were captured on video.

Thanks,

**Barry Johnson - Owner / Investigator**

# EXHIBIT B

| From: | Paraclete Investigations |
| To: | Amber Szuch |
| Subject: | Brian Keith Brewster |
| Date: | Tuesday, July 1, 2025 7:33:52 AM |

**[EXTERNAL EMAIL]** Do not click links or attachments unless you recognize the sender and know the content is safe.

Good morning,

Every morning, I have been checking to locate Brester in area jails but I still have not located him. Since he has an outstanding warrant, LE and his probation officer should be looking for him as well.

I will let you know once I do.



**East Tennessee Investigations and Services Inc.**
PO Box 482
Tellico Plains, Tn 37385
Phone 9542754239

| | | | | |
|---|---|---|---|---|
| | | Job: | 13760777 | Due: _____ |
| | | Party to Serve: | Brian Brewster | |
| | | Server: | Mark Geno | Fee: _____ |

| Case | 2025cv46 | Plaintiff | Baby Doe |
|---|---|---|---|
| Court | Roane County Circuit Court | Defendant | Allergan Finance |
| Documents | | | |
| Instructions: | | | |

**Address**
123 Parris Road, Sweetwater, TN 37874

**Brian Brewster**

| Date & Time: | Description of Service / Recipient: |
|---|---|

7-19-25   1318  Wrong address py current tenant and olds female outside. Both stated the defendant has not lived there in over a year.

Age: _____   Gender: _____   Ethnicity: _____   Weight: _____

Height: _____   Hair: _____   Eyes: _____   Relationship: _____

*Mark Geno*  7-19-25

MARK GENO
PROCESS SERVER
EAST TN INVESTIGATIONS
P.O. Box 482, TELLICO PLAINS, TN 37385
PH: 8 02-7 5-3316

| Roane County Circuit Court | **STATE OF TENNESSEE CIVIL SUMMONS** page 1 of 2 | Case Number 2025 CV 46 |
|---|---|---|

Baby Doe 1, et al.     **Vs.**     Allergan Finances, LLC., et al.

Served On:

Brian Brewster     123 Parris Road Sweetwater, TN 37874.

You are hereby summoned to defend a civil action filed against you in Circuit Court, Sevier County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: 6.9.2025

Clerk / Deputy Clerk

Attorney for Plaintiff: Tricia R. Herzfeld, Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC, 1920 Adelicia St. Ste 300, Nashville, TN 37212

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

OFFICER'S RETURN: Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Non-Service - wrong address

Date: 7-15-25     By: Mark Geno
Please Print, Officer, Title

197 Bank St, Tellico Plains TN 37385
Agency Address

Signature

RETURN ON SERVICE OF SUMMONS BY MAIL: I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Notary Public / Deputy Clerk (Comm. Expires _____)

_____
Signature of Plaintiff

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)

MARK GENO
PROCESS SERVER
EAST TN
Tellico Plains TN 37385
PH: 302-712-3216

*ADA. If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____*

Rev. 03/11

4883-7130-

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 2025 CV 46 |
| v. | ) ) | **JURY DEMAND** |
| TEVA PHARMACEUTICALS USA, INC., et al | ) ) ) ) | |
| Defendants. | ) | |

## PROPOSED ORDER ON MOTION TO EXTEND DATE FOR SERVICE UPON BRIAN BREWSTER AND FOR NEW SUMMONS

On July 25, 2025, Plaintiffs filed a Motion to Extend the date for service upon Defendant, Brian Brewster, and for issuance of a new summons. For good cause shown, Plaintiffs' Motion is GRANTED. Plaintiffs may obtain a new summons and are granted an extension of 180 days from the date of entry of this order to serve Brian Brewster.

Entered this the _____ day of _____, 2025.

_____
Circuit Court Judge

Filed_____ 7·25 ,20 25
ANN GOLDSTON Time 353
By_____ D.C.

1

**IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT**
**ROANE COUNTY, TENNESSEE**

|  |  |  |
|---|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil Action No.:** 2025CV46 |
| **v.** | ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** | ) ) ) | |
| **Defendants.** | ) ) | |

## MOTION TO APPOINT GUARDIAN AD LITEM FOR THE BABY DOE PLAINTIFFS

Plaintiffs Baby Doe 1, Baby Doe 2, and Baby Doe 3 (the "Baby Doe Plaintiffs") have simultaneously filed a Complaint. Mary Doe is the natural parent of Baby Doe 1, Baby Doe 2 and Baby Doe 3, (collectively referred to herein as the "Baby Doe Plaintiffs). She is the current parent and legal guardian of Baby Doe 2 and Baby Doe 3. Mary Doe's sister, Jane Doe, is the current legal guardian of Baby Doe 1.

Mary Doe and Jane Doe respectfully request that the Court appoint a Guardian *ad litem* ("GAL") solely for the purposes of pursuing litigation on behalf of the Baby Doe Plaintiffs for damages resulting from their *in utero* drug exposure. The Baby Doe Plaintiffs were exposed to opioids prior to birth and, as a result, they were all born with Neonatal Abstinence Syndrome.

Because a lawsuit of this nature would inherently place the needs of the children directly in conflict with the interests of the parents, a GAL should be appointed to pursue claims that may be available to them.

Filed _4.29_, 20_25_
ANN GOLDSTON Time _1:05_
By _____ D.C.

1

Mary Doe and Jane Doe, who (collectively) are the parents and legal guardians of the Baby Doe Plaintiffs, are fully in agreement with this motion and believe that the Baby Doe Plaintiffs would be best served to have a GAL appointed to represent their needs in this very limited manner.

Pursuant to Tennessee Rules of Civil Procedure 17.03, the appointment of a GAL is appropriate under these circumstances. In fact, such a situation is specifically discussed in the Advisory Commission Comments: "Rule 17.03 establishes a uniform practice regarding suits brought on behalf of an infant or incompetent person, and, when justice requires, allows suit by next friend and requires that the court appoint a guardian ad litem."

The proposed GAL is Tim Householder. Mr. Householder is more than qualified to serve as the GAL in this context. Mr. Householder has nearly 25 years of legal experience. Among other forms of service, he has served as a Member of the House of Delegates of the Tennessee Bar Association and as a Member of the Board of Governors of Tennessee Trial Lawyers Association. He is prepared to serve as the GAL if appointed by the Court, and has agreed not to request any fee for his time or expenses from the Administrative Office of the Courts. Instead, if appointed, Mr. Householder intends to keep detailed billing records for potential submission as a cost in the underlying litigation.

Accordingly, Mary Doe and Jane Doe, request that this Court appoint Tim Householder to serve as GAL for the Baby Doe Plaintiffs for the limited purpose of pursuing litigation on their behalf relating to their *in utero* opioid drug exposure.

Dated: April 25, 2025                    Respectfully submitted,

*/s/ Tricia R. Herzfeld*

**HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St., Suite 300
Nashville, Tennessee 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

*Counsel for Plaintiffs*

3

**IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL DISTRICT** *Ninth*
**ROANE COUNTY, TENNESSEE**

| | |
|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** ) ) ) ) | |
| **Plaintiffs,** ) | **Civil Action No.: 2025CV46** |
| ) | |
| **v.** ) | **JURY DEMAND** |
| ) | |
| **TEVA PHARMACEUTICALS USA, INC., et al** ) ) | |
| ) | |
| **Defendants.** ) | |

## PROPOSED ORDER APPOINTING TIM HOUSEHOLDER AS GUARDIAN AD LITEM FOR THE BABY DOE PLAINTIFFS

This matter involves a lawsuit relating to the Baby Doe Plaintiffs' exposure to opioids *in utero*. The appointment of a guardian ad litem for the Baby Doe Plaintiffs is required pursuant to Tenn. Code Ann. § 37-1-149, because the Baby Doe Plaintiffs are parties to this lawsuit and their interests may conflict with those of their respective parents and legal guardians.

**IT IS THEREFORE ORDERED**:

1. Tim Householder is appointed Guardian Ad Litem for the Baby Doe Plaintiffs;

2. The guardian ad litem will represent the Baby Doe Plaintiffs' interests throughout the pendency of any lawsuit involving the minor child's drug exposure *in utero* (including any prelitigation investigation and throughout any potential appeals process); and

3. The guardian ad litem will not be compensated through the administrative office of the courts and instead shall keep accurate billing records of his/her billable time as he/she may be able to recoup his/her time through the litigation.

Filed_____4.29____,2025
ANN GOLDSTON Time_020
By_____D.C.

**IT IS FURTHER ORDERED** that Tim Householder is to represent the best interest of the Baby Doe Plaintiffs throughout the pendency of any litigation and any appeals and is fully empowered by this appointment to make all litigation decisions on behalf of the Baby Doe Plaintiffs.

Entered this the _____ day of _____, 2025.

_____
Circuit Court Judge

# IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ Ninth JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

|  |  |
|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** ) ) ) ) | |
| **Plaintiffs,** ) ) | **Civil Action No.:** 2025 CV46 |
| **v.** ) ) | **JURY DEMAND** |
| **TEVA PHARMACEUTICALS USA, INC., et al** ) ) ) | |
| **Defendants.** ) | |

### MOTION FOR BABY DOE PLAINTIFFS TO PROCEED BY PSEUDONYM

This action concerns three minor children[1] who were born dependent on opioids. It centers around the illegal opioid use of their biological mothers and the immediate and long-term damages caused by their *in utero* opioid exposure. The privacy and protection of the Baby Doe Plaintiffs are paramount in this case. Due to the highly private and sensitive nature of these facts, the Baby Doe Plaintiffs and their family face embarrassment and psychological harm if publicly identified.

The Baby Doe Plaintiffs move this Court to minimize these risks by granting their motion to proceed by pseudonym. A proposed order is attached. This Motion is also supported by the Declaration of Tricia Herzfeld.

### ARGUMENT

When a case involves sensitive subject matter and a minor plaintiff, Tennessee courts customarily allow the minor plaintiffs and their parents/guardians to proceed pseudonymously.[2] It

---

[1] BABY DOE 1, BABY DOE 2 and BABY DOE 3 (collectively "the Baby Doe Plaintiffs").

[2] *See, e.g.*, *State ex rel. T.H. by H.H. v. Min*, 802 S.W.2d 625, 625 (Tenn. Ct. App 1990) (allowing minor and parents to proceed pseudonymously in termination of parental rights case); *Doe 1 v. Woodland Presbyterian*, 2022 WL 1837455, at *1 n.4 (Tenn. Ct. App. Jun. 3, 2022) (allowing

Filed _____4.29_____, 20 25

ANN GOLDSTON Time _____1:06_____

By _____ D.C.

1

is the duty of the court when an action "is brought on behalf of very young children," to "grant a heightened protection" as to the identity of the children.[3] This Court must weigh "'the gravity of danger posed…in light of the special vulnerability of these child-plaintiffs.'"[4]

Because of the highly sensitive nature of this case, the Baby Doe Plaintiffs specifically request the use of pseudonyms (as opposed to initials), because anything less would be insufficient to protect their identities. First, the Baby Doe Plaintiffs are siblings. Second, the Complaint identifies their birthdates and birth locations and sibling status. Third, all of the Baby Doe Plaintiffs were born in the same community. With this level of information, any curious onlooker could potentially deduce their identities. These children are especially vulnerable plaintiffs, and they require an additional layer of anonymity.

In support of their motion and in compliance, the Baby Doe Plaintiffs have attached an accompanying affidavit. The Baby Doe Plaintiffs are particularly vulnerable Plaintiffs engaged in high stakes, high publicity litigation. Plaintiffs respectfully request that this Court enter an order permitting them to proceed via pseudonym to shield them from embarrassment and potential harm. In other Tennessee actions alleging the same types of opioid-related claims, trial courts have permitted the Baby Does to proceed under a pseudonym. (*See* **Ex. A** to Herzfeld Affidavit, Order Allowing the Baby Doe Plaintiffs to Proceed by Pseudonym in *Baby Doe, et al v. Endo Health*

---

plaintiffs in clergy abuse case who were minors at the time of abuse to proceed pseudonymously); *In re Candace J.*, 2016 WL 944268, at *1 (Tenn. Ct. App. Mar. 11, 2016) ("[i]n cases involving a minor child, it is this Court's policy to redact names to protect the child's anonymity"); *In re C.J.A.H.*, 2015 WL 7720433, at *1 n.1 (Tenn. Ct. App. Nov. 30 2015) (termination of parental rights case in which the minor and her family were allowed to proceed pseudonymously); *Doe v. Mama Taori's Premium Pizza, LLC*, 2001 WL 327906, at *1 n.1 (Tenn. Ct. App. Apr. 5, 2001) (statutory rape case where the court determined "[b]ecause of the subject matter of this case, we have given the minor plaintiff and his parents pseudonymous designations").

[3] *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004) (citing *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981).

[4] *Id.* (quoting *Stegall*, 653 F.2d at 186).

*Solutions, et al.*, Case No. 22C1563 (Davidson County, Tenn. Circuit Court.) Baby Doe Plaintiffs

seek the same relief here.

**CONCLUSION**

For these reasons, the Baby Doe Plaintiffs' request that the Court grant their Motion to

Proceed by Pseudonym and enter the attached proposed order, which would allow each Baby Doe

Plaintiff to proceed under their respective pseudonyms for the duration of this action.

Dated: April 25, 2025     Respectfully submitted,

_/s/Tricia R. Herzfeld_
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI & WALL PLLC**
Tricia Herzfeld (TN BPR #26014)
Anthony Orlandi (TN BPR #33988)
1920 Adelicia St. Suite 300
Nashville, Tennessee 37212
Telephone: (615) 800-6225
Email: tricia@hsglawgroup.com
Email: tony@hsglawgroup.com

_Counsel for Plaintiffs_

**IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ *Ninth* JUDICIAL DISTRICT**
**ROANE COUNTY, TENNESSEE**

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No.: 2025CV46 |
| v. | ) ) | **JURY DEMAND** |
| TEVA PHARMACEUTICALS USA, INC., et al | ) ) ) ) | |
| Defendants. | ) ) | |

## [PROPOSED] ORDER ALLOWING THE BABY DOE PLAINTIFFS TO PROCEED BY PSEUDONYM

The Baby Doe Plaintiffs filed this action on April 25, 2025 and simultaneously filed a motion for the Baby Doe Plaintiffs to proceed by pseudonym.

Upon review of the motion and the entire record in the case, the court finds as follows:

1. This action involves highly private and sensitive facts related to the Baby Doe Plaintiffs' exposure to opioids *in utero* that threaten the Baby Doe Plaintiffs' privacy and protection;

2. The Baby Doe Plaintiffs and their families face embarrassment and psychological harm if publicly identified as parties to this action;

3. It is necessary to allow the Baby Doe Plaintiffs and their family members to proceed by pseudonym to protect their identities; and

4. There will be no prejudice to any party or the public by allowing the Baby Doe Plaintiffs to proceed by pseudonym.

Filed 4-29-2025
ANN GOLDSTON Time 1022
By_____ D.C.

1

**IT IS THEREFORE ORDERED** that the Baby Doe Plaintiffs are allowed to proceed by their respective pseudonyms, to wit: Baby Doe 1, Baby Doe 2 and Baby Doe 3.

**IT IS FURTHER ORDERED** that any family members of the Baby Doe Plaintiffs will be referred to by their respective pseudonyms, to wit: the Does.

Entered this the _____ day of _____, 2025.


_____
Circuit Court Judge

# IN THE CIRCUIT COURT FOR THE ~~TWENTIETH~~ Ninth JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

| | |
|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their guardian *ad litem*,** ) ) ) | |
| ) | |
| **Plaintiffs,** ) | **Civil Action No.: 2025CV46** |
| ) | |
| **v.** ) | **JURY DEMAND** |
| ) | |
| **TEVA PHARMACEUTICALS USA, INC., et al** ) ) | |
| ) | |
| **Defendants.** ) | |

## DECLARATION OF TRICIA R. HERZFELD IN SUPPORT OF THE BABY DOE PLAINITFFS' MOTION TO PROCEED BY PSEUDONYM

### INTRODUCTION

I, Tricia R. Herzfeld, after having been duly sworn, state as follows:

1.     I am over 21 years of age.

2.     I am competent to testify to the matters stated herein.

3.     I have personal knowledge of the matters contained herein.

4.     I am a member of Herzfeld Suetholz Gastel Leniski & Wall, PLLC in Nashville, Tennessee. My firm represents Baby Doe 1, Baby Doe 2 and Baby Doe 3 (collectively the "Baby Doe Plaintiffs") in this lawsuit.

5.     I respectfully submit this affidavit in support of the Baby Doe Plaintiffs' Motion to Proceed Pseudonymously.

6.     Baby Doe 1 is a minor who was born on June 16, 2012 at Methodist Medical Center in Oak Ridge, Tennessee.

7. Baby Doe 2 is a minor who was born on November 14, 2016 at the University of Tennessee Medical Center.

8. Baby Doe 3 is a minor who was born on January 31, 2019 in the Sacred Heart Hospital in Pensacola, Florida.

9. Baby Doe 1, Baby Doe 2 and Baby Doe 3 are siblings.

10. The Baby Doe Plaintiffs were each diagnosed with Neonatal Abstinence Syndrome ("NAS") at birth as a result of their exposure to opioids *in utero*.

11. The Baby Doe Plaintiffs each continue to suffer psychologically from their *in utero* exposure to opioids.

12. The case concerns the medical diagnoses and ongoing medical treatment of the Baby Doe Plaintiffs, and disclosure of their identities would publicly identify them as victims of NAS and subject them to unnecessary scrutiny during the litigation and thereafter.

13. The disclosure of the identities of the Baby Doe Plaintiffs and their diagnosis of NAS to the public has the potential to cause severe embarrassment and stress to the Baby Doe Plaintiffs and their family, compounding the damage which they have suffered as a result of their *in utero* exposure to opioids.

14. Defendants will not be prejudiced by the Baby Doe Plaintiffs proceeding pseudonymously.

15. Allowing the Baby Doe Plaintiffs to proceed pseudonymously will not interfere with the public's right to follow these proceedings.

16. In other actions involving similar claims by Baby Does, courts have permitted the Baby Does to proceed via pseudonym. For example, attached as **Exhibit A** is an Order entered by the Davidson County Circuit court in a previously filed matter.

2

I declare under penalty of perjury that the foregoing is true and correct.

Tricia R. Herzfeld

Dated this 25th day of April, 2025.

# EXHIBIT A

## IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL DISTRICT
## DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| BABY DOE and BROTHER DOE; BABY ROE, BROTHER ROE, and SISTER ROE; and BABY SMITH, by and through their guardian *ad litem*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COMPANIES, INC. f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.; IMPAX LABORATORIES; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; TEVA PHARMACEUTICALS USA, INC.; ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; RITE AID HDQTRS. CORP.; RITE AID OF TENNESSEE, INC.; RITE AID OF MARYLAND, INC. d/b/a RITE AID MID-ATLANTIC CUSTOMER SUPPORT CENTER, INC.; WALGREEN CO.; WALMART INC.; WAL-MART STORES EAST, L.P.; TIMOTHY ABBOTT; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: _ _ _ _ _ _ _ _ _ _ JURY DEMAND |

1

| CINDY SCOTT; | ) |
| HEMAL MEHTA; | ) |
| HEATHER MARKS; | ) |
| JAMES MACCARONE; and | ) |
| DEL MAR MEDICAL, INC. d/b/a | ) |
| PARDUE'S PHARMACY, | ) |
| | ) |
| Defendants. | ) |

---

## [PROPOSED] ORDER ALLOWING THE BABY DOE PLAINTIFFS TO PROCEED BY PSEUDONYM

---

The Baby Doe Plaintiffs filed this action on August 3, 2022 and simultaneously filed a motion for the Baby Doe Plaintiffs to proceed by pseudonym.

Upon review of the motion, statements of the parties, and the entire record in this case, the Court finds as follows:

1. This action involves highly private and sensitive facts related to the Baby Doe Plaintiffs' exposure to opioids *in utero* that threaten the Baby Doe Plaintiffs' privacy and protection;

2. The Baby Doe Plaintiffs and their families face embarrassment and psychological harm if publicly identified as parties to this action;

3. It is necessary to allow the Baby Doe Plaintiffs and their family members to proceed by pseudonym to protect their identities; and

4. There will be no prejudice to any party or the public by allowing the Baby Doe Plaintiffs to proceed by pseudonym.

**IT IS THEREFORE ORDERED** that the Baby Doe Plaintiffs are allowed to proceed by their respective pseudonyms, to wit: Baby Doe, Brother Doe, Baby Roe, Brother Roe, Sister Roe, and Baby Smith.

**IT IS FURTHER ORDERED** that any family members of the Baby Doe Plaintiffs will be referred to by their respective pseudonyms, to wit: the Does, the Roes, and the Smiths.

2

Entered this the _____ day of _____, 2022.

_____
Judge

3

## IN THE CIRCUIT COURT FOR THE NINTH JUDICIAL DISTRICT
## ROANE COUNTY, TENNESSEE

| | |
|---|---|
| **BABY DOE 1, BABY DOE 2, and BABY DOE 3, by and through their Guardian *ad litem*,** | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; TEVA PHARMACEUTICALS USA, INC.; WATSON LABORATORIES; JOHNSON & JOHNSON, INC.; JANSSEN PHARMACEUTICALS, INC., KVK TECH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALGREEN CO.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WAL-MART, INC.; WAL-MART STORES EAST, L.P.; WILLIAM BAIRD, BRIAN BREWSTER, JACOB DALTON, STEPHANIE PUCKETT and MICHAEL PUCKETT** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Civil Action No.:** 25-CV-46

**JURY DEMAND**

**Defendants.**

**COMPLAINT**

Filed 7-8 , 2025
ANN GOLDSTON Time
BY____ D.C.

4. The Baby Doe Plaintiffs were born dependent on opioids. They bring suit against people and companies that supplied and otherwise facilitated the illegal drug market in their community. These include:

  a. The "Producer Defendants" or "Drug Producer Defendants": ACTAVIS LLC, ACTAVIS PHARMA, INC., ALLERGAN FINANCES, LLC, and WATSON LABORATORIES, INC. (collectively "Allergan"); JANSSEN PHARMACEUTICALS, INC. and JOHNSON & JOHNSON, INC. (collectively "J&J"); TEVA PHARMACEUTICAL USA, INC. ("Teva"); and KVK TECH. INC.;

  b. The "Drug Distributor Defendants" or "the Distributor Defendants": AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") and CARDINAL HEALTH, INC. ("Cardinal Health"); and MCKESSON CORPORATION ("McKesson");

  c. The "Pharmacy Chain Defendants": WALGREEN CO. ("Walgreens"); WAL-MART, INC. and WAL-MART STORES EAST, L.P. ("Walmart"); and CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC, CVS INDIANA, LLC; AND TENNESSEE CVS PHARMACY, LLC ("CVS");

  The "Pill Mill Defendants": Stephanie Puckett and Michael Puckett; and

  d. The "Individual Dealer Defendants": WILLIAM BAIRD, BRIAN BREWSTER, and JACOB DALTON

5. As described below, the Producer Defendants, the Drug Distributor Defendants, the Pharmacy Chain Defendants, Pill Mill Defendants, and the Individual Drug Dealer Defendants committed various acts that were intended to—and did—facilitate illegal diversion of their drugs.

6. Indeed, upon information and belief, Defendants spent years convincing suspicious doctors that prescription opioids' addictive properties had been overblown, aggressively marketing opioids, and/or filling suspicious orders and suspicious prescriptions even when these Defendants knew that millions of Americans and hundreds of thousands of Tennesseans were abusing and misusing prescription opioids. Defendants had to have known that entire regions of the country were being devastated by addiction to prescription drugs that they distributed. They also

recognized or should have recognized that prescribers were writing – and pharmacies filling – volumes of opioids that necessarily were both creating and supplying large volumes of drug addicts and pill seekers. Nevertheless, the Drug Producer Defendants, Drug Distributor Defendants, Pharmacy Chain Defendants, Pill Mill Defendants, and Individual Dealer Defendants persisted with distributing incredible volumes of opioids into these same abuse-riddled communities.

7. Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."[4] For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.[5] If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain.[6]

8. Upon information and belief, the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants violated those Tennessee obligations, resulting in drugs that entered the illegal drug market. This included distributing drugs without maintaining necessary controls (rendering the distribution unlawful) and knowingly distributing those drugs into channels that they knew were resulting in diversion, and supplying opioids into Tennessee communities at levels that far exceeded any conceivable legitimate medical need, knowingly encouraging high-volume

---

[4] Tenn. Code Ann. § 39-17-407.

[5] *See, e.g.*, Tenn. Code Ann. § 53-11-302, -303, -312(c), 401(a), *and* Rules of Tenn. Bd. Of Pharmacy, Ch. 1140-02.01; *see also* Tenn. Code Ann.§ 53-10-312.

[6] *See* Tenn. Code Ann. § 53-11-401.[7] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune.com, Nov. 9, 2011. Available at: http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/.

pill mill prescribers to prescribe opioids without a legitimate medical purpose, and supplying pharmacies serving pill mills.

9. Upon information and belief, the Producer Defendants also committed various other acts intended to facilitate the illegal drug market including, inter alia:

e. waging a public campaign of misinformation concerning opioids (including through "key opinion leaders" and front groups);

f. encouraging prescribers to engage in prescription practices that the Producer Defendants knew and expected would drive up addiction rates;

g. repeatedly calling on and targeting the highest volume prescribers to prescribe more opioids while knowing that those prescribers were or were likely operating pill mills;

h. convincing naïve doctors willing to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale; devising marketing strategies to overcome prescribers' legitimate objections to prescribing opioids for long-term use and in higher doses;

i. convincing prescribers whom defendants knew were likely engaging in unlawful conduct and feeding the illegal drug market to prescribe even more opioids;

j. incentivizing sales representatives to do business both with pill mills and with pharmacies supplying pill mills through volume-based compensation (and financially rewarding those sales associates for doing so);

k. adding high-volume prescribers and pharmacies as customers without any (or adequate) due diligence, knowing that there was a strong likelihood that these high-volume businesses were running or supplying pill mills;

l. filling suspicious orders despite knowing or reasonably suspecting that the orders reflected diversion;

m. filling suspicious orders without any investigation;

n. filling suspicious orders even where they met the Producer Defendants' own criteria for orders reflecting potential diversion;

o. filling orders that they had subjectively identified as suspicious before undertaking or completing an investigation;

p. continuing to do business with prescribers and pharmacies that had a history of suspicious prescribing or ordering practices;

q. implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded;

r. continuing to target pill mill prescribers to prescribe more opioids and to target associated pharmacies that served them, even after being told by law enforcement that they were likely feeding the illegal drug market;

s. supplying outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need;

t. over-supplying Tennessee with opioids while recognizing that doing so would create addicts and expand the illegal drug market; and

u. choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

10. Upon information and belief, the Distributor Defendants and the Pharmacy Chain Defendants committed similar acts that facilitated the diversion of drugs into the illegal drug market in Tennessee:

a. failing to maintain effective controls against diversion as required by Tennessee law;

b. filling suspicious orders despite knowing or reasonably suspecting that the orders reflected diversion;

c. filling suspicious orders without any investigation;

d. filling suspicious orders even where they met these Defendants' own criteria for orders reflecting potential diversion;

e. filling orders that they had subjectively identified as suspicious before undertaking or completing an investigation;

f. continuing to do business with pharmacies that had a history of suspicious prescribing or ordering practices, or that the Defendants were aware were filling prescriptions for suspicious prescribers;

g. implementing sham suspicious order monitoring programs that were structured to fail;

h. supplying outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need; and

i. Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

11.     Moreover, upon information and belief, everyone in the distribution chain collaborated to get around whatever sham suspicious order monitoring systems that the drug producers may have put in place by offering sham justifications for suspicious orders that everyone in the chain accepted without question, no matter how ludicrous – thereby giving the Producer Defendants, Distributor Defendants, and the Pharmacy Chain Defendants a convenient pretense to make, fill, and ship orders that they knew would supply the illegal drug market.

12.     Upon information and belief, through this symbiotic relationship, they persisted in filling suspicious orders for large volumes of products, calling on suspicious prescribers and pharmacies, filling suspicious prescriptions, and/or otherwise shipping drugs to Tennessee communities ravaged by the opioid epidemic at levels far exceeding any conceivable need. They knew that their actions would cause (and in fact did cause) increased abuse, addiction, and overdose rates in Tennessee. They also knew or should have known that their actions facilitated illegal drug transactions in Tennessee.

13.     The Pill Mill Defendants and the Individual Dealer Defendants also illegally distributed and sold prescription opioids as part of Tennessee's illegal drug market.

14.     Defendants' misconduct garnered significant profits. In 2010 alone, opioids generated $11 billion in revenue for drug companies.[7] Opioids are now among the most prescribed class of drugs and the United States' opioid painkiller market is worth an estimated $10 billion annually.[8] According to Fortune magazine, the Distributor Defendants are each among the top 15

---

[7] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune.com, Nov. 9, 2011. Available at: http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/.
[8] Ariana Eunjung Cha, *The drug industry's answer to opioid addiction: More pills*, The Washington Post, Oct. 16, 2016. Available at: https://www.washingtonpost.com/national/the-drug-industrys-answer-to-opioid-addiction-more-pills/2016/10/15/181a529c-8ae4-11e6-bff0-d53f592f176e_story.html?utm_term=.42e0328ca459.

companies in the 2022 Fortune 500: AmerisourceBergen, No. 10, with $213 billion in total revenue; and Cardinal Health, No. 15, with $162 billion in total revenue.[9]

15.     The Baby Doe Plaintiffs now sue to recover damages for which Defendants are liable under the DDLA.

**JURISDICTION AND VENUE**

16.     Jurisdiction is proper pursuant to Tenn. Code Ann. § 16-10-101, et seq., and Tennessee's Drug Dealer Liability Act, Tenn. Code Ann. § 29-38-101, et seq. Baby Doe 1 was born in Roane County, Tennessee. Mary Doe consumed and made unlawful purchases of opioids in Roane County before and during her pregnancies with each of the Baby Does.

17.     Venue is proper pursuant to Tenn. Code Ann. § 20-4-101 because the minor children reside in Roane County, and their birth mother purchased, was prescribed, and consumed legal and illegal opioids in Roane County, Tennessee.

**BACKGROUND CONCERNING MARY DOE AND BABY DOES 1-3**

**I.      Mary Doe**

18.     When she was 17 years old, Plaintiffs' mother ("Mary Doe"), got into a car wreck and was prescribed opioids. Mary Doe became addicted to opioids. She turned to the illegal market and purchased drugs on the street from others who, due to the abundance of prescription opioids flooding her community, were enabled to divert the drug for abusive purposes.

19.     Mary Doe, the biological mother of Baby Doe 1, Baby Doe 2, and Baby Doe 3, consumed illegal opioid drugs during her pregnancy with each child.

20.     For example, between ages 17 and 25, Mary Doe purchased opioids off the street, including but not limited to Oxycontin, Oxycodone, Roxicodone, and Hydrocodone.

---

[9] https://fortune.com/fortune500/2022/search/

21.     Mary Doe would typically purchase opioids at $1/per milligram.

## II.     Baby Doe 1

22.     When she was about 25 years old, Mary Doe became pregnant with her first child in late 2011. She continued to fill prescriptions for opioids and purchase from the street until April 2012, when (approximately seven months into her pregnancy) she was prescribed Subutex. She continued with Subutex through the end of the pregnancy.

23.     On June 16, 2012, she gave birth to Baby Doe 1 at Methodist Medical Center in Oak Ridge, Tennessee. Baby Doe 1 was diagnosed with NAS as a result of exposure to opioids in utero.

24.     For treatment of NAS, Baby Doe 1 was transferred to East Tennessee Children's Hospital on June 17, 2012. Baby Doe 1 was treated for NAS there for nearly 8 weeks. Baby Doe 1 was initially placed on morphine to help treat Baby Doe's dependence on opioids.

25.     After Baby Doe 1's birth, Mary Doe and Baby Doe 1 attended Mothers and Infants Sober Together Program, in addition to individual counseling.

26.     Nevertheless, Mary Doe continued to struggle due to her opioid addiction.

## III.     Baby Doe 2

27.     In 2016, Mary Doe became pregnant with Baby Doe 2. During the pregnancy, she bought opioids off the street in Tennessee, such as Roxicodone, Oxycodone, and Suboxone.

28.     On November 14, 2016 (after about 38 weeks of pregnancy), Mary Doe gave birth to Baby Doe 2 at the University of Tennessee Medical Center. Baby Doe 2 was diagnosed at birth with NAS as a result of exposure to opioids in utero.

29.     Baby Doe 2 spent six weeks in the Neonatal Intensive Care Unit ("NICU") due to her exposure in utero.

30.     Baby Doe 2 spent the first weeks of her life in excruciating pain as doctors weaned Baby Doe 2 off of powerful opioids. This included placing Baby Doe 2 on morphine for the withdrawal.

31.     Due to her NAS diagnosis, Baby Doe 2 was followed by the Pediatric Rehabilitation Therapy Team.

32.     Baby Doe 2 had abnormal 36-month milestones and behavioral issues.

33.     Baby Doe 2 was diagnosed with speech abnormality in December 2019 at age three.

34.     Baby Doe 2 initially attended public school. However, Baby Doe 2 was removed for homeschooling due to her illnesses.

35.     Baby Doe 2 continues to suffer effects from her prenatal opioid exposure, including behavioral disorders.

36.     Baby Doe 2 will require years of treatment and counseling to deal with the effects of prenatal opioid exposure.

IV.     **Baby Doe 3**

37.     In April 2018, Mary Doe became pregnant with Baby Doe 3. During the first 7 months of her pregnancy, Mary Doe bought opioids off the street in Tennessee. These included, but were not limited to, Roxicodone and Subutex. After moving to Florida about 7 months into her pregnancy, Mary Doe attempted to quit opioids, but was taken to the Emergency Room about a month prior to delivery with Baby Doe 3 and was prescribed Subutex to treat her withdrawal.

38.     On January 31, 2019 (after about 39 weeks of pregnancy), Mary Doe gave birth to Baby Doe 3 in the Sacred Heart hospital in Pensacola, Florida.

39.     At birth, Baby Doe 3 was diagnosed with NAS as a result of exposure to opioids in utero and was placed in the NICU.

40.     Baby Doe 3 spent over two months in the NICU and was not discharged until April 4, 2019.

41.     Due to high NAS scores, Baby Doe 3 was placed on Methadone for treatment for about 8 weeks until being discharged.

42.     Baby Doe 3 spent the first several weeks of his life in excruciating pain as doctors weaned him from drug dependence.

43.     After Baby Doe 3 was born, Mary Doe returned to Roane County, Tennessee.

44.     Baby Doe 3 will require years of treatment and counseling to deal with the effects of prenatal opioid exposure.

45.     Baby Doe 3 struggles every day with sensory issues and other effects from his prenatal opioid exposure, and will continue to suffer these effects for the rest of his life.

46.     Mary Doe and Baby Does 1, 2, and 3 all currently reside in Roane County, Tennessee.

47.     The Producer Defendants produced opioids and otherwise contributed to the illegal drug market that caused Plaintiffs harm. The Distributor Defendants and the Pharmacy Defendants distributed opioids and otherwise contributed to the illegal drug market that caused Plaintiffs harm. And the Drug Dealer Defendants illegally sold and distributed opioids into and within the illegal market that caused Plaintiffs harm.

48.     During one or more of Mary Doe's pregnancies with Baby Doe 1, Baby Doe 2, and Baby Doe 3, Mary Doe illegally obtained and consumed opioids manufactured by (at least) Purdue Pharma (including OxyContin), Endo Pharmaceuticals (including oxycodone), Mallinckrodt (including oxycodone), and KVK Tech., Inc.

49.     Baby Doe 1, Baby Doe 2, and Baby Doe 3 bring this action through a guardian *at litem* ("GAL"). Legal guardians of children exposed to illegal drugs in utero are authorized to bring this action under the DDLA, T.C.A. § 29-38-106(a)(1).

## PARTIES

### I.     Plaintiffs

**A. Baby Doe 1**: Baby Doe 1 was born in 2012 with NAS, as described above.

**B. Baby Doe 2**: Baby Doe 2 was born in 2016 with NAS, as described above.

**C. Baby Doe 3**: Baby Doe 3 was born in 2019 with NAS, as described above.

### II.    Defendants

#### A. Drug Producer Defendants

##### i. Allergan

50.     Defendant ALLERGAN FINANCES, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) ("Allergan Finances") is a Nevada limited liability company that exists for the purpose of holding shares of other companies that manufacture and distribute prescription pharmaceuticals.

a.   The sole member of Allergan Finances is Allergan W.C. Holding Inc. f/k/a Actavis.

b.   W.C. Holding Inc. is a Delaware corporation with its principal place of business in Madison, New Jersey. It is a wholly owned, indirect subsidiary of Allergan PLC.

51.     Defendant WATSON LABORATORIES, INC. ("Watson") is a Nevada corporation with its principal place of business in Corona, California.

52.     Defendant ACTAVIS PHARMA, INC. (f/k/a Watson Pharma, Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey.

53.     Defendant ACTAVIS LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in New Jersey.

54.     Before August 2016, Allergan plc owned Watson, Actavis Pharma, and Actavis LLC. During that time, Watson, Actavis Pharma, and Actavis Pharma LLC were part of the same corporate family as Allergan Finances. Those companies sold and marketed opioids as part of a coordinated strategy to sell and market opioids (both branded and generic).

55.     For the time frame before August 2016, the term "Allergan" in this pleading refers only to Actavis Pharma and Actavis LLC.

56.     In August 2016, Teva Pharmaceuticals Industries Ltd. purchased Watson, Actavis Pharma, and Actavis LLC. For the time August 2016 forward, the term "Allergan" includes these entities.

### ii.  J&J Defendants

57.     Defendant JOHNSON & JOHNSON, INC. is a New Jersey corporation that is headquartered in New Jersey.

58.     Defendant JANSSEN PHARMACEUTICALS, INC. (formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.) is a Pennsylvania corporation headquartered in New Jersey. Janssen is a wholly-owned subsidiary of Johnson & Johnson, which controls the sale and development of Janssen's drugs. Janssen's profits inure to Johnson & Johnson's benefit. Janssen and Johnson & Johnson are collectively referred to herein as "J&J."

### iii.  Teva

59.     TEVA PHARMACEUTICALS USA, INC. ("TPUSA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

60.     TPUSA is a wholly owned subsidiary of Teva Pharmaceuticals Industries, Ltd. ("TPIL"), an Israeli corporation.

61.     Cephalon, Inc. ("Cephalon") is also a wholly owned subsidiary of TPIL.

62.     In August 2016, TPIL bought Actavis Pharma and Actavis LLC from Allergan Plc.

63.     Thus, since August 2016, TPIL has owned the generic business that was formerly owned by Allergan.

64.     This pleading refers to TPUSA, TPIL, Actavis Pharma, Actavis LLC, and Cephalon collectively as "Teva."

65.     Inclusive of companies and product lines it has acquired, Teva develops, markets, and sells prescription drugs, including opioids.

66.     In 2011, Teva purchased Cephalon, which was manufacturing a branded opioid called "Actiq" (a branded opioid containing fentanyl) and Fentora (an oral tablet form of fentanyl).

67.     Teva marketed and sold both Actiq and Fentora in Tennessee.

68.     In 2016, Teva purchased Actavis, which produces generic opioids.

### iv.  KVK Tech, Inc.

69.     Defendant, KVK Tech, Inc. ("KVK") is a Pennsylvania corporation with its principal place of business in Newton, Pennsylvania.

70.     At all relevant times, KVK has packaged, distributed, supplied, sold, and otherwise placed into the stream of commerce in Tennessee, opioid drugs. From 2014 to 2019, KVK had a substantial share of the market in Tennessee for opioid pills.

71.     KVK manufactured and sold prescription opioids without fulfilling its legal duty to prevent diversion, report suspicious orders, decline to fill suspicious orders, and implement an effective suspicious order monitoring program. KVK's actions violated its duties under applicable Tennessee law.

### B.  The Drug Distributor Defendants

### i. AmerisourceBergen

72. Defendant AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") is a Delaware corporation with its principal place of business located at 1300 Morris Drive in Chesterbrook, Pennsylvania 19087.

73. At all relevant times, AmerisourceBergen and its affiliates were licensed as wholesaler/distributors in Tennessee.

74. AmerisourceBergen, through various subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

75. This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

76. The illegal drug market in those communities would have included pills distributed by AmerisourceBergen.

77. AmerisourceBergen is the second largest pharmaceutical distributor in North America.

78. According to its 2016 Annual Report, AmerisourceBergen is "one of the largest global pharmaceutical sourcing and distribution services companies, helping both healthcare providers and pharmaceutical and biotech manufacturers improve patient access to products and enhance patient care."

79. In 2018, AmerisourceBergen was the 11th largest company by revenue in the United States.

80. AmerisourceBergen established direct relationships with Tennessee pharmacies, including (upon information and belief) in the Baby Doe Plaintiffs' community.

### ii. Cardinal

81. Defendant CARDINAL HEALTH, INC. ("Cardinal") is an Ohio Corporation with its principal place of business in Dublin, Ohio.

82. At all times relevant, Cardinal and its affiliates have been licensed as wholesalers/distributors in Tennessee, and currently holds multiple Tennessee licenses.

83. Cardinal, through various subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

84. This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

85. The illegal drug market in those communities included pills distributed by Cardinal.

86. Upon information and belief, Cardinal Health established direct relationships with Tennessee pharmacies, including in the Baby Doe Plaintiffs' community.

### iii. McKesson

87. Defendant MCKESSON CORPORATION ("McKesson") is a Delaware Corporation with its principal place of business located in San Francisco, California.

88. At all times relevant, McKesson and its affiliates were licensed as wholesalers/distributors in Tennessee.

89. McKesson, through subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

90. This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

91. The illegal drug market in those communities would have included pills distributed by McKesson.

92. Upon information and belief, McKesson established direct relationships with Tennessee pharmacies and dispensing physicians, including those in the Baby Doe Plaintiffs' community.

93. Collectively, McKesson, AmerisourceBergen, and Cardinal Health currently account for the vast majority of drug shipments in the United States. These companies together collect about $400 billion in annual revenue.

### C. Pharmacy Chain Defendants

#### ii. Walgreens

94. Defendant WALGREEN CO. ("Walgreens") is a Delaware corporation with its headquarters and principal place of business located in Deerfield, Illinois.

95. Walgreens self-distributed opioids to its locations in Tennessee. At all times relevant, Walgreens has been licensed as a wholesaler/distributor in Tennessee.

#### ii. CVS

96. Defendant CVS PHARMACY, INC. ("CPI") is a Rhode Island corporation with its headquarters and principal place of business in Woonsocket, Rhode Island.

97. Defendant CVS TN DISTRIBUTION LLC (f/k/a CVS TN Distribution, Inc.) ("CVS TN Distribution") is a Tennessee limited-liability corporation with a principal office in Woonsocket, Rhode Island.

    a. CVS TN Distribution is a subsidiary of CPI.

    b. CVS TN Distribution holds a wholesaler/distributor license in Tennessee and held that license at all relevant times.

    c. Upon information and belief, CVS TN Distribution distributed prescription opioids to CVS-branded pharmacies in Tennessee at all relevant times.

98. Defendant CVS INDIANA, LLC is an Indiana corporation and a subsidiary of CVS Pharmacy, Inc.

99. Defendant TENNESSEE CVS PHARMACY, LLC is a Tennessee limited-liability corporation with its principal place of business in Woonsocket, Rhode Island.

100. Tennessee CVS Pharmacy, LLC is a subsidiary of CPI.

101. Collectively, CPI, CVS TN Distribution, CVS Indiana, and Tennessee CVS Pharmacy are collectively referred to as "CVS."

102. CVS self-distributed opioids to its pharmacy locations in Tennessee.

103. Upon information and belief, it self-distributed to those pharmacies at least through TN CVS Distribution.

### iii.    Walmart

104. Defendant WALMART INC. (f/k/a Wal-Mart Stores, Inc.) is a multinational retail corporation incorporated in the State of Delaware.

105. Defendant WAL-MART STORES EAST, L.P. is a Delaware corporation which holds the DEA registrations for its parent company's distribution centers.

106. Collectively, these entities are referred to as "Walmart."

107. Walmart self-distributed opioids to its locations in Tennessee. At all times relevant, Walmart has been licensed as a wholesaler/distributor in Tennessee.

### D. Pill Mill Defendants

108. Stephanie Puckett is an individual who used her employment at pill mills located in Knoxville and Lenoir City to supply drug rings that diverted drugs to the illegal drug market existing in and around Roane County. She is a Tennessee resident.

109.    Michael Puckett is an individual who capitalized on his wife's employment at the same pill mills located in Knoxville and Lenoir City to obtain oxycodone pills that he diverted to the illegal drug market existing in and around Roane CountyHe is a Tennessee resident.

### E. Individual Drug Dealer Defendants

110.    Brian Brewster is an individual who illegally dealt drugs in the illegal market in or around Roane County. He is a Tennessee resident.

111.    Jacob Dalton is an individual who illegally dealt drugs in the illegal market in or around Roane County. He is a Tennessee resident.

112.    William Baird is an individual who illegally dealt drugs in the illegal market in or around Roane County. He is a Tennessee resident.

## SCIENTIFIC BACKGROUND

### I.    Opioids Have Never Been Proven Appropriate for Long-Term Chronic Pain and Other Non-Acute Medical Problems

113.    This case primarily, but not exclusively, concerns the following four types of opioids:

    a.  Oxycodone: Oxycodone is a powerful type of opioid. It can be prescribed as oxycodone or more specifically branded by a company, such as OxyContin or Roxicodone.

    b.  Hydrocodone: Hydrocodone is also a type of opioid. It can be prescribed as hydrocodone or more specifically branded by a company, such as Lortab or Vicodin.

    c.  Oxymorphone: Oxymorphone is also a type of opioid. It can be prescribed as oxymorphone or more specifically branded by a company, such as Opana and Opana ER.

    d.  Hydromorphone: Hydromorphone is also a type of opioid. It can be prescribed as hydromorphone or more specifically branded by a company, such as Exalgo.

114.    The scientific consensus is that opioids such as these are dangerous, highly addictive, and inappropriate for long-term chronic pain – as opposed to cancer pain and pain associated with surgery and acute injuries. This opinion existed in the mid-1990s and has never been challenged in any meaningful way with new, valid scientific evidence.

