UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| BABY DOE 1, by and through their Guardian ad litem, *et al..*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No.: 3:25-CV-383-TAV-JEM |
| MCKESSON CORPORATION, *et al.*, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This civil action is before the Court on the Moving Defendants'[1] motion to sever dispensable parties [Docs. 33, 34], plaintiffs' motion to remand [Docs. 43, 44], defendants' motion for oral argument [Doc. 53], and plaintiffs' motion to ascertain status [Doc. 64]. The parties have submitted supplemental authority on these issues [Docs. 54, 56, 58, 61] as well as responses to these submissions [Docs. 55, 59, 60, 62]. Accordingly, these matters are ripe for review. For the reasons set forth below, plaintiffs' motion to remand [Docs. 43, 44] is **DENIED**. Moving Defendants' motion to sever dispensable parties [Docs. 33, 34] is **GRANTED**. Defendants' motion for oral argument [Doc. 53] and plaintiffs' motion to ascertain status [Doc. 64] are accordingly **DENIED as moot**.

[1] "Moving Defendants" refers to Actavis LLC, Actavis Pharma, Inc., Allergan Finance, LLC, AmerisourceBergen Drug Corporation, Cardinal Health, CVS Indiana, L.L.C., CVS Pharmacy, Inc., CVS TN Distribution L.L.C., Janssen Pharmaceuticals, Inc., Johnson & Johnson, KVK-Tech, Inc., Tennessee CVS Pharmacy, L.L.C., Teva Pharmaceuticals USA, Inc., Walgreen Co., Walmart Inc., Wal-Mart Stores East, LP, and Watson Laboratories, Inc.

## I. Background

Plaintiffs in this case, three minor children who were born dependent on opioids, bring this suit for injuries arising from their in utero opioid exposure [Amended Complaint ("Am. Compl.") ¶¶ 23, 28, 39].[2] Specifically, plaintiffs allege that their mother ("Mary Doe") became addicted to opioids after being prescribed the same following her involvement in a car wreck at the age of 17, during or around the year 2003 [*Id.* ¶ 18]. Plaintiffs further allege that, to fuel her addiction, Mary Doe "turned to the illegal market and purchased drugs on the street [in Tennessee] from others who, due to the abundance of prescription opioids flooding her community, were enabled to divert the drug for abusive purposes" [*Id.*]. Plaintiffs assert that defendants' acts and omissions allowed Mary Doe to illegally purchase and consume opioids during each of her pregnancies in 2011, 2016, and 2018 [*Id.* ¶¶ 19, 22–25, 27, 37].

Plaintiffs filed suit on April 29, 2025, in the Circuit Court for the Ninth Judicial District of Roane County, Tennessee [Doc. 1 ¶ 1]. Plaintiffs' original complaint named various companies and individuals, classifying and referring to them as the "Producer

[2] The Amended Complaint can be found on the record in Doc. 1-7, pp. 333–452. Given that both the original complaint and amended complaint are contained in Doc. 1-7, the Court will refer to the documents as "Original Complaint" and "Amended Complaint" when citing them throughout this Order.

Defendants,"[3] the "Distributor Defendants,"[4] the "Pharmacy Chain Defendants,"[5] and the "Individual Dealer Defendants"[6] [Original Complaint ("Compl.") ¶ 4]. On July 8, 2025, plaintiffs filed an amended complaint, naming two additional defendants, referring to them as the "Pill Mill Defendants"[7] [Am. Compl. ¶ 4]. Plaintiffs bring a claim under the Tennessee Drug Dealer Liability Act ("DDLA") (Count 1) and a civil conspiracy claim (Count 2) [Am. Compl. ¶¶ 454–77]. Plaintiffs allege that defendants "committed various acts that were intended to—and did—facilitate illegal diversion of their drugs" [Am. Compl. ¶ 5].

First, plaintiffs allege that Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants each failed to "maintain appropriate safeguards against abuse and diversion," which resulted in opioids entering Tennessee's "illegal drug market" [Am. Compl. ¶¶ 7–8]. Plaintiffs further allege that these defendants committed various other acts, which include filling suspicious prescription orders without investigation, "supplying

---

[3] "Producer Defendants" refers to Actavis LLC, Actavis Pharma, Inc., Allergan Finance, LLC, Watson Laboratories, Inc., Janssen Pharmaceuticals, Inc., Johnson & Johnson, KVK-Tech, Inc., and Teva Pharmaceuticals USA, Inc.

[4] "Distributor Defendants" refers to AmerisourceBergen Drug Corporation, Cardinal Health, and McKesson Corporation.

[5] "Pharmacy Chain Defendants" refers to Walgreen Co., Walmart Inc., Wal-Mart Stores East, LP, CVS Pharmacy, Inc., CVS TN Distribution L.L.C., CVS Indiana, L.L.C., and Tennessee CVS Pharmacy, L.L.C.

[6] "Individual Dealer Defendants" refers to William Baird, Brian Brewster, and Jacob Dalton.

[7] "Pill Mill Defendants" refers to Stephanie Puckett and Michael Puckett.

outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need," and doing business with prescribers and pharmacies with suspicious practices [*Id.* ¶¶ 9–10]. Plaintiffs further allege that Producer Defendants "wag[ed] a public campaign of misinformation," "convinc[ed] naïve doctors to write prescriptions to pill seekers and prescription drug abusers," and "devis[ed] marketing strategies to overcome prescribers' legitimate objections to prescribing opioids for long-term use and in higher doses" [*Id.* ¶ 9]. Plaintiffs allege that these defendants acted through a "symbiotic relationship" to exacerbate the opioid crisis and otherwise enable illegal drug transactions [*Id.* ¶ 12].

As to the other defendants, plaintiffs allege that they "also illegally distributed and sold prescription opioids as part of Tennessee's illegal drug market" [*Id.* ¶ 13]. Plaintiffs allege that "Stephanie Puckett and Michael Puckett collaborated to divert opioids from pain clinics (where Stephanie worked) into the illegal drug market" [*Id.* ¶ 370]. Plaintiffs allege that the Pucketts resided in Roane County when they were both arrested in March 2015 and that they both pleaded guilty to conspiracy drug charges [*Id.* ¶¶ 375, 381, 383]. Plaintiffs further allege that Brewster, Dalton, and Baird were individuals "who dealt drugs in the illegal market in or around Roane County" and that each were arrested and subsequently pleaded guilty or were convicted of drug charges [*Id.* ¶¶ 396–411]. Plaintiffs allege that the drugs sold by Brewster, Dalton, and Baird "included drugs that were the same type as those manufactured, distributed, and sold by the Manufacturing Defendants, Distributor Defendants, and Pharmacy Chain Defendants [*Id.* ¶¶ 395, 404, 411].