115.    The National Safety Council, a not-for-profit organization chartered by Congress to improve public health, has published a summary of research titled "Evidence for the Efficacy of Pain Medications."[10] The National Safety Council report concludes that "[d]espite the widespread use of opioid medications to treat chronic pain, there is no significant evidence to support this practice."[11]

116.    Multiple researchers have found that "no evidence exists to support long term use—longer than four months—of opioids to treat chronic pain."[12]

117.    A 2013 review of existing literature by Dr. Igor Kissin of the Department of Anesthesiology, Perioperative, and Pain Medicine at Brigham and Women's Hospital, Harvard Medical School, concluded that "[n]ot a single randomized controlled trial with opioid treatment lasting [greater than] 3 months was found."[13]

118.    The same review found that "[a]ll studies with a duration of opioid treatment [greater than or equal to] 6 months were conducted without a proper control group."[14]

---

[10] Dr. Donald Teater, Nat'l Safety Counsel, *Evidence for the Efficacy of Pain Medications*, 3 (2014) (hereinafter Evidence for Efficacy).
[11] *Id.* at 6.
[12] *Id.* (citing multiple publications)
[13] Dr. Igor Kissin, *Long-term Opioid Treatment of Chronic Nonmalignant Pain: Unproven Efficacy and Neglected Safety?*, 2013:6 J. Pain Research 513, 513 (2013), available at https://www.dovepress.com/long-term-opioid-treatment-of-chronic-nonmalignant-painnbspunproven-ef-peer-reviewed-article-JPR.
[14] *Id.*

119.     Dr. Kissin further concluded that "[t]here is no strong evidence-based foundation for the conclusion that long-term opioid treatment of chronic malignant pain is effective."[15]

## II.     Opioids Carry a High Risk of Addiction, Serious Medical Problems, and Death

120.     Opioids have severe side effects, including gastrointestinal bleeding, impaired recovery from injury or surgery, cognitive impairment, respiratory depression, endocrine abnormalities, hyperalgesia (increased sensitivity to pain), increased risk of fractures and hospitalization for the elderly, addiction, and death.[16]

121.     Research based on actual patient interviews has found that, among patients who received four or more prescriptions in the prior year, 35% met the criteria for a lifetime opioid dependence, and 25.8% met the criteria for current opioid dependence.[17]

122.     Dr. Nora D. Volkow and Dr. Wilson M. Compton, the Director and Deputy Director of the National Institute of Drug Abuse at the National Institute of Health, respectively, co-authored a 2006 study that concluded: "[t]hough the use of opioid analgesics for the treatment of acute pain appears to be generally benign, long-term administration of opioids has been associated with clinically meaningful rates of abuse or addiction."[18]

---

[15] *Id.*

[16] Dr. Donald Teater, Nat'l Safety Council, *The Psychological and Physical Side Effects of Pain Medications*, 2-6 (2014) (summarizing side effect data). (hereinafter *Side Effects*).

[17] Joseph A. Boscarino, *Opioid-Use Disorder Among Patients on Long-Term Opioid Therapyl*, 2015:6 Substance Abuse and Rehabilitation 87, 87-89 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4548725/.

[18] Wilson M. Compton et al., *Major Increases in Opioid Analgesic Abuse in the United States: Concerns and Strategies*, 81 Nat'l Inst. on Drug Abuse 103, 103-07 (2006) (emphasis added).

123.     Consistent with this finding, a 2011 review of medical and pharmacy claims records revealed that two thirds of patients who took opioids daily for ninety days were still taking opioids five years later.[19]

124.     Researchers evaluating opioids for treatment following lumbar disc herniation likewise found that giving such patients opioids had no effect on treatment outcome, but significantly increased their risk for long term opioid addiction.[20]

125.     Dr. Mitchell H. Katz, current President and CEO of the New York City Health and Hospitals (the largest public healthcare system in the United States), has described how patients with nonmalignant conditions can end up as drug addicts because of the prescribing of opioids:

> A certain number of patients get better with NSAIDs [non-steroidal anti-inflammatory drugs, like Tylenol]. For those still complaining of pain, you next prescribe a short-acting opioid with a relatively low potency, such as acetaminophen with codeine. …You tell them about the adverse effects of opioids and encourage them to use the lowest dose necessary. Not infrequently, at the next visit they tell you that the medicine works but that they are taking the pills more frequently than directed. At this point, you worry about liver damage from the acetaminophen and switch to a higher potency, longer acting agent. The patient returns for follow-up visits and tells you that the pills work but that they sometimes take an extra pill and could you please increase the number so they "don't run out before the next visit." Before you know it, the patient is on a high dose of an opioid, and you are unsure whether you have actually helped them. *What you know is you have committed yourself to endless negotiations about increasing doses, lost pill bottles, calls from emergency departments, worries that your patient is selling the drugs, and the possibility that one day, your patient will take too many pills, perhaps with alcohol, and overdose.*[21]

## MATERIAL FACTS

I.     <u>Overview: The Defendants Created the Illegal Drug Market Through Unlawful Distribution and Otherwise Knowingly Supplied and Knowingly Participated in the Illegal Drug Market in Tennessee</u>

---

[19] Bradley C. Martin et al., *Long-term Chronic Opioid Therapy Discontinuation Rates from the TROUP Study*, 26(12) J. Gen. Intern. Med. 1450, 1450-57 (2011).

[20] Evidence for Efficacy at 5 (citing Radcliff et al., Does Opioid Pain Medication Use Affect the Outcome of Patients with Lumbar Disk Herniation?, 38(14) The Spine J. E849, E849-60 (2013)).

[21] Mitchell H. Katz, *Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith*, 170(16) Arch Intern. Med. 1422, 1422-24 (2010) (emphasis added).

126. The Drug Producer Defendants, Drug Distributor Defendants, Pharmacy Defendants, Pill Mill Defendants, and Drug Dealer Defendants all participated in the illegal drug market in Tennessee and capitalized on it. Each played a knowing role in creating, perpetuating, and expanding the opioid crisis.

127. Controlled substances are, by definition, highly subject to abuse and diversion. For this reason, Tennessee regulates every participant in the chain of distribution. No one can distribute or dispense prescription opioids in Tennessee without maintaining effective controls against diversion and ensuring that the drugs are serving a lawful medical purpose. Indiscriminate distribution without sufficient controls is unlawful and can lead to criminal penalties in Tennessee.

128. Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."[22]

129. For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.[23]

130. If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee.

131. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain.[24]

---

[22] Tenn. Code Ann. § 39-17-407.
[23] *See, e.g.*, Tenn. Code Ann. § 53-11-302, -303, -312(c), 401(a), *and* Rules of Tenn. Bd. Of Pharmacy, Ch. 1140-02.01; *see also* Tenn. Code Ann.§ 53-10-312.
[24] *See* Tenn. Code Ann. § 53-11-401.

132.    In sum, in Tennessee, all licensed entities in the distribution chain were to maintain effective controls against diversion, and to meet that obligation were required to (A) design and operate a system to identify suspicious orders; (B) report suspicious orders, and (C) stop shipment of suspicious orders pending appropriate investigation and due diligence.

133.    Upon information and belief, and as described, each Defendant involved in the distribution chain violated one or more these Tennessee duties.

134.    In particular, upon information and belief, the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants knowingly distributed drugs into Tennessee without effective diversion controls. Upon information and belief, they knew or should have known that they were feeding pill mills and the black market rather than legitimate medical need.[25] That conduct was unlawful. Even in isolation, it subjects them to liability under the DDLA.

135.    At every step, these Defendants supplied drugs into the illegal market, to continue over-supplying Tennessee communities at levels that were not medically justifiable, and enjoy profits derived from the illegal distribution of opioids.

## II.    The Drug Producer Defendants, Distributor Defendants, Pharmacy Chain Defendants, Pill Mill Defendants, and Individual Dealer Defendants Have All Participated in the Distribution Pipeline for Opioids in Tennessee and in Plaintiffs' Community

### A.  The Drug Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants Possessed Information Reflecting Diversion by Prescribers and Pharmacies but Facilitated that Diversion Anyway

136.    As described herein, the Drug Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants did not maintain effective controls against diversion, rendering their

---

[25] As noted in the Disclaimer below, this conduct does not encompass opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.[26] *Id.*

actions illegal, and they otherwise engaged in many other acts to facilitate diversion of their drugs illegally. They also plainly undertook actions in Tennessee or directed at Tennessee that they knew were detrimental to public health and safety.

137. The related crises of abuse and illegal diversion of prescription opioids in Tennessee is well-documented in a variety of publicly available sources. Indeed, the prescription statistics reflect how the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants are participating in the unconscionable flow opioids into Tennessee and East Tennessee in particular.

138. Upon information and belief, through their market research and extensive networks of sales representatives and face-to-face detailing of health care providers ("HCP"), the Drug Producer Defendants could, and did, observe signs of illegal diversion.

139. The Drug Producer Defendants also possess information called "chargeback" data from their distributors. As reported in the Washington Post, there is an "industry-wide practice" whereby pharmaceutical drug producers pay their distributors rebates and/or "chargebacks" on prescription opioid sales. In return, the distributors provide the Drug Producer Defendants with downstream purchasing information, which allows them to track their prescription opioids down the entire supply chain, all the way to the retail level.[26]

### B. Allergan Knowingly Participated in Tennessee's Illegal Drug Market

140. Allergan was one of the two largest manufacturers of generic opioids. Because Allergan lacked a meaningful suspicious order monitoring program, its opioids flooded the market without pause, worsening the opioid epidemic.

---

[26] *Id.*

141. Allergan's promotional spending on opioids, which was virtually nonexistent in the 2004-2008 period, began to sharply rise in 2009, when it began marketing Kadian. The third quarter of 2011 saw a peak of $3 million and nearly $7 million for the year.

142. To ensure that these messages reached individual physicians, Allergan deployed sales representatives to visit HCPs in Tennessee and across the country. Allergan chose its detailed targets based on the likelihood of higher numbers of prescriptions at higher doses, with no consideration as to the risk of misuse. Allergan carefully tracked the prescription trends of the HCPs whom it detailed.

143. Allergan trained its sales representatives to deceptively minimize the risk of addiction by: (1) attributing addiction to "predisposing factors" like family history of addiction or psychiatric disorders; (2) emphasizing the difference between substance dependence and substance abuse; and (3) promoting the unsupported term "pseudoaddiction."

144. Allergan misleadingly instructed its sales team that opioid doses could be escalated during long-term opioid therapy, without hitting a dose ceiling, which purportedly made them safer than other forms of therapy such as acetaminophen or NSAIDs.

145. Allergan also actively marketed its generic drugs. Prior to the sale of its generic business to Teva, Allergan's marketing strategy included promotion of its generic opioids, including generic Kadian (morphine sulfate), directly to HCPs. Allergan sales representatives received bonuses for both branded and generic Kadian sales, and used the same selling points for both versions of the drug, available in many leading pharmacies, advertising that the generic had the same features and benefits as the branded product.

146. Allergan also promoted its generic Opana ER (oxymorphone ER). Allergan saw a business opportunity due to Endo discontinuing certain dosages and Endo production issues, and

began training and deploying the Kadian sales force to detail doctors to promote generic Opana ER. Allergan also paid bonuses to its sales team for meeting sales goals for generic Opana ER.

147. Allergan also promoted its generics through direct mail and email campaigns and journal advertisements aggressively marketed its generic opioids through its distributors, in particular Distributor Defendant McKesson. To promote Allergan's generic oxymorphone ER, oxycodone, and generic morphine sulfate, McKesson deployed a variety of tactics, including notifying pharmacies about the products using Allergan talking points and posting sell sheets on its website. McKesson had an incentive to maximize Allergan's opioid sales because it received a rebate through its "OneStop" sales program if it achieved a certain sales volume

148. Allergan similarly collaborated with Distributor Defendants Cardinal and ABC to promote Allergan's generic opioids through targeted telemarketing and direct mail campaigns aimed at pharmacies. Allergan collaborated with ABC in an initiative to drive generic conversion at a faster rate than what would occur without its intervention.

149. Allergan also worked with Walgreens to send a letter to patients who had filled a prescription for Opana ER within the prior year, informing them that although Endo no longer manufactured certain dosages of Opana ER, a generic was now available from Allergan.

150. Through its aggressive marketing, Allergan expanded the market for opioids in Tennessee.

151. As an entity registered with the DEA and the Tennessee Board of Pharmacy, Allergan knew it was required to maintain effective controls against diversion of opioids and to report suspicious orders.

152. Upon information and belief:

        a. Allergan failed to put in place appropriate procedures to ensure that suspicious orders—orders of unusual size, frequency, or those deviating

from a normal pattern—would be reported to governmental authorities as required by law in Tennessee.

b. Allergan (for its entities both pre- and post-merger) did not maintain effective controls against diversion as required by Tennessee law, and used a SOM system that was not meaningfully designed to detect and halt suspicious orders.

c. Allergan continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

d. Allergan possessed ample sources of data that allowed it to detect and report suspicious orders of opioids, both from its direct and indirect customers. The company's sales representatives regularly visited pharmacies and HCPs to promote Allergan's products, which allowed them to observe red flags of diversion.

153. Despite these available sources of information regarding potential diversion, Allergan failed to properly design and operate a system that would be capable of detecting suspicious opioid orders. Prior to 2011, any process that Allergan had that could be considered an opioid order monitoring system was not even properly automated. After 2011, Allergan finally began to acknowledge its responsibility to create an opioid order monitoring system, but the procedures it put in place were severely lacking, and were focused on approving—not restricting—orders of excessive quantities of opioids.

154. To the extent Allergan established thresholds to detect suspicious orders, they were wholly inadequate.

155. Allergan failed to perform appropriate due diligence on its customers, both generally and at the time it should have been alerted to a suspicious order.

156. Allergan failed to stop shipments after it knew or should have known that opioid orders remained suspicious, had no requirement to stop shipments on suspicious indirect sales, and failed to report suspicious orders to the DEA. Eventually, Allergan ceased operating any suspicious order monitoring program at all, when it "outsourced" those duties to a distributor.

157. Upon information and belief, Allergan failed to discontinue detailing HCPs who were suspected of diversion. On the contrary, Allergan chose its detailing targets based on the likelihood of higher numbers of prescriptions.

### C. J&J Knowingly Participated in Tennessee's Illegal Drug Market

158. J&J manufactures, markets, sells, and distributes the following opioids in Davidson County, in Tennessee, and nationwide: Duragesic (fentanyl patch), Nucynta ER (tapentadol hydrochloride), and Nucynta (tapentadol hydrochloride), both of which are Schedule II narcotics.

159. J&J introduced Duragesic in 1990. It is indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." After seeing the success of OxyContin for chronic non-cancer pain, J&J re-launched Duragesic for chronic non-cancer pain as well.

160. J&J also marketed Nucynta, which was first approved by the FDA in 2008, formulated in tablet form and in an oral solution, and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older. J&J also marketed Nucynta ER ,which was first approved by the FDA in 2011 in tablet form. Initially, it was indicated for the "management of...pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." This pain indication was later altered to "management of moderate to severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."

161. J&J instructed sales representatives in Tennessee, and nationwide to market Duragesic as having better efficacy, better tolerability, and better patient compliance because it was a patch instead of a pill. These sales representatives were instructed to tell doctors that the

patch provided better control in the event of patient opioid abuse because patients could not increase the patch dosage. However, sales representatives were aware of patients who increased the dosage by applying more than one patch at a time and were also aware that some patients abused the patch by freezing then chewing on it.

162.    These tactics extended to J&J's promotion of Nucynta, wherein J&J trained its sales representatives to avoid the so-called "addiction ditch"—i.e., to avoid the negatives (addiction) and emphasize the positives (supposed efficacy) in sales calls—and to use a study from Dr. Portenoy "to create dialogue about Opiophobia as a barrier."

163.    J&J further trained their sales representatives that there was a 2.6% or lower risk of addiction when using opioids prescribed by a doctor. As part of this same training, J&J trained its sales representatives to "establish that moderate to severe acute pain continues to be undertreated."

164.    However, J&J did not provide its sales force with any training on opioid addiction. Instead, J&J sales representatives were rewarded with bonuses for targeting high-volume opioid prescribers.

165.    As part of its "pain management franchise" from the 1990s through at least 2016, Johnson & Johnson wholly owned Tasmania Alkaloids Limited ("Tasmania Alkaloids"), which was based in Tasmania and cultivated and processed opium poppy plants to manufacture narcotic raw materials to be imported into the U.S. to be processed and made into active pharmaceutical ingredients ("APIs") necessary to manufacture opioid drugs. It also wholly owned Noramco, Inc. which is based in Athens, Georgia and imported the raw narcotic materials produced by Tasmania Alkaloids, processed the materials into APIs, then sold the APIs to other opioid manufacturers in the U.S. J&J, through these subsidiaries, supplied the following APIs to other drug manufacturers in the U.S.: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine,

hydromorphone, and naloxone. J&J had supply agreements to sell controlled substance API with all 7 of the top U.S. generic companies as we as many of the top branded opioid producers.

166.    J&J, acting in concert with others, embarked on a major campaign in which it used branded and unbranded marketing to disseminate the messages that pain was bring undertreated and that there was a low risk of abuse and a low danger of prescribing opioids to treat chronic, non-malignant pain and overstating the efficacy of opioids as a class of drug. J&J funded literature in medical journals and publications, materials from professional societies/patient advocacy groups, continuing medical education, unbranded marketing materials, and paid speakers. It also partnered with third-party advocacy groups or academic groups to hold seminars, symposiums, and conferences to influence prescriber behavior and increase profits from opioids.

167.    J&J trained its sales representatives to target high-opioid prescribing physicians, including pain specialists and primary care physicians.

168.    J&J did not train its sales representative regarding red flags that could indicate a "pill mill," including pain clinics with patients lined up out the door or patients passed out in the waiting room. Upon information and belief:

> a. Through its sales force, J&J had visibility, on both macro and micro levels, of how overprescribed branded and generic opioids and that they were ending up on the black market; however, J&J continued supplying these materials to opioid producers which helped fuel the illegal opioid market.
>
> b. J&J failed to design and operate a system to monitor suspicious orders of controlled substances, and otherwise violated its obligation under Tennessee law to maintain effective controls against diversion.

c. J&J continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

d. J&J shipped orders that it knew or should have known were suspicious.

e. J&J did not report orders that it knew or should have known were suspicious.

f. J&J shipped orders despite the orders being suspicious.

169. Also, upon information and belief, J&J knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were engaging in suspicious activity; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

**D. Teva Knowingly Participated in Tennessee's Illegal Drug Market**

170. Teva's generic oxycodone and hydrocodone products both represent the largest market share for either product throughout Tennessee according to IMS Health Data.

171. These quantities of opioid pills clearly exceed the number that would be appropriate for normally prescribed therapeutic use.

172. Teva also knowingly participated in the illegal drug market in Tennessee by supplying suspicious quantities of its products to suspect physicians and pharmacies in Tennessee, without disclosing suspicious orders as required by applicable regulations.

173. According to IMS data, from September 2015 to August 2016, Teva accounted for 33.5% of the hydrocodone prescribed in Tennessee, 28.8% of the oxycodone prescribed in

Tennessee, 16.8% of the oxymorphone, and 1.6% of the hydromorphone. This amounted to 1,913,712 Tennessee opioid prescriptions filled by Teva in one year. On average, this means Teva filled an opioid prescription for one out of every 3.5 Tennesseans during that year.

174.    During the same timeframe of September 2016 through August 2017, Teva accounted for 32.3% of Tennessee hydrocodone prescriptions, 25.1% of its oxycodone prescriptions, 1.8% of its oxymorphone prescriptions, and 1.8% of its hydromorphone prescriptions. This amounted to 1,619,143 Tennessee opioid prescriptions filled by Teva in one year. On average, this means Teva filled an opioid prescription for one out of every 4.1 Tennesseans during that year.

175.    Teva's role relative to branded drugs involved knowing participation in the illegal drug market. Cephalon, a pharmaceutical company purchased by Teva in 2011, sold two opioid drugs, Actiq and Fendora. As part of the approval process for Actiq the FDA required a risk management program (RMP) for the marketing of the drug. The RMP for Actiq in 1998 specifically included special adverse event reporting for adverse events related to "unintended pediatric exposure," "diversion (i.e., use by an individual other than for whom it was prescribed)," or "in the context of 'off label use'". As of 2001, the FDA further informed Cephalon that it had concerns that its fentanyl-based drug, Actiq, might be used by patients who were not indicated for its use and that there was potential for diversion and abuse of the drug. In 2006 The Wall Street Journal reported that Actiq, a fast-acting lollipop like oral analgesic that contained fentanyl, was reportedly being called "perc-a-pop" on the street.[27]

176.    In 2005, Cephalon knew that 90% of Actiq prescriptions were for off-label use, and 55% of that total were for chronic back pain. From 2000 to 2006, sales of Actiq grew from $15

---

[27] John Carreyrou, *Narcotic 'Lollipop Becomes Big Seller Despite FDA Curbs*, Wall Street Journal, Nov. 3, 2006, available at: https://www.wsj.com/articles/SB116252463810112292.

million to over $400 million a year.[28] The Wall Street Journal further reported that surveys from research firm ImpactRx from June 2005-October 2006 found that more that 80% of patients who use the drug don't have cancer.[29]

177.   In 2006, as Actiq was losing its patent protection as a branded drug, Cephalon began marking a new fentanyl-based drug to replace it, called Fentora.  Fentora, like Actiq, was only ever approved by the FDA for the treatment of breakthrough cancer pain.  As part of the FDA approval of Fentora, Cephalon again was required to agree to a risk management program or RiskMAP, including a plan to monitor, evaluate and determine the incidence of use of Fentora by opioid intolerant individuals, misuse of Fentora, and unintended (accidental) exposure to Fentora.

178.   In November 2007, Cephalon submitted a supplemental New Drug Application (sNDA) to the FDA requesting that the FDA approve Fentora for use in non-cancer opioid tolerant patients with breakthrough pain. The FDA denied Cephalon's request, explaining that "[i]n the face of a national crisis of prescription opioid abuse and misuse, it is critical that you provide a risk management program with established efficacy [and] adequate restrictions to avoid widespread abuse and misuse." The FDA's letter to Cephalon denying its request addressed the complete failure of the company to address the abuse and misuse of both its potential and its existing products:

> [Y]ou have not adequately addressed the public health concern of increased abuse, misuse, overdose and addiction that is to be expected with more widespread availability of this product in the community. Your proposed plan to mitigate these risks has not been adequately tested to assure that it will, indeed, achieve this outcome for your currently approved indication, let alone the proposed expanded indication.

---

[28] *Id.*
[29] *Id.*

These problems were never resolved by Cephalon in an amended application and the FDA never approved Fentora for expanded use beyond cancer pain.

179.     Teva expanded its opioid business beyond Actiq and Fentora when it bought pharmaceutical company Actavis, which produces several generic opioids, mainly hydrocodone-acetaminophen and oxycodone-acetaminophen. Those types of opioids are prevalent in Tennessee.

180.     After the FDA in 2012 required all opioid manufacturers to adopt a strategy to combat opioid abuse, Teva began developing a new branded opioid called Vantrela.  In seeking FDA approval of the drug, Teva presented Vantrela as an "abuse-deterrent" form of hydrocodone. Teva then developed a marketing plan to target managed care organizations in the hopes they would add this new drug to their formulary. The opioids that Teva sold were the generic versions of these same opioids.  In fact, Teva sold millions of those same opioids in Tennessee from, and as part of its pitch, Teva cited to publicly available documents that demonstrated that the U.S. was in the midst of an opioid abuse and addiction crisis.

181.     In 2015 and 2016, Teva was reviewing and sharing publicly available information and studies about opioid addiction in preparation for Teva's third-party payer marketing strategy for Vantrela, planning to promote Vantrela as an abuse deterrent product. One such publicly available source was a Time Magazine article in June 2015, highlighting the public health crisis of opioid addiction, including specifically in Tennessee.  The Time story highlighted, among other things, that patients often buy the pills on the black market after becoming addicted, and approximately 1/5 of Americans who take opioids are estimated by the National Institutes of Health to be in danger of turning to the black market for more pills.

182.     In June 2016, Actavis prepared a managed care overview to be provided to payers outlining why the misuse, abuse and diversion of opioids is a major public health concern,

including the fact that in 2010 1 in 20 Americans over 12 abused opioids, in 2011 1 in 3 ER visits were opioid related, and in 2014 there were 18,000 opioid overdose deaths, a 300% increase in deaths from 1999. Teva recognized that between 9-28% of misusers of pain relievers get their drugs through a doctor's prescription. Teva also recognized the substantial economic burden of opioid abuse on healthcare, workplace, criminal justice, and societal costs. Teva even cited studies showing that approximately 27% of chronic pain patients prescribed opioids for non-cancer pain are likely to abuse the drugs. Teva positioned its branded Vantrela as a cost savings for managed care payers compared to its generic opioids because generic opioids have a "high rate of abuse and generate enormous costs," lead to high levels of addiction, are responsible for around 2/3 of overdose deaths, contribute to increased healthcare costs and other indirect costs.