Plaintiffs also include a disclaimer in their amended complaint, in which they "expressly disavow any cause of action or claim . . . that could give rise to federal subject matter jurisdiction under either" the federal question or federal officer removal statutes [*Id.* ¶ 453]. Plaintiffs likewise "disavow any cause of action or claim for recovery related to opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency or pursuant to a federal contract including but not limited to any Pharmaceutical Prime Vendor Contract" [*Id.*].

On August 7, 2025, McKesson, one of the Distributor Defendants, filed a Notice of Removal, pursuant to 28 U.S.C. § 1442, often called the "federal officer removal statute" [Doc. 1]. McKesson's basis for removal is its distribution of pharmaceuticals to the U.S. Department of Veterans Affairs ("VA") in Tennessee pursuant to its exclusive federal contract, the Pharmaceutical Prime Vendor Contract ("PPV Contract") [*Id.* ¶ 3]. On August 11, 2025, certain defendants filed a supplemental notice of removal, asserting that the Court also has diversity jurisdiction over the matter [Doc. 2, p. 2]. That supplemental notice included consent to removal by all Moving Defendants but not by Local Defendants[8] [*See* Doc. 2, pp. 20–21]. In their notice, Moving Defendants argue that plaintiffs added Local Defendants, nondiverse parties, to avoid federal jurisdiction [*Id.*]. On August 25, 2025, Moving Defendants filed a motion to sever Local Defendants [Docs. 33, 34]. On

[8] "Local Defendants" refers to Baird, Brewster, Dalton, Michael Puckett, and Stephanie Puckett. Although plaintiffs' filings identified these defendants as "Pill Mill Defendants" and "Individual Dealer Defendants" respectively, the Court will collectively refer to them as "Local Defendants."

September 8, 2025, plaintiffs filed a motion to remand and a response in opposition to Moving Defendants' motion to sever [Docs. 43, 44].

## II. Motion to Remand

### A. Standard of Review

A defendant may remove to federal district court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). However, federal courts have limited original jurisdiction and may only exercise the "power authorized by Constitution and statute." *Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 255 (6th Cir. 2011) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). If a defendant improperly removes an action and the district court lacks subject matter jurisdiction, the district court must remand the case. *See* 28 U.S.C. § 1447(c).

A federal district court has original subject matter jurisdiction over two types of actions. First, the district court has original subject matter jurisdiction over actions that arise under the federal Constitution, federal laws, or treaties of the United States. 28 U.S.C. § 1331. Second, the district court has original subject matter jurisdiction over actions based on diversity of citizenship, which are disputes between citizens of different states where the matter in controversy exceeds $75,000. 28 U.S.C. § 1332.

McKesson removed this case under 28 U.S.C. § 1442 (a)(1), often called the "federal officer removal statute." Title 28, United States Code, Section 1442(a) specifically states that:

> (a) A civil action . . . that is commenced in a State court and that is directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
>> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . .

28 U.S.C. § 1442(a). A case properly removed under the federal officer removal statute grants the district court original subject matter jurisdiction "because the raising of a federal question in the officer's removal petition . . . constitutes the federal law under which the action against the federal officer arises." *Goins v. Saint Elizabeth Med. Ctr., Inc.*, No. 22-6070, 2024 WL 229568, at *3 (6th Cir. 2024) (quoting *Mesa v. California*, 489 U.S. 121, 136 (1989)). Federal officer removal does not require the consent of the other defendants. *See id.* (noting that proper removal removes the entire case and gives the district court supplemental jurisdiction over the non-officer defendants) (citing *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.7 (6th Cir. 2010)).

A defendant who seeks to remove a case under the federal officer removal statute must show: "(1) that it is a federal officer or a 'person acting under' a federal officer, (2) that the lawsuit is directed at conduct 'for or relating to any act under color of [federal] office,' and (3) that it involves a colorable federal defense." *Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 165 F.4th 999, 1004 (6th Cir. 2010) (citation omitted); *see also Bennett*, 607 F.3d at 1085. Although the Sixth Circuit has recognized that "removal statutes are to be strictly construed," *Mays v. City of Flint*, 871 F.3d 437, 442 (6th Cir.

2010), the federal officer removal statute is broad in scope and "must be 'liberally construed.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 142 (2007) (citing *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *see also Bennett*, 607 F.3d at 1084 (citing *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969)).

**B. Analysis**

Plaintiffs seek remand of this case, asserting that the Court lacks subject matter jurisdiction [Doc. 44, pp. 2–3]. Specifically, plaintiffs argue that the Court lacks federal officer jurisdiction because McKesson cannot satisfy any of the three elements required under the federal officer removal statute [*Id.*]. Plaintiffs next argue that the Court also lacks diversity jurisdiction because Moving Defendants did not obtain unanimous consent of all the properly joined defendants [*Id.* at 5, 16]. Plaintiffs further argue that the only exception to the unanimous consent requirement, fraudulent joinder, does not apply here because Local Defendants were properly joined [*Id.* at 16–18].

McKesson responds, arguing that it satisfies each of the three elements under the federal officer removal statute such that the Court has subject matter jurisdiction [Doc. 48, p. 10]. First, McKesson argues that it is a "person acting under" a federal officer because it distributes opioids to federal facilities in Tennessee, subject to the federal government's "strict guidance and control" [*Id.* at 11].[9] McKesson also asserts that plaintiffs' claims

---

[9] Neither party disputes that McKesson is a "person" under the removal statute. The Court nevertheless observes that "[t]he plain language of § 1442 does not exclude corporations" and that its text otherwise "suggests that interpreting 'person' to include corporations is consistent with the statutory scheme." *Bennett*, 607 F.3d at 1085 (citations omitted).

relate to McKesson's PPV distributions because plaintiffs' claims are "based on the total volume of opioids distributed by McKesson in Tennessee," and plaintiffs' disclaimer is illusory and invalid [*Id.* at 16–18]. Finally, McKesson argues that it has two colorable federal defenses [*Id.* at 23].

Moving Defendants respond that, even if the Court finds that federal officer jurisdiction does not exist, the Court should deny plaintiffs' motion to remand [Doc. 49, p. 9]. Specifically, Moving Defendants assert that diversity jurisdiction exists because there is complete diversity between the properly joined parties and unanimous consent to removal by these parties [*Id.*]. Moving Defendants further respond that the Court can sever Local Defendants, who are nondiverse and misjoined, to perfect diversity jurisdiction [*Id.*].

The Court first observes that, if removal is proper under the federal officer removal statute, it will be unnecessary to reach the parties' arguments as to whether diversity jurisdiction provides an additional ground for removal of this action and the Court's jurisdiction. Thus, the Court begins its analysis there.

**1. Person Acting Under a Federal Officer**

Turning to the first element of the federal officer removal statute, the Supreme Court has noted that "[t]he words 'acting under' are broad, and . . . the statute must be 'liberally construed.'" *Watson*, 551 U.S. at 147 (citation omitted). However, "broad language is not limitless." *Id.* An "acting under" showing "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (citation omitted) (emphasis in original). In other words, a private contractor acts under a federal officer

when it "perform[s] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.'" *Id.* at 154.