183.    Despite now having clear knowledge of the risks of abuse of opioids, including its own opioid products, Teva continued to send its generic opioid products into Tennessee and throughout the United States in large numbers. Vantrela was approved by the FDA in January 2017, yet Teva continues to promote its generic, less abuse-deterrent drugs. From 2015-2017, IMS data shows that over 2 million Teva produced opioids prescriptions were filled in Tennessee.

184.    Like the other Drug Producer Defendants, Teva received chargeback data from its distributors that told Teva precisely where its pills were going, in what amount, and to whom. It had the ability to deny chargebacks relative to pharmacies and dispensing physicians supplied by its distributors, which effectively amounted to controlling whether its pills would reach those pharmacies or not.

185.    Upon information and belief:

        a. Teva recognized when orders were suspicious (because of the size of the order, the size of the community served, and other indicators) and likely to be diverted.

b. However, Teva rarely, if ever, denied chargebacks relative to pharmacies anywhere in the country, let alone in Tennessee.

c. Instead, Teva chose to fill those suspicious orders anyway, recognizing that the shipments were likely being dispensed to fill pill mill prescriptions or otherwise to be diverted into the black market.

186. Upon information and belief:

a. Teva recognized that prescription rates per capita are an indicator of potential abuse of prescription opioids.

b. Nevertheless, Teva continued to fill orders in Tennessee where the per capita prescription rates were high and Teva knew or should have known had no legitimate medical need for the opioids being sold there.

c. In violation of Tennessee law, Teva failed to design and operate a system to monitor suspicious orders of controlled substances, and otherwise failed its obligation under Tennessee law to maintain effective controls against diversion.

d. Teva continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

e. Teva shipped orders that it knew or should have known were suspicious.

f. Teva did not report orders that it knew or should have known were suspicious.

g. Teva shipped orders despite the orders being suspicious.

187. Upon information and belief, Teva placed primary responsibility for detecting and reporting suspicious orders with its sales personnel. Those sales personnel were financially incentivized to call on customers who made suspicious prescriptions or submitted suspicious orders rather than report them, and to come up with sham justifications to "clear" suspicious orders or to justify calling on them further.

188. From 2002 to 2011, Teva did not report a single one of its prescription orders as suspicious.

189. In fact, prior to being named in numerous opioid-related lawsuits, Teva's SOM system has only flagged – and Teva only reported to the DEA – 6 TOTAL suspicious orders for the entire country.

190. This included just one reported suspicious order in 2013, one in 2014, four in 2015, and none in 2016.

191. Otherwise, Teva supplied essentially anyone and everyone who submitted an order for its drugs.

192. This included filling orders that it recognized were being dispensed, in large volumes, to fill prescriptions relative to prescribers under circumstances that Teva recognized were suspicious and indicative of diversion.

193. Teva shipped orders of opioids in frequencies and in volumes that were inherently suspicious. For example, in April 2015 alone, Teva shipped nearly 5 million pills of hydrocodone into Tennessee, through AmerisourceBergen, McKesson, and others. The multitude of orders comprising this volume necessarily were suspicious. Yet Teva filled them.

194. Upon information and belief, Teva filled similarly large volumes of orders from all of the Distributor Defendants for pharmacies and dispensing physicians within Tennessee, under circumstances demonstrating that each order was suspicious. Other than its so-called suspicious order monitoring program, Teva did nothing to prevent the illegal diversion of its prescription opioid products once the products leave the individual manufacturing facilities, even though it knew that some customers of prescription opioids obtain them expressly for nonmedical purposes. Teva was also aware that the opioid drug diversion problem was particularly large and problematic in Tennessee.

195. Upon information and belief:

a. Teva's suspicious order monitoring program was structured to be ineffective.

b. Teva, like the other Producer Defendants, utilized a sales force to sell its branded opioids who called on prescribers directly and on pharmacies and dispensing physicians – nationwide and in Tennessee.

c. Teva, like the other Producer Defendants, paid sales representatives of its branded opioids bonuses or commissions based on sales volume relative to Tennessee (as elsewhere).

d. Relative to branded sales, Teva financially incentivized its sales force to call on high-volume prescribers and targeted those high-volume prescribers to prescribe more opioids.

e. Relative to its relationship with pharmacies and dispensing physicians, Teva financially incentivized its sales personnel to process and fill suspicious orders.

196. Upon information and belief, Teva knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were engaged in suspicious activity; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

### E. KVK Knowingly participated in Tennessee's Illegal Drug Market.

197. KVK knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. KVK is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. KVK knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including KVK's products. KVK also knowingly participated in the illegal drug market in Plaintiffs'

community by supplying quantities of its products to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein. This included knowingly and illegally distributing opioids without effective controls against diversion and filling suspicious orders.

198. KVK knowingly distributed, or knowingly participated in the chain of distribution of, an illegal drug that was actually used by Mary Doe (an individual drug user) for purposes of liability under T.C.A. § 29-38-106(b)(1). Mary Doe illegally obtained and consumed pills manufactured by KVK while pregnant with Baby Doe 1, Baby Doe 2, or Baby Doe 3.

## III.   The Distributor Defendants Participated in the Illegal Drug Market

### A. The Distributor Defendants Facilitated Diversion

199. The Distributor Defendants facilitated illegal drug transactions in Tennessee by submitting suspicious orders, having them filled, and stocking suspect independent and retail chain pharmacies and dispensing physicians with opioids destined for the illegal drug market.

200. The Distributor Defendants had a choice when faced with suspicious orders: submit them or impound them and investigate until they actually cleared the suspicion.

201. ABC and Cardinal and McKesson account for a vast majority of the market nationwide, and an equivalent amount in Tennessee.

202. They know that they have an important responsibility to monitor their customers' practices and that they are not supposed to fill suspicious orders.

203. The Distributor Defendants knew they should monitor, detect, and halt suspicious orders. For example, industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated

to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."[30] The guidelines set forth recommended steps in the "due diligence" process, and note in particular "[i]f an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest."[31]

204.    The Distributor Defendants sold prescription opioids in and around the Baby Doe Plaintiffs' community, which Defendants knew or should have known were likely to be diverted into the illegal drug market.

205.    DEA Agent Joseph Rannazzisi has emphasized the importance of the Distributor Defendants in preventing opioid diversion: "[b]ecause distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances . . . from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system created by the [Controlled Substances Act] collapses."[32]

206.    The sheer volume of prescription opioids distributed to pharmacies in the Baby Doe Plaintiffs' community is excessive for the medical need of the community and facially suspicious.

---

[30] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061, Doc. No. 1362415 (App'x B) (D.C. Cir. Mar. 7, 2012).
[31] *Id.*
[32] Declaration of Joseph Rannazzisi, ¶ 10 (filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW, Doc. 14-2 (D.D.C. February 10, 2012)).

Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

207.     The Distributor Defendants filled inherently suspicious orders originating from the Baby Doe Plaintiffs' community which the Distributor Defendants knew or should have known were likely to be diverted to or within the Baby Doe Plaintiffs' community.

208.     Upon information and belief, the Distributor Defendants filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, orders of unusual frequency in the Baby Doe Plaintiffs' community, and orders which Defendants knew or should have known were likely to be diverted into the Baby Doe Plaintiffs' community.

209.     Distributor Defendants possessed direct knowledge of obvious signs of diversion by their customers. They knew that Tennessee pharmacies were receiving prescription opioids in volumes grossly disproportionate to the population and any conceivable medical need. They knew that local prescribers near those pharmacies were prescribing at levels that were not medically justifiable and that the pharmacies were filling prescriptions for suspect prescribers.

210.     Upon information and belief, rather than seek to stop pharmacies from supplying pills or to stop dispensing physicians who were operating pill mills, the Distributor Defendants targeted these entities and competed for their business.  In other words, the Distributor Defendants targeted high-volume dispensing pharmacies (including independent or locally owned pharmacies) to compete for their business.

211.     The Distributor Defendants have been subject to repeated investigations and citations for streaming prescription opioids into the illegal drug market.

212. For example, on September 27, 2006, the DEA sent a letter to "every commercial entity in the United States registered with the [DEA] to distribute controlled substances."[33] The letter stated that manufacturers and distributors "share responsibility for maintaining appropriate safeguards against diversion" and "given the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[34] The letter advised that "DEA will use its authority to revoke and suspend registrations in appropriate cases."[35] The letter also provides that "in addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[36] The letter further discusses that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[37]

213. The DEA sent another letter on December 27, 2007 to "reiterate the responsibilities of controlled substance manufacturers and distributors to inform DEA of suspicious orders." [38] This letter reminded manufacturers and distributors of their obligation to "maintain effective

---

[33] 2006 Rannazzisi Letter at 1.
[34] *Id.* at 2 (emphasis added).
[35] *Id.*
[36] *Id.*
[37] *Id.* at 1.
[38] 2007 Rannazzisi Letter at 1.

controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[39]

214. The letter states that in terms of reporting suspicious orders:

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communications with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by a registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."[40]

The 2007 letter also said that "[f]ailure to maintain effective controls against diversion is inconsistent with the public interest . . . and may result in the revocation of the registrant's DEA Certificate of Registration."[41]

215. The 2007 letter also references the final order issued in Southwood Pharmaceuticals, Inc., 72 FR 36487 (2007), which "[i]n addition to discussing the obligation to report suspicious orders when discovered" and "some criteria to use when determining whether an order is suspicious," the order "also specifically discusses your obligation to maintain effective controls against the diversion of controlled substances."[42]

---

[39] *Id.*
[40] *Id.* at 2.
[41] *Id.* at 1-2.
[42] *Id.* at 2.

216. The Distributor Defendants knew which pharmacies and dispensing physicians were filling prescriptions, including the amount and type of drug. The Distributor Defendants maintained direct relationships with pharmacies and dispensing physicians, including those plainly engaging in filling pill mill prescriptions en masse.

217. The illegal market for prescription opioids exists because distributors choose to submit suspicious orders to manufacturers, manufacturers choose to fill them, and the distributors distribute them to suspect pharmacies where they fill prescriptions written by pill mill doctors. In American Overdose, Mr. Rannazzisi summed up the role of distributors: To Rannazzisi, distributing highly addictive and potentially lethal drugs wasn't the same as delivering chocolate bars. He regarded the lucrative licenses the wholesalers held—McKesson is the fifth-biggest company on the Fortune 500 index with around $200 billion in revenue—as carrying particular responsibilities: "These companies have one task, and that is the safe and secure distribution of drugs, particularly prescription drugs. Otherwise FedEx or UPS could do this role. This isn't a compliance challenge, like gender discrimination at a tech company, which is horrific, but it's not fundamental to their operation. This is the equivalent of a tech company failing on cybersecurity. If these companies were doing their job right, you shouldn't be seeing black-market prescription painkillers."

## B. AmerisourceBergen Has a History of Facilitating Illegal Drug Transactions

218. On April 24, 2007, the DEA issued an immediate suspension order ("ISO") on AmerisourceBergen's Orlando, Florida distribution center, alleging that AmerisourceBergen was

not controlling shipments of prescription opioids to Internet pharmacies and revoking the facility's license to distribute controlled substances.[43]

219.    On June 22, 2007, AmerisourceBergen entered into a settlement with the DEA which led to the reinstatement of the Orlando distribution center's suspended license.[44] Under that agreement, AmerisourceBergen was required to implement an enhanced order-monitoring program in all of its distribution centers by June 30, 2007.[45]

220.    In 2012, West Virginia's then-Attorney General Darrell McGraw filed lawsuits against AmerisourceBergen, Cardinal Health, and a dozen smaller drug distributors for their role in a drug supply chain that includes doctors who write prescriptions for nonmedical purposes and "pill mill" pharmacies that dispense excessive numbers of painkillers, including opioids.[46] In February 2017, Cardinal Health and AmerisourceBergen agreed to pay $20 million and $16 million, respectively, to resolve West Virginia's claims.[47]

221.    The settlement, which is believed to be the largest pharmaceutical settlement in West Virginia history, came shortly after a Charleston Gazette-Mail investigation revealed that drug wholesalers shipped 780 million hydrocodone and oxycodone pills to West Virginia in just six years – a period when 1,728 West Virginians fatally overdosed on those two drugs.[48] AmerisourceBergen alone shipped 80.3 million hydrocodone pills and 38.4 million oxycodone

---

[43]    2007    AmerisourceBergen    Corporation    Form-10K.    Available    at: https://www.sec.gov/Archives/edgar/data/1140859/000119312507255013/d10k.htm.

[44] *Id.*

[45] *Id.*

[46] Eric Eyre, 2 drug distributors to pay $36M to settle WV painkiller lawsuits, Charleston Gazette-Mail,    January    9,    2017.    Available    at:    http://www.wvgazettemail.com/news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wv-painkiller-lawsuits.

[47] *Id.*

[48] *Id.*

pills from 2007 to 2012. McKesson shipped 3.3 million hydrocodone pills to a single county.[49]

And Cardinal Health and AmerisourceBergen combined to ship nearly 40 percent of all

hydrocodone and oxycodone pills to West Virginia.[50]

222.    According to unsealed court documents from the West Virginia case,

AmerisourceBergen distributed 149,300 hydrocodone pills – or 12,400 pills a month – to Tug

Valley Pharmacy in Mingo County in 2009.[51] The pharmacy filled prescriptions for Drs. Diane

Shafer, Katherine Hoover and William Rykman, who operated "sham" pain clinics in

Williamson.[52] Federal agents raided the clinics in 2010 and they never reopened.[53]

223.    Unsealed court documents from that case further evidence that AmerisourceBergen

shipped 8,000 hydrocodone painkiller tablets to a drive-thru pharmacy over two days in July

2012.[54] On those same two days, a competing drug wholesaler shipped 8,600 hydrocodone tablets

to the same "pill mill" pharmacy.[55] AmerisourceBergen sold another 3,800 oxycodone pills to the

same pharmacy that month.[56]

224.    AmerisourceBergen also sent 16 billion pills to Missouri in a five-year period,

during which time it reported only 244 suspicious orders nationwide.[57]

---

[49] https://www.wvgazettemail.com/news/cops_and_courts/drug-firms-poured-m-painkillers-into-wv-amid-rise-of/article_99026dad-8ed5-5075-90fa-adb906a36214.html

[50] Id.

[51] Eric Eyre, 18 'words' reveal drug giant's pain pill shipments to WV, Charleston Gazette-Mail, May 25, 2016. Available at: http://www.wvgazettemail.com/news/20160525/18-words-reveal-drug-giants-pain-pill-shipments-to-wv.

[52] Id.

[53] Id.

[54] Id.

[55] Id.

[56] Id.

[57] https://www.npr.org/sections/health-shots/2018/07/12/628191409/report-1-6-billion-opioid-doses-poured-into-missouri-over-6-years.

225. In 2017, AmerisourceBergen plead guilty to illegally distributing misbranded drugs and agreed to pay $260 million to resolve criminal liability for its distribution of drugs from a facility that was not registered with the FDA.

226. In 2018, AmerisourceBergen entered into a Corporate Integrity Agreement ("CIA") with the U.S. Dept. of Health & Human Services, and agreed to pay $625 million to resolve civil fraud charges.

227. AmerisourceBergen had a sales force responsible for establishing relationships with pharmacies and dispensing physicians. Upon information and belief, AmerisourceBergen premised utilized sales of prescription opioids as a basis for sales representative compensation at least through 2012.

228. Upon information and belief, AmerisourceBergen continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

229. AmerisourceBergen failed to report suspicious orders, shipped opioids even after flagging an order as suspicious, and did not maintain effective controls against diversion.

230. Upon information and belief, AmerisourceBergen has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to be ineffective), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

231. AmerisourceBergen maintained an internal list of suspect prescribers, but it chose not to share that information with the pharmacies it supplied.

232. AmerisourceBergen also placed certain customers on a "do not ship" list, but (upon information and belief) continued to ship opioids to them.

233. AmerisourceBergen recognized that many of its customers in Tennessee were supplying the illegal drug market, filling prescriptions for pill mills, and otherwise filling prescriptions far beyond any legitimate medical need.

234. Upon information and belief, it also filled orders originating in Tennessee and Baby Doe Plaintiffs' community of unusual size or frequency, or that the Distributor Defendants otherwise recognized were indicative of diversion.

235. Upon information and belief, AmerisourceBergen was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

236. AmerisourceBergen also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

237. Also, upon information and belief, AmerisourceBergen knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

## C. Cardinal Health Has a History of Facilitating Illegal Drug Transactions

238.    On September 27, 2006, the DEA sent a letter to Cardinal reminding Cardinal that it was the distributors' responsibility to ensure that their products were not diverted for illicit use. The letter reminded Cardinal that it could not "simply rely on the fact that the person placing the suspicious order is a DEA registrant and turn a blind eye to the suspicious circumstances." Cardinal and, upon information and belief, all the other defendants in this action nevertheless used that an entity was registered as a basis to submit and fill plainly suspicious orders.

239.    Based on findings from DEA investigations, in November and December 2007, the DEA issued three Immediate Suspension Orders ("ISOs") to Cardinal Health.

240.    On November 28, 2007, the DEA issued an ISO to Cardinal Health in connection with its distribution center in Auburn, Washington (the "Auburn Facility"), immediately suspending the facility's Certificate of Registration because its continued registration constituted "an imminent danger to public health and safety."[58]

241.    According to the ISO, the Auburn Facility repeatedly "distributed unusually large amounts of hydrocodone" to Horen's Drugstore, Inc. ("Horen's Drugstore") – distributing 600,000 dosage units of hydrocodone to Horen's Drugstore from March 2007 through September 2007 – and "disregard[ed] the clear indications that Horen's Drugstore was engaged in the diversion of controlled substances[.]" Horen's Drugstore was Cardinal Health's largest purchaser of combination hydrocodone products in 2007, and according to the ISO, the drugstore was "a pharmacy engaged in a scheme to dispense controlled substances based on prescriptions that are issued for other than a legitimate medical purpose and by physicians acting outside the usual course

---

[58] *Cardinal Health, Inc. v. Holder*, Case No. 1:12-cv-00185, Dkt. 14-15 ("Settlement and Release Agreement and Administrative Memorandum of Agreement"), ¶ 2, Appendix B (D.D.C. 2012). (Hereinafter "2008 Cardinal Health MOA").

of professional practice. This pharmacy dispensed excessive amounts of hydrocodone based on illegitimate prescriptions originating from rogue Internet pharmacy websites, in violation of applicable Federal and State law." The DEA found that Cardinal Health "failed to maintain effective controls against diversion of a particular controlled substance into other than legitimate medical, scientific and industrial channels," and concluded that its continued registration with the DEA constituted "an imminent danger to the public health and safety."

242.     On December 5, 2007, the DEA issued an ISO notifying Cardinal Health of the immediate suspension of its Lakeland, Florida drug distribution facility for failure to maintain effective controls against diversion of hydrocodone.[59]

243.     The ISO detailed how, from August 2005 through October 2007, Cardinal Health failed to maintain effective controls against the diversion of hydrocodone into other than legitimate medical, scientific and industrial channels. According to the ISO, Cardinal Health distributed hydrocodone to various pharmacies, even though the company knew that many of the orders placed by the pharmacies were of an unusual size and were "suspicious" as defined in the CSA. For example, Cardinal Health distributed 1,213,000 dosage units of hydrocodone to Q-R-G, Inc. over the course of February to June 2006, and approximately 1,148,100 dosage units to United Prescription Services, Inc. from July to October 2006. The ISO further detailed that, on September 1, 2006, Eric Brantley, Manager of Quality and Regulatory Affairs for Cardinal Health, sent an email to the DEA stating that Cardinal Health discontinued all sales of controlled substances to 13 Internet pharmacies, including RKR Holdings, Inc. Nevertheless, from September 1, 2006 to January 31, 2007, Cardinal Health distributed 393,600 dosage units of hydrocodone products to RKR Holdings.   As explained therein Cardinal distributed over 8,000,000 dosage units of

---

[59] *Id.* at ¶ 3, App'x C.

hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific, and industrial channels. Indeed, the ISO indicated that many of Cardinal's largest purchasers "were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that are issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

244.    On December 7, 2007, the DEA issued an ISO to Cardinal Health regarding its distribution center in Swedesboro, New Jersey which, from January 2005 to August 2007, "distributed over 4.5 million dosage units of combination hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific and industrial channels."[60]

245.    The ISO stated that some of Cardinal Health's "largest purchasers of combination hydrocodone products were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that were issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

246.    In addition to the November and December 2007 ISOs, on January 30, 2008, the DEA issued an Order to Show Cause as to why the agency should not revoke the Certificate of Registration assigned to Cardinal Health's Stafford, Texas distribution center for the improper distribution of hydrocodone. The DEA also found that Cardinal Health failed to maintain effective controls against the diversion of controlled substances at its McDonough, Georgia facility, Valencia, California facility, and Denver, Colorado facility. In total, the DEA had reason to

---

[60] *Id.* at ¶ 4, App'x D.

believe that seven of Cardinal Health's twenty-seven then-registered distribution centers were not adhering to their obligations under the CSA.

247. On December 27, 2007, the DEA sent another letter to Cardinal reminding it that all distributors had an obligation to maintain effective controls against diversion.[61]

248. Following the three 2007 ISOs and the Order to Show Cause, the DEA and Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement ("MOA") on September 29, 2008.[62] Pursuant to the MOA, Cardinal Health agreed to pay a civil fine of $34 million, and "maintain a compliance program designed to protect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations."[63]

249. Cardinal's 2008 settlement and MOA with the DOJ lists Cardinal facilities in La Vergne, Tennessee and Knoxville, Tennessee as having failed to maintain effective controls against diversion.

250. After entry of the 2008 MOA, Cardinal Health began violating the CSA again almost immediately. A further investigation of Cardinal Health's Lakeland, Florida facility by the DEA "revealed a persistent failure to exercise due diligence to ensure that controlled substances were not being diverted" over a period of approximately 3 years, from November 2008 to December 2011.[64] The lack of anti-diversion controls resulted in the top four customers of Cardinal Health's Lakeland facility being supplied with approximately 50 times the amount of oxycodone compared to the average Florida retailer that Cardinal Health services, which the DEA referred to

---

[61] *Cardinal Health, Inc. v. Holder*, Decl. of J. Rannazzisi, doc no. 14-2 at 12.
[62] *Id.*
[63] *Id.*
[64] *Id.* at ¶ 75.

as a "staggering" difference in distribution.[65] Of those four pharmacies, one was found to be "dispensing oxycodone 30mg prescriptions . . . for persons whose addresses were in Kentucky and Tennessee and who paid cash."[66]

251.    The DEA's further investigation culminated in the issuance of another ISO regarding the Lakeland, Florida facility on February 2, 2012 (the "2012 ISO") for failure to maintain effective controls against diversion of oxycodone.[67]

252.    The 2012 ISO stated that, "[d]espite the MOA, the specific guidance to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of [the CSA]."[68] According to the ISO:

253.    From January 1, 2008 through December 31, 2011 . . . Cardinal's sales of oxycodone products to its top four retail pharmacy customers exceeded 12.9 million dosage units. . . . From 2008 to 2009, Cardinal's sales to its top four retail pharmacy customers increased approximately 803%. From 2009 to 2010, Cardinal's sales to its top four retail pharmacy customers increased approximately 162%. [¶] The egregious quantities of oxycodone distributed by Cardinal to its top four retail pharmacy customers well exceeded the amount of oxycodone distributed to Cardinal's Florida retail pharmacies, which receive, on average, approximately 5,347 dosage units of oxycodone per month.[69]

---

[65] *Id.* at ¶ 76.