Plaintiffs argue that McKesson has not shown the "exacting level of specificity that a private contractor working for the federal government must provide to establish that it was 'acting under' a federal officer" [Doc. 44, p. 7 (citing *Bennett*, 607 F.3d at 1087)]. Plaintiffs first assert that McKesson's shipments of opioids to the VA are insufficient to satisfy the first prong of the federal officer removal statute [*Id.* at 7–8]. In support, plaintiffs cite to an Ohio federal district court case in which the court held that "a party that sells commercially available 'off the shelf' product to the federal government does not satisfy the 'acting under'" requirement [*Id.* at 7 (quoting *Ohio ex rel. Rogers v. Sherwin-Williams Co.*, No. 2:08-cv-79, 2008 WL 4279579, at *4 (S.D. Ohio Sep. 17, 2008)].[10] Plaintiffs further argue that the two declarations attached to McKesson's Notice of Removal, one from a McKesson employee ("Bell Declaration") and one from an economist ("Boberg Declaration"), lack sufficient detail to support McKesson's "acting under" argument [*Id.* at 8–9]. Plaintiffs thus argue that "unlike in *Bennett*, McKesson has not provided proof showing that the federal government exercised direct supervision of McKesson employees or exerted daily operational control" [*Id.* at 9].

---

[10] Plaintiffs also cite *Alsup v. 3-Day Blinds, Inc.*, 435 F. Supp. 2d 838, 846 (S.D. Ill. 2006); *Virden v. Altria Grp., Inc.*, 304 F. Supp. 2d 832, 846 (N.D. W. Va. 2004); *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992); and *Joseph v. Fluor Corp.*, 513 F. Supp. 2d 664, 672–73 (E.D. La. 2007) [Doc. 44, p. 7 nn.20–21]. Because the Court finds binding precedent to be sufficient in reaching a resolution, the Court does not find it necessary to distinguish each of those cases that carry persuasive authority alone.

In response, McKesson maintains that its performance under the PPV Contract involves more than supplying "commercially available 'off the shelf' products" to the federal government [Doc. 48, pp. 12–13]. McKesson argues that *Sherwin-Williams* is nevertheless distinguishable from and thus inapplicable to the present case [*Id.* at 13]. McKesson further submits that plaintiffs misstate the law and that the "acting under" requirement is not quite as demanding as plaintiffs assert [*Id.*]. Specifically, McKesson argues that *Bennett* "simply held that the defendant's contractual relationship with the government must involve 'detailed regulation, monitoring, and supervision'" [*Id.* at 13–14 (quoting *Bennett*, 607 F.3d at 1086, 1088)]. Finally, McKesson argues that numerous provisions in the PPV Contract, along with the Bell and Boberg Declarations, are sufficient to show that the federal government maintains a level of control over its shipments such that McKesson is "acting under" a federal officer [*Id.* at 11–12].

Following the parties' briefing, the Sixth Circuit issued an opinion in *Ohio ex rel. Yost*, 165 F.4th at 999. Pursuant to Local Rule 7.1(d), McKesson filed a supplemental brief, contending that *Yost* applies here [Doc. 56, pp. 3–4]. Plaintiffs replied, arguing that McKesson "continues to misapprehend the nature of Plaintiffs' claims and how the [DDLA] works" [Doc. 59, p. 2]. Plaintiffs further argue that *Yost* "involved materially different circumstances" and is inapplicable but "regardless, its reasoning actually supports Plaintiffs' arguments for remand" [*Id.*].

The Court begins its analysis by determining whether *Yost* is relevant here. In *Yost*, the State of Ohio filed suit in state court, alleging that certain healthcare firms violated

Ohio law by conspiring to drive up the cost of prescription drugs. 165 F.4th at 1002. The defendants included two Pharmacy Benefit Managers ("PBMs"), firms "that negotiate with drug companies to provide prescription drug coverage for federal employees." *Id.* at 1002–03. Following the PBMs' removal of the case to federal court under the federal officer removal statute, Ohio moved to remand. *Id.* at 1003. In its motion, Ohio "disclaimed that its claims challenged 'the operation or administration of federal health benefits programs.'" *Id.* The district court determined that, despite the PBMs' assertion that they "conducted a single negotiation" on behalf of their federal *and* non-federal clients, that "does not mean that they cannot conduct negotiations differently pursuant to a [Ohio state] court order." *Id.* at 1003–04. The district court thus concluded that the disclaimer effectively "eliminated any potential liability for acts undertaken at the direction of a federal officer" and remanded the case. *Id.* at 1004.

On appeal, the Sixth Circuit held that the PBMs were "persons who acted under" a federal officer, reasoning that the federal government, specifically the Office of Personnel Management ("OPM"), authorized subcontracts with PBMs to "fulfill its duties" of providing health insurance coverage to federal employees. *Id.* at 1004–05. The Sixth Circuit found that OPM's directives in those contracts effectively controlled the PBMs' conduct, such that the "acting under" prong was satisfied. *Id.* at 1005.

Although the Court finds *Yost* instructive, it nevertheless briefly addresses the parties' arguments concerning the applicability of *Sherwin-Williams*. As McKesson notes, that case is clearly distinguishable from the present action [Doc. 48, p. 13]. In

*Sherwin-Williams*, the court's determination that the defendant did not "act under" the federal government relied on a fact not seen here, the *lack of* a contractual relationship between the federal government and the defendant seeking removal under the federal officer removal statute. 2008 WL 4279579, at *2; *see also In re Nat'l Prescription Litig.*, 327 F. Supp. 3d 1064, 1072–73 (N.D. Ohio 2018) (finding the case inapplicable for the same reason). Because the PPV Contract between McKesson and the VA establishes the contractual relationship that was missing in *Sherwin-Williams*, that case has no bearing on the outcome here.

Turning to *Yost*, the Court finds that the differing legal claims and factual bases in that case does not preclude the Court from applying the Sixth Circuit's reasoning. Here, McKesson "act[ed] under" a federal officer. 28 U.S.C. § 1442(a)(1). First, the PPV Contract requires McKesson to supply pharmaceuticals, including opioids, to the VA [Doc. 1-1, p. 2; Doc. 1-2, p. 2, Doc. 1-3, p. 21]. Second, the VA maintains significant control over McKesson's actions pursuant to the PPV Contract. The VA assigns a contracting officer ("CO") to oversee the management of the PPV Contract [Doc. 1-5, p. 6]. McKesson is required to "provide next-day delivery (or next scheduled delivery day as specified) with a minimum 97% fill-rate" [Doc. 1-1 § I-16]. Absent approval of an alternate plan by the federal healthcare facilities, McKesson is required to make monthly physical visits to each site [*Id.* § I-4].