[66] Holidays CVS, LLC d/b/a CVS Pharmacy Nos. 219 and 5195 Decision and Order, 77 Fed. Reg. 62316, 62318 (Oct. 12, 2012).

[67] *Cardinal Health, Inc. v. Holder*, Case No. 1:12-cv-00185, Dkt. 14-18 (D.D.C. 2012).

[68] *Id.* at ¶ 3.

[69] *Id.* at ¶ 4.

254.   The 2012 ISO further provided that "[n]otwithstanding the large quantities of controlled substances ordered by Cardinal's top retail pharmacy customers, Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers."[70]

255.   In May 2012, following a DEA investigation, Cardinal Health entered into a second memorandum of agreement relative to its 28 registered distribution facilities.  The MOA required Cardinal to maintain a compliance program to monitor and detect diversion, to implement a system for conducting an in-person investigation for any suspicious orders."

256.   On December 23, 2016, Cardinal Health agreed to pay a $34 million fine (separate from the $34 million fine in 2008) to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center.[71]

257.   Also on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the Controlled Substances Act in Maryland, Florida, and New York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA. In the settlement, Cardinal Health admitted, accepted, and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to "timely identify suspicious orders of controlled substances and inform the DEA of those orders" or to "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."

---

[70] *Id.* at ¶ 5.
[71] Press Release, United States Reaches $34 Million Settlement With Cardinal Health For Civil Penalties Under The Controlled Substances Act, DOJ, U.S. Attorney's Office – Middle District of Florida. Available at: https://www.justice.gov/usao-mdfl/pr/united-states-reaches-34-million-settlement-cardinal-health-civil-penalties-under.

258.     Upon information and belief, Cardinal Health had a sales force responsible for establishing relationships with pharmacies and dispensing physicians. Cardinal Health utilized sales of prescription opioids as a basis for sales representative compensation at least through 2012.

259.     Upon information and belief, Cardinal Health continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

260.     Upon information and belief, Cardinal Health has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

261.     Cardinal also chose not to report (i.e., to conceal) customers who it identified in an initial onboarding process as having signs of diversion.

262.     Also, where a manufacturer removed a Cardinal customer from its chargeback list, Cardinal understood that this was because the customer was suspected of diversion. However, where a manufacturer reinstated a customer to the chargeback list, Cardinal would resume distributing opioids to those customers anyway.

263.     Cardinal also engaged in other practices that facilitated diversion of its productions, including:

>    a.  Terminating a customer from one distribution center but not the other (i.e., even where a customer was flagged for diversion and cut off from one

Cardinal distribution center, Cardinal did not cut the customer from other Cardinal centers).

b. Where a customer hit Cardinal's "threshold" for suspicious activity on one type of opioid, Cardinal might terminate the customer only as to that specific opioid but nevertheless continue to ship other below-threshold opioids to that customer (rather than stop shipments entirely until the suspicion was investigated and dispelled).

c. Cardinal permitted sales representatives to request SOM threshold increases to permit Cardinal to keep shipping opioids to a customer even though Cardinal's own self-imposed metrics had flagged it.

d. Cardinal chose not to examine whether pharmacy retail chains had any anti-diversion programs in place and chose not to audit the compliance efforts of national alternate care accounts or national mail order accounts.

264. Upon information and belief, Cardinal was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

265. Cardinal also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

266. Upon information and belief, Cardinal also knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate

prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

### D. McKesson Has a History of Facilitating Illegal Drug Transactions

267.    On May 2, 2008, McKesson agreed to pay a total of $13.25 million in civil penalties to six U.S. Attorney's Offices to settle allegations that the company violated federal reporting provisions relating to its handling of prescription painkillers, including hydrocodone.[72]

268.    In a press release regarding the agreement, the Department of Justice explained:

Three McKesson distribution centers received and filled hundreds of suspicious orders placed by pharmacies participating in illicit Internet schemes, but failed to report the orders to DEA. They did so even after a Sept. 1, 2005, meeting at which DEA officials met with and warned McKesson officials about excessive sales of their products to pharmacies filling illegal online prescriptions. The pharmacies filled purported online "prescriptions" for hydrocodone (contained in drugs such as Vicodin), but the prescriptions were issued outside the normal course of professional practice and not for a legitimate medical purpose. The United States Attorneys allege that the orders that McKesson received from these pharmacies were unusually large, unusually frequent, and/or deviated substantially from the normal pattern. As a result, millions of dosage units of controlled substances were diverted from legitimate channels of distribution.[73]

269.    As part of the 2008 agreement, McKesson was required to "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders . . . and follow procedures established by [McKesson's] Controlled Substance

---

[72] Press Release, McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims that it Failed to Report Suspicious Sales of Prescription Medications, Dept. of Justice, May 2, 2008. Available at: https://www.justice.gov/archive/opa/pr/2008/May/08-opa-374.html.
[73] Id.

Monitoring Program ("CSMP")." McKesson flagrantly violated those provisions of the agreement.[74]

270.    A federal government investigation revealed that, from 2008 to 2013, McKesson did not fully implement its compliance program, and, instead, supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills.[75] For example, in Colorado, McKesson processed more than 1.6 million orders for controlled substances from June 2008 through May 2013, but reported just 16 orders as suspicious.[76] This included filling every order by a pharmacist who was selling up to 2,000 pills per day in a suburban community of 38,000 people.[77] It failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records, and bypassed suspicious order reporting procedures.

271.    When confronted with the evidence gathered in the government's investigation, McKesson conceded that, following the 2008 agreement, the company:

- "[F]ailed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA . . . at the McKesson Distribution Centers" located in: Aurora, Colorado; Aurora, Illinois; Delran, New Jersey; LaCrosse, Wisconsin; Lakeland, Florida; Landover, Maryland; La Vista, Nebraska; Livonia,

---

[74] 2017 Administrative Memorandum of Agreement (DOJ, DEA and McKesson). Available at: https://www.justice.gov/opa/press-release/file/928476/download. (Hereinafter "2017 McKesson MOA").[75] Press Release, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, Dept. of Justice, January 17, 2017. Available at: https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

[75] Press Release, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, Dept. of Justice, January 17, 2017. Available at: https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

[76] *Id.*

[77] https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html?noredirect=on&utm_term=.827ab6d7a014

Michigan; Methuen, Massachusetts; Santa Fe Springs California; Washington Courthouse, Ohio; and West Sacramento, California;[78]

- "[F]ailed to properly monitor its sales of all controlled substances and report suspicious orders to DEA, in accordance with McKesson's obligations under the 2008 Agreements";[79]

- "[F]ailed to conduct due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers, and bypassed suspicious reporting procedures set forth in the McKesson CSMP";[80]

- "[F]ailed to inform the DEA Field Division Offices and/or DEA Headquarters of certain suspicious orders of controlled substances made by its customers during the relevant time period, including orders of unusual size, orders deviating substantially from normal patterns, and orders of unusual frequency";[81]

- "[F]ailed to report suspicious orders for certain controlled substances in accordance with the standards identified and outlined in the DEA Letters";[82] and

- "[D]istributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners in the usual course of their professional practice."[83]

272. Following the federal government's investigation, in January 2017, McKesson entered into an Administrative Memorandum of Agreement with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 agreement as well as failure to identify and report suspicious orders of controlled substances at its drug distribution centers across the country.[84] One of McKesson's largest sources of opioids, Mallinckrodt, admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January

---

[78] 2017 McKesson MOA at 3.
[79] *Id.* at 4
[80] *Id.*[81] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.* at 8.

17, 2017), it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson further admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 et seq., at the McKesson Distributions Centers" including the McKesson Distribution Center located in Washington County, Ohio. Due to these violations, McKesson agreed to a partial suspension of its authority to distribute controlled substances from certain of its facilities. The 2017 agreement further required McKesson to suspend sales of controlled substances from its distribution centers in Colorado, Ohio, Michigan and Florida for multiple years.[85] The suspensions are among the most severe sanctions ever agreed to by a DEA registered distributor.

273. As explained in the Washington Post and on 60 Minutes, the DEA investigation had demonstrated that McKesson had taken acts to support criminal diversion.[86] For example, the DEA found evidence that McKesson had shipped suspicious orders of millions of painkillers to pharmacies across the country that supplied drug rings. A DEA memo outlined its investigative findings concluded that McKesson "[i]gnored blatant diversion," had a "pattern of raising thresholds arbitrarily," "[f]ailed to review orders for suspicious activity," "[i]gnored its own procedures designed to prevent diversion," and "[s]upplied controlled substances in support of criminal diversion."[87]

---

[85] *Id.* at 5-7.

[86] Lenny Bernstein & Scott Higham, *'We feel like our system was hijacked': DEA agents say a huge opioid case ended in a wimper*, Washington Post, Dec. 17, 2017, https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html

[87] *Id.*

274.    On December 17, 2017, Assistant Special Agent David Schiller spoke on 60 Minutes:

> If they woulda stayed compliance with authority and held those that they're supplying the pills to, the epidemic would be nowhere near where it is right now. Nowhere near. . . .  They had hundreds of thousands of suspicious orders they should have reported, and they didn't report any. There's not a day that goes by in the pharmaceutical world, in the McKesson world, in the distribution world, where there's not something suspicious.  It happens every day.[88]

275.    Moreover, the DEA found evidence that McKesson raised distribution thresholds to high-volume pharmacies purposely to get around its suspicious order reporting obligations. When a pharmacy began to exceed its threshold, it would just raise the threshold again.[89] According to DEA officials, McKesson "paid little or no attention to the unusually large and frequent orders placed by pharmacies, some of them knowingly supplying drug rings."[90] Instead, "the company raised its own self-imposed limits, known as thresholds, orders from pharmacies and continued to ship increasing amounts of drugs in the face of numerous red flags."

276.    Upon information and belief, McKesson had a sales force responsible for establishing relationships with pharmacies and dispensing physicians, and compensated sales personnel at least in part based on volume – providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

277.    McKesson failed to report suspicious orders, shipped opioids even after flagging an order as suspicious, and did not maintain effective controls against diversion.

---

[88] Bill Whitaker, *Whistleblowers: DEA Attorneys Went Easy on McKesson, the Country's Largest Distributor*, 60 Minutes, Dec. 17, 2017, https://www.cbsnews.com/news/whistleblowers-dea-attorneys-went-easy-on-mckesson-the-countrys-largest-drug-distributor/.
[89] *Id.*
[90] Lenny Bernstein & Scott Higham, *'We feel like our system was hijacked': DEA agents say a huge opioid case ended in a wimper*, Washington Post, Dec. 17, 2017, https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html

278. Before 2013, McKesson did not have any employees overseeing the day-to-day implement of its SOM program.

279. Upon information and belief, McKesson engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to be ineffective), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

280. Upon information and belief, McKesson was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

281. McKesson also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.[91]

282. Upon information and belief, McKesson also knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for

---

[91] As noted in the Disclaimer below, these allegations do not pertain to opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.[92]

## IV. The Pharmacy Chain Defendants' Self-Distribution of Opioids Facilitated the Illegal Opioid Market in Tennessee

283. The Pharmacy Chain Defendants, in addition to purchasing opioid medications from the Distributor Defendants, also self-distributed opioid medications to their pharmacy locations.

284. The Pharmacy Chain Defendants had the same obligations under Tennessee law to monitor, detect, and halt suspicious orders as the Distributor Defendants.

285. Similarly, upon information and belief, the Pharmacy Chain Defendants failed to identify, investigate, report, and/or halt suspicious opioid orders across the country, including orders going to Tennessee, and otherwise failed to maintain effective controls against diversion for shipments into and within Tennessee.

286. The numbers that each Pharmacy Chain Defendant distributed into the State of Tennessee were staggering. From just 2006 to 2014:

      a. Walgreens distributed 642,704,930 dosage units of opioids into Tennessee;

      b. CVS distributed 186,897,900 dosage units into Tennessee; and

      c. Walmart distributed 251,048,435 dosage units into Tennessee.

287. Upon information and belief, the Pharmacy Chain Defendants did not implement effective diversion control measures when shipping these pills. Instead, they put in place policies and protocols that ensured that the flow of drugs into the illegal market would continue.

---

[92] As noted in the Disclaimer below, these allegations do not pertain to opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

## A. CVS Knowingly Fueled the Illegal Opioid Market

288. Before 2009, CVS had no suspicious order monitoring system at all. Instead, it relied on individual "Pickers and Packers" to identify orders of unusual size, frequency, or pattern without clear criteria. CVS had no written policies, procedures, or protocols for the Pickers and Packers, no formal qualifications for the position, and no training.

289. In 2009, CVS at least began using a computer algorithm to flag suspicious orders, but that algorithm was flawed from the outset. The SOM did not function properly because it monitored by drug rather than active ingredient, such that changes in a drug's description or name caused the historical data (necessary for valid calculations) to be lost. The system also failed to account for orders made by and shipped to CVS pharmacies from third parties. Thus, as CVS itself admitted, a particular store could defeat the computer threshold simply by purchasing excess of the threshold from someone other than CVS. CVS knew that this resulted in filling suspicious orders from its pharmacies. At least as of July 2013, CVS internally had identified that CVS's supposed SOM process was irrelevant and pointless. CVS did not implement an SOM system until mid to late 2014, at which point its distribution centers stopped distributing Schedule II opioids at the whole level.

290. CVS did not conduct appropriate due diligence on flagged orders. It did not conduct meaningful diligence on more than a small fraction of flagged orders. In 2012 and 2013, CVS at times had only one employee reviewing all potentially suspicious orders for every CVS pharmacy in the country. In other words, CVS designed this program to fail, knowing that it would allow for suspicious orders to be filled unabated.

291. Upon information and belief, CVS has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs.

292. Upon information and belief, CVS never reported a single suspicious order to the Tennessee Board of Pharmacy.

293. Upon information and belief, CVS has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

294. Upon information and belief, CVS was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and CVS knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

295. CVS also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

296. Also, upon information and belief, CVS knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

## B. Walgreens Knowingly Fueled the Illegal Opioid Market

297. Nationally, from 2006 to 2012, according to a Washington Post analysis, "Walgreens dominated the nation's retail opioids market."[93] During that period, Walgreens acted as its own wholesaler, obtaining 97 percent of pain pills directly from drug manufacturers, which allowed it to have more control over how many pain pills it sent to its stores.[94] Edward Bratton, Walgreens' manager of pharmaceutical integrity, described the company's SOM system prior to 2013 as a "system [that] would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing of products like Oxycodone[.]"[95]

298. For example, Walgreens used rigid formulas to "detect" suspicious orders. The formulas simply utilized an average number based on historical orders, applied a three times multiplier on that base number, and then flagged an order if it exceeded that multiplier. From 2007 forward, an order would have been flagged only if it exceeded that multiplier for two consecutive months. The formulas were not scaled to the size of the community served. Nor were they informed by geography, population, news reports, local information (provided by pharmacists or news reports), outside investigation, or any form of human input that would actually be effective at slowing the flow of opioids into the illegal drug market in Tennessee. Instead, by setting these thresholds artificially high, Walgreens ensured that it would keep shipping orders below the threshold even though it should have halted those orders (rather than fill them).

299. Even at the exceedingly high threshold it had set, Walgreens still identified thousands of orders each week that hit that threshold. Those orders were obviously suspicious. Yet

---

[93] Jenn Abelson, Aaron Williams, Andrew Ba Tran, & Meryl Kornfield, *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids*, Wash. Post, Nov. 7, 2019, https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/.

[94] *Id.*

[95] *Id.*

rather than halt the orders, Walgreens elected to ship them. By shipping orders that Walgreens

itself had identified as suspicious, it committed an act intended to facilitate the distribution of drugs

into the illegal market.

300.    Walgreens then waited until after shipping the orders to report them to anyone. By

waiting until after filling an order to report it, Walgreens was able to facilitate the flow of drugs

into Tennessee's illegal market.

301.    In September 2012, the DEA issued an immediate suspension order ("ISO") for

Walgreens' Schedule II distribution facility in Jupiter, Florida.[96]  In the ISO, the DEA found that

Walgreens' distribution practices constituted an "imminent danger to the public health and safety"

and were "inconsistent with the public interest." The ISO made the following findings:

   a.  In violation of its duty report under 21 CFR 1301.74 and a 2007 letter from
       the DEA, Walgreens had not reported suspicious orders as they were
       discovered, but instead had shipped the orders without due diligence to
       determine if the order was actually being made to serve legitimate medical
       needs;

   b.  Even though the facility served 12 states and Puerto Rico, the formula was
       the same regardless of a pharmacy's location, the population it serves, or
       the number of other pharmacies in the area;

   c.  Walgreens had failed to maintain an adequate suspicious order reporting
       system, ignored readily identifiable orders and ordering patterns that
       obviously reflected diversion at Walgreens pharmacies; and

   d.  Walgreens had distributed large amounts of opioids to pharmacies that it
       knew or should have known were dispensing the drugs to fill prescriptions
       that were not intended to serve a legitimate medical purpose.

302.    Despite these and other warnings, Walgreens continued to commit acts intended to

facilitate the distribution and dispensing of drugs by its pharmacies into the illegal market.  It has

---

[96]    https://www.dea.gov/press-releases/2012/09/14/dea-serves-suspension-order-walgreens-
distribution-center-jupiter-florida.

admitted that it is unaware of ever performing a due diligence review before shipment on orders listed on its Suspicious Drug Control Order report.

303. At the distribution center level, Walgreens purposely designed its system simply to supply whatever quantities of drugs its pharmacies requested, rather than to identify red flags of potential diversion.

304. Moreover, when Walgreens purported to implement anti-diversion measures in 2010 (for the first time), it designed the program to have significant holes. For years, the program did not include orders that Walgreens stores were also placing to outside vendors, like Cardinal and AmerisourceBergen, allowing stores to order opioids from Walgreens distribution centers and from Cardinal and AmerisourceBergen, effectively permitting double dipping. Walgreens stores also could transfer controlled substances between stores and did not review these transfers (known as "interstores") within the SOM program, allowing transfer for which Walgreens' SOM system did not account. Stores could also place ad hoc "PDQ" (short for "pretty darn quick") orders for controlled substances outside of their normal orders days and outside of the SOM analysis and limits. Walgreens even could remove a store entirely from its SOM review.

305. Furthermore, at times when a store would submit an order that exceeded Walgreens' exceedingly high threshold, Walgreens would reduce the order to the threshold and ship it without conducting further investigation into why its pharmacies were making suspicious orders.

306. Walgreens also intentionally understaffed the department that was supposed to conduct diligence and intentionally did not give that group proper training. Despite thousands of orders being flagged each week (even under Walgreens' improperly high threshold), Walgreens

officials reviewed only a small fraction. It therefore continued to ship even those orders that it had identified as suspicious.

307. In November 2012, Walgreens simply began reducing orders down to threshold rather than halting the orders, investigating them, and reporting them to an appropriate official.

308. According to Walgreens witnesses, the company did not confirm a single suspicious order that it shipped to its stores.[97]

309. Walgreens has been repeatedly cited and penalized for shipping without effective controls against diversion. For example, in April 2013, it agreed to a then-record $80 million settlement with the DEA to resolve allegations that it had shipped oxycodone and other prescription painkillers that were diverted into the black market. The agreement mandated that, at a corporate level, Walgreens had to maintain a "Department of Pharmaceutical Integrity, a Suspicious Order Monitoring system, remove controlled substance from the calculation of bonuses for pharmacists and technicians, and verify prescribers' DEA numbers to ensure their validity.

310. Upon information and belief, despite these warnings, Walgreens continued to violate its responsibilities as a Tennessee registrant.

311. In particular, Walgreens' conduct facilitated the illegal distribution of opioids into the black market in Tennessee.

312. Even when pharmacies did hit internal limits imposed by Walgreens, "they could still transfer pills from other stores or order from outside suppliers[,]"[98] Walgreens officials intentionally authorized pharmacies to exceed the internal limits to maintain sales volume.

---

[97] Bratton 65:20-66:11.
[98] Abelson, et al., supra note ___.

313. "Pharmacies could also find workarounds by placing special PDQ orders, meaning 'pretty darn quick,' from Walgreens internal network[,]"[99] a technique used repeatedly by Walgreens pharmacies in Tennessee. In 2012, Walgreens suggested forbidding PDQ orders for oxycodone products.[100] Pharmacy executive Kermit Crawford vehemently objected to the proposed change, writing, "I was not under the impression this was a done deal. Concerned we are 'all or none.' We have to do what's right for patients also."[101]

314. Upon information and belief, Walgreens has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

315. Upon information and belief, Walgreens was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

316. Walgreens also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

---

[99] Abelson, et al., supra note ___.
[100] Abelson, et al., supra note ___.
[101] Abelson, et al., supra note 192.

317. Also, upon information and belief, Walgreens knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community.

## C. Walmart Knowingly Fueled the Illegal Opioid Market

318. From 2000 to approximately May 2018, Walmart self-distributed tens of millions of shipments of controlled substances to Walmart-branded and Sam's Club-branded pharmacies. Throughout the period from 2012 to 2018, Walmart was the largest self-distributor in the country for oxycodone, hydromorphone, and hydrocodone in terms of both dosage units and grams.

319. Because Walmart acted as its own distributor, it had access to extensive data and other information that independent distributors would not ordinarily have. In particular, Walmart had a wealth of dispensing information that gave it the ability to investigate the circumstances underlying orders for controlled substances. Walmart had data about individuals who filled controlled-substance prescriptions at its pharmacies, the identities of medical providers who were prescribing controlled substances for those individuals, and reports from its own pharmacists raising concerns.

320. Despite having information about how often and how much Walmart-branded pharmacies and Sam's Club-branded pharmacies ordered from third-party distributors, Walmart did not account for these orders and shipments in its SOM program.

321. Before 2011, Walmart did not even have a SOM system in place.

322. In November 2010, Walmart adopted Pharmacy Manual 21-402 ("Controlled Substance Monitoring"). This policy simply required certain Walmart employees to review a monthly report, known as a "control drug stock exception report," after the controlled substances had been shipped to the pharmacies and identify any controlled substances that constituted more

than 3.99% of a pharmacy's total controlled and non-controlled substance purchases during the prior month.

323.    Under Pharmacy Manual 21-402 (November 2010), Walmart failed to detect many unusual orders. First, the monthly reports did not identify specific controlled substance orders that were unusually large. Instead, the reports aggregated all shipments of particular controlled substances and then compared those aggregated totals to see if they exceeded 3.99% of a pharmacy's total shipments that month. As a result, many unusually large orders were not flagged because they were not subsumed in the aggregated totals. Second, the policy did not require Walmart to flag any orders that were otherwise suspicious (e.g., exhibiting an unusual frequency or unusual pattern).

324.    Pharmacy Manual 21-402 (November 2010) did not describe these aggregated totals as "suspicious orders" or even state that Walmart was required to detect and report suspicious orders to DEA.

325.    In a June 12, 2014 email, Walmart attached a risk assessment in which it observed that its system for monitoring suspicious orders was an "existing risk" and "emerging risk" for which it had "no processes in place." Walmart's own assessment was that the risk that its pharmacies would place suspicious orders with its own distribution centers was "likely," the second-highest of five levels on Walmart's scale of likelihood of risks.

326.    In July 2014, Walmart revised Pharmacy Manual 21-402 and titled the revised policy "Evaluating Orders of Interest and Suspicious Order Reporting." Unlike the 2010 version of the policy, Pharmacy Manual 21-402 (July 2014) instructed compliance unit personnel to evaluate individual orders as they were placed—rather than monthly aggregated totals after

Walmart's distribution centers had already shipped the controlled substances—and report any suspicious orders to DEA.