More important to this case are the PPV Contract's requirements concerning the possibility of diversion. If McKesson refuses to fill an order due to concerns that the order

might be diverted, it "must notify the [] Contracting Officer within 48 hours and state the basis for the refusal" [Doc. 1-1 § AS3023]. Even then, it is the CO that determines whether the order should be filled, and McKesson "may not unreasonably delay" filling such an order while the investigation is pending [*Id.*]. The VA also reserves the right to terminate the contract, "for its sole convenience" or "for cause in the event of any default by [McKesson], or if [McKesson] fails to comply with any contract terms or conditions" [Doc. 1-2, p. 77].

Here, the PPV Contract clearly demonstrates a relationship between McKesson and the VA, its federal superior, that is "characterized by 'subjection, guidance, or control.'" *Yost*, 165 F.4th at 1004 (quoting *Watson*, 551 U.S. at 151). As in *Yost*, such "contractual control satisfies the statute's 'act[ing] under' prong" when McKesson ships opioids pursuant to the PPV Contract. *Id.* at 1005. In supplying pharmaceuticals to the VA and other federal entities, McKesson performs a job that, absent the PPV Contract, the federal government would otherwise have had to. *See Watson*, 551 U.S. at 154. And McKesson's conduct is effectively controlled by the VA's directives in the PPV Contract. *See Yost*, 165 F.4th at 1005 ("The [OPM] mandates many of the terms in those subcontracts and controls the PBMs' conduct as a result.").

As plaintiffs argue that they are not suing McKesson for its shipments under the PPV Contract, [Doc. 44, pp. 10–11], the Court must next determine whether plaintiffs' disclaimer is valid or whether the lawsuit is indeed directed at conduct related to McKesson's acts taken under federal office. *See Yost*, 165 F.4th at 1004.

### 2. For or Relating to Any Act Under Federal Office

To satisfy the second prong of the federal officer removal statute, the removing party "must show a nexus, a 'causal connection' between the charged conduct and [the] asserted official authority." *Bennett*, 607 F.3d at 1088. Even before the statute was amended in 2011 to add the words "or relating to," the "hurdle erected by this requirement [was] quite low." *Id.* Following the statute's amendment and broadened scope, it now "requires only an association, connection, or tie between the challenged conduct and the defendant's acts under color of federal office." *Yost*, 165 F.4th at 1010 (citations omitted). "Conduct thus can 'relate to' acts under color of a federal office without having been federally directed." *Id.* at 1011 (citing *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017)).

Plaintiffs argue that McKesson did not perform the actions for which it is being sued under color of federal office [Doc. 44, p. 10]. Instead, plaintiffs maintain, McKesson is liable under the DDLA for "filling suspicious orders, failing to maintain appropriate safeguards against diversion, and failing to ensure that the drugs were being distributed for legitimate medical purposes" [*Id.*]. Plaintiffs contend that these acts and omissions "facilitated the distribution of prescription opioids into the black market" [*Id.*]. Finally, plaintiffs argue that they "expressly disclaim alleging any misconduct relative to federal shipments and . . . are ***not*** alleging liability by McKesson for those shipments" [*Id.* (citing Am. Compl. ¶ 453) (emphasis in original)].

McKesson responds that plaintiffs' disclaimer is invalid because plaintiffs' theory of market liability under the DDLA "necessarily puts at issue McKesson's ***aggregate*** supply of prescription opioids that were distributed in the alleged statewide black market over the relevant timeframe" [Doc. 48, pp. 18–19 (emphasis in original)]. McKesson further argues that separating its federal and nonfederal shipments to determine its liability "would require a premature ruling on fact-specific issues of causation and injury at the removal stage" [*Id.* at 21].

Plaintiffs reply, arguing that under the market liability theory, "McKesson's participation in the ***illegal*** drug market . . . establishes its liability" [Doc. 52, p. 4 (emphasis in original)]. Plaintiffs maintain that its allegations against McKesson "have nothing whatsoever to do with its federal shipments" and that such shipments are "irrelevant" [*Id.* at 4–5]. Plaintiffs argue that their disclaimer is valid because the DDLA permits plaintiffs to distinguish between McKesson's legal and illegal market participation, unlike those situations "where a plaintiff's allegations directly involve both federal and non-federal contracts" [*Id.* at 6].

In determining the validity of plaintiffs' disclaimer, the Court again finds *Yost* instructive. There, the Sixth Circuit rejected Ohio's disclaimer of "any intent to impose liability based on the administration of" federal healthcare programs, reasoning that,

> [w]hen federal jurisdiction turns on the types of claims that a plaintiff asserts against a defendant, sure enough, the plaintiff may disclaim seeking certain kinds of liability to avoid federal jurisdiction. But not all disclaimers do the trick. We reject disclaimers that simply disavow any attempt to recover based on the defendant's indivisible federal conduct, as several other circuits have concluded. The reason respects the statute's text and text-driven

> purpose. When the applicability of the disclaimer turns on whether the defendant's actions are in fact related to conduct undertaken under color of federal office, a remand would mean denying the defendant a chance to present his federal defenses in federal court.

*Id.* at 1008 (internal citations omitted).

The Sixth Circuit found that accepting Ohio's disclaimer "would allow a state court to decide whether the federal government directed the conduct at issue." *Id.* at 1008–09 (citation omitted). It further noted that the PBMs' "theory of the case centers on the indivisibility of their work for private and federal clients and turns on conduct—negotiations—that have already occurred." *Id.* at 1009. Thus, in crediting the defendants' theory of the case, the Sixth Circuit held that Ohio's disclaimer was insufficient to defeat federal officer removal. *See id.* ("[F]ederal courts should accept the defendant's 'theory of the case' for jurisdictional purposes.") (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432–33 (1999)).

The Court finds that the second prong is met here. In crediting McKesson's theory of the case, which the Court must do for jurisdictional purposes, plaintiffs' disclaimer must be rejected. *See id.* at 1009 (citation omitted). The Court recognizes that *Yost* addressed negotiations related to federal healthcare programs whereas the instant matter concerns the distribution of opioids, but that does not defeat the common thread between the two—the defendants' theory of "the indivisibility of their work for private and federal clients." *Id.* As the Boberg Declaration illustrates, McKesson's shipments under the PPV Contract constitute 66.1 percent of its total opioid shipments in Tennessee between 2006 and 2024 [Doc. 1-6, p. 6]. Thus, the conduct for which plaintiffs seek to hold McKesson liable is

connected to its work for the VA. *See Yost*, 165 F.4th at 1010 (holding that "[t]he conduct that Ohio wishes to regulate thus has a straightforward 'connection or association' with the work that the PBMs perform for the [federal government]").