327. Pharmacy Manual 21-402 (July 2014) called for Walmart first to identify "orders of interest" from among all controlled substance orders, and then to investigate those "orders of interest" to determine whether they were indeed "suspicious orders" subject to reporting to DEA.

328. Both steps of this system failed. The criteria Walmart adopted for flagging "orders of interest in the first instance were plainly inadequate, allowing many suspicious orders to evade any scrutiny. And Walmart routinely failed to investigate orders that were flagged as "orders of interest" to ascertain whether they were suspicious, prioritizing expeditious distribution of controlled substances to meet its pharmacies' and pharmacists' demands over compliance with state and DEA regulations.

329. Walmart failed to detect and report at least hundreds of thousands of suspicious orders of controlled substances. Over an approximately four-year period from 2013 to 2018, a time during which Walmart shipped an estimated 37.5 million controlled-substance orders to its pharmacies, it reported only 204 suspicious orders to the DEA—in other words, almost none. By comparison, during the same time period, Walmart's back-up distributor McKesson Corporation, which filled orders only when Walmart could not, reported to the DEA more than 13,000 suspicious orders from Walmart pharmacies.[102]

330. Upon information and belief, Walmart has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (i.e., that

---

[102] Despite even reporting that many (and that is just for the single customer Walmart), in 2017, McKesson was fined $150,000,000 by the DEA for its systemic failure to report suspicious orders during roughly the same period that Walmart reported only 204.

was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

331.    Upon information and belief, Walmart was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

332.    Walmart also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

333.    Also, upon information and belief, Walmart knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community.

## V.    The Drug Producer Defendants Helped Create the Illegal Drug Market

### A. In the 1990s, the Drug Producer Defendants Knew that Using Opioids for Non-Malignant Pain Creates a Serious Risk of Abuse and Diversion Yet Encouraged Opioid Sales and Distribution Practices That It Knew Have Those Effects

334.    As stated by Tennessee's Commissioner of Health Dr. John Dreyzehener, "in the 1990's, MDs started prescribing opioids in large volume to treat [nonmalignant] pain which has caused an opioid addiction problem."[103] Douglas Varney, Commissioner of the Tennessee

---

[103] Tenn. Dep't of Mental Health and Substance Abuse Services, *Opioid Abuse Reduction Act Working Group*, at 22 (Nov. 10, 2015) [hereinafter *Working Group Report*] (emphasis added).

Department of Mental Health, speaking at a meeting of the Governor's Working Group, similarly concluded that "[b]asically we are dealing with the fallout from the medical profession overprescribing opioids."[104]

335.    Up until the mid-1990s, physicians prescribed opioids primarily to cancer patients and persons recovering from surgery. Fearful of the addictive qualities of opioids, physicians would not generally prescribe them for long term chronic pain. As detailed in a review of the development of the opioid crisis published in the 2015 Annual Review of Public Health, "[p]rior to the introduction of OxyContin [by Purdue in 1995], many physicians were reluctant to prescribe OPRs [opioid pain relievers] on a long-term basis for common chronic conditions because of their concerns about addiction, tolerance, and physiological dependence."[105]

336.    This research confirmed the mid-1990s consensus of medical providers regarding the dangers of opioids. According to the Agreed Statement of Facts signed by Purdue in connection with its 2007 guilty plea to federal criminal charges for misbranding OxyContin: "During the period February through March 1995, Purdue supervisors and employees obtained market research that included focus groups of forty primary care physicians, rheumatologists, and surgeons to determine their receptivity to using OxyContin for non-cancer pain… '[t]he biggest negative of [OxyContin] was the abuse potential.'"[106]

337.    When branded opioids were introduced to the U.S. market, including Tennessee, the Producer Defendants carefully evaluated physicians' concerns about the risks of addiction associated with opioids and embarked on a highly successful campaign to convince physicians that

---

[104] *Id.* (emphasis added).

[105] Andrew Kolodny, et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, 36 Ann. Rev. Pub. Health 559, 562. (2015).

[106] Information as to Purdue Frederick Co., Inc., U.S.A v. Purdue Frederick Co., Inc., No. 1:07-cr-00029 W.D. Va. May 10, 2007, ECF No. 5-2 at ¶19 (emphasis in original).

opioids created minimal risk of addiction. Upon information and belief, the Producer Defendants knew that, if its efforts were successful, many people would become addicted to prescription opioids and that, as a consequence, abuse and illegal diversion would follow.

338. As the Producer Defendants' efforts demonstrated success in the form of rapid increases in opioid prescribing, other opioid producers joined in their efforts to expand the market for opioids.

## B. The Drug Producer Defendants Funded "Key Opinion Leaders" to Spread Misinformation Regarding Opioids

339. The Producer Defendants engaged "key opinion leaders" to promote the use of their opioids in a variety of ways. Each Producer Defendant would pay a key opinion leader an honorarium each time he or she agreed to attend a variety of functions, from intimate meals with a single pain management clinic's staff to presenting at huge national and international symposia. Key opinion leaders were selected based on a number of criteria such as the prestige of their affiliated hospitals and the quantity of their published articles, but most importantly their willingness to promote the prescription of opioids.

## C. The Drug Producer Defendants Funded Dr. Russell Portenoy, Who Facilitated the Widespread Distribution and Abuse of Opioids by Acting as a Vocal Proponent of Opioid Use

340. The Drug Producer Defendants funded and worked closely with Dr. Russell Portenoy, a physician who emerged as one of the industry's most vocal proponents of long-term opioid use.[107] According to a Wall Street Journal article, Portenoy essentially made it "his life's work" to campaign for the movement to increase use of prescription opioids.[108] To this end,

---

[107] Thomas Catan & Evan Perez, *A Pain Champion has Second Thoughts*, wsj.com (Dec. 17, 2012). Available at: https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[108] *Id.*

speaking on Good Morning America in 2010, Portenoy stated categorically that "[a]ddiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted." This program was broadcasted across the country and, upon information and belief, was widely watched, including within Tennessee and in Plaintiffs' community. Portenoy, who himself is facing lawsuits for his work as a paid opioid pitchman, has now conceded that this promotion of opioids for chronic pain was "clearly the wrong thing to do."[109] He is on record stating: "I gave innumerable lectures in the late 1980s and 90's about addiction that weren't true."[110]

341. The Drug Producer Defendants paid Dr. Portenoy millions of dollars from 1997 to 2007 to continue publicizing information that they knew would continue to create opioid addicts and would fuel the secondary illegal market for opioids. For example, in approximately 2004, Endo published an education pamphlet edited by Dr. Portenoy, called Understanding Your Pain: Taking Oral Opioid Analgesics, which claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems."[111] In funding Dr. Portenoy, the Drug Producer Defendants yet again knowingly helped foster the growing population of opioids addicts and perpetuated the illegal opioids market that serviced them and which would carry forward into the late 2010's.

342. Teva listed Dr. Portenoy as a "Key Opinion Leader" at various times.

---

[109] *Id.*
[110] *Id.*
[111] http://www.thblack.com/links/RSD/Understand_Pain_Opioid_Analgesics.pdf.

**D. The Drug Producer Defendants Funded the American Pain Foundation, Which Claimed (Among Other Things) That the Belief That "Opioid Pain Medications are Universally Addictive" was a Common Misconception**

343. The Drug Producer Defendants also funded the American Pain Foundation ("APF"), which has been described by the President of Physicians for Responsible Opioid Prescribing as "a front for opioid manufacturers."[112] The APF's 2010 annual report details thousands of pro-opioid advertisements, public statements, letters, Facebook Posts, and similar communications. It states that: "Through online, print, radio, and television outlets, APF's local and national media outreach efforts secured 1,600 media stories on pain in 2010 – an increase of 1,255% from 2009. Reaching more than 600 million people with important pain-related messages, APF spokespeople and advocates provided education, information and assistance to people with pain and combated the negative stereotypes and stigmas associated with pain."[113] Upon information and belief, APF distributed the types of messages referenced in its 2010 Annual Report to physicians within Tennessee.

344. For example, in or around 2011, the APF published "Policymaker's Guide," which characterized the notion that "strong pain medication leads to addiction" as a "common misconception[]":

> Many people living with pain, and even some health care practitioners, falsely believe that opioid pain medicines are universally addictive. As with any medication, there are risks, but these risks can be managed when these medicines are properly prescribed and taken as

---

[112] Charles Ornstein and Tracy Weber, *Patient Advocacy Group Funded by Success of Painkiller Drugs, Probe Fins*, washingtonpost.com, Dec. 23, 2011. Available at: https://www.washingtonpost.com/national/health-science-/patient-advocacy-group-funded-by-success-of-painkiller-drugs-probe-finds/2011/12/20/gIQAgvczDP_story.html.

[113] American Pain Fund 2010 Annual Report. Available at: https://archive.org/stream/277604-apf-2010-annual-report/277604-apf-2010-annual-report_djvu.txt.

directed. For more information about safety issues related to opioids and other pain therapies, visit http://www.painsafe.org.[114]

The guide describes "pain in America" as "an evolving public health crisis" and characterizes concerns about opioid addiction as misconceptions: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include: . . . *Misconceptions about opioid addiction*."[115] It even characterizes as a "*myth*" that "*[c]hildren can easily become addicted to pain medications*."[116] This message is just one example of the types of messages that APF published with substantial financial support from the Drug Producer Defendants.

345.    Upon information and belief, the Drug Producer Defendants funded the APF and supported it with the intention and expectation that APF's messaging would continue to create more opioid addicts and necessarily result in more illegal abuse and distribution of opioids – and knowing that precisely those effects were occurring nationwide, in Tennessee, and in the communities at issue in this case.

## VI.    Teva Also Contributed to the Illegal Prescription Opioid Market that Fuels Tennessee's Opioid Epidemic

### A. Teva Pushed Opioid Drugs for Unapproved Purposes

346.    As described herein, Teva knowingly participated in the distribution chain of illegal opioids in Tennessee and in Baby Doe Plaintiffs' community by various means.

347.    According to a DOJ press release that summarizes Teva's guilty plea for criminal violations of the Food and Drug Act, Teva trained its sales representatives to disregard restrictions

---

[114] *A Policymaker's Guide to Understanding Pain & Its Management*, American Pain Foundation at 5. Available at: http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last visited Dec 1, 2021).

[115] *Id.* at 6 (emphasis added).

[116] *Id.* at 40 (emphasis added).

of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of Teva opioids and funded Continuing Medical Education ("CME") Courses to promote off-label uses. Specifically, the DOJ stated:

> From 2001 through at least 2006, *[Teva] was allegedly promoting [Actiq] for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy. [Teva] also promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening results.*[117]

348.    As a result of this unlawful marketing of Actiq, almost 90% of Actiq prescriptions were to patients for off-label, non-cancer use.

349.    Then-acting U.S. Attorney Laurie Magid commented on the dangers of Teva's unlawful practices:

> This company subverted the very process put in place to protect the public from harm, and put patients' health at risk for nothing more than boosting its bottom line. People have an absolute right to their doctors' best medical judgment. They need to know the recommendations a doctor makes are not influenced by sales tactics designed to convince the doctor that the drug being prescribed is safe for uses beyond what the FDA has approved.[118]

### B. Teva Funded Pro-Opioid Publications and Presentations

350.    In addition to its direct marketing, Teva indirectly marketed through third parties to change the way doctors viewed and prescribed opioids - disseminating the messages that opioids were safe for the treatment of chronic, long-term pain, that they were non-addictive, and that they were under-prescribed to the detriment of patients who were needlessly suffering. Teva did so by sponsoring pro-opioid front groups, prescription guidelines, articles, and CMEs, and Teva paid

---

[117] Press Release, U.S. Department of Justice, Pharmaceutical Company Teva To Pay $425 Million for Off-Label Drug Marketing (Sept. 29, 2008). Available at: https://www.justice.gov/sites/default/files/civil/legacy/2014/01/09/Cephalon%20Press%20Releas e.pdf (emphasis added).
[118] *Id.*

physicians thousands of dollars every year to publicly opine that opioids were safe, effective and non-addictive for a wide variety of uses.

351. Through its sponsorship of the FSMB's "Responsible Opioid Prescribing: A Physician's Guide," Teva continued to encourage the prescribing of opioid medication to "reverse ... and improve" patient function, attributing patients' displays of traditional drug- seeking behaviors as merely "pseudoaddiction."

352. Teva sponsored APF's guide, which warned against the purported under-prescribing of opioids, taught that addiction is rare and suggested that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.

353. A summary of the February 12-16, 2008 AAPM annual meeting reinforced the message, promoted both by the AAPM and the APS, that "the undertreatment of pain is unjustified." It continues:

> *Pain management is a fundamental human right* in all patients not only with acute postoperative pain but also *in patients suffering from chronic pain*. Treating the underlying cause of pain does not usually treat all of the ongoing pain. Minimal pathology with maximum dysfunction remains the enigma of chronic pain. Chronic pain is only recently being explored as a complex condition that requires individual treatment and a multidisciplinary approach. It is considered to be a disease entity.[119]

354. Teva also sponsored, through an educational grant, the regularly published journal *Advances in Pain Management*. In a single 2008 issue of the journal, there are numerous articles from Portenoy, Dr. Steven Passik, Dr. Kenneth L. Kirsh, and Webster, all advancing the safety and efficacy of opioids. In an article titled "Screening and Stratification Methods to Minimize

---

[119] Mohamed A. Elkersh & Zahid H. Bajwa, Highlights From the American Academy of Pain Medicine 24th Annual Meeting, 2(1) Advances in Pain Management 50-52 (2008) (emphasis added).

Opioid Abuse in Cancer Patients," Webster expresses disdain for the prior 20 years of opioid phobia.

355. In another article from the same issue, "Appropriate Prescribing of Opioids and Associated Risk Minimization," Passik and Kirsh state: "[c]hronic pain, currently experienced by approximately 75 million Americans, is becoming one of the biggest public health problems in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed opioids for long periods of time with success demonstrated by an improvement in function" and that then-recent work had shown "that opioids do have efficacy for subsets of patients who can remain on them long term and have very little risk of addiction."[120]

356. In November 2010, Fine and others published an article presenting the results of another Teva-sponsored study, concluding that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[121] They also conclude that the number of abuse-related events was "small."[122]

---

[120] Steven D. Passik & Kenneth L. Kirsh, *Appropriate Prescribing of Opioids and Associated Risk Minimization,* 2(1) Advances in Pain Management 9-16 (2008).
[121] Perry G. Fine, et al., Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).
[122] *Id.*

357. From 2000 forward, Teva has paid doctors nationwide millions of dollars for programs relating to its opioids, many of whom were not oncologists and did not treat cancer pain. These doctors included Portenoy, Fine, Passik, Kirsh, and others.

## VII. From 2012-2017, the Drug Producer Defendants Helped Funnel Millions of Dollars to Advocacy Groups that Promoted Opioid Use

358. On February 13, 2018, Senator Claire McCaskill, released a report showing that Jannsen and other producers funneled over $10 million to 14 advocacy groups and affiliated doctors who took "industry friendly positions," which included issuing medical guidelines promoting opioids for chronic pain, lobbying to defeat or include exceptions to state limits on opioid prescribing, and criticizing prescribing guidelines from the U.S. Centers for Disease Control and Prevention. The Report states that as these industry-funded entities and affiliated physicians:

> [o]ften echoed and amplified messages favorable to increased opioid use – and ultimately the financial interest of opioid manufacturers. These groups have issued guidelines and policy minimizing the risk of opioid addiction and promoting opioids for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for over-prescription and misbranding. Notably, a majority of these groups also strongly criticized 2016 guidelines from the Centers for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain – the first national standards for prescription opioids and a key federal response to the ongoing epidemic.

> The fact that these same manufacturers provided millions of dollars to the group described [in this report] suggests, at the very least, a direct link between corporate donations and the advancement of opioids-friendly messaging. By aligning medical culture with industry goals this way, the groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioids epidemic.[123]

---

[123] Fueling an Epidemic, Report Two: *Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Group*, U.S. Homeland Security & Governmental Affairs Committee, Ranking Member's Office, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf.

## VIII. The Drug Producer Defendants Knowingly Fostered Opioid Addiction and Fueled the Illegal Opioids Market in Which They are Now Knowingly Participating

359.    The Drug Producer Defendants' promotion of opioids gave rise to and fueled the illegal drug market that existed in Plaintiffs' community during all periods relevant to this suit. Their representations regarding the risks of opioids and actions taken to push opioids through aggressive marketing of their collective message contributed to the market for both illegally prescribed opioids and for diverted opioids (and heroin for those addicts who could no longer obtain or afford prescription opioids).

360.    As set forth in the examples above, the Drug Producer Defendants operated websites and/or funded third party physicians, organizations, and websites that all pushed the message that opioids were not highly addictive and/or were appropriate for long-term use to treat chronic pain.

361.    Upon information and belief, the Drug Producer Defendants chose not to fund any organizations and third parties who promoted the contrary (and scientifically supported) message that opioids were highly addictive and not suitable for long-term use to treat chronic pain. It also chose not to pull funding from the pro-opioids organizations.

362.    Upon information and belief, the Drug Producer Defendants made these choices knowing and expecting that by doing so, the opioids market would continue to expand and continue to create more opioid addicts dependent on the illegal diversion of their products.

363.    Speaking before the House Opioid Task Force in 2017, Dr. Michael Baron of the Tennessee Board of Medical Examiners summed up the cumulative effect of the opioid producers' multi-year campaign:

> We came out with what I call 'Generation O.' A whole generation of physicians that were taught it's ok to prescribe opiates, that they're safe, and that it's what the patient wants.

But we bypassed evidence-based medicine. The whole medical system was hijacked by industry and really agreed.

[***]

The triggers of the opioid epidemic were really the pharmaceutical industry and pain experts that were on the payroll of the pharmaceutical industry. And they preached that opioids are safe and effective for chronic, non-cancer pain, the risk of addiction is rare, and opioid therapy can be easily discontinued, all of which is nonsense.[124]

IX. **The Drug Producer Defendants, the Drug Distributor Defendants, and the Pharmacy Chain Defendants Engaged in a Conspiracy to Profit from the Illegal Opioid Market by Any Means Necessary Which Exacerbated the Opioid Epidemic**

364.    Through chargeback data, the Drug Producer Defendants had visibility into the extravagant opioid orders being placed by independent and retail chain pharmacies, including those owned and operated by the Pharmacy Chain Defendants.

365.    Upon information and belief, instead of reporting these orders to law enforcement and refusing to honor these rebates, the Drug Producer Defendants almost always continued to supply the Pharmacy Chain Defendants and others with opioids at a discounted rate to maximize their profits.

366.    Upon information and belief, the Distributor Defendants were in regular contact with the Drug Producer Defendants about potentially suspicious pharmacies; but as long as the Drug Producer Defendants continued to honor chargebacks, the Distributor Defendants continued to fill these pharmacies' suspicious orders, especially if the pharmacy at issue was one of the Pharmacy Chain Defendants.

---

[124] House Opioid Task Force, February 23, 2017.

367. Upon information and belief, the Pharmacy Chain Defendants knew that the Distributor Defendants fiercely competed with one another for their substantial books of business. As a prerequisite to gifting the Distributor Defendants their accounts, the Pharmacy Chain Defendants would demand that all of their locations be exempted from the Distributor Defendant's SOM system until their exorbitant monthly orders of opioids would not be identified as "suspicious" by the Distributor Defendants. Even when an order for a Pharmacy Chain Defendant was identified by a Distributor Defendant's SOM system, the Distributor Defendant would expediate a threshold increase to clear the order. The Distributor Defendants were so worried about losing the Pharmacy Chain Defendants' business that they would proactively reach out to the Pharmacy Chain Defendants when their SOM team saw a Pharmacy Chain Defendant location nearing its threshold for opioids.

368. Upon information and belief, as self-distributors of opioids themselves at certain points, the Pharmacy Chain Defendants understood that the Distributor Defendants had obligations to monitor for suspicious orders, but nevertheless demanded (and received) threshold increases for what the Pharmacy Chain Defendants clearly knew were suspicious orders for opioids. The Drug Producer Defendants witnessed and enabled these unlawful ordering tactics by continuing to grant chargebacks for the Pharmacy Chain Defendants, and encouraged the Distributor Defendants to keep the opioids flowing to these suspicious pharmacies.

369. The Drug Producer Defendants, the Distributor Defendants, and the Pharmacy Chain Defendants knew or should have known that their concerted and coordinated effort to subvert Tennessee state law resulted in the diversion of opioids into the illegal drug market, including the illegal drug markets in Tennessee and Baby Doe Plaintiffs' community.

## X.     The Pill Mill Defendants Participated in the Illegal Market

370.     Stephanie Puckett and Michael Puckett collaborated to divert opioids from pain clinics (where Stephanie worked) into the illegal drug market.

371.     Their criminal activity involved (collectively) four pain clinics in Knoxville and Lenoir City:

    a.  Comprehensive Healthcare Services in Lenoir City ("CHCS-Lenoir City"), which was a pain clinic opened in Loudon County in 2011;

    b.  Comprehensive Healthcare Services in Knoxville ("CHCS-Knoxville");

    c.  East Knoxville Healthcare Systems ("EKHCS"); and

    d.  Knoxville Pain Care ("KPC").

372.     Between mid-2012 and March 2015, Stephanie was employed at each of the four pain clinics.

373.     Stephanie began working at CHCS-Lenoir City in summer 2012.

374.     According to her later guilty plea:

From the moment of her interview through her first days of employment, it became apparent to Puckett that CHCS-Lenoir City was being set up by its owners and managers to operate as a 'pill mill' and not as a legitimate medical practice. That is to say, the true business plan behind the clinic was to provide large numbers of pill-seeking drug addicts with access to powerful prescription pain killers in exchange for exorbitant patient fees.

Before long, addicts and drug rings began flocking to the clinic. One or more of the owners/managers of CHCS-Lenoir City later opened CHCS-Knoxville in an effort to "cash in" even more on the unbridled demand for opioid prescriptions. Puckett managed the day-to-day operations of CHCS-Knoxville and began intentionally catering to the drug rings that patronized the clinic. Many of the addicts were sponsored by drug dealers who exploited the addicts by paying for their office visits and prescriptions in exchange for half or more of the addicts' pills. In this way, the drug rings gathered millions of prescription pain killers and diverted most of them to the illegal drug market for huge profits.

Puckett provided various favors to the drug rings, including shorter wait times, access to the most unscrupulous providers, falsification of drug screens, and assistance in locating pharmacies willing to fill the prescriptions. To make their operations run more efficiently, the drug dealers began trying to pay "tips" to Puckett for those favors. Eventually, Puckett realized that she could profit financially like everyone else seemed to be doing, and she began accepting bribes at EKHCS, as did [her co-defendants]. Later, Puckett [and others] left EKHCS to help start up a competing clinic, KPC, as a "friendly" clinic for pill-gathering groups. . .

In total, providers at CHCS-Lenoir City, CHCS-Knoxville, EKHCS, and KPC prescribed approximately 12 million opioid pills, or approximately 360,000,000 milligrams of opioid narcotics, to thousands of patients during the conspiracy. . . . . The drug rings obtained the vast majority of those prescriptions and diverted the majority of those narcotics to the illegal drug market.

(*U.S. v. Stephanie Puckett*, No. 3:15-CR-42, Dkt. 99, Plea Agreement (E.D. Tenn. filed Oct. 26, 2015).)

375.    In her plea, Ms. Puckett pleaded guilty to conspiracy to distribute and possess with intent to distribute a mixture or substance containing oxycodone.

376.    The Court sentenced Ms. Puckett to 8 years imprisonment (inclusive of about 6 years time served to that point) and 3 years of supervised release.