In light of *Yost* and other circuit courts' recent decisions, plaintiffs' citations in support of its disclaimer argument are unpersuasive. For example, plaintiffs cite *Oklahoma ex rel. Hunter v. McKesson*, No. CIV-20-172, 2020 WL 5814161 (E.D. Okla. Sep. 14, 2020), in which a federal district court rejected essentially the same argument that McKesson presents here [Doc. 44, pp. 12–13]. First, *Hunter* predates *Yost*. Second, McKesson's opioid distributions to federal facilities in Oklahoma accounted for only 17.1 percent of its total distributions in the state, far less than the 66.1 percent to Tennessee. *Hunter*, 2020 WL 5814161, at *1. Plaintiffs also cite to *Westchester County v. Mylan Pharmaceuticals, Inc.*, 737 F. Supp. 3d 214, 223–27 (S.D.N.Y. 2024) in support of their argument that an "express disclaimer or clarification routinely justifies mandatory remand" [Doc. 44, p. 13 n.35]. However, *Mylan*, a case in which the plaintiffs also sued PBMs for their role in the opioid crisis, was recently overruled by the Second Circuit. *See County of Westchester v. Express Scripts, Inc.*, No. 24-1639-cv, 2026 WL 2589574, at *1–2 (2d Cir. Sep. 2, 2026). Notably, the Second Circuit cited *Yost* in concluding that the plaintiffs' disclaimer was "ineffective in preventing removal because the claims target indivisible conduct allegedly performed by Defendants on behalf of their federal and non-federal clients and implicate similarly indivisible harms." *Id.* at *1. The Court's findings in the instant case are reinforced by the Second Circuit's reasoning.

First, the court reasoned that it could not ignore the defendants' indivisibility theory of the case. *See id.* at *7 ("[T]he federal defenses that Defendants intend to assert would cover the whole of the alleged conduct, because any supposed non-federal conduct is *inextricably intertwined* with federal conduct.") (emphasis added). The court also rejected the plaintiffs' assertion that they could prove their claims without discussing or presenting evidence related to federal conduct, finding that "this approach would still require a state court to do the disentangling of Defendants' conduct." *Id.* at 8. The Second Circuit found that either a state or federal court "will have to ascertain whether the harms from opioids distributed via federal and non-federal programs can be disaggregated at all." *Id.*

Here, plaintiffs argue that they intend to prove McKesson's liability under the DDLA, "without regard to its federal shipments" [Doc. 52, p. 4]. The Court finds, however, that remanding this case would require the Roane County Circuit Court to do the "disentangling" of McKesson's nonfederal deliveries from those under the PPV Contract. *Express Scripts*, 2026 WL 2589574, at *8. Because the federal officer removal statute seeks to "'protect the Federal Government from state-court interference with its operations,' and applies when federal conduct is implicated, even if a plaintiff does not wish to challenge that conduct," plaintiffs' disclaimer is insufficient to overcome its allegations for conduct relating to an act under color of federal office. *Id.* at *10 (citing *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 5 (2026)).

### 3. Colorable Federal Defense

Turning to the third element, one of the core purposes of the federal officer removal statute is to allow for the litigation of federal defenses in a federal forum. *Bennett*, 607 F.3d at 1085 (citing *Willingham*, 395 U.S. at 406–07). "For that reason, defendants need only articulate a colorable federal defense, not a 'clearly sustainable' one." *Yost*, 165 F.4th at 1011 (citation omitted). Indeed, a person acting under a federal official "need not win his case before he can have it removed," and the right to "raise a defense arising out of his official duties . . . is not to be frustrated by a grudgingly narrow interpretation of the removal statute." *Bennett*, 607 F.3d at 1085, 1090 (citations omitted). Further, whether a defendant raises a colorable federal defense under the removal statute "has no connection whatever with the question of jurisdiction." *Yost*, 165 F.4th at 1011 (quoting *City of Nashville v. Cooper*, 73 U.S. (6 Wall.) 247, 254 (1867)).

Plaintiffs argue that McKesson's federal preemption defense is not colorable because the Controlled Substances Act ("CSA") shows that Congress had no intent "for the CSA to preempt state law – unless there is a 'positive conflict' between a state law and the CSA that is so strong that the 'two cannot consistently stand together'" [Doc. 44, p. 14 (quoting 28 U.S.C. § 903)]. Plaintiffs argue that, because McKesson's Notice of Removal did not identify any such "positive conflict" nor otherwise provide any case law supporting its preemption defense, McKesson's defense must fail [*Id.*].

McKesson responds by first stating that under the federal officer removal statute, it is "not required to prove the success" of any defense, "but only that such a defense is

‘colorable’” [Doc. 48, p. 23 (quoting *Bennett*, 607 F.3d at 1090–91)]. McKesson further asserts that, despite needing to show “only a single colorable defense,” it can show two [*Id.*]. As to the first, McKesson notes that plaintiffs have not “clearly opposed” its government contractor defense [*Id.*]. As to the second, McKesson argues that its federal preemption defense is colorable because the claims asserted by plaintiffs conflict with the CSA and its implementing regulations [*Id.*].

The government contractor defense is available to private contractors “when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision.” *Watson*, 551 U.S. at 153. The defense applies when “(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.” *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). Although the government contractor defense originated in the context of a military procurement contract, the defense also applies in the context of non-military and performance contracts. *See Bennett*, 607 F.3d at 1089 (citations omitted) (holding that the lack of binding precedent did not defeat the plausibility of the defense).

Here, McKesson possesses a colorable federal defense. As to the first element and as discussed above, the PPV Contract demonstrates that the federal government “approved reasonably precise specifications” concerning the means and methods by which McKesson must supply pharmaceuticals, including opioids, to the VA and other providers. *Boyle*, 487

at 512. As to the second element, McKesson's deliveries have presumably "conformed to those specifications" approved by the VA. *Id.* This conformity is demonstrated not only by the federal government's acceptance of and payment for the deliveries but also by its continued renewal of the PPV Contract.[11] As to the third element, there is no suggestion on the record that McKesson knew of any opioid-related dangers that the federal government was not itself already aware of. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1995) (finding the third element satisfied because "the Army was aware of all the dangers of which the contractors were aware").

As previously mentioned, the federal officer removal statute requires only that the defendant raise "*a* colorable federal defense." *Bennett*, 607 F.3d at 1085 (emphasis added). McKesson has done that here. And because McKesson has raised a colorable federal government contractor defense, it is unnecessary to reach the parties' arguments as to the preemption defense.

In sum, the Court finds that McKesson "acted under" a federal officer, that it is being sued for conduct relating to its acts under color of federal office, and that it has raised a colorable federal defense. Thus, removal is proper under 28 U.S.C. § 1442(a)(1). Because the Court has jurisdiction pursuant to the federal officer removal statute, it need not address the parties' arguments concerning diversity jurisdiction. Accordingly, plaintiffs' motion to remand [Docs. 43, 44] is **DENIED**.