377.    Michael Puckett is Stephanie Puckett's husband.

378.    Mr. Puckett was nominally a "patient" of EKHCS and KPC, where Ms. Puckett worked.

379.    Per his later guilty plea, Mr. Puckett visited these clinics specifically to obtain large quantities of prescription oxycodone for diversion into the illegal market. The medical personnel at these clinics prescribed unreasonably high levels of oxycodone to him without a legitimate medical purpose. He diverted those oxycodone pills to the illegal market.

380.    Mr. Puckett also brought other individuals to the clinics to get pills.

381. Mr. Puckett pleaded guilty to conspiracy to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of oxycodone. (*U.S. v. Michael Puckett*, No. 3:15-CR-42, Dkt. 62, Plea Agreement (M.D. Tenn. filed Apr. 28, 2015).)

382. The Court sentenced Mr. Puckett to 2 years imprisonment.

383. Ms. Puckett and Mr. Puckett resided in Kingston, Tennessee (in Roane County) when they were arrested in March 2015.

384. In sum, Ms. Puckett knowingly helped operate pill mills in Knoxville and in Lenoir City (located in Loudon County, which borders Roane County) and knowingly used her position at these pill mills to divert massive quantities of prescription opioids to criminal drug rings.

385. Those opioids were diverted into the same illegal market from which Mary Doe obtained opioids unlawfully.

386. Similarly, capitalizing on his wife's employment at these pill mills, Mr. Puckett obtained large volumes of prescription opioids that he diverted into the illegal market.

387. Those opioids were diverted into the same illegal market from which Mary Doe obtained opioids unlawfully.

388. The Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants knew or should have known about the unreasonable volume of opioid prescriptions issuing from pill mills such as these, yet continued to do business with these pill mills or to supply the community with volumes of opioids far exceeding any conceivable medical need that were being diverted into the illegal market.

## XI. The Individual Dealer Defendants Also Participated in the Illegal Market

### A. Brian Brewster

389. Brian Brewster is an individual who dealt drugs in the illegal market in or around Roane County.

390. Brewster was arrested on drug charges in Monroe County in May 2016.

391. Brewster was also convicted in June 2016 in Loudon County for illegally selling/dealing oxycodone.

392. Brewster participated in the same illegal drug market from which Mary Doe obtained drugs illegally.

393. Brewster participated in the illegal market during the same time frame in which Mary Doe obtained drugs illegally during pregnancy. Furthermore, per T.C.A. § 29-38-113, his conviction is prima facie evidence of his participation in the illegal drug market during the two years preceding the acts for which he was convicted.

394. Brewster dealt illegal drugs of the same type that Mary Doe ingested during pregnancy.

395. The drugs that Brewster sold illegally (including oxycodone) also included drugs that were the same type as those manufactured, distributed, and sold by the Manufacturer Defendants, Distributor Defendants, and Pharmacy Chain Defendants.

**B. Jacob Dalton**

396. Jacob Dalton is an individual who dealt drugs in the illegal market in or around Roane County.

397. Dalton was arrested on November 1, 2016 by agents of the Loudon County Sheriff's Office and the Lenoir City Police Department following execution of a search warrant at a hotel room.

398. Dalton had rented out a hotel room where he and four other individuals were found with drug paraphernalia, pill grinders, plastic baggies and other items, including Opana pills. Agents observed the occupants of the room leave the room to deal drugs through hand-to-hand transactions, and they found Dalton with Opana pills for which he had no prescription.

399. Dalton was arrested and booked for manufacturing/selling/dealing/reselling Schedule II opioids, possession of drug paraphernalia, and for maintaining a dwelling from which illegal drugs were sold. In other words, Dalton was illegally dealing opioid pills and working with others to illegally deal opioid pills.

400. On February 3, 2017, Dalton pleaded guilty to possession of Opana with attempt to distribute.

401. Dalton participated in the same illegal drug market from which Mary Doe obtained drugs illegally.

402. Dalton participated in the illegal market during the same time frame in which Mary Doe obtained drugs illegally during pregnancy. Furthermore, per T.C.A. § 29-38-113, his conviction is prima facie evidence of his participation in the illegal drug market during the two years preceding the acts for which he was convicted.

403. Dalton dealt illegal drugs of the same type that Mary Doe ingested during pregnancy.

404. The drugs that Dalton sold illegally (including Opana) also included drugs that were the same type as those manufactured, distributed, and sold by the Manufacturer Defendants, Distributor Defendants, and Pharmacy Chain Defendants.

**C. William Baird**

405.     William Baird is an individual who dealt drugs in the illegal market in or around Roane County.

406.     Baird was charged for dealing oxycodone in Roane County in January 2018, February 2018, and March 2018.

407.     Baird later pleaded guilty for dealing oxycodone in Roane County in January 2018. Upon information and belief, he dealt oxycodone at least through March 2018.

408.     Baird participated in the same illegal drug market from which Mary Doe obtained drugs illegally.

409.     Baird participated in the illegal market during the same time frame in which Mary Doe obtained drugs illegally during pregnancy. Furthermore, per T.C.A. § 29-38-113, his conviction is prima facie evidence of his participation in the illegal drug market during the two years preceding the acts for which he was convicted.

410.     Baird dealt illegal drugs of the same type that Mary Doe ingested during pregnancy.

411.     The drugs that Baird sold illegally (including oxycodone) also included drugs that were the same type as those manufactured, distributed, and sold by the Manufacturer Defendants, Distributor Defendants, and Pharmacy Chain Defendants.

412.     Collectively, the Defendants facilitated the illegal distribution of drugs into and within the illegal drug market that harmed the Baby Does.

## XII.     The United States, and Tennessee in Particular, is Plagued by Rampant Opioid Abuse Driven by Defendants Perpetuating an Illegal Market for Prescription Opioids

### A. Opioids are Abused and Diverted at Alarming Rates

413.     The increasing demand, and high availability, of prescription opioids correlates with increased addiction, abuse, and diversion (a term used to describe redistribution of

prescription drugs for illegal uses) throughout the country, including Tennessee and Baby Doe Plaintiffs' community. According to the Centers for Medicare & Medicaid Services, "'[d]rug diversion' is best defined as the diversion of licit drugs for illicit purposes. It involves the diversion of drugs from legal and medically necessary uses towards uses that are illegal and typically not medically authorized or necessary."[125]

414.    Opioid misuse is a national epidemic. For example, the federal government estimated that 11.5 million people had abused opioid pain relievers in 2016, including approximately 4.4% of all people in the United States aged 12 or older.[126] These statistics are disturbing, indicating that about 1 in 20 people in the U.S. are abusing opioids.

415.    Unfortunately, the situation in Tennessee is no better, and indeed may be worse. During 2013 – 2014, the State of Tennessee estimated that nearly 5% (221,000) of adults in Tennessee used pain relievers for non-medical purposes. Of these, the State estimated that 69,100 Tennesseans were addicted to prescription opioids and required treatment for prescription opioid abuse. The other 151,900 were using prescription opioids in ways that could be harmful and may benefit from early intervention strategies.[127] Not surprisingly, opioids abuse continues to go hand in hand with an illegal drug market from which the Defendants are knowingly deriving substantial profits.

---

[125] "Drug Diversion in the Medicaid Program: State Strategies for Reducing Prescription Drug Diversion in Medicaid," Centers for Medicare & Medicaid Services (Baltimore, MD: January 2012), p. 1., accessible at https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud Prevention/MedicaidIntegrityProgram/downloads/drugdiversion.pdf.

[126]             https://www.samhsa.gov/data/sites/default/files/NSDUH-FFR1-2016/NSDUH-FFR1-2016.htm#opioid.

[127] "Prescription for Success: Statewide Strategies to Prevent and Treat the Prescription Drug Abuse Epidemic in Tennessee," Tennessee Department of Mental Health and Substance Abuse Services     et     al.,     (Summer,     2014),     pg.     9,     accessible     at https://web.archive.org/web/20160414040557/https://www.tn.gov/assets/entities/behavioral-health/sa/attachments/Prescription_For_Success_Full_Report.pdf ("Prescription for Success").



**B. The Defendants are Aware of a Nationwide Problem**

416. Trends in opioid production, prescriptions, and usage over the last decade put drug producers and distributors on notice of a heightened risk of abuse and diversion nationwide. For example:

a. according to the Working Group Report, "[s]ince 1999, there has been no overall change in the amount of pain experienced by Americans, yet the number of prescriptions for opioids has quadrupled[;]"[128]

b. in the past two decades, the rate of opioid prescribing in the United States has increased 600%. The United States accounts for 4.6% of the world population but its citizens, by 2011, were consuming 80% of the world's opioid production;[129]

c. between 2009 and 2013, both the number of prescriptions filled per patient and the number of days of medication per prescription increased by approximately 8.4%;[130]

---

[128] *Working Group Report* at 3.

[129] *Id.* (citing Daneshvari R. Solanki et al., *Monitoring Opioid Adherence in Chronic Pain Patients: Assessment of Risk of Substance Misuse*, 14 Pain Physician J. 119, 120 (2011)).

[130] "A Nation in Pain" by Express Scripts, 2015.

d. nearly half (46.9%) of new opioid users who take these medications for more than 30 days in the first year continue using them for three years or longer. Signaling a particularly alarming trend, nearly 50% of these patients are only taking short-acting opioids — which can make them more prone to addiction — rather than long-acting formulations, which are designed for extended pain relief; [131]

e. on average, the patients who chronically used these medications filled 56 short-acting opioid prescriptions over three years — nearly 19 prescriptions each year;[132] and

f. prescription opioid overdose deaths quadrupled in parallel with prescription opioid sales in the United States between 1999 and 2010.[133]

417. Defendants know that production volumes of opioids skyrocketed in the last twenty-five years. In 1993, the DEA allowed pharmaceutical companies to produce 3,520 kilograms of oxycodone. In 2015, the DEA authorized production of 137,500 kilograms of oxycodone. That's a 39-fold increase in 22 years.

418. Defendants are also well-aware that for 2018, the DEA proposed a 20% reduction in the number of prescribed schedule II opioid painkillers that can be produced in the United States, with Acting Administrator Chuck Rosenberg warning that "Physicians, pharmacists, and patients must recognize the inherent risks of these powerful medications, especially for long-term use."

## C. The Stream of Opioids into Tennessee is Alarmingly High and Put Defendants on Notice of Abuse and Diversion

419. Tennessee currently has the third highest statewide opioid prescription rate in the nation.[134] Indeed, Tennessee doctors in 2015 wrote more than 7.8 million opioid prescriptions — or 1.18 prescriptions for every man, woman and child in the State, placing Tennessee number 2 in the nation among all States for the number of opioid prescriptions per capita according to IMS

---

[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] *See* https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.

Health data. By contrast, California with its population of 38.8 million people only had 0.48 prescriptions per capita in 2015. As reported by the CDC, Tennessee's oxycodone prescription rate is twenty-two times that of Minnesota's. As reported by Commissioner of Health Dreyzehner in 2015 his presentation "Neonatal Abstinence Syndrome, a Tennessee Perspective," 51 hydrocodone pills and 21 oxycodone pills were prescribed for every Tennessean during the period covered by that report. The same report details the dramatic, multi-fold increase in opioid prescriptions since 1999, in the absence of any meaningful increase in patients experiencing chronic pain.

420. According to the Tennessee Department of Health's Drug Overdose Dashboard, there were 7,636,112 opioid prescriptions written in Tennessee in 2016 alone.[135] The State is currently dispensing opioids at rate of 68.5 opioid prescriptions per 100 persons.[136]

421. According to IMS Health Data, the number of prescriptions of popular branded and generic opioid products containing hydromorphone, oxymorphone, oxycodone, and hydrocodone in the State of Tennessee totaled 6,148,823 for the 12-month period of September 2015 through August 2016, and 5,639,429 for the 12-month period of September 2016 through August 2017. This means in just over a two-year period, Tennesseans received more than 11.7 million of these prescriptions.

### D. The Opioid Epidemic Has Devastated Tennessee Communities

422. It is difficult to overstate the human, economic, and societal toll that the opioid epidemic and associated abuse and diversion have wrought in Tennessee. The levels of opioid abuse in Tennessee are staggering: Tennessee and Plaintiffs' community are awash in opioids,

---

[135] Tennessee Drug Overdose Dashboard.
[136] Center for Disease Control, *U.S. State Opioid Dispensing Rates, 2020*, https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.

plagued by high levels of opioid-induced deaths and babies born with NAS, and racked by an illegal opioids market. The flood of opioids has had – and continues to have – predictably devastating effects on Tennessee communities, including Plaintiffs' community. This includes staggering rates of addiction, opioid-related deaths, and babies born with NAS, along with the presence of criminal drug trafficking rings.

423. "Opioid overdoses, mainly from prescription drugs, are … the leading cause of the recent unexpected rise in the mortality rate of middle-aged white Americans, particularly women in rural areas, after decades of steady decline."[137]

424. As recently as 2016, the preeminent medical journal in the United States concluded that "[t][wo major facts can no longer be questioned. First, opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions….Second, the major source of diverted opioids is physician prescriptions."[138] Overdose deaths increased in Tennessee from 342 in 1999 to 2,388 in 2020, the last year for which overdoses have been calculated.[139] That represents a nearly 600% increase. Tragically, the rates of opioid deaths in Tennessee outpace the national average by a wide margin. The vast majority of overdose deaths in Tennessee – nearly 72% in 2015 – involved opioids.[140] From 2012 to 2020 (the last year for which data has been reported), Tennessee set a new record

---

[137] Lenny Bernstein, et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'*, washingtonpost.com, Oct. 22, 2016, available at: https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[138] "Opioid Abuse in Chronic Pain — Misconceptions and Mitigation Strategies," Nora D. Volkow, M.D., and A. Thomas McLellan, Ph.D., N Engl J Med 2016; 374:1253-1263 (March 31, 2016), accessible at http://www.nejm.org/doi/full/10.1056/NEJMra1507771.

[139] Tennessee Drug Overdose Dashboard.

[140] *Id.*

each year for the number of opioid overdose deaths, with 2,388 in 2020 alone.[141] The rate in 2020

equated to more than 6 opioid overdose deaths in Tennessee every single day.

### Rates of Opioid Related Overdose Deaths (rate per 100,000 Population)
### Tennessee and United States, 1999-2010



Between 2005 and 2015, just one decade, unintentional overdose deaths in Tennessee increased

over 250%. Unintentional overdose deaths now account for more early deaths in Tennessee than

automobile accidents, suicides, or homicides.[142]

425.    Defendants also contributed to NAS deaths in Tennessee.    NAS is a clinical

diagnosis, and "a consequence of the abrupt discontinuation of chronic fetal exposure to substances

that were used or abused by the mother during pregnancy."[143]

426.    According to a report produced by Governor Bill Haslam's Opioid Abuse Working

Group pursuant to 2015 Tenn. Pub. Acts Ch. 389 ("Governor's Working Group Report"), "[t]he

---

[141] *Id.*

[142] *Working Group Report* at 4.

[143] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome*, 134(2) Pediatrics 547, 547-48 (2014),
*available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

number of babies born with Neonatal Abstinence Syndrome (NAS). . . increased tenfold from 2000 to 2010."[144] Since 2010, the problem has only gotten worse.

427. Along with overdose deaths, the number and rate of NAS has also increased dramatically in Tennessee since 2007:



**NAS Hospitalizations in TN: 1999-2012**

428. As illustrated by the following map, researchers analyzing hospital discharge data have determined that Tennessee, along with its border states Kentucky, Alabama, and Mississippi, have the highest rates of NAS births in the nation.[145]

---

[144] *Working Group Report* at 4 (emphasis added).
[145] Stephen W. Patrick et al., *Increasing Incidence of Neonatal Abstinence Syndrome: United States 2009-2012*, 35(8) J. Peronatol. 650, 650-55.



NAS Incidence by Geographic Region, 2012

NAS per 1,000
Hospital Births
15–20
10–15
5–10
0–5

Patrick. SW, Davis MM, Lehmann CU, et al. *J Perinatol.* 2015 Aug;35(8):650-5.

429.    The percentage of pregnant women served by the Tennessee Department of Mental Health & Substance Abuse Services—42.3% in 2012—listing prescription opioids as their primary substance of abuse was over twice the percentage in the United States overall (18.4% in 2012).

430.    TennCare eligibility records establish that 24.3% of babies born with NAS in 2012 were placed in the Department of Children's Services' custody within one year of birth.[146]

431.    The epidemic of NAS babies is an outgrowth of the explosion in the amount of opioids in Tennessee since the mid-1990s. As the Appalachia HIDTA recognized in its 2015 Annual Report:

> [T]he state of Tennessee and east Tennessee in particular, is plagued by an epidemic of opioid abuse, which has unfortunately now resulted in a resurgence of heroin as a growing threat. A consequence of this opioid abuse is the alarming number of children being born dependent on opioids, afflicted with Neonatal Abstinence Syndrome (NAS). Children born with NAS suffer extreme physical symptoms of withdrawal and require specialized care in the neonatal wards of hospitals. This

---

[146] *Working Group Report* at 4.

treatment often consists of children being given smaller doses of methadone or similar drugs, over time, to break their addiction to opioids.[147]

432. The direct link between the flood of prescription opioids and the NAS baby crisis in Tennessee has been clearly stated by Tennessee's Commissioner of Health Dr. John Dreyzehner. In a 2015 presentation entitled "Neonatal Abstinence Syndrome: A Tennessee Perspective," Commissioner Dreyzehner addressed "the Substance Abuse Epidemic and resulting NAS epidemic."[148]

433. In his NAS presentation, Commissioner Dreyzehner identified the obvious link between opioid sales and opioid related health problems, noting "the incredible correlation between sales and supply and availability [of opioids] and opioid related deaths and opioid treatment admissions."[149]

434. Additionally, Dr. Stephen Loyd, Medical Director of the Tennessee Department of Mental Health and Substance Abuse Services, recently testified before the Tennessee House of Representatives' Opioid Task Force ("House Opioid Task Force") that: "[m]arketing of opioids as having a low addictive potential when used for the treatment of chronic pain" resulted in "opioids prescribed more freely by practitioners," and, in turn, an "increase in number of babies born drug dependent."[150]

---

[147] U.S. Dep't of Justice, Appalachia High Intensity Drug Trafficking Area, CY2015 Annual Report, at 4 (2015).

[148] National DEC, "Neonatal Abstinence Syndrome A Tennessee Perspective," Vimeo, May 4, 2015. Available at: https://vimeo.com/126839454 (emphasis added).

[149] Id.

[150] House Opioid Task Force, February 23, 2017.

435.    The Nationwide epidemic of NAS has a focal point in Tennessee.[151] The statistics are alarming:[152]

      a.   in 2015, 12.1 of every 1,000 babies were born with NAS in Tennessee;

      b.   in 2016, 12.2 of every 1,000 babies were born with NAS in Tennessee;

      c.   in 2017, 13.5 of every 1,000 babies were born with NAS in Tennessee;

436.    Among other issues, NAS babies experience long-term difficulties, including but not limited to the following types of effects: poor performance in school;[153] higher risk of developmental disabilities and the accompanying need for special needs services;[154] and lower cognitive function.[155] Thus, the Baby Doe Plaintiffs will likely suffer long-term effects that will require lifelong treatment and special education expenses, and the Baby Doe Plaintiffs may suffer sustained (perhaps lifelong) cognitive impairments.

### E. In Addition to Death and NAS, the Opioid Abuse and Diversion Enabled by Defendants has Other Deleterious Economic and Societal Consequences

437.    In addition to these health effects, the flood of opioids into Tennessee corresponds to lost productivity and increases in crime, children in State custody, and treatment and healthcare

---

[151] The TN Department of Health has tracked statistics related to babies with NAS from which the following statistical data has been gathered. Available at: https://www.tn.gov/health/article/nas-update-archive.html.

[152] *Id.*

[153] *Neonatal Abstinence Syndrome and High School Performance* (Jan. 16, 2017), available at: http://i2.cdn.turner.com/cnn/2017/images/01/16/neonatal.abstinence.syndrome.and.high.school.performance.pdf.

[154]       https://consumer.healthday.com/pregnancy-information-29/pregnancy-drugs-news-545/babies-born-addicted-to-opioids-often-struggle-with-learning-722293.html (summarizing results of CDC study of NAS-born babies in Tennessee).

[155] Nygaard, Egil, et al., *Longitudinal Cognitive Development of Children Born to Mothers with Opioids and Polysubstance Abuse*, Pediatric RESEARCH, Vol. 28 No. 3 (Sept. 2015).

costs.[156] In a 2013 report, the State of Tennessee itself identified prescription drug as the cause of these deleterious effects:[157]

## SUMMARY OF THE PRESCRIPTION DRUG EPIDEMIC IN TENNESSEE

### Who Abuses Prescription Drugs?

* In 2012, prescription opioids became the primary substance of abuse for people in Department of Mental Health and Substance Abuse Services-funded treatment, overtaking alcohol for the first time.
* Almost 5% of Tennesseans have used pain relievers in the past year for non-medical purposes.
* Young adults (18-25-year-olds) in Tennessee are using prescription opioids at a 30% higher rate than the national average.

### Access to Prescription Drugs

* **High Number of Prescriptions Dispensed**
  * There were 25% more controlled substances dispensed in Tennessee in 2012 than in 2010.
* **Doctor Shopping**
  * In March 2013, 2,010 people received prescriptions for opioids or benzodiazepines from four or more prescribers.
* **Prescribing Practices**
  * As of August 1, 2013, 25 physicians had been prosecuted for overprescribing during 2013.
* **Source of Prescription Drugs**
  * More than 70% of people who use prescription drugs for non-medical reasons got them from a friend or relative.

### Consequences of Prescription Drug Abuse

* **Healthcare Costs**
  * The number of emergency department visits for prescription drug poisoning has increased by approximately 40% from 2005 to 2010.
* **Overdose Deaths**
  * There has been a 220% increase in the number of drug overdose deaths from 1999 to 2012 (342 in 1999 to 1,094 in 2012).
* **Criminal Justice System Involvement**
  * Drug-related crimes against property, people and society have increased by 33% from 2005 to 2012.
* **Lost Productivity**
  * The cost of lost productivity due to prescription drug abuse in Tennessee was $142.9 million in 2008. This number adjusted for 2013 inflation is $155.2 million.
* **Children in State Custody**
  * About 50% of the youth taken into Department of Children's Services custody resulted from parental drug use.
* **Neonatal Abstinence Syndrome**
  * Over the past decade, we have seen a nearly ten-fold rise in the incidence of babies born with Neonatal Abstinence Syndrome in Tennessee.
* **Treatment Costs**
  * It is estimated that the cost of providing state-funded treatment services to individuals that abuse prescription drugs and live below the poverty level would cost $27,933,600.

---

[156] "Prescription for Success" at p. 9.
[157] *Id.*

438. As the graphic below reflects, opioid overdose deaths represent only the "tip of the iceberg" of the human and societal costs of the opioid epidemic:[158]



For every **1** opioid overdose death in 2010 there were...

**15** abuse treatment admissions
**26** emergency room visits
**115** who abuse/are dependent
**733** nonmedical users

**$4,350,000** in healthcare-related costs

439. According to a recent article by the Tennessean, the "substance abuse epidemic – most notably involving opioids" -- costs Tennessee more than $2 billion annually.[159] That $2 billion annual price tag includes $46 million for babies born in Tennessee with NAS; $422.5 million for hospitalizations associated with opioid abuse; and another $372,440 in emergency room visits associated with opioid abuse.[160] However, the largest component of the substantial yearly costs is the $1.29 billion in "lost income from having an estimated 31,000 people, or 1 percent of the workforce, out of jobs.[161] As the article further explains:

---

[158] Benjamin Schachtman, *'Closer to Home' – The Cost of the Opioid Epidemic May be the Tip of the Iceberg*, portcitydaily.com, Apr. 3, 2017 (attributing graphic chart to the N.C. Public Health Department). Available at: http://portcitydaily.com/2017/04/03/closer-to-home-the-cost-of-the-opioid-epidemic-may-be-be-the-tip-of-the-iceberg/.