[11] Both the 2012 and 2020 PPV Contracts established an initial two-year performance period with three, two-year options. Renewal of those options was "at VA's discretion" [Doc. 1-2, p. 2; Doc. 1-3, p. 8].

## III. Motion to Sever

### A. Standard of Review

Federal Rule of Civil Procedure 21 provides that, "[o]n motion or its on own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Under Rule 21, the Court has "broad discretion in determining whether or not actions should be severed." *Parchman v. SLM Corp.*, 896 F.3d 728, 733 (6th Cir. 2018) (citation omitted); *see also Louisville Gas & Elec. Co. v. Isaac W. Bernheim Found.*, No. 3:20-cv-688, 2021 WL 1093638, at *1 (W.D. Ky. Mar. 22, 2021) ("Applying this standard, the court has virtually unfettered discretion in determining whether or not severance is appropriate.").

In making a Rule 21 determination, courts consider several factors, including:

> (1) whether the claims arise out of the same transaction or occurrence;
> (2) whether the claims present some common question of law or fact;
> (3) whether settlement of the claims or judicial economy would be facilitated;
> (4) whether prejudice would be avoided if severance were granted; and
> (5) whether different witnesses and documentary proof are required for separate claims.

*Parchman*, 896 F.3d at 733. "Severance is appropriate in the presence of only one of these conditions." *Reynolds v. Merck Sharp & Dohme Corp.*, No. 3:15-cv-397, 2016 WL 3090951, at *3 (N.D. Ohio June 2, 2016) (citation omitted). Moving Defendants "bear[] the burden of demonstrating that 'severance is required to avoid prejudice or confusion and to promote the ends of justice.'" *Papineau v. Brake Supply Co., Inc.*, No. 4:15-cv-168, 2021 WL 1881650, at *3 (W.D. Ky. Apr. 2, 2021) (citation omitted).

Although Rule 21 affords broad discretion, that discretion is subject to the limitations of Rule 19, which "sets criteria for what parties are 'required' to be joined and

under what circumstances a case may proceed without them." *W. Env't Corp. of Ohio v. Hardy Diagnostics*, No. 1:21-cv-194, 2022 WL 682665, at *2 (S.D. Ohio Mar. 8, 2022) (citing Fed. R. Civ. P. 19). Under Rule 19, the Court must follow a two-step process. *Joseph v. Baxter Int'l Inc.*, 614 F. Supp. 2d 868, 872 (N.D. Ohio 2009), *as amended* (May 27, 2009). First, the Court must determine whether a party is necessary. Under Rule 19(a), a party is "needed for just adjudication" if: "(1) complete relief cannot be given to existing parties in his absence; (2) disposition in his absence may impair his ability to protect his interest in the controversy; or (3) his absence would expose existing parties to substantial risk of double or inconsistent obligations." *Safeco Ins. Co. of Am. v. City of White House*, 36 F.3d 540, 546 (6th Cir. 1994) (citing Fed. R. Civ. P. 19(a)(1)). If the Court finds that the party is necessary, it then determines whether the party is indispensable, "considering whether: 1) a judgment rendered in the party's absence would prejudice the available party; 2) such prejudice could be lessened or avoided; 3) a judgment rendered in the party's absence would be adequate; and 4) the plaintiff has an adequate remedy if the action is dismissed for nonjoinder." *Joseph*, 614 F. Supp. 2d at 873 (citing *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 764 (6th Cir. 1999)).

Thus, Rule 19 presents a threshold inquiry before the Court exercises its discretion under Rule 21. This inquiry "involves an element of reverse inferencing: a party that is not required under Rule 19 *may be* dropped under Rule 21 simply because the Court, for obvious reasons, could not drop required parties." *Hardy Diagnostics*, 2022 WL 682665, at *2 (emphasis in original).

## B. Analysis

Moving Defendants argue that severance of Local Defendants is proper under Rule 21 [Doc. 34, p. 10]. Specifically, Moving Defendants argue that Local Defendants are not necessary parties under Rule 19 because the claims asserted by plaintiffs against Local Defendants differ from those asserted against Moving Defendants [*Id.*]. Moving Defendants submit that "local drug offenders [are] 'not required to adjudicate or award complete relief' on claims involving pharmaceutical supply chain defendants" [*Id.* at 11 (citations omitted)]. Moving Defendants rely heavily on Judge Polster's decision to sever nondiverse local defendants in *In re National Prescription Opiate Litigation*, No. 1:17-MD-2804, 2023 WL 2155032 (N.D. Ohio Feb. 22, 2023) ("*MDL 2804 Opiate Litig.*") [*See* Doc. 34, pp. 11, 13, 16]. Moving Defendants further argue that each of the Rule 21 factors support severing Local Defendants [*Id.* at 12–17].

Plaintiffs' response in opposition centers on their assertion that the Court "cannot use Rule 21 severance to . . . create diversity jurisdiction that was lacking at the time of removal" [Doc. 44, p. 20]. Additionally, plaintiffs argue that Moving Defendants' reliance on *MDL 2804 Opiate Litig.* is misplaced because, in his "efforts to corral thousands of lawsuits" into multidistrict litigation, "Judge Polster was dealing with a wholly different circumstance" and "had a unique need to maintain federal jurisdiction of national defendants" [*Id.* at 21–22]. Plaintiffs further respond that Local Defendants are necessary parties under Rule 19 and thus cannot be severed, especially in light of the DDLA's purpose

[*Id.* at 22–23]. Plaintiffs do not directly address Moving Defendants' arguments concerning the severance factors.

The Court first observes that the bulk of the parties' briefing addresses whether the Court can sever Local Defendants to perfect diversity jurisdiction. That question, however, is narrower than the issue of discretionary severance and is relevant only when there is not a separate ground for removal or subject matter jurisdiction. As discussed previously, McKesson properly removed this case under the federal officer removal statute, and this Court has jurisdiction. Thus, the misjoinder or severance of parties as it relates to diversity jurisdiction is not at issue here, and the Court will consider the parties' arguments using the factors for discretionary Rule 21 severance. *See Burton v. Zwicker & Assocs., PSC*, No. 10-227, 2011 WL 13156939, at *3 (E.D. Ky. Jan. 14, 2011) (noting that, although "not the norm," Rule 21 severance may still be proper when the misjoinder of parties is not at issue and if "failure to sever would place an undue burden on the parties, impose unnecessary expense, or would risk jury confusion at trial") (citation omitted).

Nevertheless, the Court finds it necessary to distinguish two cases from the present matter. First, this Court distinguishes *Staubus v. Purdue Pharma, L.P.*, No: 2-17-cv-122, 2017 WL 4767688 (E.D. Tenn. Oct. 20, 2017). In *Staubus*, this Court held that removal under the diversity jurisdiction statute was improper because several defendants did not consent. *Id.* at *6. Because the Court found that improper removal warranted remand, it did not reach the question of severance. *Id.* at *7. Thus, plaintiffs' assertion that this Court "refused to sever the diverse defendants" is inaccurate [Doc. 44, p. 23].