[159] Holly Fletcher, *Drug, alcohol abuse saps $2 billion from Tennessee annually – an under-the-radar impact of the opioid epidemic*, USA TODAY NETWORK – Tennessee (Dec. 3, 2017). Available at: https://www.tennessean.com/story/money/industries/health-care/2017/12/04/drug-alcohol-abuse-saps-2-billion-tennessee-annually-under-the-radar-impac.
[160] *Id.*
[161] *Id.*

Teresa Waters, the chair of preventive medicine at the University of Tennessee Health Sciences Center and person responsible for compiling the data used in the Tennessean article, said she "took a conservative approach to the analysis so the overall economic impact and state spending is likely higher." In particular, Waters noted that "she didn't include costs associated with substance abuse overdoses because of debate over how to estimate economic impact from early loss of life."[162]

440. Defendants' creation and/or expansion of the opioid market has given rise to a market for heroin in Tennessee, made up largely of addicts who can no longer afford diverted prescription opioids available on the black market. There is a relationship between opioid pain reliever use and heroin use. According to the federal government's National Survey on Drug Use and Health, four out of five heroin addictions begin with opioid prescription pain relievers.[163]

441. On November 13, 2015, E. Douglas Varney, Commissioner of the Tennessee Department of Mental Health, issued a message detailing the recent rise of heroin abuse in Tennessee.[164] In the message, Varney explained that, as the state "forged efforts to reduce availability of opioid based pain remedies, in the shadows, heroin arrived on the scene. It arrived like a tidal wave in Tennessee. It's a far more potent form of opioids, cheaper, more dangerous and more lethal."[165] Varney referenced data from multiple sources showing heroin, and heroin-related criminal activity, sharply on the rise, and said: "I'm saddened to see our friends and

---

[162] *Id.*

[163] Pradip K. Muhuri et al., Substance Abuse and Mental Health Services Administration, *Associations of Nonmedical Pain Reliever Use and Initiation of Heroin Use in the United States* (August 2013), *available at:* http://www.samhsa.gov/data/sites/default/files/DR006/DR006/nonmedical-pain-reliever-use-2013.htm.

[164] TN Dep't of Mental Health and Substance Abuse Services, *Message from Commissioner E. Douglas Varney on Heroin's Grip in our Cities and Suburbs* (Nov. 13, 2015), *available at:* https://www.tn.gov/behavioral-health/news/20176.

[165] *Id.*

neighbors that have been struggling with opioid addiction now transitioning to heroin which is coming from the criminal underground street dealer."[166]

442. In a December 2016 publication of the Tennessee Medical Association titled "No Easy Fix: Tennessee's Doctors Take on The Opioid Abuse Epidemic," Dr. Roland W. Gray described the opioid epidemic as the "worst and deadliest drug epidemic in our nation's history."[167] He went on to say that "[t]here's good news in that we are prescribing significantly fewer opiates in Tennessee; the bad news is they are being replaced by a heroin epidemic. Tennesseans are rapidly turning to those drugs – they're available on the street and are cheaper and far more powerful than prescription opiates."[168]

443. According to the Tennessee Department of Health, heroin-associated overdose deaths are also on the rise, increasing from 147 in 2014 to 205 in 2015.[169]

444. Commissioner Dreyzehner has determined that "[t]here is a direct correlation between opioid addiction and heroin use."[170]

445. As set forth in a September 2016 report by the Tennessee Department of Mental Health and Substance Abuse Services, people with prior treatment admissions, people who inject opioids, people ages 25-34, and people who started opioid use after age 18 are all at increased risk for switching from prescription opioids to heroin.[171]

---

[166] *Id.*

[167] Roland W. Gray, *The Good News/Bad News About Tennessee's Opioid Epidemic*, 109 Tenn. Med.. 4, 23 (2016), *available at:* https://www.tnmed.org/Documents/TennMed-Qtr4-05FINAL.pdf.

[168] *Id.*

[169] Tenn. Dep't of Health, *1,451 Tennesseans Die from Drug Overdoses in 2015*, tn.gov (Nov. 15, 2016). Available at: http://tn.gov/health/news/46773.

[170] *Working Group Report.*

[171] K. Edwards, Tennessee Department of Mental Health & Substance Abuse Services, *Turning the Curve on Opioid and Heroin Abuse in Tennessee*, 14 (September 14, 2016).

## XIII. Plaintiffs' Neonatal Abstinence Syndrome was a Result of Defendants' Participation in the Illegal Drug Market

446. Mary Doe became addicted to opioids (and maintained her addiction using diverted opioids) as a result of Defendants' participation in the illegal drug market. Defendants callously and cynically profited from that illegal market.

447. Plaintiffs are three children born opioid dependent. Each has suffered from their in utero exposure to opioids.

448. Plaintiffs' NAS and associated conditions are consequences of the illegal market in which the Defendants participated.

449. Defendants knew that their acts and omissions in marketing, distributing, and dispensing opioids would result in a community of people addicted to opioids. Defendants knew that those people would likely seek opioids through illegal distribution channels. They also knew that a significant number of those individuals are women of child-bearing ages who would give (and have given) birth to babies dependent upon opioids with alarming frequency in Eastern Tennessee.

450. Plaintiffs are just three of the thousands of innocent infants victimized by Defendants' unlawful conduct. These children will suffer the psychological, physical, and financial burdens of Defendants' campaign to addict America to opioids.

## THE THCLA DOES NOT APPLY

451. Tennessee's Healthcare Liability Act does not apply to this DDLA action or any other claims made in this lawsuit. While the THCLA applies to "any civil action...alleging that a health care provider or providers have caused an injury relating to the provision of, or failure to provide, health care services to a person," Tenn. Code Ann. § 29-26-101(a)(1), the DDLA is distinct in that defendants are liable only for "injury resulting from an individual's use of an illegal

drug." Tenn. Code Ann. § 29-38-105(a). Plaintiffs have no burden of establishing direct or proximate causation between defendants' alleged provision of health care services; instead, Plaintiffs' evidentiary burden with regard to Defendants' conduct is to show "[t]he defendant's participation in the illegal drug market was connected with the same type of illegal drug used by the individual drug user." Tenn. Code Ann. § 29-38-106(b)(2)(B). Absent a causal link to the damages alleged herein, Defendants' conduct does not fall under the umbrella of the THCLA.

452. Without conceding that Tennessee's Healthcare Liability Act applies to any claim brought in this action, or that a certificate is required under the Tennessee Healthcare Liability Act for any claim brought in this action, and pled in the alternative, to the extent necessary, Plaintiffs have complied with the certificate of good faith requirement of the Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101, et seq, which has been interpreted as a jurisdictional requirement. Pursuant to Tenn. Code Ann. § 29-26-122(a), a Certificate of Good Faith signed by the undersigned counsel is included as Exhibit A and incorporated herein by reference.

## DISCLAIMER

453. For the sake of clarity, and in the event any defendant seeks to remove this case or asserts that this pleading (or any other paper) raises any federal claim or federal question, the Baby Doe Plaintiffs expressly disavow any and all federal claims or questions related to opioids distributed by defendants as being a part of this lawsuit. Specifically, the Baby Doe Plaintiffs hereby expressly disavow any cause of action or claim for recovery related to opioids distributed by defendants that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. § 1442(a)(1) (federal officer). The Baby Doe Plaintiffs also disavow any cause of action or claim for recovery related to opioids distributed by defendants to

federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract including but not limited to any Pharmaceutical Prime Vendor Contract.

## CAUSES OF ACTION

### COUNT I
### TENNESSEE DRUG DEALER LIABILITY ACT

454. Plaintiffs incorporate all preceding and subsequent paragraphs by reference.

455. Tennessee's Drug Dealer Liability Act ("DDLA") Tenn. Code Ann. § 29-38-101, et seq., provides a civil remedy for "damages to persons in a community as a result of illegal drug use," including "infants injured as a result of exposure to drugs in utero." Tenn. Code Ann. § 29-38-102.

456. Plaintiffs have been exposed to illegal opioids in utero because of their birth mother's addiction to, purchase, and use of those illegal drugs. Those exposures provide them the right to sue for damages under the DDLA. Tenn. Code Ann. § 29-38-106(a)(2).

457. Mary Doe, the birth mother of each Plaintiff, was an "individual drug user" under Tenn. Code Ann. § 29-38-104(4) whose illegal drug use attributable to illegal opioids resulted in in utero opioid exposure during her respective pregnancy with each baby. Tenn. Code Ann. § 29-38-104(4).

458. Mary Doe's opioid use was illegal in that she used opioids obtained without a valid prescription as required by Tenn. Code Ann. § 53-11-308(a).

459. Mary Doe bought and used legal and illegal opioids throughout Roane County, Tennessee, including but not limited to, Oxycodone, Oxycontin, Roxicodone, and Hydrocodone. Under the DDLA, the legislative district in Roane County is a "place of illegal drug activity." Tenn. Code Ann. § 29-38-104(12).

460. Defendants knowingly participated in the production, procurement of the originally diverted prescription, and/or distribution of prescription opioids into the illegal market that reached Plaintiffs' community during all times relevant to this complaint. For purposes of the DDLA, Defendants' "illegal drug market target community" is the entire state of Tennessee, because Defendants participated in the illegal drug market by distributing 4 ounces or more of a "specified illegal drug." Tenn. Code Ann §§ 29-38-104(8), 29-38-109(4). As noted by the Tennessee Department of Health in a 2015 presentation, the Tennessee market for hydrocodone and oxycodone pills comprised of 51 hydrocodone pills and 21 oxycodone pills for every Tennessean. Commissioner of Health Dreyzehner noted that 50% of mothers of NAS babies obtained their pills, in whole or in part, from diverted pills (28.7% solely from diverted drugs). Given that a single oxycodone tablet, on information and belief, weighs approximately 135 mg and contains at least 10 mg of opioid, there can be no question that each of the Drug Producer Defendants far exceeded the four-ounce level, and the same holds true as to the Distributor Defendants and Pharmacy Chain Defendants.

461. The Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants all recognized that they had a responsibility not to procure or fill suspicious orders, not to convince prescribers to write scripts without a valid medical purpose, and not to supply channels of distribution that they knew or reasonably expected would result in diversion. Nevertheless, they violated these responsibilities through the various acts referenced herein.

462. Under Tennessee criminal laws, including, but not limited to, Tenn. Code Ann. § 39-17-417 and Tenn. Code Ann. § 39-17-418, opioids (including prescription opioids) are illegal drugs if possessed, sold, and distributed without a valid prescription.

463. The Pill Mill Defendants and Individual Dealer Defendants each sold prescription opioids illegally in the illegal market that included Roane County.

464. The place of illegal drug activity by the individual drug user (here, Mary Doe) is within the illegal drug market target community of the Defendants.

465. The Defendants' participation in the illegal drug market was connected with the same type of illegal drug, an opioid, used by the individual drug user (Mary Doe).

466. The Defendants participated in the illegal drug market during Mary Doe's period of illegal drug use.

467. Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence." For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes. If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain. The Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants did not lawfully distribute prescription opioids into or within Tennessee. Instead, using their licenses as a cover, they unlawfully distributed drugs without maintaining necessary controls (rendering the distribution unlawful), knowingly distributed those drugs into channels that they knew were resulting in diversion, knowingly encouraged high-volume pill mill prescribers to prescribe opioids without a legitimate medical purpose to feed drug abusers, pill seekers, and drug dealers, knowingly supplied pharmacies serving pill mills, and knowingly dispensed prescriptions that were not made for a legitimate medical purpose.

468. The Producer Defendants also committed various other acts intended to facilitate the marketing or distribution of illegal opioids (including opioids that reached Plaintiffs) for purposes of Tenn. Code Ann. § 29-38-104(9). These acts are detailed in the preceding paragraphs, which are incorporated by reference. Those acts include, but are not limited to:

a. engaging in a mass marketing campaign to downplay the risks of addiction from long-term use of opioids of non-cancer pain;

b. taking actions that violated DEA and FDA requirement or guidelines regarding the marketing and promotion of their drugs and/or suspicious order monitoring;

c. utilizing front groups and key opinion leaders to spread misinformation regarding the risks of addiction and the signs of addiction;

d. utilizing marketing teams to devise ways to overcome the legitimate concerns of Tennessee prescribers regarding long-term use of opioids;

e. successfully encouraging Tennessee prescribers to engage in prescription practices that defendants knew and expected would drive up addiction rates;

f. oversupplying Tennessee and Plaintiffs' community with opioids, knowing that the oversupply would necessarily feed and expand the black market;

g. targeting the highest-volume Tennessee prescribers for sales efforts and calling on these prescribers repeatedly to convince them to prescribe more opioids;

h. using volume-based bonuses and commissions for sales representatives with respect to a highly addictive and widely abused narcotic, and otherwise encouraging and rewarding sales representatives for doing business with Tennessee pill mills and other over-prescribers;

i. knowingly establishing business relationships with Tennessee pill mills and over-prescribers to compete for their business by convincing them to prescribe more opioids, including high-volume prescribers in small, rural Tennessee communities who were prescribing opioids at unjustifiable levels;

j. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after it was clear, even by defendants' own stated criteria, that those prescribers were engaging in highly suspicious prescribing practices or criminal conduct;

k. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after receiving reports from law enforcement that the prescribers and pharmacies were supplying drug addicts and the illegal market;

l. establishing new accounts with high-volume opioid prescribers without due diligence, knowing that the new account may be a pill mill;

m. providing patients or Tennessee prescribers incentives to prescribe more opioids;

n. convincing naïve Tennessee doctors willingly to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale;

o. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids when defendants knew that those prescribers were likely engaging in unlawful conduct and feeding the illegal drug market;

p. incentivizing sales representatives to do business both with Tennessee pill mills and with pharmacies supplying pill mills (and financially rewarding those sales associates for doing so);

q. filling suspicious orders intended for distribution in Tennessee despite knowing that the orders reflected diversion;

r. implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded in Tennessee and elsewhere;

s. filling orders that defendants had subjectively identified as suspicious before undertaking or completing an investigation into those orders;

t. permitting sales representatives to call on or prescriber or pharmacy even after internally recommending that the entity be reported to the DEA;

u. continuing to call on pill mill prescribers and associated pharmacies even after being told by law enforcement that they were likely feeding the illegal drug market;

v. collaborating with the Drug Distributors to provide sham justifications to fill suspicious orders;

w. placing primary or sole responsibility for suspicious order monitoring in the hands of a commission/volume bonus-based sales force with an inherent conflict of interest;

x. allowing inherently conflicted sales representatives to "clear" suspicious orders without any independent investigation;

y. choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

z. allowing sales associates to determine whether to self-report their best customers even where the stated criteria for reporting diversion are met; and

aa. supplying outlandish volumes of prescription opioids to rural Tennessee communities far exceeding any conceivable medical need.

469. The Distributor Defendants and the Pharmacy Chain Defendants also committed acts intended to facilitate the marketing or distribution of illegal opioids that reached the Baby Doe Plaintiffs for purposes of Tenn. Code Ann. § 29-38-104(9).[172] These acts are detailed in the preceding paragraphs, which are incorporated by reference. Those acts include, but are not limited to:

a. providing volume-based bonuses or commissions to sales representatives relating to shipment of a highly addictive and widely abused narcotic;

b. incentivizing or otherwise rewarding sales personnel who did business with pharmacies that supply pill mills and other over-prescribers;

c. routinely filling suspicious orders, including that should have been flagged as suspicious and impounded based on their own stated criteria (such as orders of unusual size or frequency);

d. routinely filling orders, including plainly suspicious orders, without due diligence;

e. establishing new accounts without due diligence;

---

[172] As noted in the Disclaimer below, this distribution does not include opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

f.  implementing a suspicious order marketing program that was designed to fail;

g.  making adjustments to the suspicious order monitoring program to make it less effective on purpose, such as changing thresholds for customers that initially exceeded them;

h.  providing sham justifications to "clear" orders from being impounded or accounts from being frozen through chargeback restrictions;

i.  intentionally seeking out relationships with pain clinics or pharmacies that serve pain clinics;

j.  Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities;

k.  shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need, where the volume of pills far exceeded the number of people, and where the prescription per capita rate was exceedingly high; and

l.  shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee, despite reports from law enforcement, firsthand observations, or other knowledge that the pharmacy was honoring pill mill prescriptions en masse.

470.  As a result, the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants knowingly disseminated massive quantities of prescription opioids to suspect physicians, pharmacies, and into the black market, including to "pill mills".

471.  The Pill Mill Defendants also used Ms. Puckett's position at multiple pill mills to divert massive quantities of opioids into the relevant illegal market (including opioids of the same type that the other Defendants manufactured, sold, or distributed in Tennessee) during the relevant time frame.

472. Similarly, the Individual Dealer Defendants illegally sold and distributed opioids (including opioids of the same type that the other Defendants manufactured, sold, or distributed in Tennessee) within the relevant illegal drug market during the relevant time frame.

473. The Defendants committed acts intended to facilitate the marketing or distribution of illegal opioids (or otherwise illegally sold or distributed opioids) that resulted in the minor children being exposed to opioids in utero. Tenn. Code Ann. § 29-38-104(9).

## COUNT II

### Civil Conspiracy (Tennessee Common Law)

474. Plaintiffs incorporate all preceding and subsequent paragraphs by reference.

475. Defendants in the case conspired with each other and with other large drug companies (including Purdue, Mallinckrodt, and Endo) to expand and supply the illegal market for opioids in Tennessee. They shared a common design to achieve this unlawful purpose.

476. Purdue, Mallinckrodt, and Endo did not comply with their Tennessee duties, including their duty to monitor, report, and refuse to fill suspicious orders – or their duty to have an adequate suspicious order monitoring program. Neither did the Defendants in this action. Among other things, Defendants conspired with each other and with Purdue, Mallinckrodt, and Endo to turn a blind eye to regulatory violations and keep opioids flowing. Defendants also worked to ensure that drugs they knew were feeding the illegal market continued to flow unimpeded. These actions were illegal and tortious. Defendants accordingly engaged in concerted action to achieve an unlawful purpose, and engaged in overt acts in furtherance of that conspiracy.

477. This civil conspiracy damaged the Baby Does for the reasons set forth above. While pregnant, Mary Doe illegally obtained and consumed opioids made by one or more Defendants (at least including KVK) and drugs manufactured by Purdue, Mallinckrodt, and Endo. Furthermore,

Mary Doe while pregnant otherwise illegally obtained and consumed opioids from the illegal market that Defendants' unlawful conspiracy created and perpetuated.

## PUNITIVE DAMAGES

478.     Plaintiffs reassert each and every allegation set forth in all preceding and subsequent paragraphs as if fully restated herein.

479.     The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants.

480.     The conduct of Defendants as set forth herein clearly and convincingly demonstrates that Defendants acted maliciously, intentionally, fraudulently, and/or recklessly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

1.     Economic damages in an amount to be proven at trial. Under the DDLA, "[e]conomic damages, including, but not limited to: the cost of treatment and rehabilitation, medical expenses, loss of economic or educational potential, loss of productivity, absenteeism, support expenses, accidents or injury, and any other pecuniary loss proximately caused by the illegal drug use" described in this Complaint. Tenn. Code Ann. § 29-38-106(c)(1);

2.     Non-economic damages in an amount to be proven at trial. Under the DDLA, "[n]on-economic damages, including, but not limited to, physical and emotional pain, suffering, physical impairment, emotional distress, mental anguish, disfigurement, loss of enjoyment, loss of companionship, services and consortium and other nonpecuniary losses proximately caused by an individual's use of an illegal drug." Tenn. Code Ann. § 29-38-106(c)(2);

3.     Exemplary/punitive damages;

4. Awards from all Defendants, including but not limited to costs, attorney's fees, an and other expenses accountants' and experts' fees, costs, and expenses recoverable in this action, including under Tenn. Code Ann. § 29-38-106(c)(3) (4)-(5);

5. Declaratory relief;

6. All other remedies and relief available under law; and

7. Such other and further relief as the Court deems just and proper.

**The Plaintiffs demand a trial by jury on all issues <u>except</u> for attorney's fees and costs**.

Dated: July 3 2025

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

Kevin W. Thompson (WVSB 5062)
David R. Barney, Jr. (WVSB 7958)
**THOMPSON BARNEY**
2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompsonwv@gmail.com
Email: drbarneywv@gmail.com

Donald E. Creadore (NYS Bar. Regis. No.
2090702)
**CREADORE LAW FIRM, P.C.**
450 Seventh Avenue - Suite 1901
New York, New York 10123
(O) 212.355.7200
(C) 917.226.1881
donald@creadorelawfirm.com

Stephen P. New (WVSB 7756)
STEPHEN NEW & ASSOCIATES
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newlawoffice.com

Kent Harrison Robbins (FL Bar No. 275484)
THE LAW OFFICES OF KENT
HARRISON ROBBINS P.A.
242 Northeast 27th Street
Miami, Florida 33137
Telephone: (305) 532-0500
Facsimile: (305) 531-0150
Cell: (305) 632-1770
Email: khr@khrlawoffices.com

| | | |
|---|---|---|
| BABY DOE 1, BABY DOE 2, and<br>BABY DOE 3,<br><br>  Plaintiffs,<br><br>v.<br><br>ALLERGAN FINANCES, LLC;<br>ACTAVIS, LLC; ACTAVIS PHARMA<br>INC.; TEVA PHARMACEUTICALS<br>USA, INC.; WATSON<br>LABORATORIES;<br>JOHNSON & JOHNSON, INC.;<br>JANSSEN PHARMACEUTICALS,<br>INC.; KVK TECH, INC,;<br>AMERISOURCEBERGEN DRUG<br>CORPORATION;<br>CARDINAL HEALTH, INC.;<br>MCKESSON CORPORATION;<br>WALGREEN CO.;<br>CVS PHARMACY, INC.; CVS TN<br>DISTRIBUTION, LLC; CVS TN<br>DISTRIBUTION; CVS INDIANA, LLC;<br>TENNESSEE CVS PHARMACY, LLC;<br>WAL-MART, INC.; WAL-MART<br>STORES EAST, L.P.;<br>WILLIAM BAIRD,<br>BRAIN BREWSTER,<br>JACOB DALTON,<br>STEPHANIE PUCKETT and<br>MICHAEL PUCKETT,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.  2025-CV-47 |

*(left margin, handwritten stamp)* Filed ANN GOLDSTON D.C. 7-29-25, 20 25 Time 10 AM By [signature]

## NOTICE OF APPEARANCE

Comes the Defendant, Jacob Dalton, through undersigned counsel, Forrest L. Wallace, and gives notice to the Court by way of this notice of his representation of the Defendant, relative to the Complaint filed on or about July 8, 2025, and requests that all future correspondence to the

1

Defendant, Jacob Dalton, should be directed as follows:

> Forrest L. Wallace
> Law Office of Forrest Wallace
> 1518 N. Broadway Street
> Knoxville, Tennessee 37917

Respectfully submitted this the ____ day of July, 2025.

                     _____

                     Forrest L. Wallace (BPR# 028167)
                     Attorney for Defendant
                     Law Office of Forrest Wallace
                     1518 N. Broadway Street
                     Knoxville, Tennessee 37917
                     (865) 850-2302
                     fwallace@forrestwallace.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing pleading has been served upon the following by forwarding either by hand delivery, facsimile transmission, electronic mail, or via first class U.S. mail, with postage prepaid and affixed thereon to:

> Tricia Herzfeld
> Herzfeld, Suetholz, Gastel, Leniski and Wall, PLLC
> 1920 Adelicia St., Ste. 300
> Nashville, TN 37212
> tricia@hsglawgroup.com

This the ____ day of July, 2025.

                     _____

                     Forrest L. Wallace

2