Second, the Court distinguishes *Dunaway v. Purdue Pharma, L.P.*, 391 F. Supp. 3d 802 (M.D. Tenn. May 22, 2019). The *Dunaway* court similarly held that jurisdictional issues warranted remand. *Id.* at 814–15. The court noted that states may enact statutes that "do not rely on federal law to impose liability" against those alleged to have contributed to the opioid crisis. *Id.* at 814. Importantly, the court found that, when states enact such statutes, as Tennessee has done with the DDLA, "the appropriate forum for such causes of action are state courts, *unless a filing or removing party can establish a recognized basis for federal jurisdiction*." *Id.* at 814–15 (emphasis added). Finally, although the court rejected the argument that one of the non-consenting defendants was "nominal," the court did not engage in a Rule 19 analysis. *Id.*

The Court next turns to the parties' arguments concerning the applicability of *MDL 2804 Opiate Litig*. Although plaintiffs correctly note that this case is part of multidistrict litigation, Judge Polster's findings do not seem to rely solely on this fact, and the Court finds his reasoning persuasive as it relates to the issue of severance. As in this case, the plaintiffs in *MDL 2804 Opiate Litig.* filed suit to recover for harms arising from the opioid crisis. 2023 WL 2155032, at *1. In addition to pursuing claims against pharmaceutical companies for "fraudulent marketing," plaintiffs also named five medical doctors, alleging that four of them participated in the fraudulent marketing scheme. *Id.* As to the fifth doctor, Fredrick Floyd, plaintiffs alleged that he illegally dispensed opioids "without a legitimate medical purpose" but did not claim that he engaged in any marketing-related conduct. *Id.*

Following removal by the defendants on diversity jurisdiction grounds, the plaintiffs sought remand, arguing that complete diversity did not exist because Floyd and both plaintiffs were all citizens of Louisiana. *Id.* at *3. Defendants opposed remand and argued that the court should instead sever the claims against Floyd under Rule 21. *Id.* Judge Polster agreed, finding that each of the five factors weighed in favor of severance and then noting that, because Floyd was not a required party under Rule 19, severance was proper. *Id.* at *3–5.

Here, Local Defendants are not necessary parties under Rule 19. First, their presence "is not required to adjudicate or award complete relief" on the claims asserted against Moving Defendants. *Id.* at *5. Second, resolution of the claims against Moving Defendants is unlikely to impair Local Defendants' potential liability or ability to defend themselves in this action. *See Safeco Ins. Co. of Am.*, 36 F.3d at 546 (6th Cir. 1994). Indeed, as Moving Defendants note, Local Defendants each have criminal convictions and are thus estopped, under the DDLA, from denying their participation in Tennessee's illegal drug market [Doc. 34, p. 14 (citing Tenn. Code Ann. § 29-38-113)]. This estoppel provision applies regardless of whether Local Defendants are heard in state or federal court.

Plaintiffs' arguments concerning the purpose and joinder provisions of the DDLA do not change the Court's findings. As plaintiffs note, the DDLA authorizes the joinder of multiple defendants [Doc. 44, p. 18]. Specifically, the statute provides that two or more persons "*may be* joined . . . if those persons are liable to at least one (1) plaintiff." Tenn. Code Ann. § 29-38-110 (emphasis added). But express authorization establishing

permissive joinder of defendants to a suit does not mean that those defendants are required or necessary parties. Plaintiffs argue that severance of Local Defendants would undermine the purpose of the DDLA, which codified the General Assembly's finding that participants in a community's illegal drug market "are necessarily interrelated and in[ter]dependent" [Doc. 44, p. 22 (citing Tenn. Code Ann. § 29-38-103(8))]. To the extent that the DDLA aims to have all defendants liable to one plaintiff proceed in the same court, it does not eliminate the Court's independent authority to exercise its discretion in severing claims or parties under Rule 21.

Because Local Defendants are not required parties under Rule 19, the Court need not reach the question of whether they are "indispensable." *See Joseph*, 614 F. Supp. 2d at 873 (citation omitted). Rather, the Court may exercise its discretion under Rule 21 to determine whether severance is appropriate. *Parchman*, 896 F.3d at 733.

**1. Whether the Claims Arise Out of the Same Transaction or Occurrence**

Moving Defendants argue that plaintiffs' claims against them and those against the Local Defendants do not arise out of the same transaction or occurrence [Doc. 34, p. 13]. Specifically, Moving Defendants argue the claims against them concern Moving Defendants' alleged failure "to prevent diversion of drugs into the illegal market" whereas their claims against Local Defendants concern those parties' participation in "Tennessee's illegal drug market" [*Id.* (citing Am. Compl. ¶¶ 8–13)]. Moving Defendants assert that plaintiffs' claims against them rest on a "nationwide theory of liability" that is "wholly distinct from Plaintiffs' allegations against . . . local street-level criminals already arrested

or convicted of selling *illegal* prescription drugs in their communities" [*Id.* (emphasis in original)]. Plaintiffs do not directly respond to Moving Defendants' argument.

The Court finds that the first factor weighs in favor of severance. The claims against Stephanie and Michael Puckett arise from their conduct between 2012 and 2015, during which time they worked together to distribute drugs from pain clinics into the community, with Stephanie facilitating the distribution through four clinics where she was employed [Am. Compl. ¶¶ 371–86]. The claims against Brewster, Baird, and Dalton arise from their individual conduct between 2016 and 2018, during which time they illegally sold drugs in or around Roane County [*Id.* ¶¶ 389, 396, 405]. The claims against Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants arise from an alleged "concerted and coordinated effort" that began in the 1990s [*Id.* ¶¶ 334, 369]. The allegations include spreading false information, filling suspicious prescription orders, and devising marketing strategies to mislead the public about the dangers of opioids [*Id.* ¶¶ 9–11]. Thus, the claims against the Local Defendants "clearly arise from a different nucleus of facts" than those against the other defendants. *See MDL 2804 Opiate Litig.*, 2023 WL 2155032, at *4 (distinguishing between plaintiffs' allegations that manufacturer defendants "created" the opioid crisis while a prescribing defendant "took advantage" of it).

#### 2. Whether the Claims Present Some Common Question of Law or Fact

Moving Defendants argue that, despite plaintiffs basing their claims against all defendants on alleged violations of the DDLA, the claims against Moving Defendants share no common questions of law or fact between those asserted against the Local Defendants

[Doc. 34, p. 14]. Moving Defendants further argue that plaintiffs' allegations concern the marketing and sale of opioids by Producer Defendants, "the size, frequency, and nature of orders" placed with Distributor Defendants as well as their practices for protecting against diversion of opioids, and "the self-distribution practices of the Pharmacy Chain Defendants" [*Id.*]. Moving Defendants contrast these allegations with plaintiffs' claims against the Local Defendants, which they describe as "inherently local" [*Id.*]. Finally, Moving Defendants contend that they "will need to develop legal defenses unavailable or irrelevant to the" Local Defendants [*Id.*].

Although plaintiffs do not directly respond to Moving Defendants' argument, plaintiffs assert that all defendants "face the same DDLA claims that implicate the exact same tort law principles" [Doc. 44, p. 25].

The Court finds that the second factor also weighs in favor of severance. The facts required to prove the "symbiotic relationship" among Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants differ drastically from those that must be shown in proving the liability of Local Defendants, each of whom already has a criminal conviction stemming from their illegal distribution of opioids. Here, as in *MDL 2804 Opiate Litig.*, "[t]he most relevant underlying facts and the crux of the legal theories for relief are separate and distinct." 2023 WL 2155032, at *4.

#### 3. Whether Settlement of the Claims or Judicial Economy Would Be Facilitated

Moving Defendants argue that severance "is in the best interests of facilitating judicial economy and any potential settlement of claims" [Doc. 34, p. 15]. Specifically,

Moving Defendants assert that, if Local Defendants are severed, plaintiffs could then "swiftly pursue their claims against [them] in Tennessee state court based on their prior criminal indictments or convictions—evidence that has no bearing on Moving Defendants" [*Id.*]. Moving Defendants contend that pursuing these claims separately would facilitate judicial economy because it would avoid complications and delays that would inevitably arise from "the involvement of numerous other parties defending against substantially different facts and theories of liability" [*Id.*].

Plaintiffs do not directly respond to Moving Defendants' argument but argue that severing Local Defendants would be "needlessly complicated and expensive" [Doc. 44, p. 25]. Specifically, plaintiffs argue that cases proceeding in two separate forums would result in "duplication of effort, different case schedules, and the potential for inconsistent rulings and inconsistent verdicts" [*Id.*]. Plaintiffs further argue that severance would require all witnesses to be deposed and testify twice and that "each set of Defendants could blame the other (the empty seat) for Plaintiffs' injuries" [*Id.*].

The Court declines to resolve definitively whether the third factor weighs in favor of severance, as both parties have presented compelling arguments. Plaintiffs correctly assert that severance risks duplicative efforts. On the other hand, Moving Defendants present a strong argument that judicial economy would not be served by maintaining a single proceeding involving two distinct sets of defendants whose cases require the presentation of substantially different facts. Decisions within the Sixth Circuit also take differing approaches to similar concerns. To illustrate, in *MDL 2804 Opiate Litig.*, Judge

Polster found that severance of a nondiverse defendant would "increase the potential for settlement, the efficiencies to the parties, and judicial economy." 2023 WL 2155032, at *4. In making this finding, Judge Polster's reasoning focused on the fact that multidistrict litigation, which is not seen here, has a higher likelihood of settlement. *Id.* In *Dunaway*, however, Judge Trauger noted that "there can be little doubt that [the corporate defendants'] defenses will include the argument that the true parties responsible for opioid drugs finding their way onto the illegal market are low-level, criminal dealers." 391 F. Supp. 3d at 815. Because the third factor is only one among several, the Court need not definitively resolve the issue given its analysis and outcome regarding the other applicable factors.

#### 4. Whether Prejudice Would Be Avoided If Severance Were Granted

Moving Defendants argue that severance of Local Defendants will "avoid undue prejudice" [Doc. 34, p. 15]. Specifically, Moving Defendants assert that, as "entities affiliated with multi-national companies in the pharmaceutical and retail pharmacy industries," they are at risk of local prejudice if forced to defend themselves alongside Local Defendants [*Id.* at 15–16]. Moving Defendants further submit that a jury would likely "improperly associate the alleged conduct" of Local Defendants with Moving Defendants, imposing additional prejudice [*Id.* at 16].

Plaintiffs again do not directly respond to Moving Defendants' arguments but presumably raise an issue of prejudice by arguing that severing the Local Defendants would

"deprive Plaintiffs of their ability to present to the jury a holistic view of the players involved in the illegal market" [Doc. 44, p. 25].

The Court finds that the fourth factor weighs in favor of severance. Requiring Moving Defendants and Local Defendants to proceed together risks prejudice against all parties. In particular, Moving Defendants must defend their alleged role in the underlying conduct, while Local Defendants' liability under the DDLA is established by their prior convictions, creating a risk that evidence concerning their conduct will unfairly influence the jury's assessment of Moving Defendants' liability. Further, if Local Defendants are severed, plaintiffs are not left without a remedy. Rather, they may still pursue their claims against Local Defendants in state court, where this action was originally filed.

#### 5. Whether Different Witnesses and Documentary Proof Are Required for Separate Claims

Moving Defendants argue that it is unlikely that there will be any overlap in the witnesses and proof required for the claims against Moving Defendants and Local Defendants [Doc. 34, p. 16]. Specifically, they argue that Moving Defendants' "witnesses and proof will include national corporate policies and strategies, and the production, marketing and distribution of opioids" [*Id.*]. Additionally, they argue that Local Defendants are unlikely to be witnesses against Moving Defendants because plaintiffs have failed to allege any connection between the two sets of defendants [*Id.* at 16–17].

The Court finds that the fifth factor also weighs in favor of severance. As previously discussed, plaintiffs' claims against Local Defendants involve different conduct than their claims against Moving Defendants. Thus, the evidence presented by the parties will be

distinct, with little to no overlap, as each party seeks to establish its respective and available defenses. *See MDL 2804 Opiate Litig.*, 2023 WL 2155032, at *5.

Severance of Local Defendants would be appropriate where even one factor weighs in its favor; here, four factors support severance. *See Reynolds*, 2016 WL 3090951, at *3. These claims do not arise out of the same transaction or occurrence; there are no common questions of fact; the parties will not be prejudiced; and different witnesses and documentary proof would be required if the case proceeds to trial. Moving Defendants have demonstrated that severance would "avoid prejudice or confusion" and "promote the ends of justice." *Papineau*, 2021 WL 1881650, at *3 (citation omitted).

Accordingly, Moving Defendants' motion to sever [Docs. 33, 34] is **GRANTED**.

## IV. Conclusion

For the reasons above, plaintiffs' motion to remand [Docs. 43, 44] is **DENIED**, and Moving Defendants' motion to sever dispensable parties [Docs. 33, 34] is **GRANTED**. Plaintiffs' claims against Local Defendants are severed from this case and remanded to the Circuit Court for the Ninth Judicial District of Roane County, Tennessee. Defendants' motion for oral argument [Doc. 53] and plaintiffs' motion to ascertain status [Doc. 64] are accordingly **DENIED as moot**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE